Jonathan Shub (SBN 237708)
jshub@seegerweiss.com
**SEEGER WEISS LLP**
1515 Market Street, Suite 1380
Philadelphia, PA 19102
Telephone: (215) 564-2300
Facsimile: (215) 851-8029

Rosemary M. Rivas (SBN 209147)
rrivas@finkelsteinthompson.com
**FINKELSTEIN THOMPSON LLP**
100 Bush Street, Suite 1450
San Francisco, California 94104
Telephone: (415) 398-8700
Facsimile: (415) 398-8704

*Interim Co-Lead Class Counsel*

J. Paul Gignac (SBN 125676)
j.paul@aogllp.com
**ARIAS OZZELLO & GIGNAC LLP**
115 S. La Cumbre Lane, Suite 300
Santa Barbara, California 93105
Telephone: (805) 683-7400
Facsimile:  (805) 683-7401

*Interim Liaison Class Counsel*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

| | |
|---|---|
| In re FACEBOOK PPC Advertising Litigation | Master Case No. C 09-03043 JF<br><br>**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED**<br><br>This Document Relates To: All Actions |

Plaintiffs RootZoo, Inc., Fox Test Prep, and Steven Price (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, allege the following against Facebook, Inc., based on personal knowledge, information and belief and their counsel's investigation:

## **INTRODUCTION**

1.       Plaintiffs bring this class action suit against Facebook, Inc. ("Facebook or Defendant") for improper charges that they and members of the Class incurred in connection with advertising placed on Defendant's website at www.facebook.com during the period of January 1, 2006 to the present.   As of November 2009, www.facebook.com was the most popular social networking site on the Internet with more than 300 million active users worldwide.

2.       Plaintiffs contracted with Facebook to pay Facebook a fee each time a Facebook user (defined as persons registered with Facebook) clicked on Plaintiffs' advertisements in an attempt to view the advertisements.  Plaintiffs and Facebook regarded such an action by a Facebook user to be a valid or "billable click" for which advertisers were contractually obligated to pay Facebook a fee in accordance with their contracts.

3.       Facebook, however, systematically fails to limit charges to valid clicks from Facebook users.  Instead, advertisers have been and continue to be unlawfully charged for and presently pay for a panoply of "invalid clicks" resulting from deficiencies in Facebook's advertising platform, such as: (a) failed attempts by Facebook users to reach an advertisement because of a glitch in Facebook's website that are improperly counted by Facebook as a billable click; (b) Facebook's counting of clicks as billable clicks when in fact there was no click at all from a Facebook user; (c) clicks by Facebook users that fail to open the advertiser's web page but still result in Facebook regarding the click as a billable click; (d) improperly recorded, or unreadable, clicks by Facebook users caused by an invalid proxy server or unknown browser types (indicating that the visitor may be a computer "bot" and not a human); (e) unintentional, multiple clicks from a Facebook user in rapid succession that Facebook regards as separate, billable clicks but that should be filtered out; and (f) Facebook's failure to properly filter out certain other clicks that were made in a deliberate effort to drive up the cost of an ad or deplete an advertiser's budget (this type of invalid click is referred to in the industry as "click fraud.").

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CV 09-03043

4.      Since the date Facebook began providing advertising services until the present, Facebook has consistently represented on its website that it charges advertisers only for valid clicks and that it has measures in place to reduce and eliminate invalid clicks, including the types set forth in Paragraph 3(a)-(f).  Plaintiffs reasonably expected, based on industry norms and Facebook's own statements, that Plaintiffs would only be charged for valid clicks and that Facebook would have measures in place to eliminate invalid clicks and would implement procedures to avoid billing for such clicks.   Additionally, since the date Facebook began providing advertising services through the present, Facebook has failed to disclose or adequately disclose material information, namely, that it does not have the appropriate measures in place to eliminate invalid clicks and that it does not implement procedures to avoid billing for such invalid clicks.

5.      Thus, Facebook engaged in a knowing or reckless misrepresentation regarding its capabilities to detect and eliminate clicks, including those clicks recognized in the industry as "click fraud."

6.      Facebook claims that its "Statement of Rights & Responsibilities" with Plaintiffs and all of its advertisers contains a provision disclaiming Facebook's responsibility for *"click fraud or other improper actions"* by third parties.  Facebook, however, does not define the terms "click fraud" or "other improper actions" in its Statement of Rights & Responsibilities where those terms appear.  In any event, the disclaimer does not insulate Facebook from the types of invalid clicks set forth in Paragraph 3(a)-(e), as those invalid clicks cannot be attributed to "click fraud or other improper actions" by third parties.

7.      Plaintiffs dispute that the Statement of Rights & Responsibilities represents the entire terms and conditions of their contracts with Facebook (if at all).  They also dispute the existence of Facebook's disclaimer in their contracts and whether such a disclaimer was disclosed or adequately disclosed to them and other advertisers.  Nevertheless, this limited disclaimer is ambiguous and, to the extent it could be interpreted broadly, strikingly inconsistent with a range of provisions in both Facebook's contract and statements by Facebook promising to limit its charges to valid clicks, which do

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CV 09-03043

1    not include clicks generated for an improper purpose.  It also belies prevailing industry standards and

2    practices.

3        8.    Businesses interested in advertising their goods and services to Facebook users can

4    contract with Facebook to advertise on the Facebook website.  Advertisers can choose to pay for and

5    place their ads on Facebook pages based on a specific set of demographic factors aimed at targeting a

6    Facebook user's age, gender or geographic location, as well as select keywords which appear on a

7    Facebook profile page and may indicate interests of the page owner or visitors to a page.  This is

8    commonly referred to as contextual advertising.

9        9.    Advertisements are displayed on a portion of the page viewed by Facebook users.  If a

10   user clicks on that advertisement, Facebook's policy is to charge the advertiser for the click irrespective

11   of whether the click actually resulted in a visit by a human to the destination URL.  Indeed, Defendant

12   promises that the amount charged to an advertiser will be the result of Facebook users selecting the ad

13   and clicking on it.  Advertisers contract with Facebook with the reasonable expectation that they will be

14   charged based on actual and valid clicks.  To ensure that occurs, Defendant explicitly represents that it

15   takes measures to ensure that it reports and charges advertisers accurately and only for actual and valid

16   clicks generated by Facebook users who click after having seen the ad placed by the advertiser.

