1

2                                                          **E-Filed 12/15/2010**

3

4

5

6

7

8

9

10

11

12

13                      **IN THE UNITED STATES DISTRICT COURT**

14                    **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

15                               **SAN JOSE DIVISION**

16

| | |
|---|---|
| IN RE FACEBOOK PPC ADVERTISING LITIGATION | Case Numbers 5:09-cv-03043-JF, 5:09-cv-03519-JF, 5:09-cv-03430-JF |
| | ORDER[1] GRANTING MOTION TO DISMISS SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT |
| | [Document No. 109] |

23

24       Defendant Facebook PPC ("Facebook") moves to dismiss aspects of Plaintiffs' second

25 amended complaint ("SAC") pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon

26 which relief may be granted.  The Court has considered the moving and responding papers and

27 oral argument of counsel presented at the hearing on December 3, 2010.  For the reasons

28

_____

[1] This disposition is not designated for publication in the official reports.

1    discussed below, the motion will be granted, with leave to amend.

2                                **I.  BACKGROUND**

3         The instant putative class action was filed on July 7, 2009.  The dispute arises out of

4    individual contracts between Facebook and Plaintiffs RootZoo, Inc. ("RootZoo"), Steven Price

5    ("Price"), and Fox Test Prep ("Fox") (collectively, "Plaintiffs").[2]  Facebook operates a popular

6    social networking website, www.facebook.com.  (SAC ¶ 23.)  RootZoo, Price, and Fox

7    individually entered into contracts with Facebook for advertising on the website.  (SAC ¶¶ 55,

8    66, and 76.)  Facebook offers to display advertisements on portions of its website that are viewed

9    by Facebook users.  (SAC ¶ 9.)  Each advertisement contains a link either to another portion of

10   the website or to an external website.  (SAC ¶ 29.)  If a user clicks on the advertisement, the

11   user's web browser is directed to the other location.  (SAC ¶¶ 2, 29.)

12        To place an advertisement on Facebook, a potential advertiser must perform four steps.

13   (SAC ¶ 29.)  First, the advertiser designs an advertisement and selects the destination of the link

14   embedded within the advertisement.  (*Id.*)  Second, the advertiser selects the target demographic

15   for the advertising campaign.  (SAC ¶ 30.)  Third, the advertiser identifies the payment structure

16   for the advertising campaign.  Facebook provides two payment options: cost per click ("CPC") or

17   cost per thousand impressions ("CPM").  (SAC ¶ 32.)  Plaintiffs each entered into a CPC

18   contract.  (SAC ¶¶ 55, 68, 76.)  Under the CPC option, the advertiser pays a fee to Facebook each

19   time a user clicks on the advertisement.  (SAC ¶¶ 32-34.)  To select this option, the advertiser

20   must specify its "Max Bid" (the maximum amount the advertiser is willing to pay to Facebook

21   for each click) and its "Daily Budget" (the maximum amount the advertiser is willing to pay to

22   Facebook each day).  (SAC ¶ 34.)

23        Finally, the advertiser must submit its advertising design to Facebook for approval and

24   agree to certain terms and conditions.  (SAC ¶ 29.)  Agreements of this type commonly are

25   referred to as "click-through" agreements.  Advertisers are presented with a copy of the terms and

26

27        [2]  Matthew Smith was identified as a named plaintiff in the original complaint and the
     first amended complaint.  However, the operative pleading omits Matthew Smith and names Fox
28   as a third plaintiff.

                                         2

conditions, and they communicate their assent to those terms and conditions by placing their

advertising order.  (*See* Howitson Decl. ISO Def.'s Mot. to Dismiss the Original Complaint

("Howitson Decl."), Ex. 4.)  RootZoo initially contracted with Facebook in November 2007.

(SAC ¶ 55).  Price and Fox first contracted with Facebook in May 2009.  (FAC ¶¶ 66, 76).

RootZoo's contract differs in certain respects from those entered into by Price and Fox.

