Jonathan Shub (SBN 237708)
jshub@seegerweiss.com
**SEEGER WEISS**
1515 Market Street, Suite 1380
Philadelphia, PA 19102
Telephone: (215) 564-2300
Facsimile: (215) 851-8029

Rosemary M. Rivas (SBN 209147)
rrivas@finkelsteinthompson.com
**FINKELSTEIN THOMPSON LLP**
100 Bush Street, Suite 1450
San Francisco, California 94104
Telephone: (415) 398-8700
Facsimile: (415) 398-8704

*Interim Co-Lead Class Counsel*

J. Paul Gignac (SBN 125676)
j.paul@aogllp.com
**ARIAS OZZELLO & GIGNAC LLP**
115 S. La Cumbre Lane, Suite 300
Santa Barbara, California 93105
Telephone: (805) 683-7400
Facsimile:  (805) 683-7401

*Interim Liaison Class Counsel*

[Additional Counsel listed in Signature Block]

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE FACEBOOK PPC ADVERTISING LITIGATION | Master File Case No. 5:09-cv-03043 JF |
| | **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| | **REDACTED VERSION** |
| **This Document Relates To:**<br>    **All Actions** | Date:      TBD<br>Time:      TBD<br>Judge:     Honorable Jeremy Fogel<br>Courtroom: 3, 5th Floor |

# TABLE OF CONTENTS

Page

I.   SUMMARY OF ARGUMENT ....................................................................... 1

II.  FACTUAL CONTEXT AND COMMON EVIDENCE ............................................. 3

A.  The Pay-Per-Click Model and Determining Click Validity. ................................. 4

B.  Facebook Uniformly Promises Advertisers That They Will Be Charged Only for Legitimate Clicks, and Then Breaks That Promise. .......................................... 5

C.  Facebook's Click Filtering System Does Not Comply With Industry Standards Endorsed by Facebook Itself. ............................................................................... 11

   1.  IAB Standards Emphasize Legitimacy and Transparency. ......................... 11

   2.  Facebook Violates the IAB Standards. .................................................... 12

      a.  Facebook does not adhere to IAB standards for counting valid clicks. ........ 12

      b.  Facebook does not utilize industry lists of known Bots & Spiders. ............. 13

      c.  Facebook knowingly billed advertisers for clicks that violated its own rules. ............................................................................................. 13

   3.  Facebook Does not Permit Third-Party Audits to Certify Filter Validity. ............. 13

   4.  Facebook Does Not Publish a Description of Methodology. ...................... 15

   5.  Facebook Concedes Internally That Its Systems Are Not IAB-Compliant. ........... 16

D.  Facebook Maintains Detailed Click Data That Can Be Analyzed Retroactively. .............. 16

E.  A Plausible Method Exists for Determining Liability and Damages on a Classwide Basis Using Facebook's Click Data. ......................................................................... 17

F.  The Named Plaintiffs' Experiences Exemplify Facebook's Liability and Damages. ....... 18

   1.  Fox Test Prep .................................................................................... 18

   2.  Steven Price ...................................................................................... 18

III. LEGAL ARGUMENT ............................................................................... 19

A.  Governing Law ..................................................................................... 19

B.  Plaintiffs' Proposed Class Definition ......................................................... 21

C.  The Proposed Class Action Satisfies The Requirements of Rule 23(a). ..................... 21

   1.  The Class Is So Numerous that Joinder of All Members Is Impracticable. ........... 21

i

2.   The Case Involves Questions of Law and Fact Common to the Class.................. 22

3.   The Claims of the Named Plaintiffs Are Typical of the Claims of the Class. ....... 23

4.   Plaintiffs Will Fairly and Adequately Protect the Interests of the Class............... 24

D.   The Proposed Class Satisfies the Rule 23(b)(3) Predominance Requirement................... 24

1.   Common Questions Predominate for Plaintiffs' Breach of Contract Claim. ......... 25

2.   Common Questions Predominate for Plaintiffs' UCL Claim of Unfair Business
     Practices. ........................................................................................... 26

3.   Plaintiffs Have Presented a Plausible Method of Proving Classwide Liability and
     Damages.............................................................................................. 28

E.   A Class Action Is Superior to Other Available Methods for the Fair and Efficient
     Adjudication of This Case. ............................................................................ 29

IV.   CONCLUSION ................................................................................................ 30

ii

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Aho v. AmeriCredit Fin. Servs., Inc.,*
  2011 WL 3047677 (S.D. Cal. July 25, 2011) ..................................................... 22

*Arnold v. United Artists Theatre Circuit, Inc.,*
  158 F.R.D. 439 (N.D. Cal. 1994)....................................................................... 21

*Behrend v. Comcast Corp.,*
  2011 WL 3678805 (3rd Cir. Aug. 23, 2011)......... ...................................... ...........20, 28

*Brazil v. Dell Inc.,*
  2010 WL 5387831 (N.D. Cal. Dec. 21, 2010)..................................................... 28

*Camacho v. Automobile Club of Southern California,*
  142 Cal. App. 4th 1394 (2006) ......................................................................... 26

*Chavez v. Blue Sky Natural Beverage Co.,*
  268 F.R.D. 365 (N.D. Cal. 2010)............................................................ 24, 26, 28

*Cummings v. Connell,*
  316 F.3d 886 (9th Cir. 2003) ........................................................................... 23

*Davis v. Ford Motor Credit Co.,*
  179 Cal. App. 4th 581 (2009) ........................................................................... 26

*Ewert v. eBay,*
  2010 WL 4269259 (N.D. Cal. Oct. 25, 2010)........................................21, 22, 23, 29

*Gentry v. Superior Court,*
  42 Cal. 4th 443 (2007) ..................................................................................... 29

*Gonzales v. Arrow Fin. Servs., LLC,*
  489 F.Supp.2d 1140 (S.D. Cal. 2007).............................................................. 19

*Hanlon v. Chrysler Corp.,*
  150 F.3d 1011 (9th Cir. 1998) .................................................................. 22, 23, 24

*Hanon v. Dataproducts Corp.,*
  976 F.2d 497 (9th Cir. 1992)............................................................................ 22

*In re Aftermarket Auto. Lighting Prod. Antitrust Litig.,*
  2011 WL 3204588 (C.D. Cal. 2011).................................................................. 20

i

*In re Amaranth Natural Gas Commodities Litig.*,
   269 F.R.D. 366 (S.D.N.Y. 2010) ................................................................... 20

*In re Citigroup Pension Plan Erisa Litig.*,
   241 F.R.D. 172 (S.D.N.Y. 2006) ................................................................... 20

*In re Hydrogen Peroxide Antitrust Litig.*,
   552 F.3d 305 (3rd Cir 2008) ................................................................... 20, 25

*In re Infineon Techs. AG Sec. Litig.*,
   256 F.R.D. 386 (N.D. Cal. 2009) ................................................................... 22

*In re Online DVD Rental Litig.*,
   2010 WL 5396064 (N.D. Cal. Dec. 23, 2010) ........................................... 22, 23

*In re Rubber Chem. Antitrust Litig.*,
   232 F.R.D. 346, 350-51 (N.D. Cal. 2005 ..................................................... 21

*In re Tableware Antitrust Litig.*,
   241 F.R.D. 644 (N.D. Cal. 2007) ................................................................... 19

*In re Tobacco II Cases*,
   46 Cal. 4th 298, 320 (2009) ......................................................................... 27

*In re Vioxx Class Cases*,
   180 Cal. App. 4th 116 (2009) ....................................................................... 27

*Lerwill v. Inflight Motion Pictures*,
   582 F.2d 507 (9th Cir. 1978) ......................................................................... 23

*Lozano v. AT&T Wireless Servs., Inc.*,
   504 F.3d 718 (9th Cir. 2007) ......................................................................... 26

*Mazur v. eBay, Inc.*,
   275 F.R.D. 563 (N.D. Cal. 2009) ................................................................... 20

*Menagerie Prods. v. Citysearch*,
   2009 WL 3770668 (C.D. Cal. Nov. 9, 2009) ......................................... passim

*Miletak v. Allstate Ins. Co.*,
   2010 WL 809579 (N.D. Cal. Mar. 5, 2010) .............................................. 23, 29

