1   COOLEY LLP
    MICHAEL G. RHODES (116127)
2   (rhodesmg@cooley.com)
    WHITTY SOMVICHIAN (194463)
3   (wsomvichian@cooley.com)
    PETER M. COLOSI (252951)
4   (pcolosi@cooley.com)
    MATTHEW M. BROWN (264817)
5   (mmbrown@cooley.com)
    101 California Street, 5th Floor
6   San Francisco, CA  94111-5800
    Telephone:    (415) 693-2000
7   Facsimile:    (415) 693-2222

8   Attorneys for Defendant
    FACEBOOK, INC.
9

10              UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12                   OAKLAND DIVISION

13

14   In re FACEBOOK PPC Advertising          Master File Case No.  C 09-03043 PJH
     Litigation,
15                                            **DEFENDANT'S OPPOSITION TO
                                              PLAINTIFFS' MOTION FOR CLASS
16   This Document relates To:               CERTIFICATION**
           All Actions.
17                                            Date:      TBD
                                              Time:      TBD
18                                            Judge:     Hon. Phyllis J. Hamilton
                                              Courtroom: 3, 3rd Floor
19

20

21

22

23

24

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FACEBOOK'S OPP TO PLAINTIFFS'
MTN FOR CLASS CERTIFICATION
C 09-03043 PJH

**Table of Contents**

|  |  |  | Page |
|---|---|---|---|
| I. | | INTRODUCTION ....................................................................................................... 1 | |
| II. | | BACKGROUND. ........................................................................................................ 3 | |
| | A. | Facebook's Online Advertising Platform ..................................................... 3 | |
| | B. | The Named Plaintiffs ................................................................................... 9 | |
| | C. | Procedural History. ..................................................................................... 13 | |
| | | 1. | Plaintiffs' Shifting Definitions of "Fraudulent" and "Invalid" Clicks...... 13 |
| | | 2. | All Claims For Click Fraud Have Been Dismissed as a Matter of Law ........................................................................................................ 14 |
| | | 3. | The Help Center Is Not A Part of The Advertising Contract .................. 14 |
| | | 4. | Advertisers Must Prove Their Individual Review of the Help Center. ..................................................................................................... 15 |
| III. | | ARGUMENT. ............................................................................................................ 15 | |
| | A. | Applicable Class Certification Standards ................................................... 15 | |
| | B. | Plaintiffs' UCL Class Is Overbroad and Individualized Issues Will Predominate In Identifying Advertisers (If Any) With Proper Standing.............. 16 | |
| | C. | Plaintiffs' Contract Claims Cannot Be Certified Given The Individualized Issues In Applying The Extrinsic Evidence On Which The Claims Depend ....... 20 | |
| | D. | Plaintiffs Have No Viable Method For Proving Each Class Member's Individual Recovery ................................................................................... 22 | |
| | | 1. | Plaintiffs Have No Method To Differentiate Among The Different Types Of Clicks At Issue ........................................................................ 22 |
| | | 2. | Plaintiffs' Effort To Rely On Purported "Industry Standards" Fails ........ 25 |
| | | 3. | The Named Plaintiffs' Claims Demonstrate Why Damages And Restitution Cannot Be Litigated On A Classwide Basis......................... 28 |
| | E. | The Named Plaintiffs are Inadequate Class Representatives................................ 29 | |
| IV. | | CONCLUSION............................................................................................................ 30 | |

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

i.

FACEBOOK'S OPP TO PLAINTIFFS'
MTN FOR CLASS CERTIFICATION
C 09-03043 PJH

## TABLE OF AUTHORITIES

Page(s)

CASES

*Adams v. Kan. City Life Ins. Co.,*
   192 F.R.D. 274 (W.D. Mo. 2000) ................................................................................. 21-22

*Allen v. Wright,*
   468 U.S. 737 (1984) .................................................................................................. 17, 18

*Avritt v. Reliastar Life Ins. Co.,*
   615 F.3d 1023 (8th Cir. 2010) ......................................................................................... 17

*Burdick v. Union Sec. Ins. Co.,*
   No. CV 07-4028 ABC (JCx), 2009 WL 4798873, at \*3 (C.D. Cal. Dec. 9, 2009) ............... 18

*Burkhalter Travel Agency v. MacFarms Int'l, Inc.,*
   141 F.R.D. 144 (N.D. Cal. 1991) .................................................................................... 30

*Campion v. Old Republic Home Prot. Co., Inc.,*
   No. 09-CV-748-JMA (NLS), 2011 WL 42759 (S.D. Cal. Jan. 6, 2011) .............................. 18

*Chamberlain v. Ford Motor Co.,*
   402 F.3d 952 (9th Cir. 2005) .......................................................................................... 22

*Cohen v. Directv, Inc.,*
   178 Cal. App. 4th 966 (2009) ......................................................................................... 18

*Colgan v. Leatherman Tool Grp., Inc.,*
   135 Cal. App. 4th 663 (2006) ..................................................................................... 24-25

*Denney v. Deutsche Bank AG,*
   443 F.3d 253 (2d Cir. 2006) ........................................................................................... 17

*Deiter v. Microsoft Corp.,*
   436 F.3d 461 (4th Cir. 2006) .......................................................................................... 30

*Endres v. Wells Fargo Bank,*
   No. C 06-7019 PJH, 2008 WL 344204 (N.D. Cal. Feb. 6, 2008) ...................................... 18

*Hanon v. Dataproducts Corp.,*
   976 F.2d 497 (9th Cir. 1992) .......................................................................................... 29

*In re Conoco Phillips Co. Serv. Station Rent Contract Litig.,*
   No. M:09-cv-02040 RMW, 2011 U.S. Dist. LEXIS 40471 (Apr. 13, 2011) ......................... 20

*In re First Alliance Mortgage Co.,*
   471 F.3d 977 (9th Cir. 2006) .......................................................................................... 24

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*In re Flash Memory Antitrust Litig.*,
  No. C 07-0086 SBA, 2010 WL 2332081 (N.D. Cal June 9, 2010) ...................................... 24

*In re GPU Antitrust Litig.*,
  253 F.R.D. 478 (N.D. Cal 2008) .................................................................................. 29, 30

*In re Light Cigarettes Mktg. Sales Practices Litig.*,
  271 F.R.D. 402 (D. Me. 2010) ........................................................................................ 18

*In re Med. Waste Servs. Antitrust Litig.*,
  No. 2:30MD1546, 2006 WL 538927 (D. Utah Mar. 3, 2006) .............................................. 23

*In re Vioxx Class Cases*,
  180 Cal. App. 4th 116 (2009) ......................................................................................... 24

*Lee v. Am. Nat'l Ins. Co.*,
  260 F.3d 997 (9th Cir. 2001) .......................................................................................... 17

*Linear Tech. Corp. v. Applied Materials*,
  152 Cal. App. 4th 115 (2007) ......................................................................................... 20

*Lozano v. AT&T Wireless Servs., Inc.*,
  504 F.3d 718 (9th Cir. 2007) .......................................................................................... 21

*Mahfood v. QVC, Inc.*,
  No. SACV 06-0659-AG(ANx), 2008 WL 5381088 (C.D. Cal. Sept. 22, 2008) ................... 18

*Menagerie Prods. v. Citysearch*,
  No. CV-08-4263-CAS (FMO), 2009 WL 3770668 (CD. Cal. Nov. 9, 2009) ................. 20, 22

*Parkinson v. Hyundai Motor America*,
  258 F.R.D. 580 (C.D. Cal. 2008) ...................................................................................... 9

*Pfizer Inc., v. Super. Ct.*,
  182 Cal. App. 4th 622 (2010) ......................................................................................... 16

*Reed v. Advocate Health Care*,
  268 F.R.D. 573 (N.D. Ill. 2009) ...................................................................................... 24

*Rosenbluth Int'l, Inc. v. Super. Ct.*,
  101 Cal. App. 4th. 1073 (2002) ....................................................................................... 30

*Sanders v. Apple Inc.*,
  672 F. Supp. 2d 978 (N.D. Cal. 2009) (Fogel, J.) .............................................................. 17

*Sevidal v. Target Corp.*,
  189 Cal. App. 4th 905 (2010) ..................................................................................... 17-18

*Tidenberg v. Bidz.com*,
  2010 WL 135580 (C.D. Cal. Jan. 7, 2010) ....................................................................... 24

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii.

FACEBOOK'S OPP TO PLAINTIFFS'
MTN FOR CLASS CERTIFICATION
C 09-03043 PJH

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011) ................................................................................ 1, 15-16, 21, 24

*Webb v. Carter's Inc.*,
    No. CV 08-7367 GAF (MANx), 2011 WL 343961, at *6-7 (C.D. Cal. Feb. 3, 2011) .......... 18

*Welling v. Alexy*,
    155 F.R.D. 654 (N.D. Cal. 1994) ............................................................................ 30

*Westways World Travel, Inc. v. AMR Corp.*,
    No. 05-056603, 2008 WL 205296 (9th Cir. Jan. 22, 2008) ........................................ 21

*Williams v. Balcor Pension Investors*,
    150 F.R.D. 109 (N.D. Ill. 1993) ............................................................................ 12

*Windham v. Am. Brands, Inc.*,
    565 F.2d 59 (4th Cir. 1977) ................................................................................ 23

*Woods v Google*,
    No 05:11 cv-1263-JF, 2011 WL 3501403 (N.D. Cal. Aug. 10, 2011) ........................ 21, 29

**STATUTES**

California Business & Professions Code § 17203 .............................................................. 16

**OTHER AUTHORITIES**

Rules of Court
    11 ................................................................................................................ 12
    23 ........................................................................................................... passim
    23(a) .................................................................................................. 15, 16, 29
    23(a)(2) .......................................................................................................... 1
    23(a)(4) .......................................................................................................... 3
    23(b)(3) ................................................................................................. 1, 9, 16
    23(f) ............................................................................................................ 22
    30(b)(6) ........................................................................................................ 11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iv.

