# Exhibit E

1              UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3                 SAN JOSE DIVISION

4    _____

5    In Re FACEBOOK PPC        )     Master Case No.

6    Advertising Litigation,   )     5:09-cv-03043 JF

7                              )

8    This Document Related To: )

9        All Actions.          )

10   _____)

11

12

13

14

15           VIDEOTAPED DEPOSITION OF NATHAN FOX

16                  JUNE 21, 2011

17

18

19

20

21

22

23

24   REPORTED BY:

25   JANIS JENNINGS, CSR 3942, CLR, CCRR

                                        Page 1

1    this complaint.

2        Q.    Well, let me ask you, then:  What is your

3    understanding of the term "invalid clicks"?

4            MS. RIVAS:  Objection.  Seeks a legal

5    conclusion.  Lacks foundation.                          10:09:30

6            THE WITNESS:  It seems to me that that's

7    what this case is about, is what is a valid click

8    and what is not a valid click.  I think I should

9    have to pay for valid clicks and not have to pay for

10   invalid clicks.                                         10:09:44

11   BY MR. SOMVICHIAN:

12       Q.    Okay.  So tell me what your understanding

13   is of the types of invalid clicks that you don't

14   think you should be charged for.

15           MS. RIVAS:  Objection.  Seeks a legal          10:09:56

16   conclusion.  Calls for expert testimony.  Lacks

17   foundation.

18           THE WITNESS:  Yeah.  The reason why I got

19   involved in this case is that I had a suspicion

20   based on my Google Analytics that there was a          10:10:11

21   problem.  And that's why I quit advertising with

22   Facebook, is because I didn't think that I was

23   getting good-quality traffic from Facebook.  I think

24   it's really to my attorneys and to expert testimony

25   to figure out what a valid click is and what an        10:10:30

Page 34

1          MS. RIVAS:  Same objections.

2          THE WITNESS:  I feel like that's what this

3    case is about, and I feel like it's going to require

4    more investigation and experts -- you know, I was

5    under the understanding that there were supposed to      10:16:35

6    some systems in place to protect me from invalid

7    clicks, whatever that means.  These clicks seemed

8    invalid to me.

9    BY MR. SOMVICHIAN:

10      Q.   Did you think that they were invalid          10:16:51

11    because they might have come from automated sources

12    and not from real people?  Is that part of the

13    reason why you thought that they were not good

14    quality, to use your words?

15          MS. RIVAS:  Objection.  Lacks foundation.      10:17:03

16    Vague and ambiguous.  Seeks a legal conclusion.

17          THE WITNESS:  Yeah.  I have no idea.  I

18    know the results, which is that it looked like

19    bad -- it looked like a bad deal to me.

20    BY MR. SOMVICHIAN:                                   10:17:17

21      Q.   What do you mean by "a bad deal"?

22      A.   Like I wasn't getting my money's worth,

23    like somehow something was wrong.  Just seemed -- it

24    seemed like I was getting ripped off.

25      Q.   Well, you knew and expected at the time       10:17:34

                                                      Page 40

1    basis to become a party to the lawsuit, so

2    regardless of what your lawyers may have told you

3    recently, what was in your mind when you made the

4    decision "I want to be a named plaintiff in this

5    lawsuit to sue Facebook"?                          10:20:57

6            MS. RIVAS:  Objection.  Asked and

7    answered.  Seeks a legal conclusion.  Vague and

8    ambiguous.

9            THE WITNESS:  Yeah.  The reason I am here

10   is because -- in the first place is because the    10:21:05

11   Analytics suggested that I had gotten ripped off.

12   BY MR. SOMVICHIAN:

13       Q.    Okay.  Other than the Analytics program,

14   did you have any other basis to think that you had

15   been overcharged by Facebook at the time that you   10:21:22

16   filed your lawsuit?

17           MS. RIVAS:  Objection.  Seeks a legal

18   conclusion.  Vague and ambiguous.

19           MR. SHUB:  At the time he filed the

20   lawsuit, you had already talked to him, so it is    10:21:31

21   attorney-client privilege.

