United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

In re FACEBOOK, INC., PPC
ADVERTISING LITIGATION

_____/

No. C 09-3043 PJH

**ORDER DENYING MOTION FOR
CLASS CERTIFICATION**

    Plaintiffs' motion for class certification came on for hearing before this court on

March 7, 2012.[1]  Plaintiffs appeared by their counsel Jonathan Shub, R. Alexander Saveri,

Rosemary Rivas, Julie Miller, and J. Paul Gignac.  Defendant Facebook, Inc. ("Facebook")

appeared by its counsel Michael Rhodes and Whitty Somvichian.  Having read the parties'

papers and carefully considered their arguments, the court hereby DENIES the motion.

**BACKGROUND**

    Facebook operates a popular social networking website, www.facebook.com, on

which it also sells advertising space.  Facebook offers to display advertisements on

portions of its website that are viewed by Facebook users.  Each advertisement contains a

link either to another portion of the website or to an external website.  If a user clicks on the

advertisement, the user's web browser is directed to the other location.  This case involves

allegations that Facebook breached its contracts with its advertisers and engaged in unfair

business practices by charging the advertisers for "clicks" that did not result in any benefit

to the advertisers.

    Advertisers may contract with Facebook through two different channels – through an

automated "self-service" process that is available on-line to the general public, and by

directly contacting Facebook's account management group.  The process utilized by the

_____

    [1]  This matter was reassigned from Judge Jeremy Fogel's docket to that of the
undersigned judge on September 27, 2011.

1  "Direct Advertisers" differs markedly from that used by the "Self-Service Advertisers," as do

2  the contracts that apply to each.  Named plaintiffs RootZoo, Inc. ("RootZoo"), Steven Price

3  ("Price"), and Fox Text Prep, through its founder, Nathan Fox ("Fox") individually entered

4  into contracts with Facebook for advertising on the website, and exclusively used the self-

5  service channel.

6       To place an advertisement on Facebook via the self-service channel, a potential

7  advertiser must take several steps.  As explained in the Declaration of John McKeeman,

8  who is employed at Facebook as a Manager in Advertising Operations, an advertiser who

9  uses Facebook's "self-service tool" must begin by designing an advertisement and

10  selecting the destination of the link embedded within the advertisement, and then selecting

11  the target demographic for the advertising campaign.

12       Next, the advertiser must identify the payment structure for the advertising

13  campaign.  Facebook provides two payment options – cost per click or cost per thousand

14  impressions.  The named plaintiffs each entered into a cost-per-click ("CPC") contract.

15  Under the CPC option, the advertiser pays a fee to Facebook each time a user clicks on

16  the advertisement.  To select this option, the advertiser must specify its "Max Bid" (the

17  maximum amount the advertiser is willing to pay to Facebook for each click) and its "Daily

18  Budget" (the maximum amount the advertiser is willing to pay to Facebook each day).

19       Finally, the advertiser is given the opportunity to review the specifics entered in the

20  preceding steps, and must then submit its advertising design to Facebook for approval and

21  agree to certain terms and conditions.

22       Adjacent to the "Place Order" button, is the following statement:

23      By clicking on the "Place Order" button, I agree to the Facebook Statement of
    Rights and Responsibilities including my obligation to comply with the

24      Facebook Advertising Guidelines.  I understand that failure to comply with the
    Terms and Conditions and the Advertising Guidelines may result in a variety

25      of consequences, including the cancellation of any advertisements I have
    placed, and termination of my account.  I understand that if I am resident or

26      have my principal place of business in the US or Canada, I am contracting
    solely with Facebook, Inc.  Otherwise I am contracting solely with Facebook

27      Ireland Limited.

28       Agreements of this type are commonly referred to as "click-through" agreements.

2

1    Advertisers are presented with a copy of the terms and conditions, and they must

2    communicate their assent to those terms and conditions, thereby placing their order.  Here,

3    clicking on the "Place Order" button finalizes the order.  The "Place Order" page also

4    includes hyperlinks to the "Statement of Rights and Responsibilities" and the "Facebook

5    Advertising Guidelines."

6        RootZoo initially contracted with Facebook in November 2007.  Price and Fox first

7    contracted with Facebook in May 2009.  RootZoo's contract differs in certain respects from

8    those entered into by Price and Fox.  RootZoo agreed to Facebook's Advertising Terms

9    and Conditions (the "ATCs").  The ATCs state, "I understand that Facebook will determine,

10   in its sole discretion, how to measure the number of impressions, inquiries, conversions,

11   clicks, or other actions taken by third parties in connection with my advertisements, and all

12   charges will be based on such measurements."  The ATCs also contain a disclaimer,

13   stating that the advertiser agrees that Facebook will have "no responsibility or liability to me

14   in connection with any third party click fraud or other improper actions that may occur."  In

15   the present motion, plaintiffs have indicated in a footnote that they are no longer proffering

16   RootZoo as a named plaintiff.

17       Price's and Fox's contracts do not contain the ATCs; instead, Price and Fox

18   assented to the Facebook Statement of Rights and Responsibilities (the "SRR").  The SRR

19   provides, "You will pay for your Orders in accordance with our Payment Terms.  The

20   amount you owe will be calculated based on our tracking mechanisms."  In addition, the

21   SRR states that it "makes up the entire agreement between the parties regarding

22   Facebook, and supercedes any prior agreements."  Throughout the class period, the SRR

23   has also included the following disclaimer:  "We [Facebook] cannot control how people

24   interact with your ads, and are not responsible for click fraud or other improper actions that

25   affect the cost of running ads."  Plaintiffs allege that despite these disclaimers, Facebook

26   represented elsewhere that it would charge only for certain types of clicks and that they

27   relied on these representations when entering into their respective contracts.

