1  Jonathan Shub (SBN 237708)
   jshub@seegerweiss.com
2  **SEEGER WEISS LLP**
   1515 Market Street, Suite 1380
3  Philadelphia, PA 19102
   Telephone: (215) 564-2300/ Facsimile: (215) 851-8029
4
5  Rosemary M. Rivas (SBN 209147)
   rrivas@finkelsteinthompson.com
6  **FINKELSTEIN THOMPSON LLP**
   100 Bush Street, Suite 1450
7  San Francisco, California 94104
   Telephone: (415) 398-8700/Facsimile: (415) 398-8704
8
   *Interim Co-Lead Class Counsel*
9
   Guido Saveri (SBN 22349)
10 guido@saveri.com
   R. Alexander Saveri (SBN 173102)
11 rick@saveri.com
   Cadio Zipoli (SBN 179108)
12 cadio@saveri.com
   **SAVERI & SAVERI, INC.**
13 706 Sansome Street
   San Francisco, California 94111
14 Telephone: (415) 217-6810
   Facsimile: (415) 217-6817
15
   *Attorneys for Plaintiffs*
16
   [Additional Counsel listed in Signature Block]
17

13  **REDACTED Pursuant to Court Order**
14  **DKT. No. 254**

18                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF CALIFORNIA
19

| | |
|---|---|
| 20  **IN RE FACEBOOK PPC ADVERTISING LITIGATION** | Master File Case No. 5:09-cv-03043 PJH |
| 21 | ~~**PLAINTIFFS' REPLY MEMORANDUM OF**~~ **POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION** |
| 22 | |
| 23 | |
| 24 | Date:        TBD |
| 25  **This Document Relates To:**<br>   **All Actions** | Time:        TBD<br>Judge:       Honorable Phyllis J. Hamilton |
| 26 | Courtroom: 3, 5th Floor |
| 27 | |

28                         **REDACTED**

# TABLE OF CONTENTS

Page

I.    INTRODUCTION................................................................................................ 1

II.   FACEBOOK'S FACTUAL AND LEGAL ADMISSIONS .......................................... 2

III.  THE BREACH OF CONTRACT CLAIM IS APPROPRIATE FOR CLASS CERTIFICATION 3

      A.   The Operative Agreement Includes the Promise to Charge Only for Legitimate Clicks. ... 6

      B.   The Click Definition is Also Contained in the Direct Advertisers' Contracts .................. 8

           1.   Class Members Need Not Prove They Read The Click Definition.......................... 8

           2.   Facebook's Arguments are a Contortion of Judge Fogel's  Rulings on the Motions to Dismiss........................................................................................ 11

           3.   Even if Facebook's Click Definition Constitutes Extrinsic Evidence, Class Certification is Appropriate................................................................. 13

IV.   THE UNFAIR BUSINESS PRACTICES CLAIM IS BASED ON A SYSTEMATIC BREACH OF CONTRACT AND IS APPROPRIATE FOR CLASS TREATMENT ................................. 14

      A.   Common Issues Predominate the UCL Claim................................................. 14

      B.   Plaintiffs and the Class have Standing to Pursue the UCL Claim...................................... 15

V.    FACEBOOK'S EXPERTS HAVE NOT SHOWN THAT PLAINTIFFS' LIABILITY AND DAMAGES METHODOLOGY IS IMPLAUSIBLE................................................................. 17

VI.   PLAINTIFFS MEET THE TYPICALITY AND ADEQUACY REQUIREMENTS .................. 18

VII.  CONCLUSION .......................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**                                                                              **Page(s)**

*Adams v. Kansas City Life Ins. Co.*,
192 F.R.D. 274 (W.D. Mo. 2000) ................................................................................. 13

*Alaimo v. Tsunoda*,
215 Cal. App. 2d 94 (1963) ........................................................................................ 7

*Badie v. Bank of Am.*,
67 Cal. App. 4th 779 (1998) ...................................................................................... 12

*Bates v. United Parcel Serv., Inc.*,
511 F.3d 974 (9th Cir. 2007) ..................................................................................... 15

*Beard v. Goodrich*,
110 Cal. App. 4th 1031 (2003) .................................................................................... 8

*Berard Const. Co. v. Percin*,
49 Cal. App. 3d 710 (1975) ........................................................................................ 9

*Berrien v. New Raintree Resorts Int'l, LLC*,
276 F.R.D. 355 (N.D.Ca. 2011) ................................................................................ 10

*Biancur v. Hickey*,
No. C-95-2145, 1997 WL9857 (N.D. Cal. Jan. 7, 1997) ........................................... 20

*Buckley v. C.A. Terhune*,
441 F.3d 688 (9th Cir. 2006) ..................................................................................... 12

*Burdick v. Union Sec. Ins. Co.*,
No. CV 07-4028, 2009 WL 4798873 (C.D. Cal. Dec. 9, 2009) ................................ 16

*Burkhalter Travel Agency v. MacFarms Int'l, Inc.*,
141 F.R.D. 144 (N.D. Cal. 1991) .............................................................................. 20

*Cal. Lettuce Growers v. Union Sugar Co.*,
45 Cal. 2d 474 (1955) ............................................................................................ 4, 6

*Carbajal v. Capital One F.S.B.*,
219 F.R.D. 437 (N.D. Ill. 2004) ................................................................................ 18

*Clayworth v. Pfizer, Inc.*,
49 Cal. 4th 758 (2010) .............................................................................................. 18

*Dupler v. Costco Wholesale Corp.*,
249 F.R.D. 29 (E.D.N.Y. 2008) .................................................................................. 9

i

*Endres v. Wells Fargo Bank,*
   No. C 06-7019 PJH, 2008 WL 344204 (N.D. Cal. Feb. 6, 2008)................................................14

*Ewert v. eBay, Inc.,*
   No. C-07-02198 RMW, 2010 WL 4269259 (N.D. Cal. Oct. 25, 2010) ...........................10, 19

*Facebook, Inc. v. Pac. Nw. Software, Inc.,*
   640 F.3d 1034 (9th Cir. 2011) ................................................................................................7

*Fireman's Fund Ins. Cos., v. Ex-Cell-O Corp.,*
   702 F. Supp. 1317 (E.D. Mich, 1988).........................................................................10

*Galvan v. KDI Distribution Inc.,*
   No. SACV 08-0999-JVS, 2011 WL 5116585 (C.D. Cal. Oct. 25, 2011)............................15

*Guadagno v. E\*Trade Bank,*
   592 F.Supp. 2d 1263 (C.D. Cal. 2008) ..................................................................................9

*Ham v. Swift Transp. Co., Inc.,*
   275 F.R.D. 475 (W.D. Tenn. 2011) ........................................................................................5

*Hanon v. Dataproducts,*
   976 F.2d 497 (9th Cir. 1992) ................................................................................................19

*Horne v. Flores,*
   129 S.Ct. 2579 (2009).................................................................................................16, 17

*In re Checking Account Overdraft Litig.,*
   275 F.R.D. 666 (S.D. Fla. 2011)............................................................................................9

*In re Conseco Life Ins. Co. LifeTrend Ins. Sales and Marketing Litig.,*
   270 F.R.D. 521 (N.D. Cal. 2010)............................................................................................9

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.,*
   No. M 02-1486 PJH, 2006 WL 1530166 (N.D. Cal. June 5, 2006) ....................................19

*In re Light Cigarettes Marketing Sales Practices Litig.,*
   271 F.R.D. 402 (D. Me. 2010)..............................................................................................15

*In re Med. Capital Sec. Litig., No. SAML 10-2145 DOC,*
   2011 WL 5067208  (C.D. Cal. July 26, 2011)......................................................................9

*In re Online DVD Rental Antitrust Litig.,*
   No. M 09-2029 PJH, 2010 WL 5396064 (N.D. Cal. Dec.  23, 2010)....................................18

*Kleiner v. First Nat'l Bank of Atlanta,*
   97 F.R.D. 683 (N.D. Ga.1983)..............................................................................................10