17       10.   In spite of Defendant's contractual promises, Plaintiffs and other Facebook advertisers

18   are routinely charged for invalid clicks well in excess of industry standards, often by as much as three

19   and four times more than other major advertising platforms.

20       11.   Facebook's failure to deliver on its core promise to charge for only valid clicks results

21   from Facebook's relatively immature and incomplete reconciliation, and its pre-filtering and post-

22   filtering systems.  Those systems do not meet industry standards and fail to include standard tools and

23   methodologies common in the industry that have become increasingly effective for identifying,

24   screening and filtering out invalid.  Best practices in identifying and billing for valid clicks are well

25   established in the online advertising industry by trade groups in which Facebook is a member.

26       12.   The result of Facebook's systemic failure is that advertisers are charged for a panalopy of

27   invalid clicks identified in Paragraph 3 above.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CV 09-03043

13.     Defendant's conduct, as alleged herein, violates Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL"), and constitutes a breach of contract and a breach of the implied covenant of good faith and fair dealing.  Plaintiffs also seek a declaratory judgment as set forth herein.

## JURISDICTION AND VENUE

14.     This Court has personal jurisdiction over the parties in this case.  Defendant is a California corporation with headquarters in this District.  Defendant conducts substantial business in this State and has systematic and continuous contacts with this State.  Defendant operates an interactive website available in California and offers advertising services on that website to its advertising customers in California.  Defendant transacts business with users and advertisers located throughout California.

15.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because: at least one Class member is of diverse citizenship from Defendant; there are more than 100 Class members nationwide; and the aggregate amount in controversy exceeds $5,000,000.

16.     Venue is proper in this District under 28 U.S.C. § 1391(a) because Defendant maintains headquarters within this District.  A substantial part of the events or omissions giving rise to the claims alleged occurred within this District, and Defendant has caused harm to Class members residing within this District.

17.     Further, the wrongful conduct at issue in this complaint emanates from California. Defendant improperly billed advertisers for invalid clicks from its headquarters in California. Employees and agents of Defendant who are responsible for this wrongful conduct are located in California.  The misrepresentations and deceptive conduct that form the basis of Plaintiffs' claims emanate from California.

## INTRADISTRICT ASSIGNMENT

18.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.  Pursuant to Civil L.R. 3-2, this case should be assigned to the San Jose Division.  Defendant is headquartered in Palo

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CV 09-03043

Alto, California.  Additionally, Defendant conducts business in this Division, and a substantial part of the events giving rise to the claims asserted herein occurred within or emanated from this Division.

## PARTIES

19.    Plaintiff RootZoo, Inc. ("RootZoo") is a Delaware corporation with its principal place of business in Manhattan, New York.  RootZoo paid for advertising on Facebook and was charged for invalid clicks.

20.    Plaintiff Fox Test Prep is a sole proprietorship doing business and with its principal place of business in San Francisco, California.  Fox Test Prep paid for advertising on Facebook and was charged for invalid clicks.

21.    Plaintiff Steven Price ("Price") is a resident of the State of California, residing in El Segundo, California.  Price paid for advertising on Facebook and was charged for invalid clicks.

22.    Facebook is a Delaware corporation with its principal place of business at 156 University Ave., Palo Alto, California 94301-1605.

## FACTUAL ALLEGATIONS

A.    **The Facebook Networking Website**

23.    Defendant operates and privately owns the popular, free-access social networking website at www.facebook.com.  Founded in February 2004, Defendant develops technologies that facilitate the sharing of information.  As of November 2009, Facebook was the most popular social networking site on the Internet with more than 300 million active users.

24.    Facebook allows users to create "profiles" about themselves which can include user-uploaded photos, videos, location data, demographic information (including educational and work information), lists of personal interests and other user-supplied information.  Once a profile is created, users can create and join networks of other users and interact with them in various ways, such as by reviewing others' profiles, playing games, exchanging private or public messages or posting links to outside material.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CV 09-03043

25.     As explained below, Facebook's advertisers utilize user-supplied information to create targeted advertisements aimed at matching their goods or services with the information or interests of the Facebook user.

26.     About 50%, or 150 million users, log in and interact with Facebook each day and, according to Facebook, these users are active: more than 2 billion photos and more than 14 million videos are uploaded to the site each month; more than 2 billion pieces of content, including web links, news stories, blog posts, notes, photos, etc. are shared each week; and more than 45 million user status updates are made each day.

**B.      Defendant's Advertising Services**

27.     In order to generate revenue and profit, Defendant aggressively sells advertising opportunities to businesses.  Facebook touts its advertising services as a way for businesses to reach their "exact audience" and "connect real customers" to their businesses.  According to Facebook, as a result of the detailed personal information that Facebook users provide on their respective profile pages, advertisers are able to "target [their] exact audience with demographic and psychographic filters."

28.     In 2009, Defendant generated a reported $500 million in revenue, much of which comes from advertising by small, self-serve advertisers, often referred to as "Mom and Pop" businesses.  However, many major advertisers have intentionally chosen not to deploy large campaigns within Facebook given its immature advertising platform and inability to provide sophisticated reporting and reconciliation functions.

29.     The creation of an advertisement on Facebook is a four-step process: design, selection of target demographic, scheduling the running of the ad and setting the daily budget, and finally design review and submission.  All ads are designed using software created by Defendant and accessible to advertisers via a link from the Facebook website.  During the design process, advertisers may choose to have their ad linked either to their external web page outside of the Facebook website or an internal Facebook link within the Facebook website.

30.     Advertisers select demographic and other data provided by Facebook users on their respective Facebook pages, such as city, gender, age, relationship status, employer, education level,

political views, interests, languages and "keywords."  Defendant then applies a proprietary system that uses advertiser-selected information to place advertisements on users' Facebook pages that match the criteria selected by advertisers to target Facebook users.

31.     In creating an ad, advertisers select a "Daily Budget" for the most they would like to spend for their ad per day, as well as a "Max Bid" for each click.  The Facebook ad system decides which ads to run by employing a secret algorithm that estimates the best performing advertisement based on a number of factors, including historical performance of the ad and its bid.  The bid necessary to win the advertisement fluctuates as the system learns more about the ad's actual performance and as the pool of competing ads changes.