RootZoo agreed to Facebook's Advertising Terms and Conditions (the "AT&Cs").  (*See*

Howitson Decl. Ex. 1.)  The AT&Cs state that "I understand that Facebook will determine, in its

sole discretion, how to measure the number of impressions, inquiries, conversions, clicks, or

other actions taken by third parties in connection with my advertisements, and all charges will be

based on such measurements."  (*Id.*)  The AT&Cs also contain the following disclaimer:

> I UNDERSTAND THAT THIRD PARTIES MAY GENERATE IMPRESSIONS,
> CLICKS OR OTHER ACTIONS AFFECTING THE COST OF THE ADVERTISING
> FOR FRAUDULENT OR IMPROPER PURPOSES, AND I ACCEPT THE RISK OF
> ANY SUCH IMPRESSIONS, CLICKS, OR OTHER ACTIONS.  FACEBOOK SHALL
> HAVE NO RESPONSIBILITY OR LIABILITY TO ME IN CONNECTION WITH ANY
> THIRD PARTY CLICK FRAUD OR OTHER IMPROPER ACTIONS THAT MAY
> OCCUR.

(*Id.*)  Price's and Fox's contracts do not contain the AT&Cs; instead, Price and Fox appear to

have assented to a later agreement called a Statement of Rights and Responsibilities (the

"SR&Rs").  (*See* Clark Decl. ISO Mot. to Dismiss the Original Complaint ("Clark Decl."), Ex.

A.)  The SR&Rs provide that "You will pay for your Orders in accordance with our Payment

Terms.  The amount you owe will be calculated based on our tracking mechanisms."  (*Id.*)  The

SR&Rs also include a disclaimer: "We [Facebook] cannot control how people interact with your

ads, and are not responsible for click fraud or other improper actions that affect the cost of

running ads."  (*Id.*)

Plaintiffs allege that despite these disclaimers, Facebook represented elsewhere that it

would charge only for certain types of clicks and that they relied on these representations when

entering into their respective contracts.  (SAC ¶¶ 4, 56, 66, 76, 95.)  Facebook's website includes

a "Help Center" that offers definitions of several terms.  (SAC ¶¶ 35-36; Exhs. B-C.)  There is a

statement in the Help Center that "clicks are counted each time a user clicks through your ad to

your landing page," (SAC Ex. B), and that "[i]f your ads are bid on a CPC basis, you will be

3

charged when users click on your ads and visit your website," (SAC Ex. C.)   The Help Center

also contains a representation that "[Facebook] ha[s] a variety of measures in place to ensure that

[it] only report[s] and charge[s] advertisers for legitimate clicks, and not clicks that come from

automated programs, or clicks that may be repetitive, abusive, or otherwise inauthentic."  (SAC

Ex. B.)  Notwithstanding these representations, Plaintiffs allege that they have been charged for:

> (a) failed attempts by Facebook users to reach an advertisement because of a glitch in Facebook's website that are improperly counted by Facebook as a billable click; (b) Facebook's counting of clicks as billable clicks when in fact there was no click at all from a Facebook user; (c) clicks by Facebook users that fail to open the advertiser's web page but still result in Facebook regarding the click as a billable click; (d) improperly recorded, or unreadable, clicks by Facebook users caused by an invalid proxy server or unknown browser type (indicating that the visitor may be a computer "bot" and not a human); (e) unintentional, multiple clicks from a Facebook user in rapid succession . . .; and (f) . . . clicks that were made in a deliberate effort to drive up the cost of an ad or deplete an advertiser's budget (this type of invalid click is referred to in the industry as "click fraud.").

(SAC ¶ 3.)  Plaintiffs seek relief under California's Unfair Competition Law ("UCL"), Cal. Bus.

Prof. Code § 17200 *et seq*.; remedies for breach of contract; and a judicial declaration of the

rights and obligations of the parties under the subject contracts.

## II.  LEGAL STANDARD

A complaint may be dismissed for failure to state a claim upon which relief may be

granted if a plaintiff fails to proffer "enough facts to state a claim to relief that is plausible on its

face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Allegations of material fact must

be taken as true and construed in the light most favorable to the nonmoving party. *Cahill v.

Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1997).  However, the Court need not accept

as true allegations that are conclusory, unwarranted deductions of fact, or unreasonable

inferences. *See Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir. 2001).  *See also

Twombly*, 550 U.S. at 561 ("a wholly conclusory statement of [a] claim" will not survive a

motion to dismiss).

On a motion to dismiss, the Court's review is limited to the face of the complaint and

matters judicially noticeable. *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir.

1986)*; N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  However, under

the "incorporation by reference" doctrine, the Court also may consider documents which are

1  referenced extensively in the complaint and which are accepted by all parties as authentic.  *In re*

2  *Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999).  *See also Branch v. Tunnell*,

3  14 F.3d 449, 454 (9th Cir. 1994), *overruled on other grounds by Galbraith v. County of Santa*

4  *Clara*, 307 F.3d 1119, 1127 (9th Cir.  2002) (holding that "documents whose contents are alleged

5  in a complaint and whose authenticity no party questions, but which are not physically attached

6  to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss"); and *In re*

7  *Stac Elcs. Sec. Litig.*, 89 F. 3d 1399, 1405 n.4 (9th Cir. 1996) (noting that complete copies of

8  documents whose contents are alleged in the complaint may be considered in connection with a

9  motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)).

10         In assessing whether to grant Plaintiffs another opportunity to amend, the Court considers

11  "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure

12  deficiencies by previous amendments, undue prejudice to the opposing party[,] and futility of the

13  proposed amendment."  *Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1052 (9th Cir. 2001)

14  (quoting *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 538 (9th Cir. 1989)).  When

15  amendment would be futile, dismissal may be ordered with prejudice.  *Dumas v. Kipp*, 90 F.3d

16  386, 393 (9th Cir. 1996).

17         Finally, although their claims arise under state law, Plaintiffs' allegations are subject to

18  the Federal Rules of Civil Procedure.  *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir.

19  2009) (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1102 (9th Cir. 2003)) ("[T]he

20  Federal Rules of Civil Procedure apply in federal court, 'irrespective of the source of the subject

21  matter jurisdiction, and irrespective of whether the substantive law at issue is state or federal.'").

22  Specifically, allegations sounding in fraud are subject to the heightened pleading requirements of

23  Fed. R. Civ. P. 9(b).  *See Ciba-Geigy*, 317 F.3d at 1103-04 (if "the claim is said to be 'grounded

24  in fraud' or to 'sound in fraud,' [then] the pleading of that claim as a whole must satisfy the

25  particularity requirement of Rule 9(b)."); *Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir.1994)

26  (claims based in fraud "must state precisely the time, place, and nature of the misleading

27  statements, misrepresentations, and specific acts of fraud.").

28  ///

### III.  DOCUMENTS CONSIDERED

In connection with its previous motion to dismiss, Facebook submitted an exemplary screen shot of the web page through which an advertiser agrees to place an ad.  (Howitson Decl. Ex. 4.)  The screen shot displays a link to the click-through agreement that contains the disclaimers.  The SAC references this document, and Plaintiffs do not dispute its authenticity. *See Branch*, 14 F.3d at 454; and *In re Stac Elcs.*, 89 F. 3d at 1405 n.4.  Facebook also submitted copies of the AT&Cs and the SR&Rs. (*See* Howitson Decl. Ex. 1; Clark Decl. Ex. A.) While Plaintiffs dispute that all of the terms set forth in the exhibits actually are present in their contracts, they do not question the authenticity of the exhibits, and they respond to the instant motion as if the terms in fact were included in their contracts.  The Court may consider these documents. *See Branch*, 14 F.3d at 454.

### IV.  DISCUSSION

The instant motion challenges Plaintiffs' claim under the UCL concerning charges for third-party click fraud.[3]  The Court granted Facebook's previous motion to dismiss Plaintiffs' breach of contract claim based upon Facebook's alleged charges for third-party click fraud because "the disclaimers state unambiguously that Facebook will not be liable for 'click fraud.'" *In re Facebook PPC Advertising Litigation*, Nos. 5:09-cv-03043-JF, 5:09-cv-03519-JF, 5:09-cv-03430-JF, 2010 WL 3341062, at *8 (N.D. Cal. Aug. 25, 2010).  Facebook contends that it cannot be liable under the UCL for charging for third-party click fraud because the contracts specifically allow it to make such charges.