*Moore v. Hughes Helicopters, Inc.*,
   708 F.2d 475 (9th Cir.1983) ......................................................................... 19

*Nedlloyd Lines B.V. v. Superior Court*,
   3 Cal.4th 459 (1992) ..................................................................................... 25

TABLE OF AUTHORITIES
CASE NO. 5:09-CV-03043 JF

*Negrete v. Allianz Life Ins. Co.,*
   238 F.R.D. 482 (C.D. Cal. 2006)...................................................................24, 25

*O'Connor v. Boeing N. Am., Inc.,*
   184 F.R.D. 311 (C.D. Cal. 1998)..........................................................................20

*Plascencia v. Lending 1st Mortg.,*
   259 F.R.D. 437 (N.D. Cal. 2009)...........................................................................25

*Sanders v. Faraday Lab. Inc.,*
   82 F.R.D. 99 (E.D.N.Y. 1979)...............................................................................20

*Simpson v. Fireman's Fund Ins. Co.,*
   231 F.R.D. 391 (N.D. Cal. 2005)...........................................................................23

*Sterns v. Ticketmaster Corp.,*
   2011 WL 3659354 (9th Cir. Aug. 22, 2010)...........................................19, 26, 27

*TMX Funding, Inc. v. Impero Techs., Inc.,*
   2010 WL 2509979 (N.D. Cal. June 17, 2010)........................................................25

*Wal-Mart v. Dukes,*
   131 S. Ct. 2541 (2011).......................................................................19, 20, 21

*Wolf v. Superior Court,*
   114 Cal. App. 4th 1343 (Cal. App. 2d Dist. 2004) ..................................................6

*Wolph v. Acer America, Inc.,*
   272 F.R.D. 477 (N.D. Cal. 2011)......................................................................24, 25

*Yamada v. Nobel Biocare Holdings AG,*
   2011 WL 3634197 (C.D. Cal. Aug. 12, 2011)........................................................26

**Statutes**

Cal. Bus. & Prof. Code § 17200..............................................................................2, 26
Cal. Bus. & Prof. Code § 17204................................................................................27

**Rules**

Fed. R. Civ. P. 23......................................................................................................19
Fed. R. Civ. P. 23(a)..................................................................................................19
Fed. R. Civ. 23(a)(4).................................................................................................23
Fed. R. Civ. P. 23(b)..................................................................................................19
Fed. R. Civ. P. 23(b)(3)........................................................................................24, 29

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS' OF RECORD:

PLEASE TAKE NOTICE THAT on [TBD] at [TBD], in the courtroom of the Honorable [TBD], located at 280 South 1st Street, San Jose, California, 95113, Plaintiffs Fox Test Prep and Steven Price shall, and hereby do, move the Court pursuant to Rule 23 of the Federal Rules of Civil Procedure, for an order granting certification of the following Class:

*All persons and/or entities in the United States who paid money to Facebook, Inc. for cost-per-click advertising during the period of May 2009 to the present.*

Plaintiffs' motion is based on this Notice of Motion and Motion; the following Memorandum of Points and Authorities; the accompanying Declaration of Jonathan Shub in Support of Plaintiffs' Motion for Class Certification and the evidence attached thereto; the accompanying Declaration of Rosemary M. Rivas in Support of Plaintiffs' Motion for Class Certification and the evidence attached thereto; all other pleadings and papers filed in this action; and such other matters as may be presented to the Court before or at the time of the hearing.

## STATEMENT OF ISSUES TO BE DECIDED

Pursuant to Local Rule 7-4(a)(3), Plaintiffs Fox Test Prep and Steven Price set forth the following Statement of Issues to be Decided:

1. Whether class certification should be granted because Plaintiffs have carried their burden showing numerosity, commonality, typicality, adequacy, predominance and superiority as required by Fed. R. Civ. P. 23(a) and (b)(3).

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   SUMMARY OF ARGUMENT

In just a handful of years, Defendant Facebook, Inc. ("Facebook" or "Defendant") has changed the way people communicate and has become a worldwide juggernaut with over 750 million online users and a market value reported to exceed $100 billion.  But those millions of users do not pay the bills.  Instead, Facebook makes money from a growing number of online advertisers who buy advertising space on the social networking site.  This lawsuit challenges Facebook's unlawful and largely unseen treatment of such advertisers.

One of the most popular Internet advertising models or pricing structures is "Pay-per-Click" ("PPC") advertising, in which advertisers are charged a specific amount by the website owner (the "publisher" or "PPC seller") each time a user "clicks" on an advertisement.  It is well-accepted in the PPC advertising industry that not every click by a user is an intention to view an advertisement. Many clicks can be "navigational errors," automated programs, inadvertent repetition, intentional abuse, or otherwise not the product of a user's intention to view the advertiser's product or services.  Thus, advertisers only agree to pay for, and publishers only agree to charge for, "legitimate clicks."

Facebook's uniform advertising contract follows the industry practice and promises that its PPC advertisers will be charged for only "**legitimate** clicks, and not clicks that come from automated programs, or clicks that may be repetitive, abusive, or otherwise inauthentic." (emphasis added.)  How such clicks are measured is not expressly defined in the advertising contract; however, the very notion of "legitimacy" demands that the ordinary meaning be supplied by reference to accepted industry measurement rules and third-party auditing.

Plaintiffs allege that Facebook systematically and uniformly exacts unlawful payments from its advertisers—many of them small businesses for whom every dollar counts—by charging for clicks for that are illegitimate.  Facebook's actions constitute both an express breach of contract and a violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq*.  In prosecuting these claims, Plaintiffs now move to certify a class of thousands of Facebook PPC advertisers from May 2009 to the present.

In the PPC advertising industry the "click" is the currency of commerce. Advertisers want to be assured they are paying for intentional visits to their sites by Internet users. Internet publishers need to keep their click determination rules secret so that hackers will not discover the means to circumvent them. To achieve this balance between the reasonable, and reciprocal needs for transparency and opacity, the Internet advertising industry, through the Internet Advertising Bureau ("IAB"), has promulgated industry standards[1] to establish an objective protocol in which to determine the legitimacy of a publisher's rules and methods for determining legitimate click measurements. The IAB standards, embraced by industry leaders such as Microsoft, Yahoo!, and Google, are the only click measurements standards generally accepted in the Internet advertising community and provide advertisers with assurance that the PPC system is not "rigged" against them by publishers seeking to pump up revenue.

In spite of contracting with its advertising customers to report and charge advertisers only for "legitimate clicks," Facebook has largely eschewed industry standards. Although an IAB member since at least 2008 and currently on its Board of Directors, ████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████ The consequence of this refusal is that Facebook cannot state, let alone "ensure," that any of the clicks it charges customers for are in fact "legitimate," which is the very promise at the heart of Facebook's contractual obligation to its customers.

In this lawsuit, Plaintiffs will be able to prove at trial, on a classwide basis and via common evidence: (1) that Facebook has systematically and deliberately failed, over a period of years, to abide by its contractual promises to charge advertisers for only "legitimate" clicks and to implement click filtering systems that would achieve that result; and (2) that this undisclosed failure has caused substantial, unavoidable injury in a uniform manner to PPC advertisers. For the purpose of the instant motion, Plaintiffs are not required to prove these assertions, but must merely satisfy the requirements for class certification under Rule 23 of the Federal Rules of Civil Procedure—including the need to

---

[1] *See* accompanying Declaration of Rosemary M. Rivas ("Rivas Decl."), Exh. A (Interactive Advertising Bureau, *Click Measurement Guidelines, Version 1.0—Final Release* (May 12, 2009)).

demonstrate that common evidence and a plausible theory of liability and damages exist to prove their claims at trial on a classwide basis.

Plaintiffs have conducted a vigorous discovery program, including numerous depositions of industry stakeholders, aimed at meeting the class certification requirements.  While significant document and deposition discovery remains to be completed, the record thus far reveals that Facebook knowingly failed to develop the practices and procedures necessary to adhere to reasonable standards with respect to click legitimacy and measurement—standards developed to protect advertisers from precisely the type of material overbilling being challenged in this case.

Common evidence reveals that Facebook's ██████████████████████████████ ████████████████████████████████ mandate to ensure the reporting and charging of only "legitimate" clicks. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

As demonstrated below, plausible expert evidence shows that classwide liability and damages can be proven using Facebook's own ███████████ without the need for individualized proof. Accordingly, class certification is appropriate.