FACEBOOK'S OPP TO PLAINTIFFS'
MTN FOR CLASS CERTIFICATION
C 09-03043 PJH

# I.   INTRODUCTION.

This case involves Facebook's "pay-per-click" ("PPC") advertising platform in which Facebook displays advertising on its website and charges advertisers on a per-click basis. Plaintiffs claim Facebook breached its contracts with advertisers and violated the California Unfair Competition Law (UCL) by charging for clicks that they have, at different points, labeled as "fraudulent," "invalid," or (in their most recent relabeling) "illegitimate" – each a shorthand for categories of clicks that Plaintiffs claim should not be billed to advertisers. Plaintiffs now seek to certify a nationwide class of all advertisers who have placed PPC advertising on Facebook since May 2009.

Plaintiffs' effort to certify this massively overbroad class fails under the established standards of Rule 23.  Under *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011), Plaintiffs must demonstrate a "common contention" that is "is capable of classwide resolution" and "will resolve an issue that is central to the validity of each one of the claims in one stroke," in order to meet the commonality requirement of Rule 23(a)(2).  Plaintiffs must also satisfy Rule 23(b)(3) by showing that such "common contentions" predominate over any individualized issues needed to resolve the claims of the proposed class.  Plaintiffs' Motion fails under these standards because the claims of each of the thousands of advertisers swept together in the proposed class will turn on idiosyncratic evidence specific to each individual advertiser.

First, under established UCL precedent and basic Article III standing requirements, Plaintiffs must show that proposed class members were each exposed to the same alleged misstatements in dispute.  Plaintiffs cannot prove this necessary element for all advertisers "in one stroke" because their claims are based on statements that do not appear in any contract or other document that advertisers were exposed to on a common basis.  Instead, Plaintiffs' claims are predicated on the Facebook "Help Center" – a collection of webpages that advertisers may or may not ever see depending on their method of contracting, their particular interests, and the happenstance of their individual navigation through the Facebook website, making it impossible for Plaintiffs to show that advertisers were uniformly exposed to the key statements at issue.

Second, to demonstrate commonality and predominance on their breach of contract

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1.

FACEBOOK'S OPP TO PLAINTIFFS' MTN FOR
CLASS CERTIFICATION
C 09-03043 PJH

1   claims, Plaintiffs need to show a uniform contract that can be adjudicated without resort to

2   individualized evidence. Plaintiffs claim "Facebook's uniform advertising contract … promises

3   that its PPC advertisers will be charged only for 'legitimate clicks …'"[1] But this supposed

4   obligation related to billing for "legitimate clicks" does not appear in any contract and is drawn

5   from the same informational Help Center pages that are the crux of Plaintiffs' UCL claims. Judge

6   Fogel has already ruled in this case that the Help Center is not part of any contract and can be

7   considered only as extrinsic evidence if an advertiser actually reviewed the statements in dispute

8   – a requirement Plaintiffs cannot prove on a classwide basis.

9           Third, commonality and predominance require that Plaintiffs demonstrate a viable

10  classwide method to prove the amount of harm that advertisers may have suffered from "invalid"

11  clicks, without resorting to individualized proof. Here, Plaintiffs would need to parse each click

12  on each ad displayed on Facebook during the class period to isolate the "invalid" clicks they are

13  challenging while removing (i) any "fraudulent" clicks made with wrongful intent, which are

14  subject to a binding disclaimer of liability and must be excluded per Judge Fogel's orders, and (ii)

15  any "valid" clicks from persons intentionally clicking on ads, which are not being challenged in

16  this case and must also be excluded. Plaintiffs make no effort whatsoever to show they can

17  resolve these issues on a classwide basis. Indeed, any effort to do so would require a technical

18  and highly individualized analysis of data unique to, and in the sole possession of, each

19  advertiser, including the server data for each advertiser's website, the particular way those servers

20  were configured, whether the advertiser used third-party software to track clicks to the website,

21  how any such software was set up, and a host of other issues as explained in the Expert Report of

22  Stroz Friedberg filed herewith.

23          Instead of addressing these issues, Plaintiffs claim that the term "legitimate click" from

24  the Help Center requires Facebook to comply with unidentified "industry standards" that they say

25  provide a classwide method of proving damages. But Plaintiffs provide no basis for the Court to

26  take the semantic leap of faith that the term "legitimate click" somehow carries this hidden

27  meaning regarding "industry standards." Even Plaintiffs' own experts have disavowed that there

28  [1] Plaintiff's Motion for Class Certification filed September 2, 2011 ("Motion") at 1:17-18.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2.

FACEBOOK'S OPP TO PLAINTIFFS'
MTN FOR CLASS CERTIFICATION
C 09-03043 PJH

1  are predetermined "industry standards" that apply to all online advertising platforms, ███

2  ██████████████████████████████████████████   When these fictional "industry

3  standards" are stripped away, Plaintiffs have no way to determine which clicks can support any

4  monetary recovery without resorting to an impossible click-by-click analysis.

5      Finally, certification should be denied because Plaintiffs are not adequate class

6  representatives as required under Rule 23(a)(4).  Plaintiffs should not be allowed to represent the

7  interests of a proposed class that includes sophisticated business entities whose interests bear no

8  resemblance to their own, particularly when their individual claims are subject to potentially

9  dispositive defenses and given their striking unfamiliarity with the basic issues in this case.

10  **II.   BACKGROUND.**

11      **A.   Facebook's Online Advertising Platform.**

12      Facebook operates the largest social network website in the world, with over 800 million

13  active users who use Facebook's free service to connect and share with their friends, families, and

14  communities.   This case involves Facebook's PPC advertising program, in which ads are

15  displayed on facebook.com and advertisers agree to pay Facebook on a per-click basis.   In

16  contrast to other online advertising platforms that display ads on a network of websites and allow

17  anyone (often, unknown users) to click on ads, Facebook displays ads on facebook.com and only

18  bills for clicks that originate from logged-in Facebook users.[2]

19      The "Self-Service" Channel:   Advertisers may contract with Facebook through two

20  distinct channels: an automated "self-service" process available online to the general public and

21  direct contracting through Facebook's account management group.[3]  Plaintiffs exclusively used

22  the self-service channel. This process consists of a series of webpages that advertisers use to (i)

23  set up an advertising account, (ii) create and target their ads, (iii) select the maximum amount

24  they are willing to pay per click; and (iv) set their overall advertising budget (among other

---

26  [2] Colosi Decl., Ex. A [Facebook Engineering Decl.], at ¶¶ 2-4;  *see also* Brown Decl., Ex. A [Jin Dep. Tr.] at 70:01-

27  71:1 (████████████████████); *see also id.*, Ex. B [Facebook Engineering Dep. Tr.] at 205:21-206:21 (████████████████████████████████████████).

28  [3] *See* Colosi Decl., Ex. B [Advertising Operations Decl.], at ¶ 2.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO
3.
FACEBOOK'S OPP TO PLAINTIFFS'
MTN FOR CLASS CERTIFICATION
C 09-03043 PJH

1    options).[4]  To complete the process, advertisers must click a "Place Order" button on a webpage

2    that explains: "By clicking the "Place Order" button, I agree to the Facebook Statement of Rights

3    and Responsibilities including my obligation to comply with the Facebook Advertising

4    Guidelines."[5]  An advertiser can complete this process of creating and managing their advertising

5    accounts without ever viewing any part of the Help Center.[6]

6           The Statement of Rights and Responsibilities:  Since May 1, 2009 (the beginning of the

7    proposed class period), the operative agreement between Facebook and its self-service advertisers

8    has been known as the Statement of Rights and Responsibilities ("SRR").[7]  Throughout the class

9    period, the SRR contained a disclaimer (the "Disclaimer") that precludes any liability for "click

10   fraud" and "improper actions":  "We cannot control how people interact with your ads, and are

11   not responsible for click fraud or other improper actions that affect the cost of running ads."[8]

12   Along with this Disclaimer, the SRR states that: (i) "The amount [advertisers] owe will be

13   calculated based on [Facebook's] tracking mechanisms," and (ii) advertisers "waive all claims

14   against [Facebook] related to payments unless [the advertiser] submit[s] the claim . . . within 30

15   days after the charge."[9]

16          In addition, the SRR contains an explicit integration clause that provides: "This Statement

17   makes up the entire agreement between the parties regarding Facebook, and supersedes any prior

18   agreements."[10]  While the SRR states that advertisers "may also want to review" a series of

19   specified policies, the Help Center is not referenced in this section of the SRR.[11]

20          Direct Advertisers:   Unlike Plaintiffs and other advertisers who use the self-service

21   channel, a distinct group of advertisers contract directly with Facebook through a separate process

22

23   [4] Id., at ¶¶ 3-8.
     [5] Id., at ¶ 7.
24   [6] Id., at ¶ 8.
     [7] Colosi Decl., Ex. B, Ex. 2 [SRR as of May 1, 2009] (emphasis added).
25   [8] Colosi Decl., Ex. B, Ex. 3 [SRR as of October 4, 2010] (emphasis added).
     [9] Colosi Decl., Ex. B, Ex. 5 [Payments Terms as of June 28, 2011].
26   [10] Id. (emphasis added).
     [11] Colosi Decl., Ex. B, at ¶ 15.  Beginning December 2009, the SRR included the sentence "We do, however, have
27   systems to detect and filter certain suspicious click activity, learn more here," with the word "here" being a link to the
     Help Center.  Colosi Decl., Ex. B, Ex. 4 [SRR as of Dec. 2, 2009].  This reference confirms the Help Center is a
28   source of additional educational matter and does not set forth additional contract terms incorporated into the SRR.

1    managed by Facebook's customer service teams.[12]   While they are included in Plaintiffs'

2    proposed class definition, these Direct Advertisers share virtually nothing in common with

3    Plaintiffs.  First, Direct Advertisers are sophisticated business entities (including many of the

4    largest corporations in the country)[13] that use Facebook as part of their overall marketing

5    campaigns.  These corporate entities have ample incentive and ability to pursue any disputes they

6    might feel they have with Facebook independently of this litigation.