22           MS. RIVAS:  And it is attorney-client

23   privileged, to the extent it is something that we

24   talked about.  And you can tell him what you know,

25   that you -- your own experience.                    10:21:43

                                                 Page 44

```
 1              THE WITNESS:  I am here because of the

 2    Google Analytics.

 3    BY MR. SOMVICHIAN:

 4       Q.    Setting aside your lawyer's coaching, did

 5    you have any other basis, independent basis from      10:21:58

 6    your own experience and knowledge, other than what

 7    they told you to support filing a complaint against

 8    Facebook?

 9              MS. RIVAS:  Objection.  Argumentative.

10    Vague and ambiguous.  You are seeking a legal         10:22:09

11    conclusion, and it's protected by attorney-client

12    privilege.

13    BY MR. SOMVICHIAN:

14       Q.    My question is specifically setting aside

15    anything that you were told by your lawyers.  Okay?   10:22:23

16              MS. RIVAS:  He's asked -- you've asked

17    that, and he's answered it.

18              MR. SHUB:  About four or five times, the

19    same answer.  You don't like it, but it is the same

20    answer.                                               10:22:39

21              THE WITNESS:  I am here because of the

22    Analytics.

23    BY MR. SOMVICHIAN:

24       Q.    Okay.  Have you ever spoken to any of the

25    other named plaintiffs in this case?                  10:22:49
```

Page 45

1           THE WITNESS:  I'm not sure what types of

2     clicks are involved in the lawsuit.

3     BY MR. SOMVICHIAN:

4           Q.    You aren't?

5           A.    I know that there -- I suspected that I     10:47:14

6     was getting ripped off in my deal with Facebook.

7     The -- the Analytics made it look like it was

8     something that I probably shouldn't have been

9     charged for.

10          So I think that's what we're here to         10:47:33

11    figure out, is whether I should have been charged

12    for those or not.  And I don't know what types of --

13    I have no -- I don't even know what any of those

14    clicks looked like.  I just know that they,

15    according to Analytics, were on my site for one     10:47:44

16    second.  That seems like a bad deal, so that's why I

17    am here.

18          Q.    Mr. Fox, you understand that the complaint

19    is a class-action complaint; correct?

20          A.    Yes.                                    10:47:53

21          Q.    And you understand that means that you and

22    your lawyers are seeking to represent not just you

23    and the other named plaintiffs, but also a class of

24    advertisers who advertise on Facebook.  Do you

25    understand that?                                    10:48:05

                                                Page 62

1    invalid.  I don't have my own opinion.

2    BY MR. SOMVICHIAN:

3        Q.    And you also don't have any basis to

4    believe that that's an invalid click; right?

5            MS. RIVAS:  Objection.  Argumentative.    10:57:28

6    Seeks a legal conclusion.  Vague and ambiguous.

7            THE WITNESS:  I don't know what's a valid

8    click and what's an invalid click.

9    BY MR. SOMVICHIAN:

10       Q.    Well, let me ask the questions this way.    10:57:37

11   You never formed an expectation that Facebook would

12   not charge you for that type of click; right?

13           MS. RIVAS:  Vague and ambiguous.

14           THE WITNESS:  I had an expectation that I

15   would be protected from invalid clicks.  I thought    10:57:48

16   that there were systems in place to protect me from

17   invalid clicks, whatever -- however that was

18   defined.

19   BY MR. SOMVICHIAN:

20       Q.    Okay.  And at the time that you became a    10:57:57

21   Facebook advertiser, did you expect that Facebook

22   would not charge you for the types of clicks that I

23   described?

24           MR. SHUB:  Objection.  Asked and answered.

25           Come on.                                  10:58:10

                                                 Page 72

```
 1    whatever that means.

 2    BY MR. SOMVICHIAN:

 3        Q.    Do you have any idea of what a "bot" is in

 4    the context of the Internet?

 5             MS. RIVAS:  Objection.  Vague and          11:01:27

 6    ambiguous.

 7             MR. SHUB:  Lacks foundation.

 8             MS. RIVAS:  It lacks foundation.

 9             THE WITNESS:  I -- I don't know.  Some

10    sort of a computer program or a script.           11:01:33

11    BY MR. SOMVICHIAN:

12        Q.    What's a "script"?

13        A.    I'm not a programmer.  I guess, like a

14    little bit of code that does things.  I don't know.

15        Q.    Do you have any understanding one way or   11:01:47

16    the other about whether bots can lead to clicks on

17    ads?

18             MS. RIVAS:  Objection.  Lacks foundation.

19    Seeks a legal conclusion.  Incomplete hypothetical.

20             THE WITNESS:  I have no idea what bots can  11:02:04

21    and can't do.

22    BY MR. SOMVICHIAN:

23        Q.    Do you have any opinion one way or the

24    other about whether any clicks that might originate

25    from a bot should be billed or not to advertisers?   11:02:13
```