28       Facebook's website includes a "Help Center" with a "Glossary of Ad Terms" page

1    providing definitions of several terms, including a definition of "clicks" in the advertising

2    context.  The Glossary of Ad Terms states that "[c]licks are counted each time a user clicks

3    through your ad to your landing page," and that "[i]f your ads are bid on a CPC basis, you

4    will be charged when users click on your ads and visit your website."  The Glossary of Ad

5    Terms also states that Facebook has "a variety of measures in place to ensure that [it] only

6    report[s] and charge[s] advertisers for legitimate clicks, and not clicks that come from

7    automated programs, or clicks that may be repetitive, abusive, or otherwise inauthentic."

8    Plaintiffs argue that this language was incorporated into their contract with Facebook.

9            Plaintiffs allege that they have been improperly charged for (a) failed attempts by

10   Facebook users to reach an advertisement, improperly counted by Facebook as a billable

11   click; (b) the counting of clicks as billable clicks when in fact there was no click at all from a

12   Facebook user; (c) clicks by Facebook users that fail to open the advertiser's web page but

13   result in Facebook regarding the click as a billable click; (d) improperly recorded, or

14   unreadable, clicks by Facebook users caused by an invalid proxy server or unknown

15   browser type (possibly indicating that the visitor is a computer "bot"); (e) unintentional,

16   multiple clicks from a Facebook user in rapid succession; and (f) clicks made in a deliberate

17   effort to drive up the cost of an ad or deplete an advertiser's budget ("click fraud.").  Second

18   Amended Consolidated Complaint ("SACC") ¶ 3.

19           Plaintiffs assert a claim under California's Unfair Competition Law ("UCL"), Cal. Bus.

20   Prof. Code § 17200 et seq. and also allege breach of contract.  In addition, they seek a

21   judicial declaration of the rights and obligations of the parties under the contracts.

22                                    **DISCUSSION**

23   A.    Legal Standard

24           "Before certifying a class, the trial court must conduct a 'rigorous analysis' to

25   determine whether the party seeking certification has met the prerequisites of Rule 23."

26   <u>Mazza v. American Honda Motor Co., Inc.</u>, 666 F.3d 581, 588 (9th Cir. 2012) (citation and

27   quotation omitted).  The party seeking class certification bears the burden of affirmatively

28   demonstrating that the class meets the requirements of Federal Rule of Civil Procedure 23.

4

United States District Court

For the Northern District of California

1 Wal-Mart Stores, Inc. v. Dukes, __ U.S. __, 131 S.Ct. 2541, 2551 (2011).  In order for a

2 class action to be certified, plaintiffs must prove that they meet the requirements of Federal

3 Rule of Civil Procedure 23(a) and (b).

4        Rule 23(a) requires that plaintiffs demonstrate numerosity, commonality, typicality

5 and adequacy of representation in order to maintain a class.  That is, the class must be so

6 numerous that joinder of all members individually is "impracticable;" there must be

7 questions of law or fact common to the class; the claims or defenses of the class

8 representative must be typical of the claims or defenses of the class; and the class

9 representative must be able to protect fairly and adequately the interests of all members of

10 the class.  Fed. R. Civ. P. 23(a)(1)-(4).

11        If all four prerequisites of Rule 23(a) are satisfied, the court then determines whether

12 to certify the class under one of the three subsections of Rule 23(b), pursuant to which the

13 named plaintiffs must establish either 1) that there is a risk of substantial prejudice from

14 separate actions; or 2) that declaratory or injunctive relief benefitting the class as a whole

15 would be appropriate; or 3) that common questions of law or fact common to the class

16 predominate and that a class action is superior to other methods available for adjudicating

17 the controversy at issue.  See Fed. R. Civ. P. 23(b)(3).

18        The party moving for class certification bears the burden of establishing that the

19 Rule 23 requirements are satisfied.  Gen'l Tel. Co. of Southwest v. Falcon, 457 U.S. 147,

20 156 (1982); see also Dukes, 131 S.Ct. at 2550-51; Zinzer v. Accufix Research Inst., Inc.,

21 253 F.3d 1180, 1186, amended by 273 F.3d 1266 (9th Cir. 2001).  "Rule 23 does not set

22 forth a mere pleading standard.  A party seeking class certification must affirmatively

23 demonstrate his compliance with the Rule – that is, he must be prepared to prove that

24 there are in fact sufficiently numerous parties, common questions of law or fact, etc."

25 Dukes, 131 S.Ct. at 2551 (emphasis deleted).

26        While the court does not make a preliminary inquiry into the merits of the plaintiffs'

27 claims in determining whether to certify a class, see Eisen v. Carlisle & Jacquelin, 417 U.S.

28 156, 177 (1974), the court is required to scrutinize the legal causes of action to determine

United States District Court

For the Northern District of California

1   whether they are suitable for resolution on a class-wide basis.  See, e.g., Moore v. Hughes

2   Helicopters, Inc., 708 F.2d 475, 480 (9th Cir. 1983).  Because analysis of the Rule 23

3   factors "generally involves considerations that are enmeshed in the factual and legal issues

4   comprising the plaintiff's cause of action[,]" making such a determination will sometimes

5   require examining issues that overlap with the merits.  Dukes, 113 S.Ct. at 2551-52

6   (quotations and citations omitted).

7   B.      Plaintiffs' Motion

8          Through this motion, plaintiffs seek certification of a class pursuant to Rules 23(a)

9   and 23(b)(3).  The class plaintiffs seek to have certified is a class of "[a]ll persons or entities

10  in the United States who paid money to Facebook, Inc. for cost-per-click advertising during

11  the period of May 2009 to the present."

12         1.     Rule 23(a)

13         When considering a class certification motion, the trial court must perform a

14  "rigorous analysis" to ensure that "the prerequisites of Rule 23(a) have been satisfied."  Id.

15  at 2551 (quoting Falcon, 457 U.S. at 161).  In doing so, and as Dukes clarifies, a district

16  court must examine evidence going to the merits, to the extent examination of that

17  evidence necessarily overlaps with the analysis required to determine whether Rule 23(a)

18  factors have been met.  See id. at 2552.