*Lozano v. AT & T Wireless Servs., Inc.,*
   504 F.3d 718 (9th Cir. 2007) ................................................................................................13

ii

*Maersk–Sealand v. Eurocargo Express, LLC*,
  No. 20-cv-3230, 2004 WL 1950372 (C. D. Cal. Apr. 8, 2004) ............................................... 7

*Marsu, B.V. v. The Walt Disney Co.*,
  185 F.3d 932 (9th Cir. 1992) ..................................................................................... 18

*Menagerie Prods. v. Citysearch*,
  No. 08-4263 CAS (FMO), 2009 WL 3770668 (C.D. Cal. Nov. 9, 2009) ................... 12, 13, 20

*Moeller v. Taco Bell Corp.*,
  No. C 02-5849 PJH, 2011 WL 4634250 (N.D. Cal. Oct. 5, 2011) ................................... 15, 19

*Mortimore v. Fed. Deposit Ins. Corp.*,
  197 F.R.D. 432 (W.D. Wash. 2000) ............................................................................. 10

*Norcal Waste Sys., Inc. v. Apropos Tech., Inc.*,
  No. C 06-3410 CW, 2006 WL 2319085 (N.D. Cal. Aug. 10, 2006) ...................................... 6

*One Beacon Ins. Co., v. Crowley Marine Servs., Inc.*,
  648 F.3d 258 (5th Cir. 2011) ..................................................................................... 9

*Pfizer Inc. v. Superior Court*,
  182 Cal. App. 4th 622 (2010) .................................................................................... 14

*Rodman v. Safeway, Inc.*,
  No. C 11-03003 JSW, 2011 WL 5241113 (N.D. Cal. Nov. 1, 2011)..................................12

*Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Serv., Inc.*,
  601 F.3d 1159 (11th Cir. 2010) .................................................................................. 9

*Samuel-Bassett v. Kia Motors America, Inc.*,
  No. 22 EAP 2008, 2011 WL 6004600 (Pa. Dec. 2, 2011)............................................9

*Sevidal v. Target Corp.*,
  189 Cal. App. 4th 905 (2010) .................................................................................... 14

*Smilow v. Sw. Bell Mobile Sys., Inc.*,
  323 F.3d 32 (1st Cir. 2003)........................................................................................ 9

*Stearns v. Ticketmaster Corp.*,
  655 F.3d 1013 (9th Cir. 2011) ............................................................................. 15, 18

*Toll Bros. v. Chang Su-O Lin*,
  No. 09-16955, 2011 WL 3839761 (9th Cir., Aug, 31, 2011) ............................................ 4

*Wal–Mart Stores, Inc. v. Dukes*,
  131 S.Ct. 2541 (2011).............................................................................................. 2

iii

*Walsh v. West Valley Mission Comm. Coll. Dist.,,*
 66 Cal. App. 4th 1532 (1988) ........................................................................ 6, 8

*Wamboldt v. Safety-Kleen Systems, Inc.,*
 No. 07-0884 PJH, 2007 WL 2409200 (N.D. Cal. Aug. 21, 2007) .................... 19

*Webb v. Carter's Inc.,*
 272 F.R.D. 489 (C.D. Cal. 2011) ...................................................................... 15

*Westways World Travel, Inc, v. AMR Corp.,*
 265 Fed. Appx. 472 (9th Cir. 2008) .................................................................. 13

*Westways World Travel, Inc. v. AMR Corp.,*
 218 F.R.D. 223 (C.D. Cal. 2003) ........................................................................ 5

*Winkler v. DTE, Inc.,*
 205 F.R.D. 235 (D. Ariz. 2001) .......................................................................... 9

*Woods v. Google, Inc.,*
 No. 05:11–cv–1263–JF, 2011 WL 3501403  (N.D. Cal. Aug. 10, 2001)............ 12

*Zeno v. Ford Motor Co. Inc.,*
 238 F.R.D. 173 (W.D. Pa. 2006) ...................................................................... 13

**Regulations**

Fed. R. Civ. P. 23(a) (2).................................................................................................. 2

Fed. R. Civ. P. 23(a)(1)................................................................................................... 2

Fed. R. Civ. P. 23(b)(3)................................................................................................ 16

Fed. R. Civ. P. 23(f)..................................................................................................... 10

**Secondary Sources**

*Class Certification in the Age of Aggregate Proof,*
 84 N.Y.U.L. Rev. 97 (2009) ............................................................................... 2

iv

TABLE OF AUTHORITIES
CASE NO. 5:09-CV-03043 PJH

## I.   INTRODUCTION

This is a case tailor-made for class certification. As Plaintiffs demonstrated in their opening brief and herein:

- Facebook's contract contains a California choice of law clause. Thus, this nationwide class action implicates the law of only one state – California – thus alleviating manageability issues that sometimes plague class actions when class members reside in various states.

- The contractual dispute is about a single issue – whether Facebook's form "pay-per-click" contract obligates it to only charge only advertisers for "legitimate clicks," and if so, whether Facebook complies with its obligation.

- Facebook applies the identical rules for determining the legitimacy of a click on each advertisement; thus, the ultimate determination of whether Facebook breached the contract will not vary depending on the advertiser or on the manner in which they contracted with Facebook.

- All advertisers (whether categorized by Facebook as a "self serve" or "direct" advertiser) contracted with Facebook on a "pay-per-click" basis for legitimate clicks.

- Plaintiffs have presented a methodology to determine liability and damages from a qualified industry expert that is plausible in its articulation and structure and is in compliance with the standards applicable in the industry. In contrast, Facebook's experts' purported methodology is manufactured solely for the purposes of supporting Facebook's class certification opposition.

Facebook's opposition hinges on the misguided proposition that resolving the Class members' claims will "turn on idiosyncratic evidence specific to each advertiser." (Defendant's Opposition to Plaintiffs' Motion for Class Certification ("FB Opp.") at 1:17-18). Plaintiffs' claims do not, as Facebook contends, depend on individual proof of whether they were "exposed" to or reviewed the definition of a "click" before they entered into the form contract. (*Id.* at 16:11-14). Nor do they depend on data maintained by advertisers, as Facebook's expert asserts. To be sure, the parties do not agree on what constitutes a "legitimate click" but that is a common issue that ultimately goes to the merits of this dispute and does not rise or fall based on the vagaries of any particular class member. And even if Facebook is correct that the parties need to introduce extrinsic evidence to prove the meaning of the

term "legitimate click" in the uniform contract, that does not render class certification inappropriate.  In the words of the Supreme Court in *Dukes*, Plaintiffs have shown that the common issues here have the "capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal–Mart Stores, Inc. v. Dukes,* 131 S.Ct. 2541, 2551 (2011) (*quoting* Nagareda, *Class Certification in the Age of Aggregate Proof,* 84 N.Y.U. L. Rev. 97, 132 (2009)) (emphasis in original).

## II.     FACEBOOK'S FACTUAL AND LEGAL ADMISSIONS

Facebook's opposition concedes or simply ignores critical facts and legal principles that support class certification and illustrate the efficiency of proceeding with one trial in this matter.    First, Facebook does not contest the enforceability of the contracts' uniform choice-of-law clause mandating application of California law.  Second, Facebook does not contest the ascertainability of Plaintiffs' class definition.  Third, Facebook does not question that the Class consists of thousands of advertisers, thus satisfying numerosity under Fed. R. Civ. P. 23(a)(1).  Finally, Facebook does not dispute that there are some common questions of law and fact satisfying the commonality requirement under Fed. R. Civ. P. 23(a) (2).

Facebook does not contest, or in some cases even comment on, critical factual issues that support class certification.  Facebook admits, for example, that advertisers were subject to the same two form

Period.  (Pls.' Mem. P. & A. ISO Class Certification ("Pls.' MPA") at 16:22 – 17:12).  Thus, an analysis of whether Facebook's click legitimacy determinations support its contractual obligations can proceed as the predominate common issue in this case – beyond certification and through trial.

Similarly, Facebook has not challenged Plaintiffs' damning expert testimony that its click

---

[1] Advertisers contract with Facebook using Facebook's on-line automated process (the "self serve" advertisers) or purchase advertising using a Facebook representative either directly or through an intermediary such as an advertiser agency (the "direct" advertisers).  (Decl. of Peter Colosi ISO Facebook, Inc.'s Opp. to Pls.' Mot. for Class Certification ("Colosi Decl."), Exh. B at ¶2).