32.     Defendant provides advertisers with two options to pay for Facebook ads: (1) a cost-per-click[1] ("CPC") model, or (2) a cost-per-thousand impressions ("CPM") model.  The CPC advertising option, at issue in this case, allows a business to specify a certain amount that it is willing to pay each time a user clicks on the business' ad with the intent to view the ad. The CPM option allows a business to specify how much it is willing to pay for views, or impressions, of its ad.

**C.     Defendant Represents that Advertisers will be Charged Only for Actual and Valid Clicks and that it has Measures to Ensure it only Reports and Charges Advertisers for Valid Clicks.**

33.     Defendant promises that it has policy that, when advertisers run an ad on Facebook using the CPC option, they will be charged for valid clicks, that is, only when a Facebook user actually clicks on the ad in an attempt to view the advertisement. Defendant also promises to takes steps to ensure that advertisers are charged for only valid clicks.

34.     When creating an advertising campaign, advertisers are prompted to provide the parameters of their advertisements.  During this process, Defendant expressly and impliedly represents that advertisers are charged only for valid clicks by users.  For the "Campaigns and Pricing" parameter, the advertiser is prompted to answer the question: "What is the most you want to spend per day?" (the "Daily Budget").  Advertisers who select the "Pay for Clicks (CPC)" option are prompted to input a

---

[1] The cost-per-click model is also referred to, herein and in the industry, as price-per-click or, sometimes, pay-per-click.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CV 09-03043

"Max Bid" by answering the question: "***How much are you willing to pay per click? (i.e., min. $0.01).***" (emphasis added).  *See* Exh. A.  The statements set forth in Exhibit B were in existence at the time each of the Plaintiffs contracted with Defendant for advertising services.

35.     It is customary and expected for web sites such as Facebook that offer CPC advertising to have systems that detect and prevent invalid clicks by tracking the use of a pay-per-click advertisement, including the identity and/or source of those clicking on the advertisement and the frequency of such activity.  Such tracking can be accomplished by software programs that count the number and timing of clicks originating from a single source.  Indeed, Facebook expressly promises advertisers that it has the infrastructure that will ensure that advertisers are charged only for actual *and* valid clicks. Specifically, Facebook's policy of billing only for legitimate clicks is contained in its promise to advertisers that ***"[c]licks are counted each time a user clicks through your ad to your landing page,"*** and that it has a ***"variety of measures in place to ensure that [Facebook] only report[s] and charge[s] advertisers for legitimate clicks, and not clicks that come from automated programs, or clicks that may be repetitive, abusive, or otherwise inauthentic."***  *See* Exh. B (emphasis added).  Nowhere does Defendant inform advertisers that they will be charged for invalid clicks.  The statements set forth in Exhibit B were in existence at the time each of the Plaintiffs contracted with Defendant for advertising services.

36.     In fact, Facebook's "Glossary of Ad Terms" states that "CPC stands for Cost Per Click. ***If your ads are bid on a CPC basis, you will be charged when users click on your ads and visit your website.***"  *See* Exh. C (emphasis added).  The Help Center text goes on to assure advertisers that: "As a CPC advertiser you are indicating that what is most important to you is having ***people click through to your website and controlling the actual cost to drive each individual person to your site***…"  *Id.* (emphasis added).   Further, according to Defendant's Frequently Asked Questions ("FAQ"), available at Facebook's Help Center (under the section for Ads: Campaign Cost and Budgeting), the CPC option allows users "to specify a certain amount that you are willing to pay ***each time a user actually clicks on your ad.***"  *See* Exh. D (emphasis added).  And that "[w]hen you run your ad you will only be charged for the number of clicks you receive."  *Id.*

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CV 09-03043

37.     The statements set forth in Exhibits C and D were in existence at the time each of the Plaintiffs contracted with Defendant for advertising services.

38.     Further, in response to the question, "I received an unexpected advertising credit," the Help Center says:

> There are a variety of reasons why Facebook may issue an advertising credit. Such credits will be automatically added to your ad account's funding sources, and when you run ads, the charges will first be deducted from the credit before your credit card is charged.
>
> If our system detects that there have been invalid clicks on your account, we may automatically credit your account with the value of those clicks. Please note that we filter out some clicks for a variety of reasons before they ever appear in your reports or charges. We may issue a credit if we identify certain clicks as invalid after you've been charged for them.
>
> Similarly, if there are any issues on our end that interfere with the correct delivery of your ads, Facebook may issue a credit equal to the value of any incorrectly delivered clicks.

*See* Exh. E.  The statements set forth in Exhibit E were in existence at the time each of the Plaintiffs contracted with Defendant for advertising services.

39.     Thus, Defendant represents to advertisers that select the CPC option that they will be billed based on the number of actual and valid clicks received, and that its filtering systems are adequate.  Defendant further represents that it guards against invalid clicks and that advertisers will not be charged for such clicks.

40.     In the document entitled "Statement of Rights and Responsibilities," posted on its website, Facebook purports to disclaim responsibility for a narrow subset of invalid clicks designated as "click fraud" or clicks resulting from "other improper actions."  The purported disclaimer does not attempt to cover, and does not cover, the broader category of invalid clicks identified in Paragraph 3(a) – (e), which do not constitute "click fraud" and are not the result of "other improper actions."

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CV 09-03043

41.     Moreover, the terms of Facebook's purported disclaimer are ambiguous and, to the extent they can be interpreted broadly, inconsistent with numerous statements both in the contract and in Facebook materials that promise that advertisers will only be charged for valid clicks.  Thus, the provision is ambiguous and, at best, specifically limited to a subset of invalid clicks.

42.     Facebook also fails to conspicuously present the purported disclaimer to advertisers.  For instance, instead of placing the disclaimer on the order page that businesses must review before submitting an order for CPC advertising, Facebook buries the purported disclaimer beneath numerous paragraphs of small type-size font in the "Statement of Rights and Responsibilities."  Advertisers are not required to read or review the "Statements of Rights and Responsibilities" before contracting with Facebook.

### D.     Defendant Charges Advertisers for Invalid Clicks and Fails to take Appropriate Measures to Protect Advertisers from Such Clicks.

43.     In contravention of its policies and representations in paragraphs 33-38, Defendant has charged Plaintiffs and members of the Class for invalid clicks.