The UCL prohibits any "unlawful, unfair or fraudulent business practices."  Cal. Bus. & Prof. Code § 17200, *see also Cel-Tech Commc'ns, Inc. v Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).  Because the statute is written in the disjunctive, it applies separately to business practices that are (1) unlawful, (2) unfair, or (3) fraudulent.  *See Pastoria v. Nationwide Ins.*, 112 Cal. App. 4th 1490, 1496 (2003).  *See also Albillo v. Intermodal Container Services,*

---

[3]  Facebook does not appear to challenge Plaintiffs' claim that Facebook's own conduct resulted in invalid clicks for which Plaintiffs were charged, irrespective of whether these clicks would be classified as "improper" or "fraudulent."

6

*Inc.*, 114 Cal. App. 4th 190, 206 (Cal. App. 2d Dist. 2003) (citations omitted) (To state a claim under the UCL, "[a] plaintiff must establish that the practice is either unlawful (*i.e.*, is forbidden by law), unfair (*i.e.*, harm to victim outweighs any benefit) or fraudulent (*i.e.*, is likely to deceive members of the public).").  Plaintiffs concede that they have not stated a claim under the UCL's unlawful prong.  (Pls.' Opp'n at 7 n.5.)  However, they allege that Facebook has violated the UCL's unfair and fraud prongs by:

    a)    Representing that advertisers are billed based on the number of actual and valid clicks, yet charging and collecting . . . payments for all types of invalid clicks, including those referred to as click fraud[;]

    b)    Representing that [it] has adequate measures in place to ensure that it only reports and charges advertisers for valid clicks, when it does not;

    c)    Failing to disclose or adequately disclose that it does not have adequate measure in place to avoid reporting and charging for all types of invalid clicks; and

    d)    Failing to implement adequate measures to protect advertisers against charges for all types of invalid clicks, including those referred to as click fraud.

(SAC ¶ 99.)  Plaintiffs' claim focuses on alleged misrepresentations and omissions made in Facebook's Help Center.  Whether the allegations are framed under the UCL's fraud prong or its unfair prong appears to be unimportant, as the inquiries collapse together.  If the statements in the Help Center are not likely to deceive, they cannot be "fraudulent" under the UCL, nor would they be "unfair," as non-deceptive statements would not appear to cause harm that would outweigh the benefit derived from the statements.  The parties thus focus primarily on the fraud prong.

**A.    Whether the Court's previous rulings preclude the claim**

    Facebook argues that this Court's previous ruling precludes any UCL claim predicated on click fraud.  In that ruling, the Court concluded that "it is difficult to see how Plaintiffs' allegations of 'click fraud' can survive disclaimers that state unambiguously that Facebook will not be liable for 'click fraud.'"  *In re Facebook*, 2010 WL 3341062, at *8.  However, the Court clearly was discussing third-party click fraud in connection with Plaintiffs' *breach of contract claim*, a theory of liability not asserted in the SAC.  Facebook argues that because its

7

representations in the Help Center do not render the disclaimers ambiguous, the representations cannot be fraudulent under the UCL.  However, the inquiries are distinct.  In connection with the breach of contract claim, the issue was whether "the language *of a contract*, in the light of all the circumstances, 'is fairly susceptible of either one of the two interpretations contended for . . .'" *Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.*, 69 Cal. 2d 33, 39-40 (1968) (citation omitted and emphasis added).  Here, while the Court must consider the unambiguous disclaimer as a relevant circumstance, the focus is on whether the language *in the Help Center* was "likely to deceive members of the public."