## II.   FACTUAL CONTEXT AND COMMON EVIDENCE

Facebook, headquartered in Palo Alto, California, owns the popular, free-access social networking website at www.facebook.com.  The most popular social networking site on the Internet, Facebook reportedly generated approximately $2 billion in advertising revenue in 2010 from thousands of advertisers like Plaintiffs.[2]  See accompanying Declaration of Jonathan Shub ("Shub Decl."), Exh. 1[3]

---

[2] See Linda Horn, "How Facebook Earned $1.86 Billion Ad Revenue in 2010," PCMag.com, Jan. 18, 2011 (available at http://www.pcmag.com/article2/0,2817,2375926,00.asp).

[3] All citations to numbered exhibits are to the Shub Declaration and all citations to lettered exhibits are to the Rivas Declaration, unless otherwise stated.

3

at FBCPC177317. Facebook allows users to create "profiles" about themselves which can include user-uploaded photos, videos, location data, demographic information (including educational and work information), lists of personal interests and other user-supplied information. Advertisers are able to utilize this user-supplied personal information to create targeted advertisements aimed at matching their goods or services with the information or interests the Facebook user provides in their profile. The advertisements are then placed on the right side of the pages of the Facebook website and displayed to users while they are "logged in."

A.     **The Pay-Per-Click Model and Determining Click Validity.**

Facebook gives advertisers two principal options for advertising on its website: (1) the pay-per-click ("PPC") model, or (2) a cost-per-thousand impressions ("CPM") model. The PPC model allows an advertiser to specify a certain amount that it is willing to pay each time a Facebook user clicks on an advertisement. The CPM option allows an advertiser to specify how much it is willing to pay for views of its advertisement.

The market for attracting PPC advertising is highly competitive, dominated by a few leading sellers. Exh. 2 at ¶ 12. Facebook's main competitors include Google, Yahoo!, and Microsoft. *See id; see also* Exh. 3 at FBCPC28884. Within the industry, it is accepted that not every "click" on an advertisement is one for which an advertiser should be billed. The industry recognizes that only those clicks that come from visitors intending to view an advertisement should be considered "billable" clicks. Exh. 2 at ¶ 13. Thus, clicks that result, for example, from repetitive clicking, inadvertence, or as the result of automated programs or bugs in the publisher's system should not be billed to advertisers. These clicks are referred to as "illegitimate" or "invalid" clicks. *Id.*[4]

Publishers conceive and implement algorithmic-based "rules" that determine whether a given click on an advertisement is "legitimate" (or "valid" as those terms are synonymous). Exh. 4 at ¶¶ 9-12 (Expert Report of Markus Jakobsson, PhD.). These algorithmic rules, known in the industry as click "filters," screen for objective characteristics of a click that demonstrate whether a click was the result of

---

[4] The Court previously dismissed Plaintiffs' claim involving a discreet subset of invalid clicks referred to in the industry as "click fraud." Plaintiffs' claims for overcharges do not implicate this subset.

a website visitor intending to view an advertisement. *Id.* at ¶ 22. Thus, if a click violates a rule because of certain characteristics—for example, it was made in rapid succession or it is generated from an ISP address known to be used by "spammers"—the click is categorized by the algorithm as invalid and not billed to the advertiser. *Id.* at ¶ 19. ████████████████████████████████

████████████████████████ Exh. 5 at 194:3-12.[5]

However, as Plaintiffs demonstrate below, Facebook's PPC processes during the class period have been inconsistent with both Facebook's promises to advertisers and reasonable industry standards.

**B.**   **Facebook Uniformly Promises Advertisers That They Will Be Charged Only for Legitimate Clicks, and Then Breaks That Promise.**

Placing an advertisement on Facebook entails a series of basic online steps, required of all advertisers, that are conducted on the site using Facebook software—*e.g.*, designing the ad, selecting the target demographic, scheduling the ad run, choosing a pricing structure, submitting the order. At some

---

[5] In 2007, when Facebook launched its PPC program, ████████████████ Facebook refers to these ████████████████████████████████ Ex. 16. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Exh. 6 at 215:5-7. ████ FBCPC68.████

[6] Facebook's online advertising materials refer to pay-per-click pricing as "cost-per-click" and thus use the abbreviation CPC instead of PPC. The terms are synonymous.

point in this process, all advertisers must select either a "Pay for Impressions (CPM)" or "Pay per Click (CPC)" pricing model on the web page titled "Campaigns and Pricing."[6] Exh. D. At the end of the process, prior to submitting the order, all advertisers must first agree to a "click-through" agreement. It is impossible to place advertisements on the Facebook site without first clicking on the "Place Order" button on that agreement. Exh. E at ¶¶ 2-3; Exh. F at ¶ 5 & exh. 4 thereto. The "click-through" agreement incorporates other documents and writings on Facebook's website, including the "Advertising Guidelines" and "other applicable Facebook policies." *Id.* While online versions of these documents are occasionally updated by Facebook, both the "T&C" and the Advertising Guidelines have been uniform in all material respects throughout the proposed class period and apply to all advertisers. Exh. B; Exh. 7; Exh. 8 at 29:18-25.

The Glossary of Ad Terms—available on Facebook's Help Center throughout the class period and incorporated into the uniform contract—includes a definition of "Clicks" in the advertising context:

> Clicks are counted each time a user clicks through your ad to your landing page.

> We have a variety of measures in place to **ensure** that we only report and charge advertisers for **legitimate clicks**, and not clicks that come from automated programs, or clicks that may be repetitive, abusive, or otherwise inauthentic. Due to the proprietary nature of our technology, we're not able to give you more specific information about these systems.

Exh. G (emphasis added). Facebook uses the term "legitimate" synonymously with "valid." Exh. 5 at 306:9-15.[7]

Based on the above language, Facebook made two distinct but related contractual promises to advertisers during the class period: (1) that it would charge advertisers only for "legitimate" clicks; and (2) that it has systems in place to "ensure" that it could deliver on that promise. While the Facebook

---

[7] Plaintiffs' position is that the Help Center promises are part of the uniform written agreement between Facebook and its CPC advertising customers; at a minimum, they are extrinsic evidence that reveals the intended meaning of the term "click" in Facebook's agreement. *See Wolf v. Superior Court*, 114 Cal. App. 4th 1343, 1351 (Cal. App. 2d Dist. 2004) ("Where the meaning of the words used in a contract is disputed, the trial court must provisionally receive any proffered extrinsic evidence which is relevant to show whether the contract is reasonably susceptible of a particular meaning.").

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 5:09-CV-03043 JF

contract does not expressly define the term "legitimate," according to the Merriam-Webster Dictionary, the term means "conforming to recognized principles or accepted rules or standards." *See* http://merriam-webster.com/dictionary/legitimate. Thus, a click cannot be "legitimate" without some semblance of external validation or conformance to recognized standards. As the following sections show, Facebook has not kept its contractual promises to charge PPC advertisers only for "legitimate" clicks and to maintain measures to "ensure" illegitimate clicks are not billed.

PPC sellers like Facebook keep the intimate details of their algorithmic filter rules from public disclosure because such disclosure would potentially allow individuals to game the system and attempt to obtain free clicks or otherwise corrupt proper measurement. Exh. 10 at pp. 8-9 (Expert Report of Bernard J. Jansen). Accordingly, Facebook informs advertisers that, apart from its promise to maintain systems to ensure that advertisers will be charged only for legitimate clicks, it cannot disclose any details about those systems: "[d]ue to the proprietary nature of our technology, we're not able to give you more specific information about these [filtering] systems [that determine legitimate clicks]." Exh. G at p. 5.[8] Thus, Facebook requires that advertisers repose complete trust in it to fairly and objectively determine which clicks are legitimate and billable to advertisers.

Understanding the competing needs of publishers for confidentiality in their filtering processes and the desire of PPC advertisers for transparency, the PPC industry has developed an expectation that a

---

[8] Facebook refuses to provide any details to advertisers when there is a dispute between Facebook and the advertisers over charges for clicks including even data about an advertiser's own clicks. *See, e.g.,* Exh. 11.