7        Second, Direct Advertisers are typically subject to <u>different contracts</u> than those that apply

8    to Plaintiffs and other advertisers using the self-service channel.  These direct contracts are based

9    on a number of distinct templates (including form contracts imposed in some instances by the

10   advertiser) that may be subject to individualized negotiation.[14]  These contracts differ from the

11   Plaintiffs' contracts in material ways.  Significantly, some of the direct contracts include an

12   express disclaimer of liability for <u>both</u> "click fraud" <u>and "invalid clicks"</u> and thus encompass <u>all</u>

13   of Plaintiffs' claims in this case: "Facebook shall have no liability for click fraud or other

14   improper actions, <u>or for invalid clicks or other technological issues</u>, each of [which] may affect

15   the cost of advertising."[15]

16       Third, Direct Advertisers are exposed to a different mix of information about Facebook's

17   advertising platform, as they are typically assigned to a Facebook representative with whom they

18   can ask questions one-on-one.[16]  As compared to users of the self-service process, the availability

19   of this direct resource makes it far less likely that a Direct Advertiser would seek out or rely on

20   the Help Center statements on which Plaintiffs' claims are based.

21       <u>Advertisers Using Third-Party Intermediaries.</u>  Advertisers can also hire a third-party

22   agency or developer to run their Facebook ad campaigns on their behalf.  These agencies or

23   developers operate in a number of different ways, with some placing ads through Facebook's self-

24   service process, others using the direct contracting process, and others designing their own

---

[12] *Id.*, at ¶¶ 18-19.

[13] *Id.*, at ¶ 18.

[14] *Id.*, at ¶ 19.

[15] *Id.*, at ¶ 20 and Ex. 6 [Direct Terms as of May 2010] (emphasis added).  Like the SRR, the template ad terms for Direct Advertisers contain no provision incorporating other Facebook policies.

[16] Colosi Decl., Ex. B, at ¶ 21.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5.

FACEBOOK'S OPP TO PLAINTIFFS'
MTN FOR CLASS CERTIFICATION
C 09-03043 PJH

1    interface with Facebook's advertising platform.[17]  In each of these models, advertisers typically

2    rely on the expertise of the third-party intermediary in managing their ad campaigns on Facebook.

3        Facebook's Help Center:  Like many websites, Facebook has a series of pages to answer

4    various questions about its website and the services provided.  Facebook's Help Center serves this

5    function and includes topics related to Facebook's PPC advertising platform.  As noted, Plaintiffs

6    rely heavily on statements drawn from the Help Center as the basis of their claims.  In particular,

7    Plaintiffs have premised their class certification theory on a purported obligation arising from a

8    single Help Center page that reads: "We have a variety of measures in place to ensure that we

9    only report and charge advertisers for legitimate clicks ...."[18]  Notably, in prior motion practice

10   involving this specific Help Center language, Judge Fogel ruled as a matter of law that "a

11   reasonable member of the public could not view Facebook's representation as a guarantee that its

12   filtering system always will be effective."[19]

13       Although Plaintiffs now seek to integrate the Help Center as part of their contracts, these

14   webpages are separate from the contracts that govern the relationships between Facebook and its

15   advertisers.  As noted, advertisers can set up and manage their advertising campaigns without

16   ever navigating to or reviewing any part of the Help Center.[20]

17       Facebook's Click Filters:  Plaintiffs' mischaracterizations aside,

18

19

20                                                        [21]

21

22                                                                [22]   These

23   measures provide significant protections for Facebook's advertisers as compared to other major

24   online advertising networks (including Google, Yahoo, and MSN)

---

25   [17] Id., at ¶ 23.

     [18] See Motion, at 6:15-16.

26   [19] Dkt. No. 135 [Order Granting Facebook's Motion to Dismiss Plaintiffs' Second Amended Consolidated Class
     Action Complaint, entered 12/15/10] at 13:22-25 (emphasis added).

27   [20] Colosi Decl., Ex. B, at ¶ 8.

     [21] See footnote 1.

28   [22] Colosi Decl., Ex. A, at ¶ 3; see also Brown Decl., Ex. B, at 213:07-19.



[24] While Plaintiffs pejoratively refer to the alleged "paucity" and "problems" of Facebook's click filters,[25] the massive body of discovery produced in this case provides ample evidence of

[23] Colosi Decl., Ex. A, at ¶ 4.
[24] Id., at ¶¶ 5-8.
[25] Motion at 5, at n. 5.
[26] Colosi Decl. at ¶ 4.
[27] Colosi Decl., Ex. A, at ¶¶ 6-8; see also Brown Decl., Ex. C, at 235:18-237:08.
[28] Colosi Decl., Ex. A, at ¶ 6; see also Brown Decl., Ex. C, at 85:01-07; see also id., Ex. B, at 191:10-14.
[29] Colosi Decl., Ex. A, at ¶¶ 6-8.
[30] See Motion at 7:18-19 ("clicks that come from visitors intending to view an advertisement should be considered 'billable' clicks").
[31] Colosi Decl., Ex. A, at ¶ 8; see also Brown Decl., Ex. B, at 275:12-18.
[32] Colosi Decl., Ex. A, at ¶ 7.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7.

FACEBOOK'S OPP TO PLAINTIFFS'
MTN FOR CLASS CERTIFICATION
C 09-03043 PJH

[33] Notably, in these circumstances, the user is <u>still</u> delivered to the advertiser's webpage even though the click is not billed, meaning advertisers are getting clicks – and any sales or other benefits that result from those clicks – entirely for free.[34]

[35]

Contrary to Plaintiffs' mischaracterizations,

[36]

[37]).[38]

Facebook's Process For Addressing Advertiser Issues:

---

[33] Colosi Decl., Ex. A, at ¶ 7; *see also* Brown Decl., Ex. C. at 84:20-85:02.
[34] Colosi Decl., Ex. A, at ¶ 7. *see also* Brown Decl., Ex. B, at 278:25-279:07.
[35] Colosi Decl., Ex. A, at ¶¶ 6-7; *see also* Brown Decl., Ex. C, at 84:16-24.
[36] *Id.*, at 235:18-237:08.
[37] Brown Decl., Ex. D [*Price v. Facebook, Inc.* Complaint, filed 7/31/09, Case No. C 09-03519 JF], at ¶ 32.
[38] Colosi Decl., Ex. A, at ¶¶ 10-11.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8.

FACEBOOK'S OPP TO PLAINTIFFS'
MTN FOR CLASS CERTIFICATION
C 09-03043 PJH

[black redaction box containing the number 39 and, at bottom right, 41]

**B.     The Named Plaintiffs.**

**Fox Test Prep:**  Plaintiff Nathan Fox does business as "Fox Test Prep," offering courses to prepare students for the LSAT test.  Fox advertised on Facebook from May-December 2009,[42] and he currently maintains a Facebook page to promote his business.  Fox's deposition testimony is notable for his express rejection of several core assertions in the complaint filed on his behalf. While Fox claims he saw the allegedly misleading Help Center statements at issue, the only expectation he formed as a result was that Facebook would have "some systems" to address questionable clicks: "I read this representation [in the Help Center], and I thought that according to this there would be some systems in place to protect me, and that's all I knew.  That's all I thought about it."[43]  In stark contrast to the allegation in the SAC that Plaintiffs "reasonably expected" that Facebook would "eliminate" invalid clicks,[44] Fox admitted he was well aware that Facebook's click filtering systems could not be perfect in all instances.[45]

Fox's testimony is also remarkable for his repeated admissions of ignorance on the most basic aspects of this case.  Fox admitted unequivocally that "I'm not sure what types of clicks are involved in the lawsuit" and "I don't know what's a valid click and what's an invalid click."[46] Fox further admitted he has no idea whether or not the lawsuit brought on his behalf seeks to

---

[39] *Id.*, at ¶ 12.

[40] Colosi Decl. at ¶ 4.

[41] The massive nationwide class action that Plaintiffs propose can hardly be deemed a superior method of resolving disputes as required under Rule 23(b)(3) given this exising process for addressing advertiser disputes. *See Parkinson v. Hyundai Motor America*, 258 F.R.D. 580, 593, 595 (C.D. Cal. 2008) (holding that "a class action is not superior to individual litigation" where "plaintiffs have an alternative, free forum" for resolving individual claims.)

[42] Dkt. No.101 [Second Amended Class Action Complaint, filed September 24, 2010 ("SAC") ] at ¶ 76.

[43] Brown Decl., Ex. E [Fox Dep. Tr.] at 93:20-25.

[44] Dkt. No. 101 at ¶ 4.

[45] Brown Decl., Ex. E, at 101:04-09.

[46] *Id.*, at 62:1-2; 72:7-8.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

9.

FACEBOOK'S OPP TO PLAINTIFFS'
MTN FOR CLASS CERTIFICATION
C 09-03043 PJH

1  challenge the billing of clicks from "bots" and other non-human sources, or multiple clicks from a

2  Facebook user, or any of the other types of supposedly "invalid" clicks identified by counsel in

3  this case.[47] Worse still, Fox testified he has no "independent opinion" as to whether these types

4  of clicks should be part of this case, calling into question how he can possibly exercise the

5  judgment and supervision that Rule 23 demands of class representatives.[48]

6          Fox's ignorance extends equally to the damages issues in this case. Fox testified that his

7  sole reason for thinking he was overcharged was based on Google Analytics, a third-party

8  software he used to track the visits to his website.[49] Yet Fox had no independent knowledge of

9  how his Google Analytics program was set up, whether it was set up properly, or any other of the

10  other technical information needed to test his allegations of perceived overcharges.[50]

11  **Steven Price:** Steven Price owned and operated www.drivedownprices.com,[51] a website

12  intended to facilitate the sale of vehicles.[52] Price ended his business in 2009 after failing to

13  complete any sales.[53] Price advertised on Facebook only from May-June 2009.[54]

14          Unlike the other named plaintiffs, Price testified that he had a specific expectation of the

15  types of "invalid" clicks that Facebook would filter – one that directly conflicts with the

16  allegations in the SAC and which highlights his individualized interpretation of Facebook's

17  purported obligations. Price testified that he reviewed the Help Center and understood an

18  "invalid click" to be a click that "does not get to [his] landing page or website."[55] He further

19  testified that his claims in this case are limited exclusively to those types of clicks.[56] Based on his

20  narrow understanding of an "invalid click," Price testified that he expected clicks from bots and

21  other automated non-human sources to be valid and billable so long as they reached his website.[57]

22  This admission directly undermines the central allegation of the SAC that clicks from "a

23  [47] Id., at 76:23-79:21.
    [48] Id., at 78:21-79:10; 187:09-190:25; 212:21-213:13.