                                            Page 76

1              MS. RIVAS:  Objection.  Lacks foundation.

2      Seeks a legal conclusion.  Vague and ambiguous.

3              THE WITNESS:  I have no idea.

4      BY MR. SOMVICHIAN:

5         Q.   Do you have any -- strike that.          11:02:25

6              You don't know whether a click that

7      originates from a bot should be considered a

8      fraudulent click or an invalid click or any other

9      click; right?

10             MS. RIVAS:  Objection.  Seeks a legal     11:02:57

11     conclusion.  Lacks foundation.  Vague and ambiguous.

12             THE WITNESS:  I don't know what bots do.

13     I don't know whether we should be charged.  I don't

14     know.

15     BY MR. SOMVICHIAN:                                11:03:03

16        Q.   Do you know whether clicks from bots are

17     part of this case or not?

18             MS. RIVAS:  Objection.  Seeks a legal

19     conclusion.  Lacks foundation.  Vague and ambiguous.

20             THE WITNESS:  I don't know.               11:03:17

21     BY MR. SOMVICHIAN:

22        Q.   Do you know if multiple clicks that come

23     from the same user are part of this case or not?

24             MS. RIVAS:  Same objections.

25     BY MR. SOMVICHIAN:                                11:03:26

                                                      Page 77

1    Q.    No idea; right?

2    A.    I -- I don't know.

3    Q.    Have you ever heard about instances where

4    competitors click on the ads of -- well, let me --

5    let me start over.                                11:03:58

6          Have you ever heard of instances where

7    somebody will click on the ad of a competitor in

8    order to deplete their advertising budget?

9          MS. RIVAS:  Vague and ambiguous.

10         MR. SHUB:  Lacks foundation.              11:04:09

11         THE WITNESS:  I have heard of that, yeah.

12   BY MR. SOMVICHIAN:

13   Q.    I'm not asking you whether you're aware of

14   a specific instance of that.  I'm just simply asking

15   you whether you've heard of that issue.          11:04:18

16         MS. RIVAS:  Objection.  Vague and

17   ambiguous.  Lacks foundation.

18         THE WITNESS:  Yes, I've heard of that

19   issue.

20   BY MR. SOMVICHIAN:                               11:04:24

21   Q.    Do you have any understanding of whether

22   those types of clicks are part of this case or not?

23         MS. RIVAS:  Objection.  Seeks a legal

24   conclusion.  Vague and ambiguous.  Lacks foundation.

25         THE WITNESS:  I don't know.  I mean, like  11:04:37

Page 78

1    the other things, that's something that I would rely

2    on my lawyers and my experts to determine.

3    BY MR. SOMVICHIAN:

4        Q.    Okay.  But you don't have an independent

5    opinion about whether that type of click should be      11:04:47

6    in this case or not; right?

7              MS. RIVAS:  Same objections.  And asked

8    and answered.

9              THE WITNESS:  I don't have an independent

10   opinion.                                                11:04:54

11   BY MR. SOMVICHIAN:

12       Q.    And you are relying solely on your

13   attorneys and experts to determine whether those

14   types of clicks should be in this case; correct?

15             MS. RIVAS:  Objection to the extent it       11:05:01

16   misstates his testimony.

17             MR. SHUB:  It is argumentative as well.

18             MS. RIVAS:  And argumentative.

19             THE WITNESS:  Yeah.  I don't have an

20   opinion whether it should be -- that should be part    11:05:11

21   of the case or not part of the case.

22   BY MR. SOMVICHIAN:

23       Q.    Do you expect to give input to your

24   lawyers about whether that type of click should be

25   part of this case or not?                              11:05:35

Page 79

1     that means there weren't any systems or whether the

2     system were inadequate, I don't know.

3     BY MR. SOMVICHIAN:

4          Q.    So my question was, Do you believe that

5     this document is misleading to you as an advertiser?  11:22:09

6               MS. RIVAS:  Objection.  Seeks a legal

7     conclusion.  Vague and ambiguous.  Overbroad.