19             a.     Numerosity

20         Rule 23(a)(1) requires that a class be so numerous that joinder of all members is

21  impracticable.  In order to satisfy this requirement, plaintiffs need not state the exact

22  number of potential class members, nor is there a specific number that is required.  See In

23  re Rubber Chems. Antitrust Litig., 232 F.R.D. 346, 350-51 (N.D. Cal. 2005).  Rather, the

24  specific facts of each case must be examined.  General Tel. Co. v. EEOC, 446 U.S. 318,

25  330 (1980).

26         While the ultimate issue in evaluating this factor is whether the class is too large to

27  make joinder practicable, courts generally find that the numerosity factor is satisfied if the

28  class comprises 40 or more members, and will find that it has not been satisfied when the

United States District Court

For the Northern District of California

1    class comprises 21 or fewer.  See, e.g., Consolidated Rail Corp. v. Town of Hyde Park, 47

2    F.3d 473, 483 (2d Cir. 1995); Ansari v. New York Univ., 179 F.R.D. 112, 114 (S.D.N.Y.

3    1998).

4         Here, plaintiffs argue that the proposed class is sufficiently numerous to satisfy Rule

5    23(a)(1), and Facebook offers no opposition.  Plaintiffs assert that as of the end of March

6    2011, Facebook reported more than 100,000 advertisers.  This is well over the threshold for

7    "numerosity" as that standard has been interpreted by the courts.

8              b.    Commonality

9         Commonality requires that there be questions of law or fact common to the class.

10   Fed. R. Civ. P. 23(a)(2).  The plaintiff must show that the class members have suffered "the

11   same injury" – which means that the class members' claims must "depend upon a common

12   contention" which is of such a nature that "determination of its truth or falsity will resolve an

13   issue that is central to the validity of each [claim] in one stroke."  Dukes, 131 S.Ct. at 2551

14   (quotation and citation omitted).  The plaintiff must demonstrate not merely the existence of

15   a common question, but rather "the capacity of classwide proceedings to generate common

16   answers apt to drive the resolution of the litigation."  Id. (quotation omitted).

17        Plaintiffs argue that this case involves questions of law and fact common to the

18   class.  They assert that all class members – all CPC advertisers who placed

19   advertisements on Facebook – suffered "the same injury" in being billed for invalid or

20   illegitimate clicks in contravention of their written advertising agreement with Facebook.

21   They claim that Facebook's failure to implement measures to ensure that only "valid clicks"

22   would be billed has "impacted all class members" in the same way – they have been forced

23   to pay more money than they would have otherwise.

24        Plaintiffs contend that the common questions on which their claims depend, and

25   which drive the litigation for all class members, are whether Facebook honored its

26   obligation to charge them for only "legitimate clicks," and whether Facebook's failure to do

27   so constitutes a breach of contract and an unfair business practice.  They assert that both

28   the UCL claim and the breach of contract claim are premised on Facebook's failure to

7

1  provide some system for not charging for "invalid" clicks – which they describe as

2  Facebook's "systematic breach of contract."  Based on their assertion that the contract

3  between Facebook and its advertisers was "uniform" and that all class members were

4  injured by the breach of contract, they contend that there is sufficient commonality to satisfy

5  Rule 23(a).

6      Because "proof of commonality necessarily overlaps with [the] merits contention,"

7  Dukes, 131 S.Ct. at 2552 – here, that Facebook breached its contract with its advertisers

8  by failing to implement a system to filter out "invalid" clicks – and because of the difficulty in

9  ascertaining whether all members of the class in fact suffered the same injury (as

10  discussed below in connection with the Rule 23(b)(3) predominance inquiry), an argument

11  could be made that plaintiffs have failed to provide convincing proof that common questions

12  exist.  Nevertheless, given that commonality requires only a single significant question of

13  law or fact, see id. at 2556, the court finds that plaintiffs have met this requirement.

14          c.      Typicality

15      The third requirement under Rule 23(a) is that the claims or defenses of the class

16  representatives must be typical of the claims or defenses of the class. Fed. R. Civ. P.

17  23(a)(3).  Typicality exists if the named plaintiffs' claims are "reasonably coextensive" with

18  those of absent class members.  Staton v. Boeing Co., 327 F.3d 938, 957 (9th Cir. 2003).

19  To be considered typical for purposes of class certification, the named plaintiff need not

20  have suffered an identical wrong.  Id.  Rather, the class representative must be part of the

21  class and possess the same interest and suffer the same injury as the class members.

22  See Falcon, 457 U.S. at 156.

23      The purpose of the typicality requirement is to assure that the interest of the named

24  representative aligns with the interests of the class.  See Ellis v. Costco Wholesale Corp.,

25  657 F.3d 970, 984-85 (9th Cir. 2011); Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th

26  Cir. 1992).  "Typicality refers to the nature of the claim or defense of the class

27  representative, and not to the specific facts from which it arose or the relief sought."

28  Hanon, 976 F.2d at 508 (quotation omitted).  "The test of typicality is whether other

United States District Court

For the Northern District of California

1  members have the same or similar injury, whether the action is based on conduct which is

2  not unique to the named plaintiffs, and whether other class members have been injured by

3  the same course of conduct." Id. (quotations omitted).

4      Plaintiffs argue that the claims of the named plaintiffs are typical of the claims of the

5  class, because all plaintiffs assert that Facebook charged them for "invalid" or "illegitimate"

6  clicks in contravention of their written advertising agreement with Facebook.  Plaintiffs

7  assert that Fox and Price both entered into CPC advertising agreements with Facebook

8  after May 2009, and both reviewed and relied on Facebook's "promises" to charge

9  advertisers only for legitimate "clicks" and to maintain systems to ensure such valid billing;

10  and that they were ultimately billed for clicks that were not legitimate, and in fact paid for

11  such illegitimate clicks.

12      Because plaintiffs' claims arise out of the same alleged actions as do the claims of

13  the absent class members – whether Facebook charged the class members for alleged

14  "invalid" or "illegitimate" clicks, and whether in so doing, Facebook breached the agreement

15  with plaintiffs – the court finds that the typicality requirement is met here.