2

exist.  (Jonathan Shub Decl. ISO Pls.' Mot. For Class Certification, filed Sept. 15, 2011 (under seal), Dkt. No. 206 ("Shub Decl. 9/15/11"), Exh. 10 at p. 22).

Facebook treats Kevin Lee's expert opinions in the same manner.  Mr. Lee, one of the pioneers in the digital advertising industry and a member of the group that authored the IAB Guidelines, opined

20, 22).  Facebook similarly ignores Mr. Lee's opinions.

Facebook's failure to offer any contrary expert opinion speaks volumes about its bad faith in

position on the merits of the case are profound.  But at this stage, what is critical is that the issues that will determine if Facebook is liable to the Class, and, if so, the measure of Class' damages, is based on a uniform contractual obligation, and should be resolved in one trial.

## III.   THE BREACH OF CONTRACT CLAIM IS APPROPRIATE FOR CLASS CERTIFICATION

Plaintiffs demonstrated in their Opening Brief that they and the Class contracted with Facebook to purchase advertising on a "pay-per-click" basis.  (Pls.' MPA at 5:10-7:10).  The full extent of the parties' obligations is set out in three documents: (1) the Click-Through Agreement (*see* accompanying Jonathan Shub Decl. ISO Pls.' Reply Brief Supp. Class Certification ("Shub Reply Decl."), Exh. I), where advertisers select the dollar amount they are willing to pay per click; (2) the Advertising Glossary Section of the Facebook website where Facebook expressly defines the term "Click" and describes the types of "Clicks" that will (and those that will not) be billed to advertisers (hereinafter, "Click

---

PLAINTIFFS' REPLY MEM. P. & A. ISO MOT. FOR CLASS CERTIFICATION
CASE NO. 5:09-CV-03043-PJH

Definition") (Exh. G to Rosemary Rivas Decl. ISO Pls.' Mot. for Class Certification, Dkt. No. 198 ("Rivas Decl."); and in the Statement of Rights and Responsibilities ("SRR") (Colosi Decl., Exh. B, Exh. 2). Collectively, these standardized form documents comprise the parties' agreement. Facebook does not challenge the uniformity or existence of these documents throughout the Class Period.

While the process advertisers utilize to contract with Facebook varies, as some may use Facebook's website forms on their own while others may retain third parties to actually make the advertising purchases on their behalf, the substantive bargain is uniform: all advertisers are contracting to pay for legitimate "clicks" on their advertisements and not clicks that "come[s] from automated programs, or clicks that may be repetitive, abusive, or otherwise inauthentic."[3] (Rivas Decl., Exh. G, quoting Facebook's definition of clicks in Facebook Glossary). As Plaintiffs explained, which Facebook's employee-declarant, John McKeeman, recently conceded at his deposition, Facebook

Faced with the evidence of uniformity that makes this a paradigmatic case for class treatment, Facebook's opposition resorts to a merits-based, misstatement of contract principles. Intent on arguing what would appear to be its forthcoming summary judgment position, Facebook first contends that the SRR is an integrated agreement containing no express provision obligating it to charge for only

---

[3] Facebook's Click Definition expressly "ensures" (*i.e.*, promises) advertisers that they will not be charged for clicks that are not considered "Legitimate": "Clicks are counted each time a user clicks through your ad to your landing page. We have a variety of measures in place to **ensure** that [Facebook] **only** report[s] and **charge[s] advertisers for legitimate clicks**, and not clicks that come from automated programs, or clicks that may be repetitive, abusive, or otherwise inauthentic." (emphasis added). (Pls.' MPA at 6:12-17). Significantly, Facebook does not offer a contrary definition in its opposition papers thus conceding that this uniform definition should be employed in analyzing whether Facebook breached the agreement.

1  legitimate clicks. (FB Opp. at 20:19-21).[4] Trying in vain to graft tort principles into Plaintiffs' contract

2  claim for purposes of opposing class certification, Facebook argues that, even if the contract obligates it

3  to charge only for legitimate clicks, proof of the breach will require proof that each class member had

4  knowledge of the Click Definition before entering into the pay-per-click agreement. (FB Opp. at 21:6-

5  7). Thus, according to Facebook, because class members will need to introduce "extrinsic evidence"

6  (the Click Definition) to prove the breach, class certification is inappropriate. (*Id.* at 21:1-7).

7        Facebook's argument is both procedurally and substantively infirm. As an initial matter, it is

8  premature. *See Ham v. Swift Transp. Co., Inc.,* 275 F.R.D. 475, 486, n. 10 (W.D. Tenn. 2011) (contract

9  interpretation and breach are merits questions that need not and cannot be resolved at class certification);

10  *Westways World Travel, Inc. v. AMR Corp.*, 218 F.R.D. 223, 233 (C.D. Cal. 2003) (same). As these

11  cases explain, class certification is simply not the appropriate stage to resolve contract interpretation

12  issues.

13        Facebook's position is wrong as matter of contract interpretation and contract principles. First,

14  the SRR cannot alone be the operative contract. As Facebook admits, it does not contain material terms,

15  such as price and the type of advertising (pay-per-click or impression-based advertising).[5] (Shub Reply

16

17

---

18  [4] Facebook's position fails to address the hornbook principle that, to the extent the contract provides it
with discretion to determine click legitimacy, it must be exercised reasonably and in good faith. *See*
19  *Toll Bros. v. Chang Su-O Lin*, No. 09-16955, 2011 WL 3839761, at *4 (9th Cir, Aug, 31, 2011)
("'[e]very contract [under California law] imposes upon each party a duty of good faith and fair dealing
20  in its performance and its enforcement,'" *citing* Restatement (Second) of Contracts § 205); *Cal. Lettuce
21  Growers v. Union Sugar Co.* 45 Cal. 2d 474, 484 (1955) ["[W]here a contract confers on one party a
discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good
22  faith and in accordance with fair dealing."). While the evidence accumulated thus far shows that
Facebook acted in bad faith, the resolution of that predominant, common issue must await another day.
23
24  [5] Facebook's argument that the SRR is an integrated agreement is contradicted by the SRR itself. In
section 11.2 and 11.3 of the operative SRRs, there is a hyperlink to the "Payment Terms" Document that
25  resides elsewhere on Facebook' website. (Colosi Decl., Exh. B, Exhs. 2-3). Section 8.1 of the Payment
Terms Document expressly states that, if there is a conflict between the terms on the Payment Terms
26  Document and the SRR, the Payment Terms document will prevail. (*Id.* at Exh. 5). In fact, Facebook
contradicts itself later in its papers by relying on the Payment Terms Document to argue that Plaintiffs
27  are subject to unique contractual defenses. (FB Opp. at 29:14-15 & n. 129 (*citing* Colosi Decl., Exh. B,
Exh. 5)).
28

PLAINTIFFS' REPLY MEM. P. & A. ISO MOT. FOR CLASS CERTIFICATION
CASE NO. 5:09-CV-03043-PJH

Decl., Exh. A at 83:4-16; 86:13-20).  Rather, the SRR is only a portion of the contract incorporated into the standard Click-Through Agreement that governs the relationship between Facebook and advertisers. Second, proof of a breach of contract does *not* require that individual class members prove awareness of the breached terms. This is simply not an element of a *prima facie* case for breach of contract.  *Walsh v. West Valley Mission Comm. Coll. Dist.*, 66 Cal. App. 4th 1532, 1545 (1988).  Third, even if Facebook is correct that extrinsic evidence is necessary to prove breach, that does not make certification inappropriate.

Facebook does not dispute that the SRR[6] and the Click Definition on Facebook's website were both in existence throughout the class period. (Colosi Decl., Exh. B at ¶ 11). Thus, there are only two possible likely outcomes of the contractual interpretation dispute, both of which are appropriate for class treatment: 1) Plaintiffs are correct that the Click-Through Agreement (*i.e.*, the Order Form) is part of the operative agreement that includes both the provisions of the SRR and the Click Definition, which collectively constitute the full scope of the terms of the Parties' agreement; or 2) Facebook is correct that the SRR is the operative agreement and that its integration clause precludes the Click Definition from being a part of the agreement, but may be used as extrinsic evidence to resolve the meaning of the term "click."  What is dispositive at the class certification stage is that under either scenario common issues predominate.