44.     Robust pre-filtering and filtering software are used throughout the industry to limit, and in many cases eliminate, the charges for both invalid clicks and the smaller subset of fraudulent clicks.  Facebook has failed to implement those systems adequately or in a timely manner and has failed to advise its clients of the deficiencies in its reconciliation, recording, tracking and filtering systems.

45.     The three main technological approaches that advertisers employ for tracking clicks to their websites are: log file analysis, inbound third-party ad tracking URLs, and page tagging.  Log file analysis uses software, such as AWStats, DailyStats, WebLog or dozens of other software programs (these are pixel-javascript solutions) to read and process into reports the log files in which the web server for a website records all of its transactions.  The second method, inbound third party tracking URLs,  uses an adserver to redirect an inbound click to its final destination (using a 302 command) while simultaneously tracking that click and information about the click.  The final method in common use is page tagging, which uses JavaScript and/or an invisible pixel on each page of a site including landing pages for ads to notify a third-party server when a page is displayed by a web browser.  Google

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CV 09-03043

Analytics, the market leader in web traffic monitoring, uses page tagging. All three methods collect data that can be processed to produce web traffic reports as well as commonly requested user statistics.

46.     Facebook advertisers have repeatedly complained, directly to Defendant and in group discussions on the Internet that Defendant monitors, that based on the advertisers' website traffic tracking data, Defendant is charging advertisers for invalid clicks.

47.     The statements below are just a sample of complaints from Facebook advertisers found on an advertising industry website, WickedFire.com, regarding Defendant's practice of charging advertisers for invalid clicks:

> Tracking 202 [a tracking device] is telling me 11 clicks …. Facebook is telling me 145. That's way off the 15-20%, is there a different margin for tracking 202 than there is prosper 202 or did I suffer from one of those click bots?

> Sucks how high the numbers are today.  It's clear the problem is getting worse daily.  I've moved most of my [ads] off facebook for the time being and magically my [data] is all positive again.  Crazy how that works.  There are lots of places to buy traffic, some that will even actually give you the traffic you are paying for.  Facebook is never going to admit to whats going on.  I can almost guarantee you that.

> Facebook is still reporting 20% more clicks than I actually get.  This is [bs].  If I were at least getting bot traffic or something that would be one thing, but right now Facebook is simply stealing 20% of clicks that I paid for, which adds up to thousands of dollars.  Someone should threaten legal action, this is straight up fraud on Facebook's part.

> FB click fraud update: ratio is now EXACTLY 10:1.  10 clicks reported on FB, 1 click on prosper.  No, this wasn't on a small scale either.  Were talking 1000's of clicks.  Have fun facebook.  I'm checking out till you can fix this [problem].

> I'm targeting small, specific demos, Facebook reports exactly twice as many clicks as hit my [destination page].  Facebook is stealing our money ….

> This is experienced by not just those that use 202.  When in doubt, look at your raw apache logs - which I did.  The result: 15% - 20% clicks never make it to my [Destination Page].  Clearly a case of click-fraud going on.  Tested on 3 different servers at 3 different DCs (not a network issue).

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CV 09-03043

48.     Defendant has refused to adequately respond to these complaints and has not made available any of its internal data that would allow advertisers to understand the basis for billing advertisers for clicks on advertisements which Defendant claims occurred.

49.     While Defendant does provide advertisers with statistics regarding the numbers of alleged clicks that they have received on their advertisements, it will not disclose information to advertisers that would allow them to ascertain whether the clicks were valid.  Advertisers are forced to accept Defendant's representations without any ability to verify the information that Defendant provides.

50.     Companies offering CPC advertising, including Facebook, have a duty pursuant to the contract between the company and the advertiser to properly track clicks and detect and filter out all invalid clicks.  Defendant has a contractual duty to charge only for "actual" clicks by "users."  This is referred to in the industry as ensuring "click quality."  This duty can be met by, among other things, tracking the use of a pay-per-click advertisement, including who is clicking on the advertisement/link, and how often the same individual or computer clicks on it.  Such tracking can be accomplished by computer programs that count the number of clicks originating from a single source.

51.     In response to press reports about invalid clicks on Facebook, Defendant has publicly acknowledged its duty to filter out and prevent such conduct on its website.  Defendant posted the following message that appeared at www.techcrunch.com:

> This is Brandon on the Facebook communication team.  I wanted to chime in to make sure that our voice was part of this discussion and to clarify how we are addressing this issue.  *We take click quality very seriously and have a series of measures in place to detect it.*  We have large volumes of data to analyze click patterns and can identify suspicious activity quickly.  Over the past few days, we have seen an increase in suspicious clicks. We have identified a solution which we have already begun to implement and expect will be completely rolled out by the end of today.  In addition, we are identifying impacted accounts and will ensure that advertisers are credited appropriately.

*See* http://www.techcrunch.com/2009/06/21/facebook-click-fraud-enraging-advertisers/ (last visited on November 16, 2009) (emphasis added).

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CV 09-03043

52.     Moreover, in the Help Center, in its "Glossary of Ad Terms" under "clicks," Defendant represents that it has a policy or practice of only charging for valid clicks: "We have a variety of measures in place to ensure that we only report and charge advertisers for legitimate clicks, and *not clicks that come from automated programs, or clicks that may be repetitive, abusive, or otherwise inauthentic*. Due to the proprietary nature of our technology, we're not able to give you more specific information about these systems." *See* Exh. B. (emphasis added).

53.     In spite of its representations, Defendant has failed to take appropriate and sufficient steps to ensure that its infrastructure prevents and detects invalid clicks and that advertisers are not billed for such clicks.

54.     Furthermore, Defendant has not provided appropriate recourse to the affected advertisers, including Plaintiffs and the Class.  When advertisers are charged for invalid clicks, Defendant fails to adequately notify them and fails to refund them the full excess charges that they have incurred as a result of the invalid click activity.  Defendant knows, and at all relevant times has known, that it is charging for invalid clicks. Yet, Defendant has failed to take sufficient measures to track or prevent such invalid clicks, fails to adequately warn its existing and potential customers about the existence of the problem, and bills CPC advertisers for invalid clicks.  Defendant has an inherent conflict of interest with respect to charging for invalid clicks because it derives the same amount of income from one of these clicks as it does from a valid click.