Facebook also cites the Court's earlier observation that one aspect of Plaintiffs' claim under the UCL's unfair prong "boils down to a dispute over contractual interpretation." *Id.* at *11.  That observation concerned an allegation that nearly was identical to "allegation (d)," referenced above. *Id.*; (SAC ¶ 99).  Plaintiffs framed this specific allegation under the UCL's unfair prong, contending that the harm caused by Facebook's failure to implement adequate measures to protect advertisers against charges for all types of invalid clicks was not outweighed by the benefits.  The Court held that this aspect of the claim rose and fell with Plaintiffs' breach of contract claim because it alleged essentially that Facebook was liable merely for charging Plaintiffs for click fraud.  However, at oral argument, Plaintiffs reframed their claim, contending that Facebook's failure to implement adequate measures to protect against click fraud was "fraudulent" under the UCL.  They argue that while it may have disclaimed liability in the event that click fraud did occur, Facebook nonetheless represented in the Help Center that it would protect Plaintiffs from click fraud and thus is liable for failing to implement that protection.  Under this theory, liability under the UCL, including liability premised on "allegation (d)," is distinct from the breach of contract claim, resting instead on an alleged misrepresentation outside of the contract.

The Court previously dismissed Plaintiffs' claims under the UCL's unfair and fraud prongs because Plaintiffs had not alleged reliance on the representations in the Help Center, as required by *In re Tobacco II Cases*, 46 Cal. 4th 298, 326 (2009).  *Id.*  The previous motions did not address the issue of whether the disclaimers in the contracts that shield Facebook from

8

1   liability for charging for click fraud also shield it from liability for pre-contractual

2   misrepresentations in the Help Center concerning its ability to prevent click fraud.

3   **B.     Whether compliance with the terms of an unambiguous contract precludes UCL**

4   **liability for misrepresentations made prior to the contract's formation**

5          The parties appear to agree that under certain circumstances, unambiguous contract

6   language is insufficient to preclude UCL liability where one of the parties to the contract makes

7   contradictory or misleading representations in order to obfuscate or obscure the actual terms of

8   the contract.  In *In re First Alliance Mortgage Co.*, 471 F.3d 977 (9th Cir. 2006), the plaintiffs

9   alleged that the defendant engaged in fraudulent practices to "induce" them into taking out

10  subprime mortgage loans.  While the annual percentage rate of the loan "was ultimately

11  disclosed," "[l]oan officers were taught to deflect attention away from things that consumers

12  might normally look at[,] and the loan sales presentation was conducted in such a way as to lead

13  a consumer to disregard the high annual percentage rate . . . ."  *Id.* at 985.  The Ninth Circuit

14  found that the "elaborate and detailed sales presentation . . . was unquestionably designed to

15  obfuscate the true principal amount of the loan."  *Id*.  The defendant was found liable for fraud,

16  notwithstanding that the terms of the mortgage eventually were disclosed.  While *In re First*

17  *Alliance* addressed common-law fraud rather than a claim under the UCL's fraud prong, the

18  Court finds it instructive, as it illustrates that certain types of misrepresentations outside of a

19  contract still may create liability even in the face of unambiguous contractual provisions.

20  *Accord*, *Janda v. T-Mobile, USA, Inc*., No. C 05-03729 JSW, 2009 WL 667206, at *6-7 (N.D.

21  Cal. March 13, 2009) (analyzing *In re First Alliance* during a discussion of whether advertising

22  was misleading in the context of Cal. Bus. & Prof. Code § 17500 despite clear contractual

23  disclosures)

24         The California Supreme Court has held that subsequent to its amendment on November

25  2, 2004, the UCL "imposes an actual reliance requirement on plaintiffs prosecuting a private

26  enforcement action under the . . . fraud prong."  *In re Tobacco*, 46 Cal. 4th at 326.  The

27  disclaimer in this case is unambiguous with respect to third-party click fraud, and Plaintiffs must

28  show that they were *reasonable* in relying on the representations in the Help Center even in light

9

of those disclaimers. "[R]eliance is proved by showing that the defendant's misrepresentation or nondisclosure was 'an immediate cause' of the plaintiff's injury-producing conduct. [Citation.] A plaintiff may establish that the defendant's misrepresentation is an 'immediate cause' of the plaintiff's conduct by showing that in its absence the plaintiff 'in all reasonable probability' would not have engaged in the injury-producing conduct." *Id.* (internal quotation marks and citations omitted).