Exh. 12 at FBCPC183076

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 5:09-CV-03043 JF

third-party audit will provide the checks and balances on a publisher's discretion to determine measurement metrics. Exh. 10 at p. 15. ████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████ Exh. 10 at p. 9.  In other words, there is a requirement in the PPC industry that publishers will not bias filters in a way that exploits the secrecy of the process to the detriment of advertisers. *Id.* One such obvious bias would be to design algorithms that are designed to maximize revenue.

████████████████████████████████████████████████████████████████████████████
13 at 76:1-5), ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
███████████████████████████ Exh. 14; Exh. 9 at 95:20-96:8. (emphasis added.)
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████ Exh. 9 at 235:1-6; Exh. 13 at 76:9-77:14.
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████ Exh. 9 at 235:6-8, 235:19-22 (emphasis added). ██████████████
████████████████████████████████████████████ Exh. 13 at 192:22-24. ███████████
████████████████████████████████████████████████████████████████████████████

---

[9] A black box, in engineering terms, is a system or component that is viewed solely in terms of its inputs and outputs. There is no (or little) knowledge of its internal workings. Exh. 10 at footnote 2.

1 ████████. *Id.* at 215:19-21 ████████████████████████████████

2 ██████████████; *see also* Exh. 19.

3     The process Facebook undertook in modifying the "duplicate click" filter is illustrative of the

4 revenue-driven bias in its PPC platform. ███████████████████████

5 ████████████████████████████████████████████████████

6 █████████████████Exhs. 15-17. ██████████████████████████

7 ████████████████████████████████████████████████████

8 ████████████████████████████████████████████████████

9 ████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████

11 ████████████████████████████████ (Exh. 18), █████████████

12 ████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████

16 ████████ Exh. 19 █████████████████████████████████████

17 ████████████████████████████████████████████████████

18 ████████████████████████████████████████████████████

19 █████████████████████████████████████████ Exh. 16.

20 █████████████████████████████████████████████████

21 ████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████

23 ████████████████████████████████████████████████████

24 ████████████████████████████████████████████████████

25 ███████████████████ Exhs. 23-24.

26 ████████

27 _____

28 ████████████████████████████████████████████████████

Plaintiffs' expert, Dr. Jansen, 

Exh. 10 at p. 18.

*Id.* at p. 22.

Dr. Jansen's opinion relies in part on the report and opinion of a leading PPC expert who was tasked with analyzing and reporting on Google's click filtering processes.  In 2009, Dr. Alexander Tuzhilin, a professor of computer science at New York University, concluded that Google's PPC system was reasonably and fairly deployed *because* there was a wall of separation between engineering and revenue decisions:

> I have spent a significant amount of time trying to understand who [at Google] sets these [click legitimacy] threshold parameters, how, and what are the procedures and processes for setting them.
> *****
> In particular, I tried to understand if it is an *entirely* engineering decision that tries to protect the advertisers from invalid clicks or any of the business groups at Google are involved in this decision process with the purpose of influencing it towards generating extra revenues for Google.
>
> In conclusion, …, I found Google's processes for specifying filters and setting parameters in these filters *driven exclusively by the consideration to protect the advertiser base*, and, therefore, being reasonable.

Exh. 10 at pp. 17-18 (quoting Exh. 25 at FBCPC26177-78 (*The Lane's Gift v. Google Report*)) (emphasis added).  Google's approach reflects what is expected in the industry and considered best engineering practices. When Google's Chinese Wall policy is contrasted with Facebook's bias in its click filter processes, it becomes clear that Facebook was exploiting advertisers in breach of its contractual obligations.

10

**C.** ███████████████████████████████████

Since the early days of Internet advertising in the 1990s, there has been a natural tension between advertisers and PPC providers regarding how billable clicks should be measured. Exh. 2 at ¶ 18. Advertisers were inherently suspicious that PPC sellers were taking advantage of the lack of oversight and creating lax algorithmic rules for determining what constitutes a legitimate click in order to increase revenue. Exh. 2 at ¶ 18; Exh. 26 at 22:12-17. To legitimize the lucrative PPC model, PPC sellers turned to the IAB, its industry trade association, to promulgate and adopt PPC industry standards that would establish transparency and accountability. Exh. 26 at 22:18-24. The IAB is the self-regulatory governing body for publishers and advertising, representing their interests and the interests of other stakeholders in the online advertising community. It is comprised of more than 500 leading media and technology companies who are responsible for selling 86% of online advertising in the United States. Facebook is currently on the Board of Directors of the IAB and has been a member since at least 2008. *Id.* at 29:14-17; Exh. N.

### 1.    IAB Standards Emphasize Legitimacy and Transparency.

The IAB, working with another audience measurement organization called the Media Rating Council (the "MRC"), assembled a working group of some of the larger publishers and other stakeholders to develop a protocol for standardizing click legitimacy and an audit process that would serve as a check on a publisher's click measurement processes. ███████████████████████ ███████████████████████ Exh. 26 at 43:15-19. ██████████ ███████████████████████████████████████████████████████████ ██████████████████████ at 28:10-11; 62:19-22; 63:5-7. The purpose of the IAB standards (or "guidelines," as the terms are used interchangeably in the industry) is to provide transparency in the PPC industry by standardizing the process for counting billable clicks and providing a third-party validation (*i.e.*, external validation) of the publisher's counting processes, while at the same time preserving the confidentiality of the discrete rules based operational algorithms from competitors.

11

mal-intentioned hackers, and reverse engineering. They are meant "to establish the *minimum acceptable counting procedures* for the media buying currency 'clicks.'"[11] .

███████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

█████   Exh. 6 at 242:19-24   ███████████████   Exh. 9 at 14:19-20 ███

███████████████████████████

### a.   Facebook does not adhere to IAB standards for counting valid clicks.

The IAB provides parameters for counting billable clicks. Section three of the IAB standards specifically provides that a click should be considered legitimate, if among other things, "the time between the Click and the previous Click on the ad impression (ad creative) or search-result content is greater than an amount called the repeat-click-refractory-period..." Exh. A at § 3. "The purpose of this rule is to prevent navigational mistakes (for example, unintended multiple clicking by the user) from causing inappropriate counting." *Id*. In addition, the time between the ad impression and the click must be less than the amount called the impression-staleness-window. *Id*.

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████

---

[11] *See* http://www.iab.net/clickmeasurementguidelines.



The IAB standards require that publishers implement algorithms that will discard clicks that originate from known robots ("bots") and spiders. These are automated click programs disguised to mimic Internet users █████████████████████████████████████████████████████████████████████

Exh. 27

c. ████████████████████████████████████████████████

3. ████████████████████████████████████

Outside third-party audits are at the heart of the IAB's standards.  Respecting that the intimate details of a publisher's click filtering system cannot be disclosed publicly, the IAB standards recognize that the *only* check on the legitimacy of PPC click measurement processes is an audit by an independent third party.  Exh. 10 at pp. 15-16.  Without it, the publisher acts as both judge and jury regarding which clicks should be billed to advertisers.  It is because of a publisher's obvious and palpable conflict of interest that the IAB stresses that "the process of auditing and certification is *critical* to ensuring

13

consistency and trust in a medium."[12] Exh. 10 at p. 15. The IAB standards urge publishers to submit to independent audits[13] to certify that their click filtering systems meet the IAB click measurement standards. Exh. A at § 7. "[A]ll Filtration Procedures, including 'Other Internal Quality Guidelines and Click Fraud Identification Procedures,' must be subject to audit for reasonableness and completeness as part of measurement certification." *Id.* at § 7.1.3. ███████████████████████████

████████████████████████████████████████████████ Exh. 26 at

59:4-10; Exh. 29 at 94:12-17.

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[12] *See* http://www.iab.net/clickmeasurementguidelines ████████████

████████████ Exh. 29 at 92:13-16. ██████ Exh. 26 at 56:10-12. The█

████████ As commentators have noted, an audit report of a PPC system "provides value to advertisers by giving them confidence that they are 'getting what they are paying for.' *See also* Neil Deswani et. al., ONLINE ADVERTISING FRAUD, in CRIMEWARE 22 (2008) (available at http://static.googleusercontent.com/external_content/untrusted_dlcp/www.google.com/en/us/adwords/ad trafficquality/files/crimeware.pdf ███████████████████████ Exh. 29 at 50:8-9.