24  [49] See id., at 34:18-23; 44:13-45:02

25  [50] See id., at 144:23-146:24.
    [51] Brown Decl., Ex. F [Price Dep. Tr.] at 12:06-10; 14:23-15:21.

26  [52] Brown Decl., Ex. F at 12:16-14:04.
    [53] Id., at 17:02-07; 72:25-73:06.

27  [54] Id., at 70:18-25.
    [55] Id., at 22:18-21; 80:02-15.

28  [56] Id. at 22:18-25; see also id. at 24:15-21.
    [57] See id., at 31:04-14.

Cooley LLP
Attorneys At Law
San Francisco

10.

FACEBOOK'S OPP TO PLAINTIFFS'
MTN FOR CLASS CERTIFICATION
C 09-03043 PJH

1   computer 'bot' and not a human" are "invalid clicks."[58]

2          Like Fox, Price's sole reason for believing he was overcharged was based on certain third-

3   party tracking software to estimate the number of clicks received on his ads.[59]   But in his

4   deposition, Price was unable to answer questions about any facts that would be needed to assess

5   how the software he used worked or whether he configured it correctly.[60]   Price has also failed,

6   despite repeated requests, to produce the server data that would be needed to determine exactly

7   which clicks reached his landing page (the very criteria he uses to define an "invalid" click).[61]

8   Price's counsel further admitted they have no way to distinguish the clicks Price received from

9   his Facebook ads from other clicks, thus making it impossible to evaluate Price's claims.[62]

10         **RootZoo:**  Plaintiff RootZoo, Inc. ("RootZoo") owns rootzoo.com, a largely defunct[63]

11  website that was intended to facilitate discussions about sports.   RootZoo paid for advertising on

12  Facebook between November 2007 and September 2008,[64] outside of the proposed class period.

13  In footnote 19 of the Motion, Plaintiffs' counsel mention in passing and without explanation that

14  they are no longer proffering RootZoo as a proposed class representative – as if it were a casual

15  matter of choice.[65]   In fact, RootZoo's claims had to be abandoned because discovery revealed

16  that RootZoo's former principal left the company and refused to cooperate with the litigation <u>after</u>

17  <u>the evidence in this case showed that RootZoo's allegations were false when made.</u>

18         Until February 2010, RootZoo was owned and operated by Jesse Boskoff.[66]   As confirmed

19  in the Rule 30(b)(6) deposition of the RootZoo entity, Boskoff left RootZoo on bad terms in

20  February 2010,[67] with Glenn Kesner taking over as RootZoo's president, CEO, and sole

21  employee in November 2010.[68]   Per Kesner's account, Boskoff has refused to provide any

22

---

23  [58] Dkt. No. 101 at 1:15-24.
    [59] Brown Decl., Ex. F, at 115:10-15; *see also id.* at 149:19-24; 152:19-22.
24  [60] *Id.*, at 49:5-21; 50:9-17 (inability to explain how the programs tracked clicks), 51:22-53:1; 54:3-11 (inability to
    determine precisely how many clicks came from facebook.com).
25  [61] *See* Colosi Decl. at ¶ 5 & Ex. C [Correspondence re: Price Server Logs].
    [62] *Id.*
26  [63] Brown Decl., Ex. G [Kesner Dep. Tr.] at 128:08-24.
    [64] *See* Colosi Decl. at ¶ 6 & Ex. D [RootZoo Account Information].
27  [65] *See* Motion at 21, n. 19.
    [66] Brown Decl., Ex. G, at 9:08-09; 13:08-12; 34:13-19.
28  [67] *Id.*, at 173:23-25 ("Q. And it was not an amicable parting of the ways in your view? A. No.")
    [68] *Id.*, at 7:13-15

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

11.

FACEBOOK'S OPP TO PLAINTIFFS'
MTN FOR CLASS CERTIFICATION
C 09-03043 PJH

1    information about RootZoo's purported claims since his departure.[69]   Given Boskoff's refusal to

2    cooperate, the RootZoo entity that remains a nominal plaintiff has no foundation whatsoever to

3    support the allegations in the operative complaint.   Kesner admitted as much, confirming that he

4    (as RootZoo's corporate representative) knew nothing about the case apart from second-hand

5    hearsay conveyed through counsel:

6              Q: Apart from what you've learned from talking about the case
                 with your attorney and from what you've seen in the
7                documents, you don't know one way or the other whether Root
                 Zoo's lawsuit against Facebook is valid?

8              A: Not apart from anything I've read or discussed with my
                 attorney.[70]
9

10        And when asked to identify the materials upon which RootZoo relied when deciding to

11   advertise on Facebook, Kesner admitted he could only speculate as to which materials Mr.

12   Boskoff or anyone at RootZoo reviewed before RootZoo chose to buy advertising on Facebook.[71]

13   Given the utter lack of institutional knowledge on this critical issue, it is not clear how there could

14   have been a proper Rule 11 basis for RootZoo to allege in the SAC (filed on September 24, 2010

15   well _after_ Boskoff's departure from the company) that "[p]rior to contracting with Facebook for

16   advertising, RootZoo reviewed and relied on the statements set forth on Facebook's website

17   regarding its advertising services."[72]   To the contrary, the undisputed evidence produced in

18   discovery establishes that the Help Center statements on which Plaintiffs' claims depend did not

19   exist in any form when RootZoo began advertising in late 2007.[73]   Plaintiffs may wish to sweep

20   these issues aside by abandoning RootZoo as a plaintiff now that the serious defects in RootZoo's

21   claims have been revealed, but they are still highly relevant in assessing the adequacy of class

22   counsel.   _See., e.g., Williams v. Balcor Pension Investors_, 150 F.R.D. 109, 115 (N.D. Ill. 1993)

23   (holding that class counsel's selection of a clearly inadequate named plaintiff bears on counsel's

24   adequacy).

25   _____

26   [69] _Id._, at 17:18-24.
     [70] _Id._, at 19:15-21.

27   [71] _Id._, at 48:02-49:13 ("Q. Do you know particularly what materials Mr. Boskoff or anyone from RootZoo reviewed prior to choosing to advertise on Facebook?   A. No, I do not."); _see also id._ at 50:23-54:22; 74:13-16.
     [72] Dkt. No. 101 at 13:24-25.

28   [73] Colosi Decl. at ¶¶ 7-8 & Ex. E.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12.

FACEBOOK'S OPP TO PLAINTIFFS'
MTN FOR CLASS CERTIFICATION
C 09-03043 PJH

C.    **Procedural History.**

1.    **Plaintiffs' Shifting Definitions of "Fraudulent" and "Invalid" Clicks.**

Over the course of this case, Plaintiffs have shifted their definitions of these terms to suit their litigation needs. In its initial complaint, RootZoo made no distinctions between "fraudulent" and "invalid" clicks. Instead, RootZoo explained that the term "click fraud" is used broadly in the industry "to simply describe purposeful clicks on advertisements by persons or software other than a potential customer."[74] When Plaintiffs realized that Facebook's Disclaimer expressly precludes liability for "click fraud," they split their claims into distinct causes of action for "fraudulent" and "invalid" clicks, redefining "click fraud" now to be a discrete subset of "invalid clicks."[75] In contrast to their prior representations, Plaintiffs' current complaint lists five categories of "invalid clicks," with "click fraud" a discrete subset involving "deliberate efforts to drive up the cost of an ad or deplete an advertiser's budget."[76]

While the precise definitions of the various types of clicks at issue remain to be litigated, two things are clear. First, "fraudulent clicks" or "click fraud" are distinguished from other clicks in that the person clicking on the ad does so with some form of wrongful intent. As Judge Fogel noted in construing the term "click fraud" in the SRR, "[t]he term 'fraud' generally is understood to suggest some type of knowing or reckless misrepresentation or concealment of the truth."[77] Consistent with this general understanding of "fraud," Plaintiffs and their experts have testified that a "fraudulent" click is a click made with some form of underlying wrongful intent.[78] Second, Plaintiffs acknowledge that Facebook can appropriately bill for "valid" clicks that originate from a real person with a genuine intention to view an ad.[79] Both "fraudulent" and "valid" clicks, must be excluded from any calculation of damages or restitution, as explained below.

---

[74] Dkt. No. 1 [RootZoo Compl.] at ¶ 26.
[75] *See* Dkt. 30 [Consolidated Class Action Complaint] at ¶ 3 and ¶¶ 81-107.
[76] Dkt. No. 101 at ¶ 3.
[77] Dkt. No. 97 [Order Granting in Part and Denying in Part Facebook's Motion to Dismiss First Amended Complaint, entered August 25, 2010] at 8:10-12.
[78] For example, Plaintiff Price testified that a "fraudulent" click is defined as a "third party maliciously or wrongfully clicking on an ad with improper intent." Brown Decl., Ex. F at 30:07-12; *see also* Brown Decl., Ex. H [Jansen Dep. Tr.] at 63:12-19.
[79] Brown Decl., Ex. F, at 22:18-25; *see also* Brown Decl., Ex. I [Jakobsson Dep. Tr.] at 152:18-23; 154:8-16.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

13.

FACEBOOK'S OPP TO PLAINTIFFS'
MTN FOR CLASS CERTIFICATION
C 09-03043 PJH

1     **2.      All Claims For Click Fraud Have Been Dismissed as a Matter of Law.**

2          In light of the express Disclaimer of liability in the SRR, Judge Fogel dismissed as a

3     matter of law Plaintiffs' breach of contract claim for "fraudulent" clicks, ruling that "it is difficult

4     to see how Plaintiffs' allegation of 'click fraud' can survive disclaimers that state unambiguously

5     that [Facebook] will not be liable for 'click fraud.'"[80]   Judge Fogel also granted Facebook's

6     motion to dismiss "Plaintiffs' claim under the UCL concerning charges for third-party click

7     fraud," but granted leave to amend to plead additional facts.[81]   On January 17, 2011, Plaintiffs

8     confirmed they did not intend to amend their complaint and the parties agreed that Facebook

9     would not need to provide an answer to Plaintiffs UCL claim for "fraudulent" clicks.[82]   Thus, the

10    <u>only</u> clicks at issue are those that Plaintiffs can prove are "invalid" <u>but not</u> "fraudulent."