8               THE WITNESS:  In my opinion, yeah, I don't

9     think I was protected from invalid clicks.

10    BY MR. SOMVICHIAN:                                   11:22:28

11         Q.    So what aspect of this document do you now

12    believe to be misleading?

13         A.    The part where it says I was going to be

14    protected, only charged for legitimate clicks.

15         Q.    When you read this, what -- did you have    11:22:40

16    an understanding of what a legitimate click would

17    be?

18               MS. RIVAS:  Objection.  Seeks a legal

19    conclusion.

20               THE WITNESS:  Yeah.  And I didn't form an   11:22:54

21    opinion as to that.  I just thought that -- I read

22    this representation, and I thought that according to

23    this there would be some systems in place to protect

24    me, and that's all I knew.  That's all I thought

25    about it.                                            11:23:07

Page 93

1    there were systems there that would protect me from

2    being charged for things I shouldn't be charged for.

3    BY MR. SOMVICHIAN:

4        Q.    Okay.  But you understood that they

5    weren't going to be 100 percent effective in all      11:32:48

6    instances; right?

7             MS. RIVAS:  Same objections.  Asked and

8    answered.

9             THE WITNESS:  That's right.

10            MR. SOMVICHIAN:  Now it's answered.      11:32:56

11            MR. SHUB:  Okay.  You got what you wanted.

12   The first one of the day.  Congratulations.

13            Should we take a break?  You got the tape

14   to change.

15            MR. SOMVICHIAN:  Sure.  That's fine.      11:33:08

16            THE VIDEOGRAPHER:  We are going off the

17   record.  The time is 11:33 a.m.

18            This marks the end of disk No. 1 in the

19   deposition of Nathan Fox.

20            (Whereupon, lunch was taken from      12:50:29

21            11:33 a.m. until 12:50 p.m.)

22            THE VIDEOGRAPHER:  We are back on the

23   record.  The time is 12:51 p.m.

24            This marks the beginning of disk No. 2 in

25   the deposition of Nathan Fox.      12:51:07

                                              Page 101

1    actually spent more time than people who got to your

2    site through your Facebook ads other than just

3    looking at the numbers in front of you here; right?

4           MS. RIVAS:  Objection.  Vague and

5    ambiguous.  Seeks a legal conclusion.              13:38:21

6           THE WITNESS:  Again, I based my actions on

7    this.

8    BY MR. SOMVICHIAN:

9       Q.   Okay.  You didn't do an independent

10   assessment of the number of pages that users visited  13:38:32

11   who came from Yelp; right?

12          MS. RIVAS:  Objection.  Vague and

13   ambiguous.

14          THE WITNESS:  I did not do that.

15   BY MR. SOMVICHIAN:                                  13:38:39

16      Q.   Do you have -- do you have any idea how --

17   whether you could have done that?

18          MS. RIVAS:  Objection.  Calls for

19   speculation.

20          THE WITNESS:  Yeah.  I'm not an expert.  I  13:38:46

21   don't know how that would go.

22   BY MR. SOMVICHIAN:

23      Q.   Who set up your Google Analytics tracking

24   for your website?  Did you --

25          MS. RIVAS:  Objection.  Asked and          13:38:57

                                              Page 144

 1    answered.

 2    BY MR. SOMVICHIAN:

 3        Q.    Did you do that?

 4        A.    Four Dog.

 5        Q.    Did you -- were you involved in any way in   13:39:01

 6    that process?

 7              MS. RIVAS:  Objection.  Asked and

 8    answered.

 9              THE WITNESS:  As I recall, I just gave

10    them the access to the account, and they took care   13:39:12

11    of it for me.

12    BY MR. SOMVICHIAN:

13        Q.    If I asked you details about how the

14    Google Analytics was set up, would you have any

15    basis to answer, based on your own personal         13:39:26

16    knowledge?

17              MS. RIVAS:  Objection.  Vague and

18    ambiguous.  Overbroad.

19              THE WITNESS:  No.  The professionals do

20    that.  I don't know.                                13:39:32

21    BY MR. SOMVICHIAN:

22        Q.    Did you ever ask the people at Four Dog

23    whether they had any -- strike that.