16          d.    Adequacy

17      The fourth requirement under Rule 23(a) is adequacy of representation.  The court

18  must find that named plaintiff's counsel is adequate, and that the named plaintiff(s) can

19  fairly and adequately protect the interests of the class.  To satisfy constitutional due

20  process concerns, unnamed class members must be afforded adequate representation

21  before entry of a judgment which binds them.  See Hanlon v. Chrysler Corp., 150 F.3d

22  1011, 1020 (9th Cir. 1998).

23      Legal adequacy is determined by resolution of two questions:  (1) whether named

24  plaintiffs and their counsel have any conflicts with class members; and (2) whether named

25  plaintiffs and their counsel will prosecute the action vigorously on behalf of the class.  Id.

26  Generally, representation will be found to be adequate when the attorneys representing the

27  class are qualified and competent, and the class representatives are not disqualified by

28  interests antagonistic to the remainder of the class.  Lerwill v. Inflight Motion Pictures, 582

United States District Court

For the Northern District of California

1    F.2d 507, 512 (9th Cir. 1978).

2         Plaintiffs argue that the interests of the named plaintiffs in this case are "fully

3    aligned" with those of the class, as their claims are based on Facebook's CPC advertising

4    agreement, and its course of conduct with respect to billing for valid "clicks" and ensuring

5    "click" validity.  Plaintiffs assert that the nature of the named plaintiffs' injury is exactly the

6    same as that of the class members they seek to represent.

7         There appears to be no dispute regarding conflicts between plaintiffs' counsel and

8    the members of the class, or regarding plaintiff's counsel's ability to prosecute the action

9    vigorously on behalf of the class.  The parties do dispute whether Price and Fox are

10   adequate class representatives, based on individualized defenses, as well as the possibility

11   that their experiences and interests differ from those of certain other class members.

12        The court finds that Price and Fox have not established that they are adequate class

13   representatives.  Neither Price nor Fox has attempted to show that he suffered any

14   concrete injury from specific "invalid" clicks, or that he ever disputed his CPC charges

15   within the period needed to avoid waiver under his contract.  Thus, they both may be

16   required to litigate individualized defenses that are potentially dispositive of their claims.

17   See Hanon, 976 F.2d at 508 (class certification should not be granted where there is a

18   danger that absent class members will suffer if the representative plaintiff is preoccupied

19   with defenses unique to that representative).

20        In addition, the interests of Price and Fox are different than those of other class

21   members.  The proposed class is composed of 100,000 or more "persons or entities" in the

22   United States who "paid money to Facebook" for CPC advertising.  This diverse group

23   includes large sophisticated corporations, as well as individuals and small businesses.

24   While Price and Fox, as Self-Service Advertisers, contract with Facebook using the self-

25   service process described above, the Direct Advertisers contract directly with Facebook on

26   different terms, and use different channels to manage their ongoing advertising campaigns

27   with Facebook.

28        Fox is also not an adequate class representative for the additional reason that he

10

United States District Court

For the Northern District of California

1    testified in his deposition that he knows essentially nothing about the case, and indicated

2    that he would defer to counsel in prosecuting this action.

3              2.        Rule 23(b)

4              Under Rule 23(b)(3), a plaintiff must demonstrate the superiority of maintaining a

5    class action, and must show "that the questions of law or fact common to class members

6    predominate over any questions affecting only individual members."  Fed. R. Civ. Pro.

7    23(b)(3).  Matters pertinent to the Rule 23(b)(3) inquiry include the class members'

8    interests in individually controlling the prosecution or defense of separate actions, the

9    extent and nature of any litigation concerning the controversy already begun by or against

10   class members, the desirability or undesirability of concentrating the litigation of the claims

11   in the particular forum, and the likely difficulties in managing a class action.  Id.

12             a.        Predominance of common questions

13             The Rule 23(b)(3) predominance inquiry "tests whether proposed classes are

14   sufficiently cohesive to warrant adjudication by representation."  AmChem Prods., Inc., v.

15   Windsor, 521 U.S. 591, 623 (1997).  This inquiry requires the weighing of the common

16   questions in the case against the individualized questions, which differs from the Rule

17   23(a)(2) inquiry as to whether the plaintiff can show the existence of a common question of

18   law or fact.  See Dukes, 131 S.Ct. at 2556.  Under the predominance inquiry, "there is clear

19   justification for handling the dispute on a representative rather than an individual basis" if

20   "common questions present a significant aspect of the case and they can be resolved for all

21   members of the class in a single adjudication . . . ."  Hanlon, 150 F.3d at 1022, quoted in

22   Mazza, 666 F.3d at 589.

23             Considering whether questions of law or fact common to class members

24   predominate begins with the elements of the underlying causes of action.  See Stearns v.

25   Ticketmaster Corp., 655 F.3d 1013, 1020 (9th Cir. 2011) (quoting Erica P. John Fund, Inc.

26   v. Halliburton Co., __ U.S.__, 131 S.Ct. 2179, 2184 (2011)).  Here, plaintiffs allege two

27   causes of action under California law – breach of contract, and unfair business practices

28   under Business & Professions Code § 17200.

United States District Court

For the Northern District of California

i.     Breach of contract claim

To prevail on a claim for breach of contract under California law, a plaintiff must

show (1) the existence of a contract, (2) performance by the plaintiff or excuse for

nonperformance, (3) breach by the defendant, and (4) damage.  Walsh v. West Valley

Mission Comm. Coll. Dist., 66 Cal. App. 4th 1532, 1545 (1988).  Plaintiffs argue that

because the claim arises out of the interpretation of a "uniform written contract," and

because Facebook breached this written contract by billing advertisers for "invalid" or

"illegitimate" clicks and by failing to take measures to ensure that only "valid" clicks were

billed, it is ideal for certification.

Plaintiffs assert that the existence and uniform terms of Facebook's CPC advertising

agreement, as well as the meaning of contract terms such as "click" and "legitimate click,"

and the allegation that Facebook breached the contract by charging class members for

"illegitimate" clicks, are all "susceptible to proof at trial through available evidence common

to the class" – e.g., the contents of Facebook's Help Center Glossary of Ad Terms, and

expert evidence regarding the nature of the CPC advertising industry and cooperative

efforts to measure click validity.  However, this argument begs the question of what,

exactly, comprises the contract.