A.     **The Operative Agreement Includes the Promise to Charge Only for Legitimate Clicks**

Facebook's opposition rests on the fallacy that the SRR is an integrated contract setting forth the entire scope of the Parties' obligations.  (FB Opp. at 4:6-8. ("Since May 1, 2009 (the beginning of the

___
[6] While Plaintiffs' opening brief addressed a different document that was not used during the Class Period (the "Facebook Terms and Conditions" for self serve advertisers), the documents are substantially similar to the SRR for purposes of the class certification analysis. Moreover, there are, at most, three versions of the SRR. The first was operative from May 1, 2009, to December 9, 2009, (Colosi Decl., Exh. B, Exh. 2); the second was operative from December 9, 2009 to October 4, 2010 and the third become operative on October 5, 2010.  (*Id.*, Exh. B, Exhs. 3- 4.)  As Facebook concedes, these documents are materially similar. (*Id.*, Exh. B at ¶¶ 11-15).

proposed class period), the operative agreement between Facebook and its self-service advertisers has been known as the [SRR]").[7]   Facebook has it backwards.  The document with the material terms (*i.e.*, type of ad, targeted audience, and price) that sets out the Parties' agreement is the standardized Click-Through Agreement (Shub Reply Decl., Exh. I), not the SRR.  As alleged in the Second Amended Complaint ("SAC") and confirmed by Mr. McKeeman, the Click-Through Agreement (creating the binding obligation to pay-per-click) is created by a prospective advertiser clicking an order link on Facebook's website.   (SAC ¶¶ 29-35); (Shub Reply Decl., Exh. A at 81:4-10: 82:19-25; 83:1-3); (Colosi Decl., Exh. B at ¶¶ 4-8); (Rivas Decl., Exh. E at ¶ 2) ("[I]t is impossible to place advertisements on the Facebook site without first clicking on the 'Place Order' button on that agreement.").[8]

The Click-Through Agreement specifies the essential terms of the parties' agreement, in particular the price for each click.  Absent the agreement that an advertiser will pay on a "per-click" basis, and the bid price for each click, the parties have no agreement at all.  *Facebook, Inc. v. Pac. Nw. Software, Inc.*, 640 F.3d 1034, 1037-38 (9th Cir. 2011) (price is a "necessary term, without which there can be no contract"); *Alaimo v. Tsunoda*, 215 Cal. App. 2d 94, 97-98 (1963) (terms of payment for a written services contract is material and a contract excluding such terms is not binding).  Moreover, the Click Definition (*i.e.*, one that is "legitimate" and thus billable) has been incorporated by reference by the operative document, the Click-Through Agreement, at all times during the Class Period.   *See* SAC, Exh. B.  *See also Maersk–Sealand v. Eurocargo Express, LLC*, No. 20-cv-3230, 2004 WL 1950372 (C. D. Cal. Apr. 8, 2004) (under California law, contract may validly incorporate the terms of another document so long as it guides the reader to the incorporated document).  Accordingly, Facebook's Click

---

[7] Although the SRR does contain an integration clause, that does not end the inquiry.  An integration clause is but one factor California courts consider in determining whether an agreement is in fact integrated and is certainly not dispositive on the issue.  As the court explained in *Norcal Waste Sys., Inc. v. Apropos Tech., Inc.*, C 06-3410 CW, 2006 WL 2319085, at *5 (N.D. Cal. Aug. 10, 2006), an integration clause is not effective when the document that is purported to integrate the parties' agreement incorporates other documents by reference. That is precisely the situation here.

[8] The four-step self-service channel ordering process is set forth in the Declaration of John McKeeman, submitted in support Facebook's Opposition. (Colosi Decl., Exh. B, ¶¶ 4-9).  This ordering process is identical for all advertisers using the "self serve" process. (*Id*).

PLAINTIFFS' REPLY MEM. P. & A. ISO MOT. FOR CLASS CERTIFICATION
CASE NO. 5:09-CV-03043-PJH

1    Definition (and thus the obligation to charge advertisers only for "legitimate" clicks) was a material term

2    in the parties' agreement contract during the Class Period.

3    **B.    The Click Definition is Also Contained in the Direct Advertisers' Contracts**

4    Facebook also argues that the Direct Advertisers' agreement is "different" from the agreement in

5    the "self service" channel, and that it does not incorporate the Click Definition. (FB Opp. at 5:7-20).[9]

6    Again, it misconstrues the scope of the contract. Section 3.4 of a document called the "Facebook

7    Advertising Terms and Conditions" (the "T&Cs"), which Facebook claims is applicable to Direct

8    Advertisers, incorporates the Click Definition. (Colosi Decl., Ex. B, Ex. 6). [10] Moreover, although

9    Facebook attempts to distinguish these contracts from the contracts for the "self serve" advertisers, it

10   ████████████████████████████████████████████████████████████████

11   Reply Decl., Exh. A at 111:9-112:9, 133:7-16). Thus, for purposes of this motion, the manner in which

12   an advertiser agrees to "pay-per-click" does not affect the class certification analysis.

13   **1.    Class Members Need Not Prove They Read The Click Definition**

14   Cobbling together these various arguments, Facebook concludes that proving a breach of

15   contract will require individualized evidence thus making class certification inappropriate. (FB Opp. at

16   20:9-22:21). Facebook is wrong. A breach of contract under California law requires *prima facie* proof

17   of: (1) the existence of a contract; (2) performance by the plaintiff or excuse for non-performance; (3)

18   breach by defendant; and (4) damage. *Walsh,* 66 Cal. App. 4th at 1545. Moreover, California law is

---

[9] Although Mr. McKeeman testified that these contracts may be subject to individual negotiation on certain terms immaterial to the litigation, he conceded that a Direct Advertiser could not negotiate with Facebook to define a "click" different from self-service advertisers. (Shub Reply Decl., Exh. A at 114:2-9, 133:7-133:16).

[10] In another effort to argue the merits of its breach of contract defense, Facebook points to the disclaimer in the T&C that took effect well after the start of the Class Period, in June of 2010. (FB Opp. at 5). This disclaimer purports to disclaim liability for "click fraud" and "invalid clicks" rather than just "click fraud." (Colosi Decl., Ex. B, Exh. 6 at ¶ 10.2). Putting aside the issue of whether such a disclaimer alone could be dispositive when it is contradicted by other terms and promises that are part of the contract, this disclaimer is not in earlier versions of the Direct Advertisers' T&C. (Shub Reply Decl., Exh. G at Sec. 10.2 (prior version of one of the T&Cs that did not contain such a disclaimer)); (Exh. A at 121:6-14).

clear that a contract is interpreted objectively by what a reasonable person believed the parties intended at the time of contracting. *See Beard v. Goodrich*, 110 Cal. App. 4th 1031, 1038 (2003).

California law does not, as Facebook argues, require a plaintiff to prove that it read the agreement to enforce its terms. *See Guadagno v. E\*Trade Bank*, 592 F.Supp. 2d 1263, 1271 (C.D. Cal. 2008) ("[o]nce the offeree has accepted, he is bound by the terms of the contract, regardless of whether he read over the terms beforehand."); *Berard Const. Co. v. Percin*, 49 Cal. App. 3d 710, 722 (1975) (same). *See also One Beacon Ins. Co., v. Crowley Marine Servs., Inc.,* 648 F.3d 258, 268 (5th Cir. 2011) (provisions of an Internet-based contract are binding even where a party has not read them). Thus, proving Facebook's breach of its promise to charge only for legitimate clicks, an obligation Facebook undertook vis-a-vis *all* advertisers, irrespective of which version of the SRR or T&C was in effect, will not require that Plaintiffs prove that every advertiser actually reviewed the Click Definition. *Cf. Samuel-Bassett v. Kia Motors America, Inc.*, No. 22 EAP 2008, 2011 WL 6004600, at \*10-11 (Pa. Dec. 2, 2011) (affirming class certification of a breach of contract claim; rejecting argument that class members must prove they reviewed the terms of the warranty contract as reliance is not an element of a breach of contract claim).