E.     **Plaintiffs' Experiences**

(1)     **Plaintiff RootZoo**

55.     RootZoo is a social network website for sports fans.  In approximately November 2007, RootZoo entered into a contract with Facebook for the placement of CPC advertisements on Facebook.com.

56.     Prior to contracting with Facebook for advertising, RootZoo reviewed and relied on the statements set forth on Facebook's website regarding its advertising services. Those representations and statements affirmatively and specifically set forth that in connection with its advertising services:  (1) Facebook had a range of filters and other measures in place to guard against invalid clicks; and (2)

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CV 09-03043

Facebook would not charge for invalid clicks.  See Exhibits B-D.  RootZoo reasonably believed that Facebook would only charge for valid clicks, that Facebook had measures in place to guard against invalid clicks, and that Facebook would not charge for invalid clicks.  Although Facebook was aware of its internal deficiencies, Facebook never, at any time, disclosed or adequately disclosed to RootZoo that it did not have measures in place to guard against invalid clicks, such as filters up to par with industry standards that would filter out invalid clicks, or that it would charge for invalid clicks. Facebook's affirmative representations, reflected in the exhibits attached hereto, created a duty to disclose this material information.  Facebook's representations played a substantial part and were a substantial factor in influencing RootZoo's decision to purchase CPC advertising.

57.     In or about June 2008, RootZoo received a statement from Facebook that showed that Facebook had charged RootZoo for clicks on www.RootZoo.com for which RootZoo's tracking software had no record.

58.     RootZoo contacted Facebook to report this material discrepancy and to request a refund for clicks that never occurred.   RootZoo provided Facebook with data from two software programs that showed the discrepancy between what were the actual number of clicks and the number of clicks for which Facebook was charging.

59.     Facebook emailed RootZoo and reported, "[a]ccording to our engineers, the clicks being reported within your Facebook account are accurate."

60.     RootZoo requested that Facebook provide it with a copy of the logs demonstrating that clicks for which RootZoo was being charged were indeed actual clicks.   Facebook refused to provide any back up supporting documentation that would substantiate its position.

61.     RootZoo also requested that Facebook refund back charges for clicks that never occurred. Facebook refused to refund any charges or provide any credits.

62.     In the course of investigating the situation involving charges for nonexistent clicks, RootZoo also discovered that it was receiving clicks from small towns during the period of April-May 2008 that are not indicative of the population and that would almost be statistically impossible given RootZoo's prior tracking history with Facebook advertisements.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CV 09-03043

63.     Again, RootZoo reported the discrepancy to Facebook and provided tracking data to support its claim that it was being charged for invalid clicks.

64.     Facebook wrote to RootZoo: "[w]e've been continuing to look into this on our side, and so far have found that you've only been billed for valid clicks on your ads, which match the stats reported to you in your ads account.  We're currently not able to offer you a refund for any of these charges."

65.     Facebook has never refunded any monies to RootZoo.

**(2)     Plaintiff Price**

66.     On or about May 26, 2009, Price purchased advertising from Facebook.  Prior to contracting with Facebook for advertising services, Price reviewed and relied on the statements set forth on Facebook's website regarding its advertising services.  Those representations and statements affirmatively and specifically set forth that in connection with its advertising services:  (1) Facebook had a range of filters and other measures in place to guard against invalid clicks; and (2) Facebook would not charge for invalid clicks. See Exhibits B-D.  Price reasonably believed that Facebook would only charge for valid clicks, that Facebook had measures in place to guard against invalid clicks, and that Facebook would not charge for invalid clicks.  Although Facebook was aware of its internal deficiencies, Facebook never, at any time, disclosed or adequately disclosed to Price that it did not have measures in place to guard against invalid clicks, such as filters up to par with industry standards that would filter out invalid clicks, or that it would charge for invalid clicks.  Facebook's affirmative representations, reflected in the exhibits attached hereto, created a duty to disclose this material information.  Facebook's representations played a substantial part and were a substantial factor in influencing Price's decision to purchase CPC advertising.

67.     Under the terms of Price's agreement with Facebook, Facebook was required to provide Internet advertising service to Price in exchange for payment from Price.  Price authorized Facebook to direct bill his credit card account for the payments due from him.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CV 09-03043

68.     Price created his first advertisement on May 26, 2009.  He selected the pay-per-click payment method.  Price's advertisement began running on the Facebook website on or about May 27, 2009.

69.     Price received the first charge to his credit card from Facebook on or about May 28, 2009.  He received numerous additional charges thereafter.  Between May 28, 2009 and June 21, 2009, Facebook charged Price's credit card account more than $500 for his advertisements.  Facebook sent Price email invoices for each of the charges to his credit card account.  However, none of the email invoices details the number of clicks, time of the clicks or origination of the clicks.

70.     In an effort to ascertain this information -- which would allow him to tailor his advertisements to maximize profitability -- Price accessed the Facebook Ad Manager Page.  The Facebook Ad Manager Page provides information regarding, *inter alia*, the number of clicks made on an advertisement on a day-by-day basis.  Upon reviewing the information related to his ad, Price became concerned that the number of clicks was overstated.  Therefore, Price used Google Analytics, the industry's leading web traffic tracking program, to test the veracity of the data reflected on the Facebook Ad Manager Page.

71.     Price used Google Analytics to test the veracity of the charges that he was receiving from Facebook on eight days between May 27, 2009 and June 3, 2009.  Based upon the data Price received from Google Analytics for these eight days, Price determined that approximately 66% of the clicks for which he was being charged by Facebook, as reflected on the Facebook Ad Manager Page, were invalid clicks that had never even occurred.

72.     On or about June 4, 2009, Price began to run Statcounter.com, another popular tracking program, in conjunction with the Google Analytics program.  Price used both Google Analytics and Statcounter.com to test the veracity of the charges that he was receiving from Facebook on five dates on which Price ran ads between June 4, 2009 and June 21, 2009.

73.     Based upon the data Price received from Statcounter.com for the five dates, Price determined that approximately 67% of the clicks for which he was being charged by Facebook, as reflected on the Facebook Ad Manager Page, were invalid clicks that had never even occurred.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CV 09-03043

1    Therefore, the data results from Statcounter.com confirmed the findings of Google Analytics: that is,

2    approximately two-thirds of the clicks for which Price was being charged were invalid clicks that had

3    never even occurred.