While it was a pre-2004 case, the plaintiffs in *In re First Alliance* reasonably relied on the representations of the loan officers even in the face of clear contractual provisions because the misrepresentations were "unquestionably designed to obfuscate the true principal amount of the loan." 471 F.3d at 985. The issue thus is whether under the circumstances in *this* case, a reasonable jury could find that Plaintiffs were reasonable in relying on the statements in the Help Center notwithstanding an unambiguous disclaimer in the click-through agreement providing that Facebook would not be liable for click-fraud.

Plaintiffs allege that "in all reasonable probability" they would not have entered into contracts that disclaimed liability for third-party click fraud absent Facebook's assurances in the Help Center that they would be protected from such fraud. Facebook represented that it "ha[s] a variety of measures in place to *ensure* that [it] only report[s] and charge[s] advertisers for legitimate clicks, and not clicks that come from automated programs, or clicks that may be repetitive, abusive, or otherwise inauthentic." (SAC Ex. B (emphasis added).) Plaintiffs contend that click fraud necessarily involves clicks that are repetitive, abusive, inauthentic, and generated by an automated program. They argue that the statements in the Help Center thus were likely to cause a reasonable consumer to believe that Facebook employed a filtering system that was adequate to protect them against click fraud, making them more willing to accept the disclaimers.

### 1.   Case law

In *Chern v. Bank of America*, 15 Cal. 3d 866 (1976), the defendant had represented prior to the formation of a contract that the interest rate would be calculated on a "per annum" basis. The California Supreme Court observed that the public likely would assume that a "per annum" rate would be based on a 365-day calendar year. *Id.* at 876. However, under the actual terms of

Case No. 5:09-cv-3043 JF (HRL)
ORDER GRANTING MOTION TO DISMISS SECOND AMENDED COMPLAINT
(JFEX1)

the contract, the rate was calculated on the basis of a 360-day year.  *Id.*  Because the contract

unambiguously provided for the shorter period, the Court affirmed summary judgment against

the plaintiff on a breach of contract claim.  *Id.* at 874-75.  However, it concluded that the bank's

practice still could be viewed as deceptive, noting that the "[d]efendant offer[ed] no sound reason

why it could not quote an accurate annual rate during its initial communication with its

customers, rather than withhold[ing] such information until the customer ha[d] entered its

premises."  *Id.* at 876.  Because *Chern* was decided before *In re Tobacco* and the 2004

amendments to the UCL, Facebook contends that it no longer is good law.

However, in a case decided after *In re Tobacco*, the Ninth Circuit similarly reversed the

dismissal of a claim under the UCL's fraud prong while at the same time affirming the dismissal

of a breach of contract claim.  *Rubio v. Capital One Bank*, 613 F.3d 1195, 1204 (9th Cir. 2010).

In that case, the plaintiff received a solicitation from a credit card company, indicating that the

card had a "fixed" annual percentage rate ("APR") of 6.99%.  The plaintiff responded to the

solicitation and opened a credit card account by consenting to the card holder agreement.  The

card holder agreement permitted the defendant to amend or change the APR unilaterally.  When

the defendant increased the APR, the plaintiff filed suit, alleging *inter alia* that the defendant had

breached the contract and violated both the Truth in Lending Act ("TILA") and the UCL.

The Ninth Circuit concluded that the plaintiff had stated a claim under TILA – which

requires "clear and conspicuous" disclosure of certain terms for credit cards – because "[i]n the

minds of a significant number of consumers, the term 'fixed' means 'unchangeable.'"  *Id.* at

1202.  The court also concluded that the plaintiff had stated a claim under the UCL's unlawful

and unfair prongs.  *Id.* at 1204-05.  At the same time, it affirmed the dismissal of the plaintiff's

breach of contract claim because the agreement itself unambiguously gave the defendant

discretion to increase the APR, and the solicitation – which arguably contained statements to the

contrary – did not constitute an enforceable contract.  *Id.* at 1205.  Finally, the court held that the

plaintiff had stated a claim under the UCL's fraud prong because a reasonable consumer was

likely to be deceived by the solicitation's representation of a "fixed" rate when that rate was

subject to change under the terms of the actual card holder agreement.