[13] "██████████████████████████████ Exh. 29 at 95:17-19. ██████ *Id.* at 69:3-8. ████████████████████████████ Exh. 26 at 60:1-6. ███████ *Id.* at 60:5-6; *see also* http://www.iab.net/iab_products_and_industry_services/1290962.

[14] Google stated the following: "We're pleased to announce today that the click measurement systems in Google AdWords [PPC program] has now been accredited by the Media Rating Council (MRC). MRC accreditation certifies that Google's click measurement technology adheres to the [IAB] *industry standards* for counting interactive advertising clicks and that its processes supporting this technology are accurate." (emphasis added).

---

14

1   ████████████████████████████████████████████████████████

2   ██████████████████████ Exh. 26 at 57:1-4, 19-23; Exh. 27 at 84:8-13. ████████

3   ████████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████

6   ███████████████████ Exh. 30 at 76:11-24, 117:1-119:24, 162:11-15. ████

7   ████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████

9   ████████████████████████████████████ Exh. 31 at ¶ 3.

10      4.   ████████████████████████████████████

11

12  ████████████████████████████████ Exh. 29 at 108:5-8, 116:4-15;

13  Exh. 26 at 50:2-13. Accordingly, Section 9 of the IAB standards provides that publishers should make

14  available for advertiser review a Description of Methodology ("DOM") that includes a reasonable

15  explanation of their click measurement method and a description of its manual and automated invalid

16  click filtration processes. Exh. A at § 9. Without a published DOM, an advertiser cannot hope to have

17  any insight into the method used to charge them for clicks.

18      The other leading publishers, Yahoo!, Google and Microsoft, all publish a DOM on their

19  websites for advertiser review that provides a modicum of information about their respective

20  methodology for counting legitimate clicks. Exh. J (Microsoft Description of Methodology); Exh. K

21  (Yahoo! Description of Methodology); Exh. L (Google Description of Methodology). ████████

22  ████████████████████████████████ Exh. 9 at 98:13-25; Exh. 13 at 260:10-12;

23  Exh. 26 at 52:4-9.

24

25

26

27  _____

28  [15]Exh. 32 (Yahoo Audit Report); Exh. 33 (Microsoft Audit Report); Rivas Decl., Exh. M (Google Audit Report) (also available at
    https://adwords.google.com/support/aw/bin/answer.py?hl=en$ctx=tltp&answer=153707).

**5.** <u>**Facebook Concedes Internally That Its Systems Are Not IAB-Compliant.**</u>



(emphasis added); Exh. 35 (

Exh. 36;  Exh. 30

at 161:1-4

Exh. 36; Exh. 30 at 156-157.

As the following sections demonstrate, the

breach and resulting damages can be proven on a classwide basis using common evidence—

**D.**

Exh. 13 at 91:7-10.

Exhs. 37-38.

Exh. 5 at 303:10-304:15.

16

Exh.

39 at 35:7-17, 40:12-14; Exhs. 40-41.

Exhs. 43-44.

As explained below, this is very similar to the methodology (and use of data points) that Plaintiffs' expert proposes in his report.

E.     **A Plausible Method Exists for Determining Liability and Damages on a Classwide Basis Using Facebook's Click Data.**

Plaintiffs' expert, Dr. Markus Jakobsson, has developed a methodology for calculating damages flowing from both Facebook's contractual breach and the restitution owed advertisers' for its UCL violation. This methodology can reliably measure damages on a classwide basis using methods that are grounded in traditional practices and concepts used in the PPC industry. *See generally* Exh. 4 (Jakobsson Report). Specifically, Dr. Jakobsson opines that algorithms can be developed to determine the legitimacy of a click with a high degree of confidence, using necessary and sufficient set of rules and conditions that Plaintiffs claim Facebook should have been employing during the class period but was not.

The result will detail

---

[16] Plaintiffs note, for example that

. Exh. 43; Exh. 45 (Facebook's Objections and Responses to Plaintiffs' First Set of Interrogatories, Nos. 6-7).

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 5:09-CV-03043 JF

1

2 ████████████████████   *Id.* at ¶ 5. Dr. Jakobsson's report thus demonstrates that common

3 evidence can be used to establish both liability and damages for all class members in a plausible manner.

4 **F.   The Named Plaintiffs' Experiences Exemplify Facebook's Liability and Damages.**

5

6 **1.   Fox Test Prep**

7 Plaintiff Fox Test Prep ("Fox"), which operates the website at www.foxtestprep.com, has offered

8 LSAT and GMAT instruction and tutoring in San Francisco, California since 2009. Exh. H at 11:23-25,

9 12:1-12. Fox started buying CPC advertising with Facebook in July 2009 to promote its test preparation

10 services to a targeted audience. *Id.* at 201:1-11. Before entering into a contract with Facebook for CPC

11 advertising, Fox reviewed Facebook's promises about CPC advertising, including the promise that

12 Facebook has "a variety of measures in place to ensure that [it] only report[s] and charge[s] advertisers

13 for legitimate clicks, and not clicks that come from automated programs, or clicks that may be repetitive,

14 abusive, or otherwise inauthentic." Exh. H at 91:8-19. Fox used Google Analytics, a well-known click

15 tracking software program recommended by Facebook, to track the clicks to his website from Facebook

16 and suspected that he was being charged for clicks that were not "legitimate." *Id.* at 42:18-19.[17] As a

17 result, Fox stopped advertising on Facebook. *Id.* at 219:1-5. Facebook billed Fox, and Fox paid

18 Facebook, a total of $1,058.13. *Id.* at 124:13-23.

19 **2.   Steven Price**

20

21 Plaintiff Steven Price ("Price") operated drivedownprices.com, a website that provides services

22 to buyers and sellers of new and used cars to facilitate their transactions, from early 2009 until 2010.

23 Exh. I at 12:6-22, 14:3-4, 15:1-17. On or about May 26, 2009, Price purchased advertising from

24 Facebook to promote drivedownprices.com. *Id.* at 67:4-7. Before contracting with Facebook for CPC

25

26 [17] As Fox was unaware of the algorithms that Facebook employed to categorize legitimate clicks, he
based his suspicions on the discrepancy between his count and Facebook's report without regard as to
27 whether the clicks that he was charged for were consistent with the terms his contract with Facebook.
His suspicions have been confirmed after a review of the click logs Facebook produced in discovery in
28 this action which show billing for illegitimate clicks.

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 5:09-CV-03043 JF

advertising, Price reviewed everything on Facebook's website related to CPC advertising, including the promise that Facebook has a variety of measures in place to ensure that it only reports and charges advertisers for legitimate clicks, and not clicks that come from automated programs, or clicks that may be repetitive, abusive, or otherwise inauthentic. *Id.* at 22:2-8; 29:7-12; 31:12-14.  Price used Google Analytics and Statcounter.com to test the veracity of the charges from Facebook for his CPC advertising. *Id.* at 31:23-32:12.  After using Google Analytics and Statcounter.com to track the clicks to his website from Facebook, Price believed that approximately two-thirds of the clicks for which he was being charged were invalid clicks. *Id.* at 31:23-32:12.  As a result, Price stopped advertising on Facebook. *Id.* at 21:18-22.  Facebook billed Price, and Price paid Facebook, a total of $697.12 from May 28, 2009 to June 21, 2009. *Id.* at 66:13-18.[18]

## III.   LEGAL ARGUMENT

This is a paradigmatic case for class certification. There is an ascertainable class alleging that Defendant breached a uniform contract that inflicted the same injury and same type of damage upon all class members. There are no individual determinations that prevent this case from being tried as a class action, applying California law to determine the rights and liabilities of the parties.

### A.   Governing Law

Rule 23 of the Federal Rules of Civil Procedure provides that a district court may certify a class where Plaintiffs satisfy the requirements of Rule 23(a) and one of the subsections of Rule 23(b).  Fed. R. Civ. P. 23.  Rule 23(a) requires that (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. *Id.*; *Sterns v. Ticketmaster Corp.*, No. 2:07-cv-01459 DSF-JTL, 2011 WL 3659354 at *3 (9th Cir. Aug. 22, 2010).  In addition, a party seeking certification must satisfy at least one provision of Fed. R. Civ. P. 23(b).