11    **3.      The Help Center Is Not A Part of The Advertising Contract.**

12         While Plaintiffs now contend that the Help Center is an integrated part of their advertising

13    contracts, their own prior pleadings contradict this position.  Plaintiff Price, for example, initially

14    alleged that "[t]he relationship between Facebook and its advertising customers <u>is governed by</u>

15    <u>Facebook's Statement of Rights and Responsibilities</u>," without once mentioning the supposed

16    obligations that Plaintiffs now say arise from the Help Center.[83]   Similarly, RootZoo admitted that

17    Facebook's advertising agreement "obligates the advertiser to pay Facebook for clicks <u>as</u>

18    <u>determined solely by Facebook and irrespective of whether these clicks are legitimate clicks</u>,"

19    without ever mentioning any other obligation arising from the Help Center.[84]

20         Only later, when opposing Facebook's Motion to Dismiss, did Plaintiffs argue for the first

21    time that the Help Center is integrated into their contracts.[85]   Notably, Plaintiffs' entire argument

22    at the time for incorporating the Help Center was based on a term in a <u>different</u> contract that

23    <u>predated</u> the SRR.  Specifically, Plaintiffs relied on a term in the pre-SRR contract that referenced

24    "other applicable Facebook policies" to argue that the Help Center should be incorporated by

---

25    [80] Dkt. No. 97 at 12:11-13; see also Dkt. No. 97 at 12:2-3 ("The disclaimers in <u>all</u> of the relevant agreements state
      explicitly that [Facebook] cannot be liable for 'click fraud.'")
26    [81] Dkt. No. 135 at 6:13-14 and 15:7-8.
      [82] See Colosi Decl., ¶ 9 and Ex. G [Correspondence with plaintiffs' counsel re: not amending Complaint].
27    [83] Brown Decl., Ex. D, at ¶ 56.
      [84] RootZoo v. Facebook. Inc. Complaint (Dkt. No. 1), filed 7/7/09, at ¶ 20
28    [85] See Dkt. No. 54 at 2:03-12.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

14.

FACEBOOK'S OPP TO PLAINTIFFS'
MTN FOR CLASS CERTIFICATION
C 09-03043 PJH

1   reference.[86]  That purported basis for incorporating the Help Center (as tenuous as it was) is now

2   entirely inapplicable given Plaintiffs' decision to commence the class period on May 2009.

3   Effective on May 1, 2009, the "other applicable Facebook policies" language was removed from

4   the online contract entirely and replaced with an express integration clause clarifying that the

5   SRR comprises "the entire agreement" between the parties, thus precluding any purported

6   incorporation of the Help Center as part of the contract.[87]

7           **4.      Advertisers Must Prove Their Individual Review of the Help Center.**

8           In rejecting the argument that the Help Center is an integrated part of Plaintiffs' contracts,

9   Judge Fogel held that statements from the Help Center can be considered only as <u>extrinsic</u>

10  <u>evidence</u> to determine whether the Disclaimer should be interpreted to allow a claim for "invalid"

11  clicks.  As Judge Fogel explained: "In light of the statements in the Help Center, there is a

12  plausible argument that some or all non-fraudulent but otherwise invalid third-party clicks are not

13  'improper' within the meaning of the disclaimers."[88]   In allowing this potential claim for

14  "invalid" clicks to proceed beyond the pleadings, the Court cautioned that Plaintiffs must prove

15  on the merits "that the statements in the Help Center existed at or around the time of the

16  contracting <u>and that they reviewed the policies that did exist at that time.</u>"[89]

17  **III.    ARGUMENT**

18          **A.      Applicable Class Certification Standards.**

19          In *Dukes*, the Supreme Court reiterated its longstanding rule that certification may not be

20  granted unless a court conducts "a rigorous analysis" to ensure compliance with each element of

21  Rule 23.  131 S. Ct. at 2551.  The Supreme Court also clarified that the commonality requirement

22  of Rule 23(a) requires a "common contention" that is "is capable of classwide resolution" and

23  <u>"will resolve an issue that is central to the validity of each one of the claims in one stroke."</u>  *Id.*

24

---

[86] *See* Dkt. No. 54 at 2:03-12.

25  [87] Judge Fogel recognized this significant modification in the SRR, noting that "the [SRRs] provide that '[t]his
    statement makes up the entire agreement between the parties regarding Facebook, and supersedes any prior

26  agreements.'" (*See* Dkt. No. 97 at n.4.)

    [88] Dkt. No. 97 at 11:21-23.

27  [89] *Id.*, at 11:12-13 (emphasis added).  *See also id.* at 9:19-22 ("[t]he Court determined that statements in the Help
    Center could not be relevant to the intentions of the parties at the time of contracting unless Plaintiffs could allege

28  that the statements existed at the time the contracts were formed and that Plaintiffs were aware of the statements.")

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO                                    15.

FACEBOOK'S OPP TO PLAINTIFFS'
MTN FOR CLASS CERTIFICATION
C 09-03043 PJH

1  (emphasis added).  As the Supreme Court explained, commonality is <u>not</u> measured by the "the

2  raising of common 'questions'—even in droves—but, rather the capacity of a classwide

3  proceeding to generate common <u>answers</u> apt to drive the resolution of the litigation." *Id*.  In

4  assessing commonality a court must focus on the differences among class members because

5  "[d]issimilarities within the prospect class are what have the potential to impede the generation of

6  common answers." *Id*.  In addition to the threshold requirements of Rule 23(a), a plaintiff

7  seeking monetary relief must comply with Rule 23(b)(3), which imposes "greater procedural

8  protections" by requiring plaintiffs to prove not only the existence of a "common contention"

9  with "common answers," *id.*, but that such common issues <u>predominate</u> over individualized

10  issues. Plaintiffs' Class Certification Motion fails under these standards because:

11 • With respect to Plaintiffs' UCL claims, there is no "common answer" to the crucial
    question of whether advertisers were exposed to the same alleged misstatements and
12  the proposed class necessarily includes advertisers with no standing;

13 • With respect to the breach of contract claims, individual issues will predominate in
    determining whether advertisers reviewed the extrinsic statements from the Help
14  Center that are the basis of Plaintiffs' claims, as required by Judge Fogel's orders;

15 • Plaintiffs have no classwide method to parse the many millions of clicks in this case to
    segregate the "invalid" clicks they seek to challenge from the "fraudulent" and "valid"
16  clicks that are not actionable, and their reliance on purported "industry standards" to
    avoid this burden is unavailing; and

17
   • Plaintiffs are not adequate class representatives and should not be allowed to represent
18  the interests of a widely diverse class that includes sophisticated business entities
    whose interests bear no resemblance to their own.

19  **B.     Plaintiffs' UCL Class Is Overbroad and Individualized Issues Will
            Predominate In Identifying Advertisers (If Any) With Proper Standing.**
20

21       Under the UCL, all plaintiffs seeking restitution must prove that the defendant obtained

22  the amounts in dispute "by means of" its alleged wrongful conduct.  Cal. Bus. & Prof. Code §

23  17203.  Given this causal requirement, class members cannot recover restitution if they were "not

24  exposed to the alleged misrepresentations and therefore could not possibly have lost money or

25  property as a result of the unfair competition." *Pfizer Inc., v. Super. Ct.*, 182 Cal. App. 4th 622,

26  631 (2010).  Accordingly, California courts have consistently denied certification of UCL claims

27  where plaintiffs cannot show that putative class members were uniformly exposed to the same

28  alleged misstatements and omissions. *See id.*

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO
                                16.                    FACEBOOK'S OPP TO PLAINTIFFS'
                                                       MTN FOR CLASS CERTIFICATION
                                                       C 09-03043 PJH

1    In addition to this substantive requirement of the UCL, Article III of the Constitution

2    requires that all litigants in federal court have standing based on a "personal injury fairly traceable

3    to the defendant's allegedly unlawful conduct ...." *Allen v. Wright*, 468 U.S. 737, 738 (1984).

4    Accordingly, a proposed class "cannot be certified if it contains members who lack standing," and

5    a "class must therefore be defined in such a way that anyone within it would have standing."

6    *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1034 (8th Cir. 2010) (internal citations omitted).

7    *Accord Denney v. Deutsche Bank AG*, 443 F.3d 253, 263-64 (2d Cir. 2006) ("No class may be

8    certified that contains members lacking Article III standing."); *Sanders v. Apple Inc.*, 672 F.

9    Supp. 2d 978, 991 (N.D. Cal. 2009) (Fogel, J.) (same).[90]

10    In combination, these requirements make certification of Plaintiffs' proposed UCL class

11    impossible.  Throughout their Motion, Plaintiffs repeatedly emphasize that their claims hinge on

12    statements in the Help Center that allegedly misled advertisers to believe they would only be

13    billed for "legitimate clicks."  But as discussed, the Help Center is entirely separate from the

14    process that advertisers use to create and manage their advertising campaigns.[91]  Plaintiffs have

15    no feasible way to show which proposed class members may have been affected by the alleged

16    misstatements in the Help Center webpages at issue, which advertisers may or may not ever see

17    depending on their individual navigation through the Facebook website.

18    The established law of the UCL mandates denial of certification in these circumstances.

19    In *Sevidal v. Target Corp.*, 189 Cal. App. 4th 905 (2010), for example, the Court of Appeals

20    affirmed denial of certification of UCL claims where consumers would only have seen the alleged

21    misstatements at issue only if they affirmatively clicked a link for "Additional Information" when

22    completing their online purchases.  *Id.* at 912-14.  Under these circumstances, the Court of

23    Appeal found "Sevidal's proposed class" to be "overbroad because most class members never

24    selected the 'Additional Info' icon."  *Id.* at 928.  The Court therefore affirmed the denial of

---

[90] In the specific context of the UCL, federal courts have recognized that Article III imposes an "irreducible
constitutional minimum" that must be satisfied even if state law would allow a representative action to proceed on
more relaxed standards.  *See Avritt*, 615 F.3d at 1034-35 (upholding denial of certification of a UCL claim and
explaining that "the UCL's standing requirement diverge[ ] from federal jurisprudential principles … which we are
bound to follow").  *See also Lee v. Am. Nat'l Ins. Co.*, 260 F.3d 997, 1001-02 (9th Cir. 2001) (holding that claims
may be viable in state court but not in federal court if plaintiffs lack the necessary Article III standing).