24              Did you ever talk to the people at Four

25    Dog about the information reflected in Exhibit 4?   13:40:12

                                              Page 145

1        A.     Not that I recall.

2        Q.     You didn't go to them and say, "Hey, my

3    clicks from Facebook/CPC looked like the average

4    time on-site is only a second.  What's going on

5    there?"  You didn't have a conversation with them      13:40:33

6    about that in any way?

7              MS. RIVAS:  Objection.  Vague and

8    ambiguous.  Argumentative.

9              THE WITNESS:  Not that I recall.

10   BY MR. SOMVICHIAN:                                       13:40:41

11       Q.     Did you ever talk to anybody at Four Dog

12   about any aspect of your Google Analytics reports?

13             MS. RIVAS:  Objection.  Vague and

14   ambiguous.

15             THE WITNESS:  They set it up for me.  They   13:40:48

16   showed me where the reports were.  I looked at them.

17   It all seemed like it made sense.  That was the

18   extent of our conversations.

19   BY MR. SOMVICHIAN:

20       Q.     So after -- after it was set up, did you    13:40:58

21   ever have any discussions with them about any of the

22   data that you were seeing?

23             MS. RIVAS:  Vague and ambiguous.

24             THE WITNESS:  Not that I recall.

25   BY MR. SOMVICHIAN:                                       13:41:07

                                                  Page 146

```
 1        Q.     You don't know what that means; right?

 2        A.     I will rely on my attorneys.

 3               MS. RIVAS:  Same objections.

 4   Argumentative.

 5   BY MR. SOMVICHIAN:                               14:34:54

 6        Q.     Rely on your attorneys for what?

 7        A.     I will rely on my attorneys to counsel me

 8   through the process of this suit.

 9        Q.     Do you have any bas- -- independent basis

10   to believe that any of the clicks on your Facebook   14:35:05

11   ads were affected by the "Failure to conduct

12   Off-Line Filtering"?

13               MS. RIVAS:  Objection.  Vague and

14   ambiguous.  Calls for expert testimony.

15   Argumentative.  Seeks a legal conclusion.          14:35:17

16               THE WITNESS:  I think that it will require

17   the testimony of experts and access to more data in

18   order to get to the bottom of what happened here.

19   BY MR. SOMVICHIAN:

20        Q.     Is it your intention to pursue claims on   14:35:35

21   behalf of a class for the failure to conduct

22   Off-Line Filtering?

23               MS. RIVAS:  Objection.  Seeks a legal

24   conclusion.  Lacks foundation.  Vague and ambiguous.

25               THE WITNESS:  I will rely on my attorneys   14:35:46
```

Page 187

1    and experts to help me with that.

2    BY MR. SOMVICHIAN:

3        Q.    Mr. Fox, do you have an understanding of

4    what the next item refers to, d, "Improper Billing

5    for 'Double Clicks'"?                                14:36:00

6        A.    Same answer as b and c.  I will rely on my

7    attorneys and my experts to help me.

8            MS. RIVAS:  Same objections.

9    BY MR. SOMVICHIAN:

10       Q.    So you don't have -- you don't have         14:36:09

11   independent knowledge of what that means; right?

12           MS. RIVAS:  Objection.  Vague and

13   ambiguous.  Lacks foundation.  Argumentative.

14   Harassing.

15           MR. SHUB:  It's attorney-client to the       14:36:19

16   extent if he knows based on what we told him.

17           THE WITNESS:  It will require expert

18   testimony and access to more data than I have to

19   make that determination.

20   BY MR. SOMVICHIAN:                                   14:36:32

21       Q.    Do you have an understanding of what any

22   of these items a through k refer to?

23           MS. RIVAS:  Same objections.

24           THE WITNESS:  Same answer.  I'll

25   require -- I'll rely on my attorneys and my experts   14:36:50

                                          Page 188

1    to help figure out --

2    BY MR. SOMVICHIAN:

3        Q.    What they are?

4        A.    -- what those mean and what we are

5    alleging.                                            14:37:01

6        Q.    For any of the items listed in the

7    supplemental response to interrogatory 11, items a

8    through k, do you have any basis to believe that any

9    of these issues affected the clicks on your Facebook

10   ads?                                                 14:37:18

11            MS. RIVAS:  Objection.  Seeks a legal

12   conclusion.  Lacks foundation.  Seeks expert

13   testimony.  Vague and ambiguous.