In the SACC, plaintiffs allege that the contracts at issue are "uniform contracts" that

"incorporate the information found on [Facebook's] Help Center, FAQs, and Glossary of Ad

Terms."  SACC ¶ 102.  Plaintiffs allege further that "[a] material term of the contracts was

that [p]laintiffs and the Class members would be charged only for valid clicks and that

[Facebook] would not charge advertisers for invalid clicks[;] and that "[a] second material

term of the contracts was that [Facebook] has in place reasonable and adequate processes

to prevent, detect and filter invalid clicks."  SACC ¶¶ 103-104.

In the present motion, plaintiffs argue that they and the members of the class

contracted with Facebook to purchase advertising on a "pay-per-click" basis, and that the

full extent of the parties' obligations is set forth in three documents – (1) the "Click-

Through Agreement," where advertisers select the dollar amount they are willing to pay per

12

click; (2) the "Glossary of Ad Terms" section of the Facebook Help Center pages, where Facebook defines the term "click" and (according to plaintiffs) describes the types of clicks that will be billed to advertisers (and the types that will not); and (3) the SRR. See Pltfs' Motion at 5-6, 22, 26; Pltfs' Reply at 3-4.

Plaintiffs assert that "[c]ollectively, these standardized form documents comprise the parties' agreement. In addition, however, plaintiffs also contend that "based on the . . . language" in these three documents, "Facebook made two distinct but related contractual promises to advertisers" – that it would charge them only for "legitimate" clicks, and that it had "systems" in place to ensure that it could deliver on that promise. Pltfs' Motion at 6-7.

At the hearing on the present motion, plaintiffs' counsel reiterated that "Facebook made a uniform promise that it would bill advertisers for legitimate clicks on their ads." March 7, 2012 Hearing Transcript ("Tr."), at 10. When the court asked plaintiff's counsel to explain exactly what constituted this "uniform written contract," counsel responded that the contract "comprises . . . a few documents," adding that "[i]n the online world in which we operate and in which Facebook operates, many times the contract is comprised and composed of different components on the website." Id.

Plaintiffs' counsel stated that "one of the parts of the contract is the Statement of Rights and Responsibilities," although he asserted that "the terms and responsibilities . . . alone can't constitute the contract" because the SRR lacks certain essential terms. Id. at 10-11; see also id. at 12. He identified the other components of the contract as a web page with a button that says "Create the Contract" (by which the advertiser agrees to the contract), and asserted that the "Create" button "incorporates" the SRR and the Facebook Advertising Guidelines "through different links in the Facebook website." Id. at 12-13; see also id. at 34-35. "That's what the contract says. It says, I pay for – I pay per click. That's the contract." Id. at 13.

He also asserted that the obligation to pay per click is found in the Facebook "Glossary," which states that "we will charge you only for legitimate clicks." Id. Counsel asserted that "there's no negotiation over what is a billable click," and that the "filtering" for

United States District Court

For the Northern District of California

1    invalid clicks (clicks that are not billable) is "done the same way for every single advertiser."

2    Id. at 14-15.

3         In their motion, plaintiffs argue that their performance on the CPC advertising

4    agreement can be shown through Facebook's billing records; and that Facebook's breach

5    can be shown by evidence of its failure to comply with accepted click measurement

6    standards and auditing requirements, as well as evidence of "revenue-driven bias in

7    Facebook's click filters."  Finally, they assert that they will prove that Facebook improperly

8    charged advertisers for invalid clicks through "expert evidence relying on a plausible, rule-

9    based algorithmic methodology."

10        The court finds that the proposed class cannot be certified under Rule 23(b)(3)

11   because common questions do not predominate with regard to plaintiffs' claim of

12   "systematic breach of contract."  In particular, plaintiffs have failed to establish that the

13   terms of the contract that were allegedly breached by Facebook are part of any contract

14   between CPC advertisers and Facebook; have failed to establish that there is any uniform

15   method for distinguishing, on a classwide basis, between "invalid" clicks (at issue in the

16   case) and "fraudulent" clicks (not at issue in the case); and have failed to establish that

17   damages can be calculated on a classwide basis.

18        As an initial matter, it is still not clear exactly what comprises the contract.  While it

19   appears that the "Click Agreement" (including the "Place Order" button) and the SRR may

20   form part of the contract, the court is not persuaded that "Glossary of Ad Terms" that

21   appears on the "Help Center" webpages can also be considered part of the contract.

22        The "Click Agreement" page states, "By clicking the 'Place Order' button, I agree to

23   the Facebook Statement of Rights and Responsibilities including my obligation to comply

24   with the Facebook Advertising Guidelines."  The "Click Agreement" page also has

25   hyperlinks to the SRR, and to the Facebook Advertising Guidelines, but not to the Glossary

26   of Ad Terms.

27        The format of the SRR page has changed somewhat over time.  Facebook has

28   provided copies of the version effective on May 1, 2009, and the version effective on

14

United States District Court

For the Northern District of California

October 4, 2010.  Both versions include the following language:  "The amount you owe will be calculated based on our tracking mechanisms. . . . Your ads will comply with our Ad[vertising] Guidelines. . . . We cannot control how people interact with your ads, and are not responsible for click fraud or other improper actions that affect the cost of running ads." The October 4, 2010 version adds, "We do, however, have systems to detect and filter certain suspicious activity, learn more here."

At that point – "here" – is a hyperlink to a Help Center page entitled "Click and Impression Quality," which states, "Facebook takes a proactive approach to protect you from invalid clicks, and we are constantly improving our systems to identify invalid activity." Further, "[o]ur goal is to send relevant, genuine traffic to your site. . . . [W]e try, for example, to detect and invalidate . . . [h]uman clicks that don't indicate a genuine interest in the ad or may be associated with ad testing, [or] repetitive or accidental clicks" and "[c]licks generated through prohibited means, such as bots, scrapers, browser add-ons or other non-human methods."  Nowhere on this page does Facebook promise that advertisers will never be billed for an "invalid" click, nor that Facebook will be able to identify and screen out every "invalid" click.