It is because of this lack of a need for individual inquiries that "courts routinely certify class actions involving breaches of form contracts." *In re Med. Capital Sec. Litig.*, No. SAML 10-2145 DOC, 2011 WL 5067208, at \* 3 (C.D. Cal. July 26, 2011). *See also Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Serv., Inc.,* 601 F.3d 1159, 1171 (11th Cir. 2010) ("It is the form contract, executed under like conditions by all class members, that best facilitates class treatment."); *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 41 (1st Cir. 2003) ("Overall, we find that common issues of law and fact predominate here. The case turns on interpretation of the form contract, executed by all class members and defendant."); *In re Checking Account Overdraft Litig.*, 275 F.R.D. 666, 674 (S.D. Fla. 2011) (certifying class; noting contract was a form offered on a "take it or leave it" basis); *In re Conseco Life Ins. Co. LifeTrend Ins. Sales and Marketing Litig.,* 270 F.R.D. 521 (N.D. Cal. 2010) (certifying claim for breach of form contract); *Dupler v. Costco Wholesale Corp.,* 249 F.R.D. 29, 37 (E.D.N.Y. 2008) (collecting cases for the proposition that class certification is typically appropriate in cases involving form contracts); *Winkler v. DTE, Inc.,* 205 F.R.D. 235, 243 (D.Ariz. 2001) (certifying class and rejecting

1    argument that individual issues predominate in proving a breach of a standardized contract); *Mortimore*

2    *v. Fed. Deposit Ins. Corp.*, 197 F.R.D. 432, 438 (W.D. Wash. 2000) (same); *Kleiner v. First Nat'l Bank*

3    *of Atlanta*, 97 F.R.D. 683, 692 (N.D. Ga.1983) ("claims arising from interpretations of a form contract

4    appear to present the classic case for treatment as a class action"). As this case involves the breach of a

5    form contract, it too should be certified.

6         Facebook completely ignores this Court's recent class certification of a contractual dispute

7    involving an analogous Internet form contract. In *Ewert v. eBay, Inc.*, Nos. C-07-02198 RMW, C-07-

8    04487-RMW, 2010 WL 4269259 (N.D. Cal. Oct. 25, 2010), a case cited in Plaintiffs' opening brief, the

9    plaintiff alleged a breach of contract and UCL violations on behalf of a class of eBay sellers who

10   contracted with eBay via an Internet click-through agreement. *Ewert*, 2010 WL 4269259 at *7. [11] To

11   defeat certification, eBay argued, like Facebook does here, that an individualized inquiry into the

12   knowledge of each class member was needed to determine liability for breach of contract. *See id.* The

13   Court soundly rejected that position, stating that "when there is a standardized agreement like the form

14   contract at issue in this case, the agreement is interpreted 'as treating alike all those similarly situated,

15   *without regard to their knowledge or understanding* of the standard terms of the writing.'" *Id.* (quoting

16   Restatement (Second) of Contracts § 211(2)) (emphasis added). Accordingly, in construing the form

17   contract between eBay and class members, the Court ruled that it need not delve into the actual

18   knowledge of individual class members. *Id.  See also Berrien v. New Raintree Resorts Int'l, LLC*, 276

19   F.R.D. 355, 362 (N.D.Ca. 2011) (certifying contract claim; rejecting argument that class members'

20   understanding of contractual provisions was relevant to proving claim); *Fireman's Fund Ins. Cos., v. Ex-*

21   *Cell-O Corp.*, 702 F. Supp. 1317, 1326 (E.D. Mich. 1988) (citing Restatement § 211, holding that

22   "[s]tandarized agreements should be interpreted similarly"). This case is no different than *eBay* as

23   individualized inquiries are unnecessary to resolve the breach of contract claim.

24

25   _____

26   [11] Facebook's attempt to side-step this case is especially interesting considering that its counsel here was
     also counsel to the Defendant in *eBay*. Plaintiffs further note that eBay's petition under Rule 23(f) of the
27   Federal Rules of Civil Procedure for appellate review of the order granting class certification was
     rejected by the Ninth Circuit. Given the clear precedent in the Ninth Circuit for certifying claims under
28   one state's law for breach of a form contract, the rejection is hardly surprising.

PLAINTIFFS' REPLY MEM. P. & A. ISO MOT. FOR CLASS CERTIFICATION
CASE NO. 5:09-CV-03043 PJH

**2.      Facebook's Arguments are a Contortion of Judge Fogel's Rulings on the Motions to Dismiss.**

Facebook ignores the overwhelming precedent favoring class certification of disputes involving form contracts and instead attempts to cherry-pick selected dicta from Judge Fogel's earlier rulings on the various motions to dismiss.  First, relying on a footnote from one of three prior rulings, Facebook asserts that this Court has previously ruled that "[the click definition] statements outside of the SRR contained in the Help Center as a matter of law cannot be invoked to impose additional contractual obligations on Facebook." (FB Opp. at 20:19-21:1) (*citing* Dkt. No. 97 at n. 4 (August 25, 2010 Order)). In fact, Judge Fogel was merely noting that Facebook's SRR purported to contain an integration clause; he made no rulings on the import or effect of that clause since the legality of the SRR was not yet at issue in the litigation. Moreover, as Plaintiffs demonstrated earlier, the SRRs' incorporation of other documents that impose contractual obligations on the parties clearly shows that it is not a fully integrated agreement.

Second, Facebook argues that Judge Fogel's prior opinions established that the Click Definition can only be used as extrinsic evidence, and that such use is proper *only* if the advertiser showed it was aware of and reviewed the definition.  (FB Opp. 21:4-7) (*citing* August 25, 2010 Order at 9:19-22). Facebook takes Judge Fogel's August 25, 2010 Order out of context to capitalize on an inadvertent misstatement of the black letter principles of contract law articulated in Judge Fogel's earlier ruling.

In his August 25, 2010 order, Judge Fogel was trying to reiterate his prior determination regarding the use of the Click Definition as extrinsic evidence in construing Facebook's disclaimer: "In its [prior] order dated April 22, 2010, the Court determined that [the Click definition provisions] in the Help Center could not be relevant to the intentions of the parties at the time of contracting unless Plaintiffs could allege that the statements existed at the time the contracts were formed *and* that Plaintiffs were aware of the statements.  [April 22, 2010 Order at 6:7-10]." Dkt. No. 97 at 9:18-22. (emphasis added).  *However, Judge Fogel's August 25th Order actually misstated his prior ruling in the April 22, 2010 Order*.  The April 22nd Order required Plaintiffs to allege that the Click definition "existed at the time the parties entered into the Written Agreement *or* that Plaintiffs were aware of the existence of the Extrinsic Evidence [the Click Definition] at the time." Dkt. No. 69 at 6:7-8 (emphasis

1  added).[12]  Facebook's disingenuous failure to cite to the April 22, 2010 Order is an obvious attempt to

2  exploit this inadvertent misstatement in the August 25, 2010 Order.

3        The disjunctive language in the April 22, 2010 Order is the only one consistent with California

4  law.  It is axiomatic that proof that a party has knowledge of or reviewed the extrinsic evidence at the

5  time of contracting is not a requirement under California contract law.  *Rodman v. Safeway, Inc.*, No. C

6  11-03003 JSW, at *4-5, 2011WL 5241113 (N.D. Cal. Nov. 1, 2011)  (in a case alleging breach of

7  contract, the Court found that a FAQ was relevant extrinsic evidence regarding the terms of the online

8  contract without any consideration of whether Plaintiff reviewed the FAQ); *Woods v. Google, Inc.*, No.