4         74.    Facebook has charged, and Price has paid, for all clicks on Price's ads.  On June 26,

5    2009, Facebook notified Price that "Recently, we have detected an increase in invalid clicks on

6    Facebook. Your account was impacted and as a result, we are crediting your account.  Your credit has

7    been automatically deposited into your Facebook account and will apply toward future advertising

8    campaigns.  Your credits expire December 15, 2009."

9         75.    By voluntarily crediting Price's account, Facebook admitted that it had charged Price for

10   invalid clicks.  However, rather than refunding to Price the monies he had been charged and had paid for

11   these invalid clicks, Facebook gave Price "credits" in the amount of $105.01 that could only be used to

12   purchase additional advertising from Facebook.  Moreover, unlike the cash refund to which Price was

13   entitled, these credits expired December 15, 2009.  Finally, these credits do not even come close to

14   compensating Price for the monies that he has been wrongfully charged and has paid to Facebook for

15   invalid clicks.

16                    **(3)    Plaintiff Fox Test Prep**

17        76.    Fox Test Prep ("Fox"), through its founder Nathan Fox, operates the website at

18   www.foxtestprep.com and offers personalized preparation courses for the LSAT and the GMAT.

19   In approximately May 2009 through December 2009, Fox contracted with Facebook for the placement

20   of CPC advertisements on Facebook.com.  Prior to contracting with Facebook and during the period of

21   time during which Fox placed advertising on Facebook, Fox reviewed and relied on the statements set

22   forth on Facebook's website regarding its advertising services. Those representations and statements

23   affirmatively and specifically set forth that in connection with its advertising services:  (1) Facebook had

24   a range of filters and other measures in place to guard against invalid clicks; and (2) Facebook would not

25   charge for invalid clicks. See Exhibits B-D. Fox reasonably believed that Facebook would only charge

26   for valid clicks, that Facebook had measures in place to guard against invalid clicks, and that Facebook

27   would not charge for invalid clicks.  Although Facebook was aware of its internal deficiencies,

Facebook never, at any time, disclosed or adequately disclosed to Fox that it did not have measures in place to guard against invalid clicks, such as filters up to par with industry standards that would filter out invalid clicks, or that it would charge for invalid clicks.  Facebook's affirmative representations, reflected in the exhibits attached hereto, created a duty to disclose this material information.  Facebook's representations played a substantial part and were a substantial factor in influencing Fox's decision to purchase CPC advertising.

77.    Facebook billed Fox for a total of approximately 1,052 clicks and charged Plaintiff $1,058.13 for such clicks.  Fox monitored the number of clicks on www.foxtestprep.com using, among other things, Google Analytics.  During one sample period, using Google Analytics, Fox recorded 120 clicks by Facebook with visitors spending an average time on the website of one second.  For comparison, Fox recorded 164 clicks from Yelp during the same period, with visitors spending an average time on the website of 5.27 minutes.  Fox ultimately cancelled advertising with Facebook due to these discrepancies.

78.    Defendant never refunded or credited Fox for any invalid clicks.

79.    In all cases, Facebook has either refused to refund monies or has provided inadequate refunds.

## CLASS ALLEGATIONS

80.    This action has been brought, and may be properly maintained, under Federal Rules of Civil Procedure 23(a) (1)-(4) and 23 (b) (2) and (3).

81.    Plaintiffs bring this action as a class action on behalf of themselves and all others similarly situated as members of a Class defined as follows: **All persons and/or entities in the United States who paid money to Facebook, Inc. for CPC advertising during the period January 1, 2006 to the present.**  Excluded from the proposed Class are: any entity in which Defendant has a controlling interest; any of Defendant's officers, directors, or employees; the legal representatives, heirs, successors, and assigns of Defendant; and any judge to whom this case is assigned and his or her immediate family.

82.    **Numerosity**—Fed. R. Civ. P. 23(a) (1): The members of the Class are so numerous and widely dispersed that joinder of them in one action is impractical.  The precise number of Class

1    members is unknown to Plaintiffs, but the Class likely numbers in the thousands since Defendant has

2    generated millions of dollars in revenue from its CPC advertising services. Each Class member should

3    be readily identifiable from information and records in Defendant's possession and control.

4        83.    **Existence and Predominance of Common Questions of Law and Fact—**

5    Fed. R. Civ. P. 23(a)(2) and (b)(3): Common questions of law and fact exist as to Plaintiffs and all Class

6    members and predominate over any questions affecting only individual Class members. These common

7    legal and factual questions include, but are not limited to, the following:

8            a.    Whether Defendant represented to Plaintiffs and Class members that they would

9            be charged only for actual and valid clicks;

10           b.    Whether Defendant represented to Plaintiffs and Class members that it takes

11           measures to ensure that it reports and charges advertisers for only valid clicks;

12           c.    Whether Defendant failed to disclose and/or adequately disclose to Plaintiffs and

13           Class members material information, namely, that it did not have adequate measures to

14           protect Plaintiffs and Class members from invalid clicks;

15           d.    Whether Defendant failed to disclose and/or adequately disclose material

16           information, namely, that it disclaimed liability for "click fraud or other improper

17           actions";

18           e.    Whether Defendant failed to disclose and/or adequately disclose to Plaintiffs and

19           Class members material information, namely, that advertisers will be charged for invalid

20           clicks;

21           f.    Whether Defendant agreed to charge Plaintiffs and Class members for only actual

22           and valid clicks;

23           g.    Whether Defendant failed to implement adequate measures to protect Plaintiffs

24           and Class members from invalid clicks;

25           h.    Whether Defendant charged Plaintiffs and Class members for invalid clicks;

26           i.    Whether Defendant's conduct as alleged herein violated the UCL;

27

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CV 09-03043

j.      Whether Defendant's conduct breached the express terms of the contract with Plaintiffs;

k.      Whether Defendant's conduct breached the implied covenant of good faith and fair dealing; and

l.      Whether Plaintiffs and Class members are entitled to damages, restitution, injunctive relief and declaratory relief.

84.     **Typicality** – Fed. R. Civ. P. 23(a)(3): Plaintiffs' claims are typical of the claims of the Class, as Plaintiffs entered into a uniform contract with Defendant for CPC advertising and were charged for invalid clicks.