11

Facebook argues that *Rubio* is distinguishable because the plaintiff's TILA claim
constituted a separate statutory violation.  However, that violation served as the predicate only
for the plaintiff's claims under the UCL's unlawful and unfair prongs.  *Rubio*'s holding with
respect to the UCL's fraud prong did not depend on the TILA violation, and the court observed
expressly that the UCL's fraud prong and TILA are governed by the same test:  "[a]s in TILA,
this prong of the UCL [the fraud prong] is 'governed by the reasonable consumer test' [, in which
a] plaintiff may demonstrate a violation by 'showing that reasonable members of the public are
likely to be deceived.'" *Id.* at 1204 (quoting *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938
(9th Cir. 2008)) (alternations in the original omitted).

Facebook argues that the instant case is more similar to *Spiegler v. Home Depot U.S.A.,
Inc.*, 552 F. Supp. 2d 1036 (C.D. Cal. 2008), in which the court dismissed a UCL claim in light
of an unambiguous contract.  The plaintiffs in that case contracted with the defendant for the
resurfacing of their kitchen cabinets.  The defendant dispatched a "Sales Professional" to the
plaintiffs' homes to create an estimate for the work.  The defendant also dispatched a
"Measurement Technician" to confirm the measurements of the "Sales Professional" and the
needs of the plaintiffs.  The estimates of the "Sale Professional" tended to be higher than those
based on the measurements of the "Measurement Technicians."  However, the plaintiffs were
charged for the higher estimate and were not informed of the lower estimate.  They claimed that
this practice was fraudulent under the UCL.  *Spiegler* held that the plaintiffs had not stated a
claim because the defendant had charged the plaintiffs the price that was specified by the
contracts to which they had agreed.  Importantly, the "plaintiffs concede[d] that [the] defendants
did not make any representations regarding how they established the price to be charged." *Id.* at
1047.

Facebook also points briefly to a number of other cases.  In *Janda v. T-Mobile, USA, Inc.*,
No. C 05-03729 JSW, 2009 WL 667206 (N.D. Cal. March 13, 2009), the court dismissed both
the plaintiffs' breach of contract claim and their claim under the UCL's fraud prong.  The
plaintiffs alleged that the defendant's advertising, contracts, and billing practices were
misleading and constituted a "bait and switch." *Id.* at *4.  However, the court concluded that the

12

1   defendant had made unambiguous disclosures that were not obfuscated by other representations.

2   In *Daugherty v. American Honda Motor Co., Inc.*, 144 Cal. App. 4th 824, 838 (Cal. App. 2d

3   Dist. 2006), the court "[could not] agree that a failure to disclose a fact one has no affirmative

4   duty to disclose is 'likely to deceive' anyone within the meaning of the UCL."  Finally, Facebook

5   reminds the Court of the general rule that the UCL's fraud prong "does not give the courts a

6   general license to review the fairness of contracts."  *Samura v. Kaiser Foundation Health Plan,*

7   *Inc.*, 17 Cal. App. 4th 1284, 1299 n.6 (Cal. App. 1st Dist. 1993).

8           **2.      Whether Plaintiffs' reliance was reasonable**

9           As discussed above, Facebook represented in the Help Center that it "ha[s] a variety of

10  measures in place to ensure that [it] only report[s] and charge[s] advertisers for legitimate clicks,

11  and not clicks that come from automated programs, or clicks that may be repetitive, abusive, or

12  otherwise inauthentic."  (SAC Ex. B.)  Plaintiffs contend that members of the public reasonably

13  could interpret this statement to mean that Facebook employs some means of "pre-filtering or

14  filtering software . . . used throughout the industry to limit, and in many cases eliminate, the

15  charges for both invalid clicks and . . . fraudulent clicks."  (SAC ¶ 44.)

16          To the extent that Plaintiffs allege that Facebook is subject to UCL liability merely

17  because its filtering system is insufficient or ineffective, such allegations fail to state a claim.  It

18  is true that Facebook represented that it would "ensure" against charges for a variety of clicks,

19  and "ensure" can be defined as "[t]o make certain . . . the attainment of (a result)."  Oxford

20  English Dictionary (2d ed 1989).  Arguably, Facebook could have avoided any degree of

21  uncertainty by avoiding the word "ensure," representing instead that it would "defend against,"

22  "protect from," or "make every effort to prevent" fraudulent clicks.  However, given Plaintiffs'

23  own explicit allegation that no existing filtering system is capable of detecting all fraudulent

24  clicks, (SAC ¶ 44), a reasonable member of the public could not view Facebook's representation

25  as a guarantee that its filtering system always will be effective.