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 5:09-CV-03043 JF

While "certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied," it remains a wholly procedural determination. *In re Tableware Antitrust Litig.*, 241 F.R.D. 644, 648 (N.D. Cal. 2007). "A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart v. Dukes*, 131 S. Ct. 2541, 2551-52 (2011). However, the Ninth Circuit has cautioned that, "[a]lthough some inquiry into the substance of a case may be necessary to ascertain satisfaction of the commonality and typicality requirements of Rule 23(a), it is improper to advance a decision on the merits at the class certification stage." *Moore v. Hughes Helicopters, Inc.*, 708 F.2d 475, 480 (9th Cir.1983). Moreover, any doubts regarding the propriety of class certification generally should be resolved in favor of certification. *See Gonzales v. Arrow Fin. Servs., LLC*, 489 F.Supp.2d 1140, 1154 (S.D. Cal. 2007).

In *Wal-Mart v. Dukes*, the Supreme Court described the essence of Plaintiffs' burden at the class certification stage: Plaintiffs must show that the claims of the class "depend upon a common contention ... of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 131 S. Ct. at 2551. Thus, while Plaintiffs need not prove classwide injury at this stage, they must demonstrate that their claims are "capable of proof at trial through evidence that is common to the class rather than individual to its members." *Behrend v. Comcast Corp.*, No. 10-2865, 2011 WL 3678805, at *6 (3rd Cir. August 23, 2011) (citing *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311-12 (3rd Cir 2008)); *see also In re Aftermarket Auto. Lighting Prod. Antitrust Litig.*, No. 09 MDL 2007-GW (PJWx), 2011 WL 3204588, at *3 n.2 (C.D. Cal. 2011) (interpreting *Dukes* and explaining that plaintiff is not required to *prove* class-wide injury at the class certification stage); *In re Amaranth Natural Gas Commodities Litig.*, 269 F.R.D. 366 (S.D.N.Y. 2010) (class representatives are not required to *prove* injury in fact at class certification stage). Similarly, a class representative is not required to prove damages at the class certification stage. *See In re Citigroup Pension Plan Erisa Litig.*, 241 F.R.D. 172, 178 (S.D.N.Y. 2006); *Sanders v. Faraday Lab. Inc.*, 82 F.R.D. 99 (E.D.N.Y. 1979). All that is required

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 5:09-CV-03043 JF

is that plaintiffs present a "plausible" theory of liability and damages on a classwide basis. *Hydrogen Peroxide*, 552 F.3d at 325. As Plaintiffs explain below, they have met their burden.

### B.  Plaintiffs' Proposed Class Definition

As a preliminary matter, the party seeking certification "must demonstrate that an identifiable and ascertainable class exists." *Mazur v. eBay, Inc.*, 275 F.R.D. 563, 567 (N.D. Cal. 2009). A class should be "precise, objective and presently ascertainable." *O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998).

Plaintiffs propose the following class definition:

> *All persons and/or entities in the United States who paid money to Facebook, Inc. for cost-per-click advertising during the period of May 2009 to the present.*[19]

The proposed Class is precise, is based on objective criteria, and is therefore ascertainable. *Ewert v. eBay*, Nos. C-07-02198 RMW, C-07-04487 RMW, 2010 WL 4269259, at *2 (N.D. Cal. Oct. 25, 2010). Further, members of the Class are identifiable by Facebook's own business records. Accordingly, this threshold requirement is met.

### C.  The Proposed Class Action Satisfies The Requirements of Rule 23(a).

#### 1.  The Class Is So Numerous that Joinder of All Members Is Impracticable.

"Plaintiffs need not state the exact number of potential class members; nor is a specific minimum number of class members required." *Arnold v. United Artists Theatre Circuit, Inc.*, 158 F.R.D. 439, 448 (N.D. Cal. 1994). The fact that a class is geographically dispersed, or class members difficult to identify, supports class certification. *See In re Rubber Chem. Antitrust Litig.*, 232 F.R.D. 346, 350-51 (N.D. Cal. 2005). ██████████████████████████████████ Exh. 45 (Facebook Resp. to Interrog. No. 1 at p. 5-6). Accordingly, numerosity is met.

---

[19] Plaintiffs note that this class period is temporally shorter than the class period reflected in the Second Amended Complaint. Subsequent modification of the class definition at the class certification stage is routine. Plaintiffs also note that they are not proffering Root Zoo, one of the Plaintiffs, as a class representative.

2.   **The Case Involves Questions of Law and Fact Common to the Class.**

The commonality requirement "requires the plaintiff to demonstrate that the class members have suffered the same injury." *Dukes*, 131 S. Ct. at 2551. This requires that all have suffered a violation of the same provision of law and that "[t]heir claims must depend upon a common contention" that is capable of classwide resolution. *Id.* "What matters to class certification ... [is] the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (citation omitted).

Here, Plaintiff class members—all cost-per-click advertisers who placed advertisements on Facebook—suffered the same injury in being billed for invalid or illegitimate clicks in contravention of their written advertising agreement with Facebook, which is identical for all relevant purposes for all class members. Facebook's failure to implement measures to ensure that only valid clicks are billed has impacted all class members in precisely the same adverse way—*i.e.*, each was forced to pay extra money to Facebook. The common questions upon which Plaintiffs' claims depend and which drive the litigation for all class members are whether Facebook honored its obligation to charge them for only "legitimate clicks" and whether Facebook's failure to do so constitutes breach of contract and an unfair business practice.

A sister court in the Central District of California analyzed the identical question in determining whether Plaintiffs had satisfied the commonality provision and other class certification requirements. In *Menagerie Prods. v. Citysearch*, No. CV-08-4263-CAS (FMO), 2009 WL 3770668, at *4 (C.D. Cal. Nov. 9, 2009) ("*Citysearch*"), the plaintiffs sought certification of breach of contract and UCL claims for a class of advertisers claiming that the defendant website breached the PPC advertising contract by failing to filter out invalid clicks. The *Citysearch* court found commonality existed for the plaintiffs' breach of contract and UCL claims since, as here, the common and central questions driving the litigation were "whether [the defendant's] failure to implement objectively reasonable invalid click prevention measures amounts to a breach of the express terms of its contract" with advertisers and "whether [the defendant] acted fraudulently or unfairly." *Id.* at *4. Under *Dukes* and consistent with *Citysearch*, Plaintiffs meet the commonality requirement in this case. *See also Aho v. AmeriCredit Fin.*

*Servs., Inc.*, No. 10-CV-1373-DMS-BLM, 2011 WL 3047677, at *4 (S.D. Cal. July 25, 2011) (commonality met where liability is premised on standardized documents).; *Ewert v. eBay*, 2010 WL 4269259, at *2 (citing *Citysearch*, finding that "in construing the form contract between eBay and class members, the court need not delve into the actual knowledge of individual class members").

### 3. The Claims of the Named Plaintiffs Are Typical of the Claims of the Class.

Rule 23(a)(3)'s typicality requirement is "permissive." *In re Infineon Techs. AG Sec. Litig.*, 256 F.R.D. 386, 393-94 (N.D. Cal. 2009). A representative plaintiff's claims are typical "if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). The named plaintiff's claims are typical if they stem from the same practice or course of conduct that forms the class claims and are based on the same legal theory. *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal citations omitted); *In re Online DVD Rental Litig.*, No. 09-MD-02029-PJH, 2010 WL 5396064, at *3 (N.D. Cal. Dec. 23, 2010). "In determining whether typicality is met, the focus should be on the defendants' conduct and plaintiff's legal theory, not the injury caused to the plaintiff." *See Miletak v. Allstate Ins. Co.*, No. C-06-03778-JW, 2010 WL 809579, at *11 (N.D. Cal. Mar. 5, 2010); *Simpson v. Fireman's Fund Ins. Co.*, 231 F.R.D. 391, 396 (N.D. Cal. 2005).