[91] Colosi Decl., Ex. B, at ¶ 8.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

17.

FACEBOOK'S OPP TO PLAINTIFFS'
MTN FOR CLASS CERTIFICATION
C 09-03043 PJH

1    certification because the plaintiff's claim was "based on an alleged false misrepresentation to

2    which the majority of class members were never exposed." *Id.*[92] Similarly here, certification

3    should be denied because advertisers could only have seen the alleged misstatements at issue if

4    they had taken affirmative steps to access the Help Center and navigate to the specific webpages

5    upon which Plaintiffs base their claims. Under these circumstances, Plaintiffs cannot demonstrate

6    the uniform exposure to the proposed class required under the UCL.

7         Article III dictates the same result because class members who were not exposed to the

8    Help Center could not have an injury "fairly traceable to" the alleged wrongdoing in this case.

9    *Allen*, 468 U.S. at 738. In *In re Light Cigarettes Mktg. Sales Practices Litig.*, 271 F.R.D. 402,

10   419 (D. Me. 2010), plaintiffs attempted to certify a class of consumers who had purchased "light"

11   cigarettes in reliance on defendant's alleged misstatements and omissions. *Id.* at 405-06. The

12   Court explained that at the class certification stage, "the focus is on the class definition; if the

13   definition is so broad that it sweeps within it persons who [do not have Article III standing], it is

14   too broad." *Id.* at 419 (internal quotations and citation omitted). The court rejected the proposed

15   class as overbroad because it "necessarily includes class members who knew light cigarettes were

16   not healthier than other cigarettes, notwithstanding Defendant's alleged representations to the

17   contrary." *Id.* at 420. *See also Webb v. Carter's Inc.*, No. CV 08-7367 GAF (MANx), 2011 WL

18   343961, at *6-7 (C.D. Cal. Feb. 3, 2011) (denying certification of UCL claims where some

19   proposed class members lacked Article III standing); *Burdick v. Union Sec. Ins. Co.*, No. CV 07-

20   4028 ABC (JCx), 2009 WL 4798873, at *3 (C.D. Cal. Dec. 9, 2009) (same).[93]

21        Here, it is virtually certain that large portions of the proposed class would never have

22   reviewed and relied on the Help Center. As indicated, self-service advertisers would only have

---

[92] This Court has similarly recognized that a UCL claim cannot be certified where the liability determinations would require individualized inquiries over "whether and when a particular class member heard or read the alleged misrepresentations." *See Endres v. Wells Fargo Bank*, No. C 06-7019 PJH, 2008 WL 344204, at *12 (N.D. Cal. Feb. 6, 2008). *See also Cohen v. Directv, Inc.*, 178 Cal. App. 4th 966, 979 (2009) (affirming denial of certification where "the members of the class stand in a myriad of different positions" as to the allegedly misleading advertising).

[93] *See also, e.g., Campion v. Old Republic Home Prot. Co., Inc.*, No. 09-CV-748-JMA (NLS), 2011 WL 42759, at *16 (S.D. Cal. Jan. 6, 2011) (denying certification where "an individualized inquiry [into actual reliance] is necessary due to varying means by which misrepresentations are alleged to have been made and the varying ways in which the putative class members have acquired their plans"); *Mahfood v. QVC, Inc.*, No. SACV 06-0659-AG(ANx), 2008 WL 5381088, at *4 (C.D. Cal. Sept. 22, 2008) (denying certification where proposed class members "hear or see different representations during QVC's television programming and on QVC's website").

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

18.

FACEBOOK'S OPP TO PLAINTIFFS'
MTN FOR CLASS CERTIFICATION
C 09-03043 PJH

1    seen the alleged misstatements at issue if they affirmatively navigated to the Help Center and

2    clicked on the particular pages that Plaintiffs are complaining about.   Moreover, Direct

3    Advertisers who contract directly with Facebook would have little occasion or need to review the

4    Help Center because they have direct access to a Facebook representative to address any

5    questions they might have on click-related issues.[94]   In addition, advertisers who work through

6    third-party agencies or developers to place advertising on Facebook are even less likely to review

7    the Help Center given their affirmative choice to rely on a third-party to manage their advertising

8    campaigns.   Large swaths of the class, therefore, are unlikely to have ever been exposed to the

9    Help Center (precluding the uniform exposure required under UCL) or to have affirmatively

10   relied on the specific statements that are the crux of Plaintiffs' claims (precluding the standing

11   requirements imposed Article III).

12        The lack of commonality among the proposed class on these critical issues of exposure

13   and reliance is underscored by the experiences of the Plaintiffs themselves.   While RootZoo

14   alleged that its principal relied on the Help Center, that allegation is demonstrably false: the

15   undisputed fact is that the Help Center statements at issue were not even in existence when

16   RootZoo started advertising. And while Price and Fox allegedly did review the Help Center, they

17   came to dramatically different conclusions about Facebook's obligations with respect to "invalid"

18   clicks.   In contrast to the allegations in his complaint, Price testified he expected Facebook could

19   properly bill for <u>all</u> clicks that reached his website.[95]   Fox, on the other hand, had no specific

20   understanding of what clicks can be billed and only expected (in the most general terms) that

21   Facebook would employ "some" systems to address "invalid" clicks.[96]   Neither Fox nor Price

22   interpreted the Help Center statements in the manner now posited in their Motion, highlighting

23   the need to assess each advertiser's particular understanding of the alleged misstatements at issue.

24        Moreover, the Plaintiffs' proposed class definition is impermissibly broad in that it

25   purports to encompass advertisers like the Direct Advertisers that have no claim under the UCL

26   as a matter of law because they are sophisticated business entities that contract directly with

---

[94] Colosi Decl., Ex. B, at ¶ 21.
[95] Brown Decl., Ex. F, at 31:12-14.
[96] Brown Decl., Ex. E, 40:04-07.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

19.

FACEBOOK'S OPP TO PLAINTIFFS'
MTN FOR CLASS CERTIFICATION
C 09-03043 PJH

1   Facebook using a process not available to the general public. *See, e.g., Linear Tech. Corp. v.*

2   *Applied Materials*, 152 Cal. App. 4th 115, 135 (2007) (UCL does not reach contractual disputes

3   between corporations where members of the general public are not parties to the contract); *In re*

4   *Conoco Phillips Co. Serv. Station Rent Contract Litig.*, No. M:09-cv-02040 RMW, 2011 U.S.

5   Dist. LEXIS 40471 (Apr. 13, 2011) (same). For all these reasons, the Court should deny

6   certification of Plaintiffs' proposed UCL class as improper and overbroad.[97]

7   **C.    Plaintiffs' Contract Claims Cannot Be Certified Given The Individualized**
    **Issues In Applying The Extrinsic Evidence On Which The Claims Depend.**
8

9        Plaintiffs' effort to certify their breach of contract claim fails for similar reasons.

10  Plaintiffs argue their contract claims are amenable to class-wide treatment because "Facebook's

11  uniform advertising contract" imposes an obligation to bill only for "legitimate clicks."[98] But this

12  blithe characterization of Facebook's "uniform advertising contract" is a misrepresentation of the

13  record intended to skirt the prior rulings in this case. The supposed "uniform terms" that are the

14  premise of Plaintiffs' certification theory[99] are in fact the very same statements that are the basis

15  of Plaintiffs' UCL claims – i.e., the Help Center statement that Facebook has "a variety of

16  measures in place to ensure that [it] only report[s] and charge[s] advertisers for legitimate clicks

17  …."[100]   While Plaintiffs state, without citation to any authority, that the Help Center is

18  "incorporated into the uniform contract," [101] that assertion has already been rejected in this case.

19       As Judge Fogel recognized, the SRR – which applies to all advertisers that used the self-

20  service channel after May 1, 2009 – provides that its terms "make[] up the entire agreement

21  between the parties regarding Facebook, and supersedes any prior agreements."[102] Accordingly,

22  statements outside of the SRR contained in the Help Center as a matter of law cannot be invoked

---

[97] Plaintiffs' arguments under the "unfair" prong of the UCL do not change this result. If anything, the UCL "unfair" claim underscores the need to examine each advertiser's individualized expectations of Facebook's PPC advertising platform. *See Menagerie Prods. v. Citysearch*, No. CV-08-4263-CAS (FMO), 2009 WL 3770668, at *14 (CD. Cal. Nov. 9, 2009) (refusing to certify a class under the "unfair" prong of the UCL and explaining that "a plaintiff's individual expectations about the business practice are relevant to determining the extent of the harm" for purposes of the UCL.).

[98] Motion at 1:17-18.
[99] *See id.*, at 26:12.
[100] *See id.*, at 6:15-16.
[101] *Id.*, at 6:11-12.
[102] *See* Dkt. No. 97 at n.4.