14            THE WITNESS:  I'll rely on my attorneys

15   and experts to make that determination.             14:37:30

16   BY MR. SOMVICHIAN:

17       Q.    Mr. Fox, how are you going to go about

18   deciding whether you agree with the claims in this

19   case?

20            MS. RIVAS:  Objection.                      14:37:51

21            MR. SHUB:  Attorney-client.

22            MS. RIVAS:  Attorney-client privilege.

23   Vague and ambiguous.  Relevancy.

24            I mean, I don't even understand what you

25   are trying to get at.                               14:38:03

Page 189

1    BY MR. SOMVICHIAN:

2        Q.    You can answer.

3        A.    I'll rely on my attorneys and my experts

4    to help me make those determinations.

5        Q.    Are you able to provide any input or      14:38:10

6    guidance to your lawyers and your experts in terms

7    of what types of claims should be asserted in this

8    case?

9            MS. RIVAS:  Objection.  Asked and answered

10    multiple times.  Argumentative.  Vague and       14:38:24

11    ambiguous.

12            THE WITNESS:  I'll do whatever I can do,

13    whatever I'm asked to do to help my attorneys and my

14    experts pursue this matter.

15    BY MR. SOMVICHIAN:                      14:38:38

16        Q.    Can you think of anything that you can do

17    to help inform the judgment about whether issues A

18    through K here are proper issues to pursue in a

19    class action against Facebook?

20            MS. RIVAS:  Same objections.  Lacks      14:38:50

21    foundation.  Vague and ambiguous.  Argumentative.

22            MR. SHUB:  And badgering.  Let's add that

23    one, because it is.

24            THE WITNESS:  I will rely on the help of

25    my experts and my attorneys for that matter.      14:39:02

Page 190

```
 1              MR. SOMVICHIAN:  If we can take a short

 2     break.  We are almost done.

 3              THE VIDEOGRAPHER:  We are off the record.

 4     The time is 3:12 p.m.

 5              (Off the record.)                    15:12:30

 6              THE VIDEOGRAPHER:  Back on the record.

 7     The time is 3:19 p.m.

 8     BY MR. SOMVICHIAN:

 9        Q.    Mr. Fox, can you look at Exhibit 9 again,

10     please.  We were looking at a list of issues on     15:19:16

11     page 4, items a through k.

12        A.    Yep.

13        Q.    Do you have any understanding as to

14     whether any of these issues relate to either

15     fraudulent clicks or invalid clicks?               15:19:52

16              MS. RIVAS:  Objection.  Lacks foundation.

17     Calls for expert testimony and legal conclusion.

18              THE WITNESS:  I would rely on my attorneys

19     and my experts to make that determination.

20     BY MR. SOMVICHIAN:                                 15:20:05

21        Q.    You don't have any independent basis to

22     conclude whether any of these issues should be

23     considered fraudulent clicks or invalid clicks or

24     anything else; right?

25              MS. RIVAS:  Same objections.  Compound.   15:20:16
```

Page 212

```
 1                    THE WITNESS:  I rely on my attorneys and

 2      my experts to help me make that determination.

 3      BY MR. SOMVICHIAN:

 4          Q.   And you haven't made any independent

 5      judgment about that issue; right?                    15:20:24

 6                    MS. RIVAS:  Same objections.

 7                    THE WITNESS:  I'll rely on my attorneys

 8      and my experts to help me make that determination.

 9      BY MR. SOMVICHIAN:

10          Q.   You haven't made an independent judgment    15:20:31

11      on that issue; correct?

12                    MS. RIVAS:  Vague and ambiguous.

13                    THE WITNESS:  I have not.

14      BY MR. SOMVICHIAN:

15          Q.   Does the terminology of a "static website"  15:20:57

16      as opposed to a "dynamic website" have any meaning

17      to you?

18                    MS. RIVAS:  Vague and ambiguous.

19                    THE WITNESS:  I know a tiny bit about it.

20      BY MR. SOMVICHIAN:                                   15:21:06

21          Q.   Do you know if your website is a static

22      website or a dynamic website?

23          A.   It's a little bit of both, to my

24      understanding.

25          Q.   What's your understanding of those          15:21:13
```

Page 213