Moreover, the SSR does not link directly to the Help Center Glossary of Ad Terms (which plaintiffs claim is part of the contract).  Rather, as Facebook's counsel explained at the hearing, the advertiser must enter a search term in the search box on the Help Center page in order to reach the Glossary.  It is this Glossary – and particularly the references to "clicks" being counted and advertisers being "charged" when "users click on" an advertiser's ad, and to Facebook's having "a variety of measures in place to ensure" that advertisers are charged only for "legitimate" clicks – that appears to provide a basis for the additional terms that plaintiffs seek to import into the contract.

Because the Glossary is not referenced in or linked to the "Place Order" page or to the SRR, it is not clear how it can reasonably be considered part of a "uniform written contract."  Not only is it unnecessary for an advertiser to review any material on the Glossary page in order to place an ad, it is also impossible to link directly to the Glossary

from the "Click Agreement" or "Place Order" page, or even from the SRR.

Moreover, the "click definition" in the Help Center Ad Glossary cannot be relevant to the intentions of the parties at the time of contracting unless the definition was part of the contract.  The SRR contains an integration clause, which precludes a finding that the "click definition" statements outside the SRR can be used to impose additional contractual obligations on Facebook.

Plaintiffs also suggest that rather than being part of the contract, the "click definition" might better be considered extrinsic evidence, which, under California law, can be considered where relevant to prove a meaning to which the language of the contract is reasonably susceptible.  See Pacific Gas & Elec. Co. v. G.W. Thomas Drayage  69 Cal. 2d 33, 37 (1968).  Plaintiffs argue that where the contract at issue is a form contract, and the extrinsic evidence necessary to analyze the contract is itself uniform and standardized, the possibility that advertisers may need to introduce extrinsic evidence to prove the meaning of a "legitimate click" should not prevent certification.

If the contract at issue here were truly a standardized form contract, plaintiffs' argument would have more merit.  But where, as here, the contract presents such a moving target, the court cannot find that class certification is appropriate.  Moreover, "extrinsic evidence is not admissible to add to, detract from, or vary the terms of a written [integrated] contract," but only to interpret the terms in the contract.  Id., 69 Cal. 2d at 39; see also Appling v. State Farm Mut. Auto. Ins. Co., 340 F.3d 769, 777 (9th Cir. 2003).  As explained above, an advertiser cannot get to the Glossary by clicking on the link on the "Place Order" page.  Thus, the Glossary cannot reasonably be considered part of the contract, and rather than simply attempting to use "extrinsic evidence" to prove the meaning of the contract, plaintiffs are improperly seeking to add terms to the contract.

Similarly, the injury claimed by plaintiffs is that Facebook promised to charge its advertisers "per click," but failed to do so, and plaintiffs assert that Facebook breached the contract by failing to set up the "click" filters so that they were consistent with "reasonable industry standards" established by an industry advocacy group, the Internet Advertising

United States District Court
For the Northern District of California

Bureau ("IAB"), and by failing to submit to an independent audit of the operation of the click filters.  As Facebook points out, however, these terms appear nowhere in the documents that could reasonably be considered to comprise the contract – that is, the documents that the advertiser would be exposed to during the process of placing the order.

Finally, while the Self-Service Advertisers would have seen the alleged misstatements at issue only if they affirmatively navigated to the Help Center and clicked on the particular pages the plaintiffs are complaining about, the Direct Advertisers who contract directly with Facebook would have had no reason to consult the Help Center, because they have direct access to a Facebook representative to answer any questions they might have on click-related issues; and the advertisers who work through third-party agencies or developers to place advertising on Facebook are even less likely to have consulted the Help Center.  Thus, it is highly likely that many members of the proposed class would never have reviewed the material on the Help Center pages.

This lack of commonality on these issues is underscored by the experiences of the representative plaintiffs, Price and Fox.  While both allegedly reviewed the Help Center material, they came to different conclusions with respect to "invalid" clicks.  Price testified in his deposition that he understood an "invalid" click to be one that did not reach to his landing page or website, and that he expected that Facebook would bill for all clicks that reached the website – including clicks from automated non-human sources.  This is contrary to plaintiffs' allegation in the SAC that clicks from "a computer 'bot' and not a human" are "invalid" clicks.

For his part, Fox testified in his deposition that he had no specific understanding of what clicks would be billed, and that while he claimed to have reviewed the Help Center material, the only expectation he formed as a result was that Facebook would employ "some systems" in place to address "invalid" clicks.  It seems clear that neither Price nor Fox interpreted the Help Center statements in the manner that plaintiffs are now claiming in their motion. In contrast to the allegation in the SAC that plaintiffs' "reasonably expected" that Facebook would eliminate "invalid" clicks, Fox admitted he was aware that Facebook's

17

United States District Court

For the Northern District of California

1   click-filtering systems could not be perfect in all instances.

2       Plaintiffs contend that their contract claim is amenable to classwide treatment

3   because Facebook's "uniform advertising contract" imposes an obligation on Facebook to

4   bill only for "legitimate" clicks.  However, this argument fails because it is unclear what the

5   contract is and no determination that it is "uniform" can be made.  Because individual

6   assessments will be required to determine the parties' intent, and because plaintiffs have

7   not established that these additional terms were part of what the advertisers and Facebook

8   agreed to at the time of contracting, common questions do not predominate with regard to

9   the critical issue of whether Facebook performed its obligations under the contract.

10      A second area in which individualized questions predominate is in the method of

11  distinguishing between "valid" and "invalid" clicks (at issue in this lawsuit) or distinguishing

12  "valid/invalid" clicks from "fraudulent" clicks (not at issue).  Plaintiffs contend that even

13  though there are differences in the ways that advertisers use the Facebook website, the

14  "substantive method" is uniform, in that all advertisers are contracting to pay for "legitimate"

15  clicks on their advertisements, and not for clicks that come from automated programs, or

16  those that are repetitive or abusive.  They argue that Facebook uses identical "algorithmic

17  rules" for its "click legitimacy" determination, irrespective of the type of advertiser, and that

18  common issues therefore predominate.