9  05:11–cv–1263–JF, 2011 WL 3501403 at *3-4 (N.D. Cal. Aug. 10, 2001) (analyzing issue of extrinsic

10  evidence and incorporation by reference of an alleged breach of an online advertising contract without

11  reference to whether advertisers read or reviewed the evidence).  As the court explained in  *Buckley v.*

12  *C.A. Terhune*, 441 F.3d 688, 695-96 (9th Cir. 2006), issues regarding a party's awareness or review of

13  extrinsic evidence is immaterial as courts look to the objective manifestations of the parties' intent.  *See*

14  *also Badie v. Bank of Am.*, 67 Cal. App. 4th 779, 802 & n.9 (1998) ("Although the intent of the parties

15  determines the meaning of the contract, the relevant intent is objective-that is, the objective intent as

16  evidenced by the words of the instrument, not a party's subjective intent.") (internal citations omitted).

17  Here, the words of the instrument that must be objectively determined is the uniform Click Definition on

18  Facebook's website and its promise to charge only for legitimate clicks. While the parties disagree on

19  whether Facebook fulfilled its obligation, that is an issue that will be determined by common, objective

20  evidence, including, if necessary, evidence of the industry standard for making click legitimacy

21  determinations.

---

[12] Judge Fogel's restatement of Facebook's argument is further evidence that Judge Fogel intended (and
Facebook understood) to use the disjunctive "or" rather than the conjunctive "and." As Judge Fogel
explained in his August 25, 2010 Order, "Defendant contends that the Court may not consider the
alleged representations in the Help Center, even at this preliminary stage, because Plaintiffs do not plead
with Rule 9 specificity that the statements existed at the time of contracting *or* that Plaintiffs reviewed
the statements." Dkt. No. 97 at 11:6-9 (Aug. 25, 2010 Order) (emphasis added).

PLAINTIFFS' REPLY MEM. P. & A. ISO MOT. FOR CLASS CERTIFICATION
CASE NO. 5:09-CV-03043 PJH

### 3. <u>Even if Facebook's Click Definition Constitutes Extrinsic Evidence, Class Certification is Appropriate</u>

Even if Facebook is correct and defining a click requires extrinsic evidence of its meaning for purposes of charging advertisers under the contract, it is hardly the death knell to class certification. Courts routinely certify breach of form contract cases where, as here, the extrinsic evidence necessary to analyze the contract itself is uniform and standardized. Most notably, in *Menagerie Prods. v. Citysearch*, the Court certified the class, rejecting defendant's arguments that extrinsic evidence of which clicks should be billed under the pay-per-click contract made the case inappropriate for class treatment. *See* No. 08-4263 CAS (FMO), 2009 WL 3770668 (C.D. Cal. Nov. 9, 2009) ("*Citysearch*"). As here, the parties there disputed whether advertisers were charged for invalid clicks pursuant to a form pay- per-click advertising contract. As the court concluded: "[E]xtrinsic evidence that the Court would consider in making this determination, such as representations on Citysearch's website [about which clicks are billable], can be established on a classwide basis." *Id.* at *10. Thus, Facebook's strained attempt to distinguish *Citysearch* on the grounds that the instant case has a "unique procedural history" should be rejected. (FB Opp. at 22:20-21).

Similarly, in *Zeno v. Ford Motor Co. Inc.*, 238 F.R.D. 173, 198 (W.D. Pa. 2006), the court certified a breach of contract case for a class of truck purchasers whose trucks were not equipped with an upgraded radiator as promised via the window-sticker and other extra-contractual materials. Defendant argued the claim was not amenable to class certification because plaintiffs would need to show "extraneous evidence" that "would include inquiries whether a 'radiator upgrade' formed the 'basis of the bargain' for any particular purchase and whether that purchaser paid anything for the option package." *Id.* at 190-91. The court soundly rejected the argument that the necessity of extrinsic evidence by itself prevented certification: "The mere fact that plaintiff and defendant might need to resort to parol evidence to prove or defend against plaintiff's claim does not in itself create a problem for the predominance requirement *when the extrinsic evidence at issue is common among the class* to the extent that it consists of *standardized forms* and other forms of proof generally applicable to the entire class." *Id.* at 195-96 (emphasis added).

Thus, Facebook's argument that the need to considerer any extrinsic evidence *ipso facto* makes class certification inappropriate is a gross oversimplification. It is only where the required extrinsic

1    evidence is *individualized in nature*, such as individual contracts, varied sales presentations or oral

2    statements, are courts reluctant to certify the class. *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d

3    718, 735 (9th Cir. 2007) (extrinsic evidence consisting of various oral statements by defendant agents

4    made class certification of contract claim inappropriate); *Adams v. Kansas City Life Ins. Co.*, 192 F.R.D.

5    274, 280 (W.D. Mo. 2000) (class certification denied where extrinsic evidence included "the varied oral

6    representations and explanations of KCL agents"); *Westways World Travel, Inc, v. AMR Corp.*, 265 Fed.

7    Appx. 472, 476 (9th Cir. 2008) (affirming denial of decertification where trial court found that travel

8    agents and airlines had multiple legal relationships covering numerous subjects and contracts). Unlike

9    those cases, the contract here is a form contract for one type of advertising relationship (a pay-per-click

10   agreement) that will be interpreted based on its objective meaning using uniform evidence on

11   Facebook's website.  Accordingly, the possibility that advertisers may need to introduce extrinsic

12   evidence to prove the meaning of a "legitimate click" does not prevent certification.

13

14   **IV.    THE UNFAIR BUSINESS PRACTICES CLAIM IS BASED ON A SYSTEMATIC
     BREACH OF CONTRACT AND IS APPROPRIATE FOR CLASS TREATMENT**

15       Facebook asserts that Plaintiffs' UCL claim cannot be certified because (1) each individual Class

16   member must show exposure to the Click Definition; and (2) that the same "exposure" issue makes the

17   class definition overbroad because not every member of the Class would have Article III standing.  (FB

18   Opp. at 16:26-17:9). As set forth above, Plaintiffs' breach of contract claim will be proven through

19   common evidence establishing Article III standing for the entire class.

20       **A.    Common Issues Predominate the UCL Claim**

21       Rather than addressing Plaintiffs' arguments, Facebook misconstrues the nature of Plaintiffs'

22   UCL claim by creating a fiction of the alleged need to demonstrate "exposure" to "misstatements." *Id.*

23   at 16:26-19:11.  As this Court has previously ruled, Plaintiffs' UCL claim under the unfair prong is

24   based on a systematic breach of contract. Dkt. No. 97 at 16:24-17:4. As such, Facebook's argument that

25   the UCL claim cannot be certified because individual issues predominate is wrong. Illustrating the

26   incorrect nature of that position is Facebook's abject reliance on inapposite cases involving UCL claims

27   sounding in fraud, which arguably require proof of reliance by the named plaintiffs.  *See, e.g., Pfizer*

28

14

*Inc. v. Superior Court*, 182 Cal. App. 4th 622, 629 (2010) (reliance required under the "fraud prong of the UCL"); *Sevidal v. Target Corp.*, 189 Cal. App. 4th 905, 923 (2010) (false advertising under UCL).

*Endres v. Wells Fargo Bank*, No. C 06-7019 PJH, 2008 WL 344204 (N.D. Cal. Feb. 6, 2008) illustrates why fraud-based claims are not relevant to the class certification analysis here. In *Endres*, plaintiffs' UCL fraud-based claim was grounded on the contention that the "overdraft protection feature constituted an unfair business practice based on the non-disclosure of the cost of the overdraft protection." *Id.* at *3. The Court determined that liability determinations would be based, in part, "on whether and when a particular class member heard or read the alleged **misrepresentations** (or the Bank's disclosures)." *Id.* at *12 (emphasis added).  Since Plaintiffs' UCL claim against Facebook is based on systematic breach of contract, and is not fraud-based, there is no need for any individual inquiry into a class member's exposure to the allegedly breached term. *See Galvan v. KDI Distribution Inc.*, SACV 08-0999-JVS ANX, 2011 WL 5116585, at *9 (C.D. Cal. Oct. 25, 2011) ("A UCL violation that is not based on a fraud theory involving false advertising and misrepresentations to consumers does not require a showing of reliance or causation.") (citation and quotation omitted).