85.     **Adequacy of Representation**—Fed. R. Civ. P. 23(a)(4): Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class members they seek to represent.  Plaintiffs have retained competent and experienced class action counsel who will vigorously prosecute this action.  The Class members' interests will be fairly and adequately protected by Plaintiffs and their counsel.

86.     **Superiority**—A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all of the Class members is impracticable. Even if Plaintiffs and the other Class members could afford individual litigation, the courts could not. The amount at stake for each Class member is such that individual litigation or arbitration would be inefficient and cost prohibitive. Additionally, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudications of the claims asserted herein.  There will be no difficulty in the management of this action as a class action.

87.     In the alternative, this action is certifiable under the provisions of Fed. R. Civ. P. 23(b)(2) because:

a.      the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members which would establish incompatible standards of conduct for Defendant;

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CV 09-03043

b.      the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of the other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

c.      Defendant has acted or refused to act on grounds generally applicable to the Class members, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class members as a whole and necessitating that any such relief be extended to the Class members on a mandatory, class-wide basis.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(Violation of the Unfair Competition Law,
Cal. Bus. & Prof. Code §§ 17200 *et seq.*)**

**Charging for Invalid Clicks**

88.      Plaintiffs incorporate by reference and reallege paragraphs 1 through 87, as previously alleged herein.

89.      Prior to contracting with Facebook for advertising, Plaintiffs reviewed and relied on the statements made by Facebook on its website regarding its policies and practices for charging only for valid clicks.

90.      The acts and practices engaged in by Defendant, and described herein, constitute unfair, unlawful, and/or fraudulent business practices in that:  (a) Defendant's practices, as described herein, constitute a breach of contract; (b) the justification for Defendant's conduct is outweighed by the gravity of the consequences to Plaintiffs and Class members; (c) Defendant's conduct is immoral, unethical, oppressive, unscrupulous or substantially injurious to Plaintiffs and Class members; and/or (d) Defendant's conduct constitutes fraudulent, untrue or misleading actions in that such conduct has a tendency to deceive a reasonable person, including Plaintiffs and Class members.

91.      Plaintiffs have suffered injury in fact and have lost money or property as a result of Defendant's unfair competition, as alleged herein.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CV 09-03043

92.     Defendant's unlawful, unfair, and fraudulent business practices include, but are not limited to, the following:

a)     Representing that advertisers are billed based on the number of actual and valid clicks, yet charging and collecting from advertisers payment for invalid clicks;

b)     Representing that Defendant has adequate measures in place to ensure that it only reports and charges advertisers for valid clicks, when it does not;

c)     Failing to disclose or adequately disclose that it charges and collects payments from advertisers for invalid clicks;

d)     Failing to disclose or adequately disclose that it does not have adequate measures, such as filters that are up to par with industry standards, in place to ensure that it only reports and charges advertisers for valid clicks; and

e)     Failing to implement adequate measures to protect advertisers against charges for invalid clicks.

93.     Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs and Class members are therefore entitled to equitable relief, including: restitution of all monies paid to Defendant as a result of its alleged misconduct; a permanent injunction enjoining Defendant from its unlawful, unfair, and fraudulent business activities as alleged herein and requiring Defendant to implement adequate measures to protect advertisers against charges for invalid clicks; and appropriate declaratory relief as described herein.

### SECOND CLAIM FOR RELIEF

**(Violation of the Unfair Competition Law,
Cal. Bus. & Prof. Code §§ 17200, *et seq.*)**

**Charging for Fraudulent Clicks**

94.     Plaintiffs incorporate by reference and reallege paragraphs 1 through 87, as previously alleged herein.

95.     Prior to contracting with Facebook for advertising, Plaintiffs reviewed and relied on the statements made by Facebook on its website regarding its representations, policies and practices for charging only for valid clicks. Those representations and statements affirmatively and specifically set

forth that in connection with its advertising services:  (1) Facebook had a range of filters and other measures in place to guard against invalid clicks; and (2) Facebook would not charge for invalid clicks. See Exhibits B-D. Although Facebook was aware of its internal deficiencies, Facebook never, at anytime, disclosed or adequately disclosed to Plaintiffs that it did not have measures in place to guard against invalid clicks, such as filters up to par with industry standards that would filter out invalid clicks, or that it would charge for invalid clicks.  Facebook's affirmative representations, reflected in the exhibits attached hereto, created a duty to disclose this material information.  Facebook's representations played a substantial part and were a substantial factor in influencing Plaintiffs' decisions to purchase CPC advertising.

96.     The acts and practices engaged in by Defendant, and described herein, constitute unfair, unlawful and/or fraudulent business practices in that:  (a) the justification for Defendant's conduct is outweighed by the gravity of the consequences to Plaintiffs and Class members; (b) Defendant's conduct is immoral, unethical, oppressive, unscrupulous or substantially injurious to Plaintiffs and Class members; and/or (c) Defendant's conduct constitutes fraudulent, untrue or misleading actions in that such conduct has a tendency to deceive a reasonable person, including Plaintiffs and Class members.

97.     The disclaimer in the Statement of Rights and Responsibilities purporting to disclaim liability for "click fraud" or "other improper actions" is ambiguous and inconsistent with other statements in the contracts and elsewhere proclaiming that Facebook will only charge and collect for valid clicks.

98.     Plaintiffs have suffered injury in fact and have lost money or property as a result of Defendant's unfair competition, as alleged herein.

99.     Defendant's unlawful, unfair, and fraudulent business practices include, but are not limited to, the following:

a)     Representing that advertisers are billed based on the number of actual and valid clicks, yet charging and collecting from advertisers payments for all types of invalid clicks, including those referred to as click fraud.

b)   Representing that Defendant has adequate measures in place to ensure that it only reports and charges advertisers for valid clicks, when it does not;

c)   Failing to disclose or adequately disclose that it does not have adequate measures in place to avoid reporting and charging for all types of invalid clicks; and

d)   Failing to implement adequate measures to protect advertisers against charges for all types of invalid clicks, including those referred to as click fraud.

100.   Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs and Class members are therefore entitled to equitable relief, including: restitution of all monies paid to Defendant as a result of its alleged misconduct; a permanent injunction enjoining Defendant from its unlawful, unfair, and fraudulent business activities as alleged herein and requiring Defendant to implement appropriate measures to protect advertisers against charges for fraudulent clicks; and appropriate declaratory relief as described herein.