26          To the extent that Plaintiffs could allege that Facebook failed to employ *any* "filtering"

27  system to protect against click fraud or *knew* but did not disclose that its system was subject to

28  regular and frequent failure in excess of flaws inherent in such systems, they might state a claim.

13

1   Although Plaintiffs do not contend that the statements in the Help Center obfuscated the terms of

2   the contract, the statements obviously represent to the public that Facebook employs a system

3   that at least attempts to minimize the risk of click fraud.  Under these circumstances, Facebook

4   could be liable for misrepresentation, notwithstanding the contractual disclaimers.

5          With respect to defects in Facebook's filtering system, RootZoo alleges that it was

6   charged for "clicks from small towns . . . that are not indicative of the population and that would

7   almost be statistically impossible given RootZoo's prior tracking history with Facebook

8   advertisements."  (SAC ¶ 62.)  RootZoo informed Facebook of the discrepancy, but Facebook

9   denied that it had charged for invalid clicks.  (*Id.* at ¶ 64.)  Price alleges that he used two separate

10  tracking programs, Google Analytics and Statcounter.com, to discover that sixty-six percent of

11  the clicks for which he was charged consistently were "invalid clicks that had never even

12  occurred."  (*Id.* at ¶¶ 71, 73.)  He informed Facebook of the discrepancy, and while Facebook

13  did offer a refund, it "[did] not even come close to compensating Price for the monies that he has

14  been wrongfully charged . . . ."  (*Id.* at ¶ 75.)  Fox used Google Analytics to monitor its traffic

15  and discovered that approximately eleven percent of the clicks for which Facebook charged

16  involved visitors that spent an average time of one second on "the website."  (*Id.* at ¶ 77.)

17  Facebook again failed to provide adequate refunds.  (*Id.* at ¶ 79.)

18         While the allegations in the SAC may be sufficient at the pleading stage to support a

19  claim that Facebook's filtering system suffers from serious defects, Plaintiffs' current allegations,

20  even viewed in the light most favorable to them, are insufficient to support a reasonable

21  inference that Facebook *knew* of the problems at the time that it made its representations in the

22  Help Center with respect to the filtering systems.  Price and Fox alerted Facebook of their

23  concerns only after they had entered into their respective contracts.  Plaintiffs allege that

24  Facebook acknowledged the click-fraud issue after a series of complaints was aired on

25  WickedFire.com, (SAC ¶¶ 47, 51), but that alleged acknowledgment occurred on June 21, 2009,

26  again after each of the Plaintiffs had entered into their respective contract.  While RootZoo

27  alleges that in June 2008, it informed Facebook of a "material discrepancy" and an "almost . . .

28  statistically impossible" number clicks from small towns, (SAC ¶¶ 57-58), allegations that

14

1  Facebook knew but did not disclose serious flaws in its system are allegations that sound in

2  fraud.  Accordingly, the claims must be plead with particularity, *Ciba-Geigy*, 317 F.3d at

3  1103-04, and RootZoo does not provide more than conclusory allegations with respect to the

4  materiality of the discrepancy or the "almost" impossibility of the number of clicks.

5  **V.  DISPOSITION**

6  The motion will be granted with respect to a claim under the UCL's fraud prong based on

7  allegations that Facebook employs an insufficient click-filtering system.  Leave to amend is

8  granted in a manner consistent with the foregoing discussion.  Any amended complaint shall be

9  filed within thirty (30) days of the date of this order.

10  IT IS SO ORDERED.

11

12  DATED:  12/15/10                                        _____

13                                                         JEREMY FOGEL
                                                           United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 5:09-cv-3043 JF (HRL)
ORDER GRANTING MOTION TO DISMISS SECOND AMENDED COMPLAINT
(JFEX1)