The Named Plaintiffs satisfy the typicality requirement. Bringing both breach of contract and UCL claims, the Named Plaintiffs allege that Facebook caused them substantial injury by charging them for invalid or illegitimate clicks in contravention of the written advertising agreement with Facebook, identical for all relevant purposes for all CPC advertisers. Named Plaintiffs Fox Test Prep and Steven Price both entered into CPC advertising agreements with Facebook after May 2009, and both reviewed (and relied) on Facebook's contractual promises to charge advertisers only for "legitimate" clicks and to maintain systems necessary to "ensure" such valid billing. Plaintiffs both allege that they were ultimately billed and paid Facebook for clicks that were not "legitimate."

While not all Facebook CPC advertisers are small "mom and pop" businesses like the Named Plaintiffs, any difference in size is not material as all were parties to the same contractual terms obligating Facebook to charge them only for valid clicks. *See Ewert*, 2010 WL 4269259, at *3-4

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 5:09-CV-03043 JF

(finding typicality in UCL/breach of contract case involving form contract in spite of defendant's arguments that the class included plaintiffs of different levels of sophistication); *Miletak*, 2010 WL 809579, at *11 (finding typicality in UCL/breach of contract case involving uniform misrepresentations); *Citysearch*, 2009 WL 3770668 at *7.

### 4. Plaintiffs Will Fairly and Adequately Protect the Interests of the Class.

The adequacy requirement of Rule 23(a)(4) permits certification of a class action only if "the representative parties will fairly and adequately protect the interests of the class." This factor requires: (1) that the proposed representative plaintiffs do not have conflicts of interest with the proposed class, and (2) that the plaintiffs are represented by qualified and competent counsel. *Hanlon*, 150 F.3d at 1020. "'Generally, representation will be found to be adequate when the attorneys representing the class are qualified and competent, and the class representatives are not disqualified by interests antagonistic to the remainder of the class.'" *In re Online DVD Rental Litig.*, 2010 WL 5396064, at *4 (citing *Lerwill v. Inflight Motion Pictures*, 582 F.2d 507, 512 (9th Cir. 1978)). "The mere potential for a conflict is not sufficient to defeat class certification." *Cummings v. Connell*, 316 F.3d 886, 896 (9th Cir. 2003).

Here, the interests of the Named Plaintiffs in this case are fully aligned with those of the class. Like all class members, the Named Plaintiffs' claims are based on Facebook's CPC advertising agreement and its course of conduct with respect to billing for valid clicks and ensuring click validity. The nature of the Named Plaintiffs' injury is exactly the same as that of the class members they seek to represent. *See Citysearch*, 2009 WL 3770668 at *8. Plaintiffs have no interests that conflict with the proposed Class, and they are represented by qualified and competent counsel experienced in class action litigation and the types of consumer claims at issue here. *See* Shub Decl. at ¶¶ 50-55; Rivas Decl. at ¶¶ 16-22.[20] The adequacy requirement is met.

### D. The Proposed Class Satisfies the Rule 23(b)(3) Predominance Requirement.

Plaintiffs pursue certification under Rule 23(b)(3), which requires parties seeking certification to

---

[20] This Court previously appointed co-lead class counsel and liaison counsel on an interim basis. *See* Dkt. No. 43. Plaintiffs now request that the Court make the appointments permanent in connection with this motion.

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 5:09-CV-03043 JF

show that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The predominance inquiry "tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Hanlon*, 150 F.3d at 1022 (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997)). As a California federal district court recently explained,

> [i]n order to determine whether common issues predominate, the Court neither decides the merits of the parties' claims or defenses nor does it decide 'whether the plaintiffs are likely to prevail on their claims. Rather, the Court must determine whether plaintiffs have shown that there are plausible classwide methods of proof available to prove their claims.'

*Wolph v. Acer America, Inc.*, 272 F.R.D. 477, 487 (N.D. Cal. 2011) (quoting *Negrete v. Allianz Life Ins. Co.*, 238 F.R.D. 482, 489 (C.D. Cal. 2006)). In analyzing predominance, the court measures the relative weight of the common to individualized claims: "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Chavez v. Blue Sky Natural Beverage Co.*, 268 F.R.D. 365, 378 (N.D. Cal. 2010) (quoting *Hanlon*). Predominance is not defeated by individual damages questions as long as liability is still subject to common proof. *Negrete v. Allianz Life Ins. Co. of N. Am.*, 238 F.R.D. at 494. To show that common questions predominate, Plaintiffs must demonstrate how each claim can be proven predominantly through common evidence on a classwide basis. Accordingly, each claim will be discussed in turn.

### 1.    Common Questions Predominate for Plaintiffs' Breach of Contract Claim.

A claim for breach of contract under California law requires the existence of the contract, performance by the plaintiff or excuse for nonperformance, breach by the defendant, and damage.[21] *TMX Funding, Inc. v. Impero Techs., Inc.*, No. C 10-00202 JF, 2010 WL 2509979, at *5 (N.D. Cal. June 17, 2010) (Fogel, J.). Claims arising from interpretations of a uniform contract present the classic case

---

[21] California law will govern the resolution of Plaintiffs' breach of contract claim. Facebook's uniform contract with advertisers provides for application of California law to resolve all disputes over the advertising terms and conditions "without regard to choice of law principles." Exh. B at FBCPC87. *See also Wolph*, 272 F.R.D. at 484 (citing *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal.4th 459 (1992)).

for classwide treatment, and such breach of contract cases are routinely certified. *See, e.g., Citysearch,* 2009 WL 3770668 at *10; *Plascencia v. Lending 1st Mortg.,* 259 F.R.D. 437, 443 (N.D. Cal. 2009) ("The class members' claims clearly have something in common: all class members purchased [a mortgage] from Lending 1st, and their claims are based on a common theory of liability.").

To prove their breach of contract claim, Plaintiffs will show that at the time of contracting: (1) Facebook offered to charge advertisers for only legitimate clicks on their advertisements and to maintain systems necessary to ensure such valid billing; (2) Plaintiffs accepted the offer and performed under the contract by paying the amounts Facebook billed; (3) Facebook breached the agreement by charging Plaintiffs for illegitimate clicks and ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ and (4) Plaintiffs suffered damages as a result of the brief. Each of these factual assertions is "susceptible to proof at trial through available evidence common to the class." *Hydrogen Peroxide,* 552 F.3d at 325.

The existence and uniform terms of Facebook's CPC advertising agreement are subject to generalized evidence. Relevant extrinsic evidence that would shed light, if necessary, on the intended meaning of contract terms like "click" and "legitimate click" is also common evidence in this case. For example: the contents of Facebook's Help Center glossary of ad terms and expert evidence regarding the nature of the PPC advertising industry and cooperative efforts to measure click validity. Plaintiffs' performance on the CPC advertising agreement can be shown efficiently via ▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇ Facebook's breach may be demonstrated by common evidence showing its ▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Finally, as the next section describes, Plaintiffs will prove that Facebook improperly charged advertisers for invalid clicks during the class period, and class members sustained damages as a result, through ▇▇▇▇▇▇▇ ▇▇▇▇▇

### 2. Common Questions Predominate for Plaintiffs' UCL Claim of Unfair Business Practices.

California's UCL prohibits any "unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. A broad remedial statute, the UCL permits individuals to challenge

26

wrongful business conduct "in whatever context such activity might occur." *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007) (citation omitted). Each prong of the UCL is a separate and distinct theory of liability. *Id.* Plaintiffs' surviving UCL claim against Facebook arises under the "unfair business practices" prong.[22]

To prove their claim for unfair business practices under the "unfair" prong, Plaintiffs must show that Facebook's unfair business practices (1) cause substantial injury, and (2) is not outweighed by countervailing benefits to consumers or competition, and (3) causes an injury that consumers could not avoid. *Davis v. Ford Motor Credit Co.*, 179 Cal. App. 4th 581, 584 (2009); *Camacho v. Automobile Club of Southern California*, 142 Cal. App. 4th 1394, 1405 (2006).

It is well-settled that classwide relief under the UCL "is available without individualized proof of deception, reliance, and injury." *Stearns v. Ticketmaster Corp.*, Nos. 08-56065 and 09-56126, 2011 WL 3659354, at *4 (9th Cir. Aug. 22, 2011) (quoting *In re Tobacco II Cases*, 46 Cal. 4th 298, 320 (2009)). However, to have standing to bring a class action under the UCL, a representative plaintiff must establish their own injury in fact, or that they "lost money or property as a result of the unfair competition." *In re Tobacco II Cases*, 46 Cal. 4th at 313-14 (quoting Cal. Bus. & Prof. Code § 17204). Proof of reliance by the representative plaintiffs is unnecessary where, as here, the unfair business practices do not involve false advertising or misrepresentations. *Id.* at n.17.