1   to impose additional contractual obligations on Facebook.  Instead, Judge Fogel allowed Plaintiffs

2   to apply the Help Center only as <u>extrinsic evidence</u> to argue that the Disclaimer should be

3   interpreted to permit claims for "invalid" clicks,[103] and then <u>only</u> if they could prove that they

4   reviewed the Help Center statements at the time they contracted with Facebook: "statements in

5   the Help Center could not be relevant to the intentions of the parties at the time of contracting

6   <u>unless Plaintiffs could allege that the statements existed at the time the contracts were formed and</u>

7   <u>that Plaintiffs were aware of the statements</u>."[104]

8      This established law of the case precludes certification of Plaintiffs' contract claims.

9   While Plaintiffs were able to avoid dismissal of their individual claims by alleging they reviewed

10  the Help Center (an allegation that has been proven false with respect to RootZoo), Plaintiffs have

11  failed to explain how they can determine which of the many thousands of proposed class

12  members might be similarly situated.  As in *Dukes*, commonality is lacking here because there is

13  no "common answer" to the critical question that drives the outcome of the contract claims of the

14  proposed class – namely, whether advertisers "reviewed the [Help Center] policies that did exist

15  at [the] time" of their initial contracting.[105]

16     Courts have consistently denied certification in similar circumstances, where a contract

17  claim involved consideration of extrinsic evidence or other individualized evidence. *See, e.g.,*

18  *Lozano v. AT&T Wireless Servs., Inc.* 504 F.3d 718, 735 (9th Cir. 2007) (affirming denial of

19  certification of contract claim where court would have to "ascertain each individual's

20  expectations about the contract, and determine whether those expectations were reasonable");

21  *Westways World Travel, Inc. v. AMR Corp.*, No. 05-056603, 2008 WL 205296, at *2 (9th Cir.

22  Jan. 22, 2008) (affirming denial of certification where contract claims "would require

23  individualized inquiries into [defendant]'s legal and contractual relationship with each class

24  member"); *Adams v. Kan. City Life Ins. Co.*, 192 F.R.D. 274, 282 (W.D. Mo. 2000) ("By

[103] In *Woods v Google*, No 05:11 cv-1263-JF, 2011 WL 3501403 (N.D. Cal. Aug. 10, 2011), Judge Fogel dismissed a complaint, ruling that the statements in Google's Help Center could not be applied to impose contractual obligations on Google where the Help Center statements at issue were "spread across a variety of pages in a variety of formats [that] make it difficult to identify the terms of any actual and unambiguous contractual obligations."
[104] Dkt. No. 97 at 9:19-22 (emphasis added).
[105] Dkt. No. 97 at 11:12-13

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO                                21.

FACEBOOK'S OPP TO PLAINTIFFS'
MTN FOR CLASS CERTIFICATION
C 09-03043 PJH

1   allowing extrinsic evidence of the parties' dealings, the breach of contract claims become

2   individualized and not reasonably susceptible to class action treatment."). The circumstances

3   here are no different and mandate denial of plaintiffs' motion.

4         Plaintiffs' reliance on *Menagerie Prods. v. Citysearch,* No. CV-08-4263-CAS (FMO),

5   2009 WL 3770668 (C.D. Cal. Nov. 9, 2009), to support certification is misplaced. *Citysearch* is

6   superficially similar on the facts in that it involved a class of advertisers challenging certain

7   aspects of the defendant's PPC advertising platform. But the unique procedural history of this

8   case as compared to *Citysearch* dictates an entirely different outcome. First, Judge Fogel's prior

9   rulings in this case require Plaintiffs to prove that advertisers individually reviewed the extrinsic

10  statements in the Help Center in order to pursue a claim for "invalid clicks." There was no such

11  ruling in *Citysearch* and so the plaintiffs on class certification were not faced with the obstacle of

12  proving that individual advertisers had reviewed any extrinsic evidence (nor did it appear that the

13  contracts at issue were integrated contracts like the SRR). Second, Judge Fogel has dismissed all

14  claims related to "fraudulent" clicks, thus requiring Plaintiffs to demonstrate a classwide method

15  to identify and remove these clicks from the case (as discussed further below). In contrast, the

16  *Citysearch* court ruled prior to class certification that the particular disclaimer of liability in that

17  case did <u>not</u> apply to bar any part of plaintiffs' claims and so the plaintiffs were not faced with the

18  same need to parse among "invalid" and "fraudulent" clicks. *Citysearch,* No. CV-08-4263-CAS,

19  Dkt. No. 35 at 10-11. Under these circumstances, *Citysearch* provides no meaningful guidance

20  on how to resolve the certification issues in this case, which arise from the unique procedural

21  history established through Judge Fogel's prior rulings.[106]

22      **D.**   **Plaintiffs Have No Viable Method For Proving Each Class Member's**
23          **Individual Recovery.**

24          **1.**   **Plaintiffs Have No Method To Differentiate Among The Different**
               **Types Of Clicks At Issue.**

25        To certify a class seeking monetary recovery under Rule 23(b)(3) (whether for restitution

26

27  [106] Notably, the Ninth Circuit granted interlocutory review of the *Citysearch* decision under Rule 23(f), presumably reflecting a concern with the District Court's grant of certification. *See Chamberlain* v. *Ford Motor Co.,* 402 F.3d

28  952, 955, 962 (9th Cir. 2005) (interlocutory review is warranted when a certification order is "manifestly erroneous" or "applies an incorrect Rule 23 standard or ignores a directly controlling case.") The case settled on appeal.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

22.

FACEBOOK'S OPP TO PLAINTIFFS'
MTN FOR CLASS CERTIFICATION
C 09-03043 PJH

1   or damages), Plaintiffs must show that each advertiser's purported harm from "invalid" clicks can

2   be calculated using common proof and without resorting to individualized evidence. *See, e.g.,*

3   *Windham v. Am. Brands, Inc.,* 565 F.2d 59, 68-69 (4th Cir. 1977) (where proof of injury "does

4   not lend itself to … a mechanical calculation" courts generally find the matter to be

5   "unmanageable as a class action").   Given the scope of the claims in this case, Plaintiffs must

6   convince the Court that a workable method exists to analyze every click on every ad shown on

7   Facebook during the class period to isolate the "invalid" clicks at issue from the clicks that are

8   either "fraudulent" (which must be excluded per Judge Fogel's orders) or "valid" (which are not

9   at issue at all).

10          Remarkably, Plaintiffs make no effort at all to show they can litigate this essential issue

11   on a classwide basis.

12   ██████████████████████████████████████████████████████████

13   ██████████████████████████████████████████ [107] Certification should be

14   denied on this ground alone, as Plaintiffs' failure of proof leaves the Court to guess at how they

15   can prove this critical element of their case. *See, e.g., Windham,* 565 F.2d at 70 (courts "should

16   not certify the class merely on the assurance … that some solution will be found" to damages

17   issues); *In re Med. Waste Servs. Antitrust Litig.,* No. 2:30MD1546, 2006 WL 538927, at *8 (D.

18   Utah Mar. 3, 2006) ("It is simply not enough that Plaintiffs merely promise to develop in the

19   future some unspecified workable damage formula.").

20          Equally important, Dr. Jakobsson admitted (i) ████████████████████

21   ███████████████████████████████████████████████████████████

22   ██████████████████████████████████ [108] and (ii) ██████████

23   ███████████████████████████████████████████████████████████

24   ████████████████████████ [109] ████████████████████████████

25   ███████████████████████████████████████████████████████████

26   ███████████████████████████████████████████████████████████

27   [107] Brown Decl., Ex. I, at 147:06-153:16.
     [108] Brown Decl., Ex. I, at 159:14-22.

28   [109] *Id.* at 159:24-160:09; *see also id.* at 152:12-153:09.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

23.

FACEBOOK'S OPP TO PLAINTIFFS'
MTN FOR CLASS CERTIFICATION
C 09-03043 PJH

1 ████████████████████████████

2     Not surprisingly, courts have consistently rejected models of recovery that would lead to

3 windfall recoveries of this sort.  In *In re First Alliance Mortgage Co.*, for example, the Ninth

4 Circuit rejected a proposed a measure of classwide recovery in which consumers would have

5 obtained a full refund of fees paid to the defendant because the entire amounts paid could not be

6 tied to the alleged misconduct in that case.  471 F.3d 977, 997 (9th Cir. 2006) (holding that

7 awarding full refunds was improper where "there is no basis to conclude that every single dollar

8 that ultimately flowed to [the defendant] was 'ill-gotten'")[110].  Similarly here, Plaintiffs should

9 not be allowed to proceed with a case that, by their own expert's admission, would

10 indiscriminately award recovery for clicks that are not linked to any alleged wrongdoing and must

11 be excluded from this case as a matter of law.  *See, e.g.*, *Reed v. Advocate Health Care*, 268

12 F.R.D. 573, 588 (N.D. Ill. 2009) (denying class certification where plaintiffs' damages model

13 would lead to "false positives" and "errors of prediction" in which damages would be awarded to

14 uninjured class members); *In re Flash Memory Antitrust Litig.*, No. C 07-0086 SBA, 2010 WL

15 2332081, at *12 (N.D. Cal. June 9, 2010) (rejecting proposed damages method that would "sweep

16 in an unacceptable number of uninjured plaintiffs"); *Tidenberg v. Bidz.com*, No. CV 08-5553

17 PSG (FMOx) 2010 WL 135580, at *4 (C.D. Cal. Jan. 7, 2010) (denying certification where

18 plaintiffs failed to show a classwide method for determining which particular class members may

19 have been harmed).

20     Moreover, given their UCL claim for restitution, Plaintiffs must be able to prove, for each

21 advertiser in the proposed class, "[t]he difference between what the plaintiff paid and *the value of*

22 *what the plaintiff received* . . . ."  *See In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 131 (2009)

23 (emphasis added) (affirming denial of class certification of UCL claims), *see also Colgan v.*

24 *Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663 (2006) (reversing restitution award because

25 plaintiffs did not have a sufficient method to measure the difference between the amount that

---

26 [110] The Supreme Court expressed similar concerns in *Dukes*.  In denying certification, the Supreme Court rejected an
expert's opinion on discrimination issues because the expert could not state specifically what percentage of Wal-
27 Mart's employment decisions might have been affected by the bias described in the report.  *Dukes*, 131 S. Ct. at
2554.  Similarly here, Plaintiffs' damages expert should be rejected because he admits he has no way to identify the
28 percentage of "false positives" that would result when trying to calculate damages and restitution in this case.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

24.

FACEBOOK'S OPP TO PLAINTIFFS'
MTN FOR CLASS CERTIFICATION
C 09-03043 PJH

class members paid and the value of what they received).

████████████████████████████████████

### 2. Plaintiffs' Effort To Rely On Purported "Industry Standards" Fails.

In an effort to skirt these issues, Plaintiffs claim there is no need to distinguish among the various categories of clicks in this case because damages and restitution can be calculated by applying "industry standard" rules that provide an objective standard for determining whether a click is billable. This argument should be rejected for multiple reasons.