19      Plaintiffs claim that their expert Dr. Markus Jakobsson will be able to design a rule-

20  based operational algorithmic methodology to distinguish between "valid" and "invalid"

21  clicks, and to also distinguish clicks that are based on "fraud."  However, when asked at his

22  deposition about the rules that would be needed for an advertising system to comply with

23  "industry standards," or what those "industry standards" might be, Dr. Jakobsson

24  responded that he had not been instructed to design such a methodology, and further, that

25  he did not know of any source that provides specific parameters purporting to be "industry

26  standards."  He also agreed that the IAB guidelines do not specify the parameters, and that

27  the ad networks would therefore have to determine what the parameters should be.

28      Because all claims relating to "fraudulent" clicks have been eliminated from the case,

18

based on the fact that the disclaimers in all the relevant agreements expressly state that Facebook cannot be liable for "click fraud," plaintiffs will need to demonstrate a classwide method to identify "invalid" clicks and distinguish them from "valid" clicks on the one hand, and from "fraudulent" clicks on the other.  However, Dr. Jakobsson testified in his deposition that he was not prepared to opine on whether a workable method exists to distinguish among "valid," "invalid," and "fraudulent" clicks on a classwide basis.

The court is persuaded, based on the analysis of Facebook's expert Stroz Friedberg, that using Dr. Jakobsson's methodology, there is no way to conduct this type of highly specialized and individualized analysis for each of the thousands of advertisers in the proposed class.  Thus, common issues do not predominate in this case because plaintiffs have no classwide method to parse the millions of clicks in this case to segregate the "invalid" clicks they seek to challenge from the "fraudulent" clicks that are no longer part of the case and therefore are not actionable, and the "valid" clicks that are not at issue in the case and are therefore not actionable.

Finally, common issues do not predominate because of the individualized assessment required to determine damages.  Dr. Jakobsson conceded in his deposition that using Facebook's data alone to distinguish among the various types of clicks would invariably lead to "false positives" in which damages could be awarded for "valid" clicks from real users; and that there would be no way to identify and remove those "false positives" or even estimate the rate of "false positives" in any potential model of recovery.

Under Ninth Circuit law, the general rule is that the need for individualized damages, alone, cannot defeat class action treatment.  Yokoyama v. Midland Nat'l Life Ins. Co., 593 F.3d 1087, 1094 (9th Cir. 2010); see also Stearns, 655 F.3d at 1026.  Nevertheless, the Ninth Circuit has also suggested that where damages calculations are not a matter of straightforward accounting, damages can be a factor in the predominance analysis.  See Local Joint Executive Board of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc., 244 F.3d 1152, 1163 (9th Cir. 2001).  Based on the difficulty of determining injury on a classwide basis, the court finds that the calculation of damages will require an

United States District Court

For the Northern District of California

1    individualized inquiry.  At a minimum, the need for an individualized assessment of

2    damages is a factor in the superiority analysis.

3                        ii.    Unfair business practices claim

4        The elements of a § 17200 claim of unfair business practices in the consumer

5    context are that the defendant's business practices (1) cause substantial injury that

6    consumers cannot avoid, and (2) which is not outweighed by countervailing benefits to

7    consumers or competition.  Davis v. Ford Motor Co., 179 Cal. App. 4th 581, 584 (2009).[2]

8    Classwide relief under the UCL is available without individualized proof of deception,

9    reliance, and injury.  Stearns, 655 F.3d at 1020 (quoting In re Tobacco II Cases, 46 Cal. 4th

10   298, 320 (2009)).

11       Plaintiffs originally alleged their § 17200 claim under all three prongs of the statute –

12   unlawful, unfair, and fraudulent.  Judge Fogel dismissed the claims under the unlawful and

13   fraudulent prongs.  In addition, in the August 25, 2010 order regarding Facebook's motion

14   to dismiss the first amended complaint, the court found that the UCL claim – in which

15   plaintiffs alleged that Facebook failed to implement adequate measures to protect

16   advertisers from charges from "invalid" third-party clicks – "mirrors" the breach of contract

17   claim, in that it "boils down to a dispute over contractual interpretation."  See August 25,

18   2010 Order at 16-17.

19       Plaintiffs argue that the UCL claim is based on a "systematic" breach of contract,

20   and is therefore appropriate for class treatment.  See Allied Grape Growers v. Bronco Wine

21   Company, 203 Cal. App. 3d 432, 449-52 (1988) (breach of contract may form the predicate

22   for § 17200 claim, provided it also constitutes conduct that is "unlawful, or unfair, or

23   fraudulent"); see also Smith v. Wells Fargo Bank, N.A., 135 Cal. App. 4th 1463, 1483

24   (2005) ("systematic breach of certain types of contracts (e.g., breaches of standard

25   consumer or producer contracts involved in a class action) can constitute an unfair

26   _____

27       [2] This is one of three tests of "unfair" business practices applied by California courts in
     consumer cases.  See Drum v. San Fernando Valley Bar Ass'n, 182 Cal. App. 4th 247, 256
28   (2010).

United States District Court

For the Northern District of California

1  business practice under the UCL").

2       Plaintiffs argue that they will be able to prove all the elements of a classwide UCL

3  unfair practices claim against Facebook by relying on common evidence.  They assert that

4  common evidence will demonstrate that Facebook's failure to properly filter out "invalid"

5  clicks was the result of behind-the-scenes decisions to give more importance to advertising

6  revenue than to the integrity of its pay-per-click advertising program.  They contend that

7  CPC advertisers had no way of knowing that Facebook would not "honor its promise" to

8  charge only for "legitimate" clicks.  Finally, they assert that common evidence will show that

9  there is no countervailing benefit to class members or the CPC industry in Facebook's

10 practice of systematically charging its advertising customers for invalid clicks.