## B.   Plaintiffs and the Class have Standing to Pursue the UCL Claim

Facebook does not dispute that Fox and Price have standing under the UCL and Article III to pursue the UCL claim on a class basis nor does Facebook dispute that absent class members need not establish UCL standing.   Thus, Facebook's only argument is that each Class member must establish Article III standing; otherwise the class is overly broad.  Again, Facebook's argument is based on cases involving fraud-based UCL claims.[13]

The claim that absent class members must establish Article III standing has been rejected and is inconsistent with Ninth Circuit precedent.  *See, e.g., Stearns v. Ticketmaster Corp.*, 655 F.3d 1013,

---

[13] The cases, *In re Light Cigarettes Marketing Sales Practices Litig.*, 271 F.R.D. 402, 405 (D. Me. 2010), involved a UCL claim that defendants misrepresented the health risks of smoking light cigarettes and *Webb v. Carter's Inc.*, 272 F.R.D. 489, 503 (C.D. Cal. 2011) involved a UCL claim based on an alleged failure to disclose that children's tagless clothing contained chemicals that could cause skin reactions.

1020-21 (9th Cir. 2011) (standing is satisfied if at least one named plaintiff meets the requirements); *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (*en banc*); (same); *Moeller v. Taco Bell Corp.*, C 02-5849 PJH, 2011 WL 4634250, at *15 (N.D. Cal. Oct. 5, 2011). Thus, the issue of establishing Article III standing for absent class members is irrelevant to the class certification analysis. Moreover, even if absent class members must establish Article III standing, that requirement is easily met on a classwide basis. To establish Article III standing, a plaintiff must "present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged action; and redressable by a favorable ruling." *Horne v. Flores*, 129 S.Ct. 2579, 2592 (2009).

Here, all class members have suffered a concrete, particularized, and actual pecuniary injury (*i.e.*, an overcharge for CPC advertising due to being charged for illegitimate clicks); that injury is traceable to Facebook's breach of contract (*i.e.*, Facebook's failure to charge for only legitimate clicks); and the injury is redressable by a ruling in this case (*i.e.*, restitution by Facebook to the Class for the overcharge amount) – all of which will be established by common evidence as set forth above. Thus, unlike the cases cited by Facebook where standing could not be established on a common basis because the fraud-based claims arguably required proof of reliance (*i.e.*, if a class member did not rely on the misrepresentation, there would be no injury traceable to the defendant's action), the Class is not overbroad and individual issues will not predominate.[14] Accordingly, Plaintiffs have shown that the Article III's standing requirements are met for all class members and that satisfaction of these requirements does not raise individualized issues that defeat class certification under Rule 23(b)(3).

---

[14] The case *Burdick v. Union Sec. Ins. Co.*, No. CV 07-4028, 2009 WL 4798873 (C.D. Cal. Dec. 9, 2009) does not involve a fraud-based UCL claim; nevertheless, the case is inapposite because the UCL claim was premised on a "diminished value theory" (*i.e.*, purported economic harm incurred by paying for insurance coverage that is substantially less valuable than what the insured were supposedly promised). The diminished value theory has been rejected as insufficient to confer Article III standing because plaintiffs "cannot allege that they have been provided with less disability coverage than they contracted for. Indeed, Plaintiffs here have never sought *any* benefits under Defendant's plans. An allegation that Defendants' administration of the plan might result in denial of future benefits is purely speculative." *Id*. at *5 (citation and quotation omitted). Here, there is no speculative injury – the absent class members have been overcharged for clicks.

PLAINTIFFS' REPLY MEM. P. & A. ISO MOT. FOR CLASS CERTIFICATION
CASE NO. 5:09-CV-03043-PJH

## V.   FACEBOOK'S EXPERTS HAVE NOT SHOWN THAT PLAINTIFFS' LIABILITY AND DAMAGES METHODOLOGY IS IMPLAUSIBLE

Plaintiffs presented a "plausible" methodology for proving liability and damages on a classwide basis using an algorithmic methodology similar what Facebook employs in making its determinations of click validity.   (Shub Decl. 9/15/11, Exh. 4 at ¶¶ 27 – 32); (Exh. C at 129:20-23).  Moreover, despite Facebook's insistence to the contrary, Plaintiffs' expert, Dr. Markus Jakobsson, opined that he could devise algorithms that would distinguish between valid and invalid clicks, and that he could further design algorithms that would determine clicks that are based on fraud (referred to "click fraud") and invalid clicks that are not.  (Shub Decl. 9/15/11, Exh. 4 at ¶¶ 2 – 6); (Shub Reply Decl., Exh. B at ¶¶ 8, 23, 31).



PPC industry. (Shub Reply Decl., Exh. B at ¶ 22).

Although Facebook's experts attack Dr. Jakobsson for not having already written the algorithms reflecting the rules Facebook should have employed, such an argument ignores Dr. Jakobsson's assigned task at class certification. Similarly, contrary to Facebook's arguments, Dr. Jakobsson did not testify that there are no industry standard algorithms; rather, he testified that he was not asked at this stage of the case to determine what they are.  (Shub Reply Decl., Exh. C at 29:14-17; 77:11-23); (Exh.  B at ¶ 1).  In

PLAINTIFFS' REPLY MEM. P. & A. ISO MOT. FOR CLASS CERTIFICATION
CASE NO. 5:09-CV-03043-PJH

fact, Dr. Jakobsson was clear in his opinion that he will write such algorithms for the merits part of this case. (*Id.*, Exh. B at ¶ 25).

In any event, a court's role at class certification is not to adjudge which sides' experts present the more sound methodology for proving liability and damages. As this Court recently explained:

> '[t]he issue at class certification is not which expert is the most credible, or the most accurate modeler, but rather have the plaintiffs demonstrated that there is a way to prove a class-wide measure of [impact] through generalized proof.' *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 100 (D.Conn. 2009). In resolving this issue, however, plaintiffs are not required to 'prove the merits of their case-in-chief at the class certification stage… The court must thus ultimately leave 'disputes over the results reached and assumptions made with respect to competing methodologies to the trier of fact, and discern only whether the plaintiffs have advanced a plausible methodology to demonstrate that antitrust injury can be proved on a class-wide basis.' *In re eBay Seller Antitrust Litig .*, 2009 WL 2779374, at *1 (N.D. Cal. 2009).

*In re Online DVD Rental Antitrust Litig.*, No. M 09-2029 PJH, 2010 WL 5396064, at *10 (N.D. Cal. Dec. 23, 2010) (plaintiffs need not supply a "'precise damage formula,'" but must simply offer a proposed method for determining damages that is not "'so insubstantial as to amount to no method at all.'") (citation omitted). *See also Marsu, B.V. v. The Walt Disney Co.*, 185 F.3d 932, 939 (9th Cir. 1992) ("The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation."); *Carbajal v. Capital One F.S.B.*, 219 F.R.D. 437, 441 n. 2 (N.D. Ill. 2004) (setoffs for credits would not be a significant focus of the case and would likely involve nothing more than a mere calculation). Plaintiffs' expert's methodology easily meets the "plausibility" requirement.

## VI.   PLAINTIFFS MEET THE TYPICALITY AND ADEQUACY REQUIREMENTS

In their opening brief, Plaintiffs[16] amply showed that they are typical and adequate class representatives. Facebook's arguments do not merit a different conclusion. First, Facebook argues that Plaintiffs are inadequate because it claims their "standing" is in "serious doubt" because Plaintiffs could

---

[16] In light of a corporate change in management, Plaintiff RootZoo was not proffered as a Class Representative and therefore the Court need not consider Facebook's lengthy arguments as to RootZoo's adequacy. Facebook's attack on RootZoo's integrity and Class Counsel's selection of RootZoo as a class representative is meritless.

PLAINTIFFS' REPLY MEM. P. & A. ISO MOT. FOR CLASS CERTIFICATION
CASE NO. 5:09-CV-03043 PJH

not at their depositions point to the specific clicks they claim are invalid. However, Facebook does not actually assert that Plaintiffs lack standing. (FB Opp. at 29:13). Facebook misunderstands the standing requirement; Plaintiffs do not have to prove they were charged for invalid clicks at this stage. *See Stearns,* 655 F.3d at 1021; *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 788 (2010) ("That a party may ultimately be unable to prove a right to damages (or, here, restitution) does not demonstrate that it lacks standing to argue for its entitlement to them"). In any event, Facebook has cross-examined Plaintiffs' expert on the evidence Plaintiffs provided showing they were charged for invalid clicks. (Shub Reply Decl., Exhs. D-E); (Exh. F at 172-76).