### THIRD CLAIM FOR RELIEF

### (Breach of Contract)

### Invalid Clicks

101.   Plaintiffs incorporate by reference and reallege paragraphs 1 through 87, as previously alleged herein.

102.   Plaintiffs and the members of the Class, on the one hand, and Defendant, on the other hand, entered into uniform contracts.  These contracts incorporate the information found on Defendant's Help Center, FAQs, and Glossary of Ad Terms.

103.   A material term of the contracts was that Plaintiffs and the Class members would be charged only for valid clicks and that Defendant would not charge advertisers for invalid clicks. Plaintiffs and the Class members, however, were charged for invalid clicks.

104.   A second material term of the contracts was that Defendant has in place reasonable and adequate processes to prevent, detect and filter invalid clicks.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CV 09-03043

105.     The contracts contain an implied covenant of good faith and fair dealing that Defendant will not do anything that will have the effect of depriving Plaintiffs and the Class members of their ability to receive the benefits of the contracts.

106.     Defendant breached its contracts with Plaintiffs and Class members, including the covenant of good faith and fair dealing, by failing to have reasonable and adequate processes in place to detect and filter invalid clicks and by collecting fees from Plaintiffs and the Class members for invalid clicks.

107.     As a direct and proximate result of Defendant's breach of the contracts, including the implied covenant of good faith and fair dealing, Plaintiffs and the Class members have been damaged in an amount to be determined at trial, but in excess of an aggregated amount of $5,000,000.

**FOURTH CLAIM FOR RELIEF**

**(Declaratory Judgment Under 28 U.S.C. § 2201)**

108.     Plaintiffs incorporate by reference and reallege paragraphs 1 through 87, as previously alleged herein.

109.     An actual controversy has arisen and now exists between Plaintiffs and the other Class members, on one hand, and Facebook on the other hand, concerning their respective rights and duties. Plaintiffs and the other Class members contend that Facebook has engaged in and continues to engage in unlawful and improper practices of: (a) failing to implement and institute appropriate and adequate measures to protect advertisers against charges for invalid clicks; (b) charging its advertising customers for invalid clicks; and (c) giving certain of its CPC advertising customers partial "credits," rather than full cash refunds to all affected advertisers, for such clicks. Facebook maintains that its actions are lawful and proper.

110.     A judicial declaration is necessary and appropriate at this time, under the circumstances presented, in order that Plaintiffs and the other Class members may ascertain their rights and duties with respect to Facebook's practices of: (a) failing to implement and institute appropriate and adequate measures to protect advertisers against charges for invalid clicks; (b) charging its advertising customers

for invalid clicks; and (c) giving its CPC advertising customers partial "credits," rather than full cash refunds, for such clicks.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment on behalf of themselves and the proposed Class as follows:

A.      For an order certifying the Class herein under Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3) and appointing Plaintiffs and their undersigned counsel to represent said Class under Federal Rule of Civil Procedure 23(g);

B.      For a declaration that Defendant is financially responsible for notifying Class members of the pendency of this suit;

C.      For an order pursuant to Cal. Bus. & Prof. Code §§ 17200, *et seq.* requiring Defendant to: (1) end the unlawful, unfair, and deceptive practices alleged herein; and (2) implement appropriate and adequate measures to protect Plaintiffs and Class members from charges for invalid clicks;

D.      For an order pursuant to Cal. Bus. & Prof. Code §§ 17200, *et seq.* awarding restitution to Plaintiffs and Class members for all monies paid for invalid clicks;

E.      For monetary damages, including, but not limited to any compensatory damages in an amount to be determined at trial, together with prejudgment interest at the maximum rate allowable by law;

F.      For an order awarding Plaintiffs and Class members the reasonable costs and expenses of suit, including their attorneys' fees; and

G.      For any further relief that the Court may deem appropriate.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury for all claims so triable.

Dated: September 24, 2010                    By:    /s/ Jonathan Shub

jshub@seegerweiss.com
**SEEGER WEISS LLP**
1515 Market Street, Suite 1380
Philadelphia, PA 19102

Telephone: (215) 564-2300
Facsimile: (215) 851-8029

Rosemary M. Rivas
rrivas@finkelsteinthompson.com
**FINKELSTEIN THOMPSON LLP**
100 Bush Street, Suite 1450
San Francisco, CA 94104
Telephone: (415) 398-8700
Facsimile: (415) 398-8704

Mila F. Bartos
**FINKELSTEIN THOMPSON LLP**
1050 30th Street, N.W.
Washington, D.C. 20007
Telephone: (202) 337-8000
Facsimile: (202) 337-8090

*Interim Co-Lead Class Counsel*

J. Paul Gignac (SBN: 125676)
j.paul@aogllp.com
**ARIAS OZZELLO & GIGNAC LLP**
115 S. La Cumbre Lane, Suite 300
Santa Barbara, California 93105
Telephone: (805) 683-7400
Facsimile: (805) 683-7401

*Interim Liaison Class Counsel*

Steven Berk
**BERK LAW PLCC**
1225 15th Street, NW
Washington, D.C. 20005
Telephone: (202) 232-7500
Facsimile: (202) 232-7566

Paul M. Weiss
**FREED & WEISS LLC**
111 West Washington Street, Suite 1311
Chicago, IL 60602
Telephone: (312) 220-0000

27

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CV 09-03043

Brian S. Kabateck
**KABATECK BROWN KELLNER LLP**
664 S. Figueroa Street
Los Angeles, CA 90017
Telephone: (213) 217-5000
Facsimile: (213) 217-5010

Gordon M. Fauth, Jr.
**LITIGATION LAW GROUP**
1801 Clement Avenue, Suite 101
Alameda, CA 94501
Telephone: (510) 238-9610
Facsimile: (510) 337-1431

Melissa Meeker Harnett
**WASSERMAN, COMDEN, CASSELMAN & ESENSTEN, LLP**
5567 Reseda Boulevard, Suite 330
Tarzana, CA 91357-7033
Telephone: (818) 705-6800
Facsimile: (818) 996-8266

TerriAnne Benedetto (admitted pro hac vice)
**SEEGER WEISS LLP**
1515 Market Street, Suite 1380
Philadelphia, PA 19102
Telephone: (215) 564-2300
Facsimile: (215) 564-1606

*Additional Counsel for Plaintiffs*

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CV 09-03043