Plaintiffs will be able to prove all the elements of a classwide UCL unfair practices claim against Facebook by relying on common evidence. ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[22] As with Plaintiffs' contract claim, California law will govern the resolution of the UCL claim. Facebook is headquartered in Palo Alto, and Facebook's conduct giving rise to the UCL claim occurred in California. Accordingly, application of California law would not be arbitrary or unfair. *See Yamada v. Nobel Biocare Holdings AG*, __F.R.D. __, No. 2:10-cv-04849-JHN-PLAx, 2011 WL 3634197, at *8 (C.D. Cal. Aug. 12, 2011); *Chavez*, 268 F.R.D. at 379.

█████████████████████████████████

██████████████████████. CPC advertisers had no way of knowing that Facebook would not honor its promise to charge for only "legitimate clicks." Finally, common evidence, if not common sense, will show that there is no countervailing benefit to class members or the PPC industry in Facebook's practice of systematically charging its advertising customers for invalid clicks. The only entity that benefits is Facebook itself. Plaintiffs satisfy predominance on their UCL claim.

   3.   **Plaintiffs Have Presented a Plausible Method of Proving Classwide Liability and Damages.**

Plaintiffs present a classwide method for establishing contractual liability and damages, as well as their claim for restitution under the UCL.[23] Plaintiffs' expert, Dr. Jakobsson, has articulated a reasonable and straight-forward methodology to determine whether Facebook improperly charged advertisers for invalid clicks on advertisements during the class period, and, if so, a methodology for determining damages. Exh. 4 at ¶¶ 15-18. ████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

In *Citysearch*, a similar case challenging improper billing for clicks on advertisements, the court held that Plaintiffs had demonstrated that liability and damages could also be established on a classwide basis. In certifying the plaintiffs' breach of contract claims, the *Citysearch* court found that plaintiffs' proposed three-step method for establishing liability and calculating damages was plausible and thus met the requirements for class certification. *See Citysearch*, 2009 WL 3770668, at *16-17. Dr. Jakobson's methodology is similar. ████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████      ████████████

---

[23] Restitution under the UCL is defined as "the difference between what the plaintiff paid and the value of what the plaintiff received." *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 131 (2009). In the context of this case, damages for breach of contract and UCL restitution would be equivalent—Plaintiffs received no arguable advertising or other value from being charged for illegitimate clicks.

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 5:09-CV-03043 JF

█████████████████████████████ Exh. 4 at ¶¶ 15-18.  Moreover, unlike in *Citysearch*, █

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████ More is not required at the

certification stage.  *See Behrend*, 2011 WL 3678805, at *31, n.13 (expert model does not have to be

perfect at class certification stage, only plausible); *Chavez*, 268 F.R.D. at 379 (N.D. Cal. 2010); *Brazil v.*

*Dell Inc.*, No. C-07-01700 RMW, 2010 WL 5387831 (N.D. Cal. Dec. 21, 2010) (certification was

warranted where plaintiffs had presented a "plausible" method of calculating damages).   Accordingly,

the predominance requirement is met with respect to Plaintiffs' claims.

E.   **A Class Action Is Superior to Other Available Methods for the Fair and Efficient**
     **Adjudication of This Case.**

Rule 23(b)(3) also requires plaintiffs seeking certification to show that "a class action is superior

to other available methods for the fair and efficient adjudication of the controversy."   Matters pertinent

to the "superiority inquiry" include: (A) the class members' interests in individually controlling the

prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the

controversy already begun by or against class members;  (C) the desirability or undesirability of

concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in

managing a class action.  Fed. R. Civ. P. 23(b)(3).  "If the main issues in a case require the separate

adjudication of each class member's individual claim or defense, a Rule 23(b)(3) action would be

inappropriate."  *See    Ewert*, 2010 WL 4269259, at *12; *see also Miletak*, 2010 WL 809579, at *13

(finding superiority based, in part, on small individual claims, with geographically disbursed class

members, and where a class action is likely to be "the only method for providing meaningful

recovery."); *Citysearch*, 2009 WL 3770668, at *16.

Similarly here, Plaintiffs meet the superiority requirement.  With the huge costs of litigation, the

damages per advertiser in most cases are simply not significant enough to justify hiring an attorney and

pursuing individual litigation. *See, e.g.*, Exh. 46 ████████████████████████

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 5:09-CV-03043 JF

In fact, there are no individual actions that Plaintiffs are aware of against Facebook for failing to implement an adequate click filtering system as Facebook's secrecy poses significant obstacles for advertisers trying to analyze whether Facebook is charging them only for legitimate clicks. *See Gentry v. Superior Court*, 42 Cal. 4th 443, 457-58 (2007) (notifying unwary claimants that they have been wronged is a significant benefit of the class action device). Further, if a multitude of individual actions were brought, it would burden the judiciary system. Finally, this proposed Class presents no manageability issues as individualized proof and the involvement of individual class members should not be necessary to establish liability and damages for the reasons discussed above. Accordingly, the superiority requirement is met.

## IV.   CONCLUSION

For the foregoing reasons, and on the basis of the authorities cited herein, Plaintiffs respectfully submit that the proposed Class should be certified, and that Plaintiffs and their counsel be appointed to represent the Class.

DATED: September 2, 2011

Respectfully submitted,

By: /s/ Jonathan Shub
    Jonathan Shub

**SEEGER WEISS**
1515 Market Street, Suite 1380
Philadelphia, Pennsylvania 19102
Telephone: 215-564-2300
Facsimile: 215-851-8029

*Interim Co-Lead Class Counsel*

J. Paul Gignac
**ARIAS OZZELLO & GIGNAC LLP**
115 S. La Cumbre, Suite 300
Santa Barbara, California 93105
Telephone: (805) 683-7400
Facsimile: (805) 683-7401

*Interim Liaison Counsel*

By: /s/ Rosemary M. Rivas
    Rosemary M. Rivas

**FINKELSTEIN THOMPSON LLP**
100 Bush Street, Suite 1450
San Francisco, California 94104
Telephone: (415) 398-8700
Facsimile: (415) 398-8704

*Interim Co-Lead Class Counsel*

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 5:09-CV-03043 JF

Christopher A. Seeger
David R. Buchanan
TerriAnne Benedetto
**SEEGER WEISS LLP**
1515 Market Street, Suite 1380
Philadelphia, PA 19102
Telephone: (215) 564-2300
Facsimile: (215) 851-8110

Mila Bartos
Stan Doerrer
**FINKELSTEIN THOMPSON LLP**
1050 30th Street, N.W.
Washington, D.C. 20007
Telephone: 202-337-8000
Facsimile: 202-337-8090

Jeffrey Leon
Julie Miller
**FREED & WEISS LLC**
111 West Washington Street, Suite 1311
Chicago, IL 60602
Telephone: (312) 220-0000
Facsimile: (312) 220-7777

Steven Berk
Gouri Bhat
**BERK LAW PLLC**
2002 Massachusetts Ave. NW, Suite 100
Washington, D.C. 20036
Telephone: (202) 232-7500
Facsimile: (202) 232-7566

Gordon M. Fauth, Jr.
**LITIGATION LAW GROUP**
1801 Clement Avenue, Suite 101
Alamada, CA 94501
Telephone: (510) 238-9610
Facsimile: (510) 337-1431

Brian S. Kabateck
**KABATECK BROWN KELLNER LLP**
664 S. Figueroa Street
Los Angeles, CA 90017
Telephone: (213) 217-5000
Facsimile: (213) 217-5010

31

Melissa Meeker Harnett
**WASSERMAN, COMDEN &
CASSLEMAN, LLP**
5567 Reseda Boulevard, Suite 330
Tarzana, CA 91357-7033
Telephone: (818) 705-6800
Facsimile: (818) 996-8266

Benjamin G. Edelman
**LAW OFFICES OF BENJAMIN
EDELMAN**
27A Linnaean Street
Cambridge, MA 02138
Telephone: (617) 359-3360

*Additional Counsel for Plaintiffs*

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 5:09-CV-03043 JF