First, Plaintiffs should not be allowed invoke unidentified "industry standards" to avoid addressing an essential requirement imposed by Judge Fogel's orders, namely the identification and removal of "fraudulent" clicks from this case. As Plaintiffs and their own experts have repeatedly acknowledged, "fraudulent clicks" are defined by a wrongful intent – an inherently subjective standard that is dependent on the circumstances of each user and each click.[111] Indeed, the very IAB guidelines that Plaintiffs and their experts rely on define a "fraudulent" click based on the underlying purpose of the click and not by reference to some fixed objective rule:

> Click Fraud means a sub-component of Invalid Clicks … for the purpose of manipulating click measurement activity or click-based advertising payments, having no intention of legitimately browsing site content, making a purchase or performing any other type of legitimate conversion activity.[112]

Against this backdrop, Plaintiffs should not be allowed to impose purported "industry standard" rules as a substitute for identifying and removing "fraudulent" clicks from this case.



In his report,

---

[111] See Brown Decl., Ex. F, at 30:07-12; see also Brown Decl., Ex. H, at 63:12-19.
[112] Brown Decl., Ex. J [Interactive Advertising Bureau, Click Measurement Guidelines, Version 1.0 – Final Release, May 12, 2009] at page 9 (emphasis added).

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

25.

FACEBOOK'S OPP TO PLAINTIFFS'
MTN FOR CLASS CERTIFICATION
C 09-03043 PJH



As discussed above, in contrast to Google or Yahoo or other search-based advertising platforms,

[114]  Indeed, the IAB's suggestions regarding click measurement methods were not published until May 12, 2009 (<u>after</u> the start of the proposed class period) and

---

[113] Brown Decl., Ex. I at 95:22-98:11.
[114] *See, e.g.*, Brown Decl., Ex. C, at 250:12-251:12.
[115] *See* Brown Decl., Ex. H at 102:12-22; 118:21-119:05.
[116] Jakobsson Report at ¶ 27.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FACEBOOK'S OPP TO PLAINTIFFS'
MTN FOR CLASS CERTIFICATION
C 09-03043 PJH



120   Instead, they proffer a series of opinions that purport to

The Lee and Jansen expert reports should therefore be disregarded in their entirety.

[117] Brown Decl., Ex. I, at 48:15-49:01; 51:17-52:11; 55:16-57:07; 73:16-77:19

[118] Brown Decl., Ex. H, at 60:15-61:09; 70:21-72:01. *See also id.*, Ex. K [Lee Dep. Tr.] at 106:04-07.

[119] Plaintiffs' reliance on purported "industry standards" also contradicts their express agreement that "[t]he amount [advertisers] owe will be calculated based on [Facebook's] tracking mechanisms," as reflected in the SRR. Colosi Decl., Ex. B, Ex. 2 (emphasis added).

[120] Brown Decl., Ex. K, at 33:06-25; 48:15-22; 75:02-16; 77:17-25; 80:18-81:11; 104:21-105:19; *see also id.*, Ex. H, at 17:02-18:05.

[121] Lee Report at ¶¶ 20-22; *see also* Jansen Report at 8-9, 14-22.

[122] Brown Decl., Ex. K, at 75:02-16; 77:17-25; 80:18-81:11; 104:21-105:19; 161:20-162:23; *see also id.*, Ex. H, at 104:22-106:15, 128:01-130:03, and 167:18-171:25.

[123] Brown Decl., Ex. I, at 162:04-166:22; 169:01-170:10.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

27.

FACEBOOK'S OPP TO PLAINTIFFS'
MTN FOR CLASS CERTIFICATION
C 09-03043 PJH

**3.    The Named Plaintiffs' Claims Demonstrate Why Damages And Restitution Cannot Be Litigated On A Classwide Basis.**

Plaintiff Fox's circumstances illustrate the individualized issues that would need to be addressed to assess whether advertisers have suffered any harm in this case.   Fox alleges Facebook charged him for "invalid" clicks because certain third-party software appeared to him to show (i) that Facebook charged him for more clicks than he actually received, and (ii) that the clicks on his Facebook ads resulted in visits to his website that lasted only a single second.[124]   But as set forth in the Expert Report of Stroz Friedberg, the server data obtained from Fox's web hosting service shows (i) that Facebook in fact charged Fox the correct number of clicks, with any perceived discrepancy explained by issues beyond Facebook's control (for example, Fox's website failing to respond to a request to view a page), and (ii) that clicks from Facebook ads did <u>not</u> uniformly result in site visits of a single second, as Fox contends, and that these perceived issues were caused by Fox's own (mis)configuration of his servers and software.[125]

On this latter point, an examination of Fox's server logs show that clicks on his Facebook ads in fact led to Facebook users reaching his website, viewing multiple pages on the site, and even accessing the registration page to sign up for his LSAT class – in other words, achieving the very objectives Fox likely was seeking when advertising on Facebook.[126]   None of these clicks can be deemed "invalid" or "fraudulent" by any definition.   There is certainly no feasible way to undertake this sort of highly technical and individualized analysis for each of the thousands of advertisers in the class.

---

[124] Dkt. No. 101 at ¶ 77.
[125] Brown Decl., Ex. L [Expert Report of Stroz Friedberg, October 24, 2011], at pages 26-34.
[126] *Id.*

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FACEBOOK'S OPP TO PLAINTIFFS'
MTN FOR CLASS CERTIFICATION
C 09-03043 PJH

E.     **The Named Plaintiffs are Inadequate Class Representatives.**

Plaintiffs' Motion also fails because they cannot meet the adequacy requirements of Rule 23(a).  First, Fox and Price are inadequate representatives because they will be forced to litigate individualized defenses that are potentially dispositive of their claims.  *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) ("class certification should not be granted if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.") (citations and quotation omitted).  Here, neither Fox nor Price has attempted to show that he suffered any concrete injury from specific "invalid" clicks.  In fact, both Plaintiffs refused to answer multiple discovery requests asking them to identify the "invalid" clicks for which they believe they were overcharged.[127]  And Plaintiffs' experts confirmed that they made no effort to determine whether Plaintiffs were actually billed for any "invalid" clicks; nor did they attempt to assess the accuracy of Plaintiffs' allegations in the SAC.[128]  Under these circumstances, Plaintiffs' standing to pursue their individual claims is in serious doubt.  Moreover, Plaintiffs are subject to a potentially dispositive defense in that neither Price nor Fox ever disputed their PPC charges within the period needed to avoid waiver under their contracts.[129] *See Woods*, 2011 WL 3501403, at *5.

Second, Plaintiffs are inadequate because their interests are fundamentally different from those of other putative class members.  In assessing the typicality and adequacy requirements of Rule 23, the Court must "'ensure that the named plaintiffs have incentives that align with those of absent class members . . . .'"  *In re GPU Antitrust Litig.*, 253 F.R.D. 478, 489 (N.D. Cal. 2008) (citation omitted).  Here, the proposed class is composed of a diverse array of Facebook advertisers, many of which are sophisticated corporations that share virtually nothing in common with Plaintiffs Fox and Price.  In particular, the Direct Advertisers are business entities that contract directly with Facebook on different terms than those available to the general public and use entirely different channels to manage their ongoing advertising campaigns on Facebook.  In

---

[127] *See* Colosi Decl. at ¶ 10 and Ex. H.

[128] *See* Brown Decl., Ex. H, at 90:02-95:16; Ex. I, at 99:6-11; 105:23-118:16.

[129] *See* Colosi Decl., Ex. B, Ex. 5 (providing that advertisers "waive all claims against [Facebook] related to payments unless [the advertiser] submit[s] the claim . . . within 30 days after the charge.").

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

29.

FACEBOOK'S OPP TO PLAINTIFFS'
MTN FOR CLASS CERTIFICATION
C 09-03043 PJH

1  contrast, Plaintiffs are individuals who exclusively used the self-service process, have ceased all

2  advertising on Facebook, and (in Price's case) whose business is shut down entirely.  Under these

3  circumstances, the Court should not certify a class that would require the Direct Advertisers and

4  other business entities to place their interests in the hands of Plaintiffs and their counsel. *See Id.*

5  at 489-90 (rejecting proposed class where the plaintiffs' interests as individual purchasers differed

6  from those of business entities that purchased through a different channel); *Deiter v. Microsoft*

7  *Corp.*, 436 F.3d 461 (4th Cir. 2006) (holding that individual plaintiffs could not represent

8  business entities that had direct contracts with the defendant); *Rosenbluth Int'l, Inc. v. Super. Ct.*,

9  101 Cal. App. 4th. 1073, 1078-79 (2002) (holding that an individual plaintiff could not pursue a

10  UCL claim to represent corporations with independent resources to pursue direct claims).

11       Finally, Fox should be rejected as a proposed class representative given his striking

12  unfamiliarity with the facts of this case. *See Welling v. Alexy*, 155 F.R.D. 654, 659 (N.D. Cal.

13  1994) (rejecting class representative who lacked the ability and willingness to "serve the

14  necessary role of 'check[ing] the otherwise unfettered discretion of counsel in prosecuting the

15  suit.'") (citation omitted); *Burkhalter Travel Agency v. MacFarms Int'l, Inc.*, 141 F.R.D. 144,

16  153-54 (N.D. Cal. 1991) (finding plaintiff to be inadequate given his "alarming unfamiliarity"

17  with basic aspects of the case).  As explained above, Fox knows essentially nothing about this

18  case and conceded he would defer entirely to counsel in prosecuting this action, thus abdicating

19  the role demanded by Rule 23 and making him an inadequate class representative.

20  **IV.    CONCLUSION.**

21       For the foregoing reasons, Facebook respectfully requests that the Court deny Plaintiffs'

22  Motion for Class Certification in its entirety.

23

24

25  Dated: October 24, 2011

                    COOLEY LLP

                    /s/ Whitty Somvichian

26

27                      Whitty Somvichian

                    Attorneys for Defendant FACEBOOK, INC.

28  1240859

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

30.

FACEBOOK'S OPP TO PLAINTIFFS'
MTN FOR CLASS CERTIFICATION
C 09-03043 PJH