11      As with the breach of contract claim, plaintiffs contend that their expert Dr.

12 Jakobsson can design "rule-based algorithms" and can use Facebook's own historical data

13 to confirm the volume of "invalid" clicks charged by Facebook, and can then assign a dollar

14 value amount paid by each class member for "invalid" clicks, which in plaintiffs' view will

15 demonstrate substantial injury to the named plaintiffs and the class.  They also argue that

16 Dr. Jakobsson's "rule-based algorithms" can be applied to common historical data

17 maintained by Facebook, in order to establish both classwide liability and the dollar amount

18 paid by each class member, without individualized proof.

19      As set forth above in the discussion of the breach of contract claim, the court finds

20 that common issues do not predominate with regard to the § 17200 claim.  That is,

21 common questions do not predominate because plaintiffs have failed to establish that the

22 terms of the contract that were allegedly breached by Facebook are part of a contract

23 between CPC advertisers and Facebook; and have failed to establish that there is any

24 uniform method for distinguishing, on a classwide basis, between "invalid" clicks and

25 "fraudulent" clicks.  Thus, because plaintiffs cannot show that the proof of injury lends itself

26 to a workable, mechanical calculation, the case would be unmanageable as a class action.

27      The court finds further that common questions do not predominate because plaintiffs

28 have no viable method for proving each class member's individual recovery.  Plaintiffs

United States District Court

For the Northern District of California

1   argue that it is enough that Dr. Jakobsson opined that he <u>could</u> design algorithms that

2   would distinguish between valid and invalid clicks, and that would  also determine clicks

3   that are based on "fraud."  They claim he did not testify that there are no industry standard

4   algorithms, just that he had not been asked at this stage of the litigation to determine what

5   they are – and that he was clear that he will design such algorithms for the merits part of

6   this case.  However, the distinction between types of clicks is crucial here.  And plaintiff

7   have provided no explanation as to how they believe a "fraudulent" click can be

8   distinguished from a click that is merely "invalid," as the difference appears to be largely

9   based on the intent of the user.

10      Under the UCL, all plaintiffs seeking restitution must prove that the defendants

11   obtained the amounts in dispute "by means of" its alleged wrongful conduct.  Cal. Bus. &

12   Prof. Code § 17203.  In view of this requirement, class members cannot recover restitution

13   if they were not exposed to the alleged misrepresentation (and therefore could not have

14   lost money or property as a result of the unfair competition).

15      If plaintiffs cannot demonstrate that money to be refunded to consumers is tied to

16   the alleged misconduct in the case, awarding full refunds would be improper.  Nor would it

17   be permissible to indiscriminately award recovery in this case for clicks that are not linked

18   to any alleged wrongdoing and must be excluded from the case as a matter of law.  In

19   addition, with regard to the UCL claim for restitution, plaintiffs must be able to prove, for

20   each class member, the difference between what the plaintiffs paid and the value of what

21   the plaintiffs received.  <u>See</u> <u>In re Vioxx Class Cases</u>, 180 Cal. App. 4th 116, 131 (2009).

22      One of the central concerns of the Rule 23(b)(3) predominance test is whether

23   "adjudication of common issues will help achieve judicial economy."  <u>Vinole v. Countrywide</u>

24   <u>Home Loans, Inc.</u>, 571 F.3d 935, 944 (9th Cir. 2009) (citation and quotation omitted).

25   Thus, the question here is whether common issues constitute such a significant aspect of

26   the case that there is a clear justification for handling the dispute on a representative rather

27   than on an individual basis.

28      The parties agree that the UCL claim depends on the viability of the breach of

United States District Court

For the Northern District of California

contract claim. The court is persuaded by Facebook's argument that plaintiffs have not

shown that they have a viable method for proving each class member's recovery. While

restitution need not be determined with exact precision, it "must be based on a specific

amount found owing, and this measurable amount of restitution due must be supported by

substantial evidence." In re Google AdWords Litig., 2012 WL 28068 at *15 (N.D. Cal., Jan.

5, 2012) (citation and quotation omitted); see also Campion v. Old Republic Home

Protection Co., Inc., 272 F.R.D. 517, 533 (S.D. Cal. 2011). Plaintiffs have not established

that the appropriateness of and entitlement to restitution can be said to constitute a

common question that can be resolved for all members of the class in a single adjudication.

　　　　b.　　Superiority

　　　　Plaintiffs assert that a class action is superior to other available methods for the fair

and efficient adjudication of this case, because the damages per advertiser are likely not

sufficient to justify hiring an attorney and pursuing individual litigation, and because the

proposed class presents no manageability issues, as individualized proof and the

involvement of individual class members should not be necessary to establish liability and

damages, for the reasons argued in connection with the predominance inquiry.

　　　　The court finds, however, that a class action would not be superior because of the

existence of numerous matters requiring individualized inquiry. In particular, the need to

determine both liability and damages on an individualized basis makes this case

inappropriate for class treatment. See Six Mexican Workers v. Arizona Citrus Growers,

904 F.2d 1301, 1304 (9th Cir. 1990) ("manageability" requirement includes consideration of

potential difficulties in calculation of individual damages and distribution of damages).

**CONCLUSION**

　　　　In accordance with the foregoing, the motion to certify the plaintiff class is DENIED.

While plaintiffs have made a sufficient showing as to three of the four Rule 23(a) factors,

they have not established that questions of law or fact common to the class members

predominate over questions affecting only individual members, nor that a class action is

superior to other methods for fairly and efficiently adjudicating the controversy.

As noted above, the court finds that plaintiffs fail to show that common questions predominate because they have not clearly established what constituted the contract, and also because they have not shown they can establish injury through common proof.

A case management conference will be held on May 17, 2012, at 2:00 p.m.  If an appeal is taken pursuant to Federal Rule of Civil Procedure 23(f), this date will be VACATED, pending action by the Court of Appeals.

**IT IS SO ORDERED.**

Dated:  April 13, 2012

_____
PHYLLIS J. HAMILTON
United States District Judge