Facebook's next argument, that Plaintiffs did not dispute invalid click charges within 30 days as allegedly required by a recent version of the SRR, is curious considering the requirement is in the Payment Terms Document and not in the SRR (which Facebook claims is a fully integrated agreement). Moreover, the purported requirement was not in the Payment Terms Document until July 2011. (Colosi Decl., Exh. B, Exh. 5 at ¶ 5.2); (Shub Reply Decl., Exh. A at 94:1-97:3); (FB Opp. at 29:14-15). In any event, this so-called defense arises from a uniform contract and is not unique to Plaintiffs. *See Ewert,* 2010 WL 4269259, at *5 (N.D. Cal. Oct. 25, 2010); *Hanon v. Dataproducts*, 976 F.2d 497, 508-09 (9th Cir. 1992) (only truly unique defenses destroy typicality).[17]

Facebook's attempt to concoct an artificial "conflict of interest" between the self-serve and direct advertisers also fails. (FB Opp. at 29:17-30:4). *See In re Dynamic Random Access Memory (DRAM) Antitrust Litig.,* No. M 02-1486 PJH, 2006 WL 1530166, at *4-6 (N.D. Cal. June 5, 2006) (rejecting argument that different categories of customers or different sales channels destroyed typicality because proof of claims depended solely on proof of violations by defendants). All Class members, whether they advertised through the self-service channel or directly, contracted to "pay-per-click" and Facebook's determination of click legitimacy was identical across the Class. (Shub Reply Decl., Exh. A at 56:5-6;

---

[17] In contrast to the facts here, *Hanon* was a 10b-5 securities case where the defendant had unique arguments against the plaintiff's reliance, a critical element of the claims there. *Id.* at 508. Specifically, the plaintiff had prior securities litigation experience, had a relationship with his lawyers, and a practice of buying minimal amounts of stock in various companies. *Id.*

PLAINTIFFS' REPLY MEM. P. & A. ISO MOT. FOR CLASS CERTIFICATION
CASE NO. 5:09-CV-03043-PJH

110:15-19; 112:3-9; 114:4-8); (Exh. I).  Since Fox continues to buy CPC advertising and the UCL authorizes injunctive relief to "any person who has suffered injury in fact and has lost money or property" as a result of unfair competition, Plaintiffs have standing to pursue injunctive relief.  *Moeller*, 2011 WL 4634250, at *17  (N.D. Cal. Oct. 5, 2011); *Wamboldt v. Safety-Kleen Systems, Inc.*, No. 07-0884 PJH, 2007 WL 2409200, at *11-12 (N.D. Cal. Aug. 21, 2007); *see also Citysearch*, 2009 WL 3770668, at *8 (former advertisers can seek monetary relief).[18]

Finally, Facebook's attacks on Fox's are groundless.  The level of knowledge required to qualify as a class representative is not particularly high and as long as a class representative is familiar with the basic elements of the claim, he will be adequate.  *Biancur v. Hickey*, No. C-95-2145, 1997 WL9857, at *9 (N.D. Cal. Jan. 7, 1997); *Burkhalter Travel Agency v. MacFarms Int'l, Inc.*, 141 F.R.D. 144, 153-54 (N.D. Cal. 1991) (plaintiff inadequate because he could not identify the defendant he was suing).  Here, Fox testified that the case is about Facebook's charges for invalid clicks other than fraudulent clicks; that he intends to act as a class representative in a class action on behalf of advertisers; and that he consults with his lawyers and is prepared to appear at trial and otherwise do whatever he is necessary. (Shub Reply Decl., Exh. H at 31:21-22; 32:17-18; 34:2-10; 64:7-20; 65:9-12).  Simply because Fox could not answer questions calling for legal conclusions or technical questions for which Facebook itself offered expert testimony does not render him inadequate.  (*Id.*, Exh. B at ¶ 33).

## VII.   CONCLUSION[19]

For the foregoing reasons, and on the basis of the authorities cited herein, Plaintiffs respectfully submit that the proposed Class should be certified, and that Plaintiffs and their counsel be appointed to represent the Class.

//

[18] Question to Fox: "[I]f you found out that someone did look at them and [Facebook] received a clean bill of health, so to speak, in an audit process, would you consider advertising on Facebook again?" Answer: "Yeah, I would."  (Shub Reply Decl., Exh. H at 220:6-11).

[19] By Stipulation and Order, the parties agreed to extend the page limits for the class certification briefing.  [Dkt. No. 196]

DATED: December 8, 2011

Respectfully submitted,

By: /s/ Jonathan Shub                By: /s/ Rosemary M. Rivas
    Jonathan Shub                        Rosemary M. Rivas

**SEEGER WEISS LLP**                 **FINKELSTEIN THOMPSON LLP**
1515 Market Street, Suite 1380       100 Bush Street, Suite 1450
Philadelphia, Pennsylvania 19102     San Francisco, California 94104
Telephone: 215-564-2300              Telephone: (415) 398-8700
Facsimile: 215-851-8029              Facsimile: (415) 398-8704

*Interim Co-Lead Class Counsel*      *Interim Co-Lead Class Counsel*


J. Paul Gignac
**ARIAS OZZELLO & GIGNAC LLP**
115 S. La Cumbre, Suite 300
Santa Barbara, California 93105
Telephone: (805) 683-7400
Facsimile: (805) 683-7401


*Interim Liaison Counsel*

Guido Saveri
R. Alexander Saveri
Cadio Zipoli
**SAVERI & SAVERI, INC.**
706 Sansome Street
San Francisco, California 94111
Telephone: (415) 217-6810
Facsimile: (415) 217-6817

Mila F. Bartos
Stan Doerrer
**FINKELSTEIN THOMPSON LLP**
1077 30 th Street, N.W.
Suite 150
Washington, D.C. 2007
Telephone: (202) 337-8000
Facsimile: (202) 337-8090

Jeffrey Leon
Julie Miller
**FREED & WEISS LLC**
111 West Washington Street, Suite 1311

PLAINTIFFS' REPLY MEM. P. & A. ISO MOT. FOR CLASS CERTIFICATION
CASE NO. 5:09-CV-03043-PJH

1 | Chicago, IL 60602
Telephone: (312) 220-0000
2 | Facsimile: (312) 220-7777

3

4 | Steven Berk
Gouri Bhat
5 | **BERK LAW PLLC**
2002 Massachusetts Ave. NW, Suite 100
6 | Washington, D.C. 20036
Telephone: (202) 232-7500
7 | Facsimile: (202) 232-7566

8

9 | Gordon M. Fauth, Jr.
**LITIGATION LAW GROUP**
10 | 1801 Clement Avenue, Suite 101
Alamada, CA 94501
11 | Telephone: (510) 238-9610
Facsimile: (510) 337-1431
12

13 | Brian S. Kabateck
**KABATECK BROWN KELLNER LLP**
14 | 664 S. Figueroa Street
Los Angeles, CA 90017
15 | Telephone: (213) 217-5000
Facsimile: (213) 217-5010
16

17 | Melissa Meeker Harnett
**WASSERMAN, COMDEN &**
18 | **CASSLEMAN, LLP**
5567 Reseda Boulevard, Suite 330
19 | Tarzana, CA 91357-7033
Telephone: (818) 705-6800
20 | Facsimile: (818) 996-8266
21

22 | Benjamin G. Edelman
**LAW OFFICES OF BENJAMIN**
23 | **EDELMAN**
27A Linnaean Street
24 | Cambridge, MA 02138
Telephone: (617) 359-3360
25

26 | *Additional Counsel for Plaintiffs*

27

28

PLAINTIFFS' REPLY MEM. P. & A. ISO MOT. FOR CLASS CERTIFICATION
CASE NO. 5:09-CV-03043-PJH