1  Jonathan Shub (SBN 237708)
   jshub@seegerweiss.com
2  **SEEGER WEISS LLP**
3  1515 Market Street, Suite 1380
   Philadelphia, PA 19102
4  Telephone: (215) 564-2300/Facsimile: (215) 851-8029

5  Rosemary M. Rivas (SBN 209147)
6  rrivas@finkelsteinthompson.com
   **FINKELSTEIN THOMPSON LLP**
7  100 Bush Street, Suite 1450
   San Francisco, California 94104
8  Telephone: (415) 398-8700/Facsimile: (415) 398-8704

9
   *Interim Co-Lead Class Counsel*
10
11  Guido Saveri (SBN 22329)
    guido@saveri.com
    R. Alexander Saveri (SBN 173102)         **REDACTED Pursuant to Court Order**
12  rick@saveri.com                                    **DKT. No. 254**
    Cadio Zirpoli (SBN 179108)
13  cadio@saveri.com
14  **SAVERI & SAVERI, INC.**
    706 Sansome Street
15  San Francisco, California 94111
    Telephone: (415) 217-6810/Facsimile: (415) 217-6817
16
17  *Attorney for Plaintiffs*        **UNITED STATES DISTRICT COURT**

18                                 **NORTHERN DISTRICT OF CALIFORNIA**

19                                        **OAKLAND DIVISION**

20
21  IN RE FACEBOOK PPC ADVERTISING            Master File Case No. 5:09-cv-03043 JF
    LITIGATION
22 ─────────────────────────────────────      **DECLARATION OF JONATHAN SHUB IN**
                                              **SUPPORT OF PLAINTIFFS' REPLY BRIEF**
23  **This Document Relates To:**             **SUPPORTING MOTION FOR CLASS**
        **All Actions**                       **CERTIFICATION**
24
25                                            Date:  TBD
                                             Time:  TBD
26                                            Judge: Honorable Phyllis J. Hamilton
                                             Courtroom 3, 5th Floor
27
28
              **DOCUMENT (EXHS. A - F) SUBMITTED UNDER SEAL**

       SHUB DECLARATION ISO PLAINTIFFS' REPLY BRIEF SUPP. MOT. FOR CLASS
                                  CERTIFICATION
                          CASE NO. 5:09-CV-03043 JF

I, Jonathan Shub, declare as follows:

1.      I am a partner with the law firm of Seeger Weiss LLP ("SW"), one of the firms representing the Plaintiffs and court-appointed Interim Co-Lead Class Counsel in this action.  I am a member in good standing of the bar of the State of California and am admitted to practice in this Court. This declaration is based on my own personal knowledge and if called to testify, I could and would do so competently as to the matters set forth herein.  I submit this declaration in support of Plaintiffs' Reply Brief Supporting Motion for Class Certification ("Reply Brief").

2.      Attached hereto as **Exhibit A** are true and correct copies of excerpts from the transcript of the deposition of John McKeeman, a Facebook, Inc. employee, who testified in this litigation on November 30, 2011.

3.      Attached hereto as **Exhibit B** is a true and correct copy of the rebuttal report of Plaintiffs' expert, Dr. Markus Jakobsson.

4.      Attached hereto as **Exhibit C** are true and correct copies of excerpts from the transcript of the deposition of Plaintiffs' expert Dr. Markus Jakobsson, who testified in this litigation on September 21, 2011.

5.      Attached hereto as **Exhibit D** are true and correct copies of excerpts from an excel spreadsheet with data produced by Defendant in this litigation bearing production number FBCPC65A relating to Plaintiff Steven Price.  The entire excel spreadsheet was marked as Exhibit 8 on a CD at the deposition of Dr. Bernard Jansen.  Due to the voluminous nature of the document, Plaintiffs have only provided the Court with excerpts.  Plaintiffs can provide a complete copy of the excel spreadsheet at the Court's request.

6.      Attached hereto as **Exhibit E** are true and correct copies of excerpts from an excel spreadsheet with data produced by Defendant in this litigation bearing production number FBCPC202A relating to Plaintiff Fox Test Prep.  The entire excel spreadsheet was marked as Exhibit 8 on a CD at the deposition of Dr. Bernard Jansen.  Due to the voluminous nature of the document, Plaintiffs have only provided the Court with excerpts.  Plaintiffs can provide a complete copy of the excel spreadsheet at the Court's request.

1

7.     Attached hereto as **Exhibit F** are true and correct copies of pages 172-176 from the transcript of the deposition of Plaintiffs' expert, Dr. Bernard Jansen, who testified in this litigation on October 17, 2011.  Dr. Jansen testified regarding the significance of the information on Exhibit E.

8.     Attached hereto as **Exhibit G** is a true and correct copy of a document bearing production numbers FBCP00208922 – FBCP00208928 and produced by Defendant Facebook, Inc. in this litigation.

9.     Attached hereto as **Exhibit H** are true and correct copies of excerpts from the transcript of the deposition of Nathan Fox, who testified in this litigation on behalf of Plaintiff Fox Test Prep on October 24, 2011.

10.    Attached hereto as **Exhibit I** is a true and correct colored copy of a document referred to in the Reply Brief as the "Click- Through Agreement."  The office of Finkelstein Thompson LLP, Interim Co-Lead Class Counsel, downloaded this document on November 17, 2011 from Facebook's website at http://www.facebook.com/ads/create/index.php?act=27632189&oid=195909611248.  This document is a colored version of Exhibit A attached to Plaintiffs' Second Consolidated Amended Complaint.

I declare under penalty of perjury under the laws of the United States of America that the foregoing facts are true and correct.  Executed this 8th day of December 2011 in Philadelphia, Pennsylvania.

                    /s/ Jonathan Shub
                    Jonathan Shub

**Filer's Attestation:**  Pursuant to General Order No. 45, §X(B), I attest under penalty of perjury that concurrence in the filing of the document has been obtained from its signatory.

Dated: December 8, 2011                    Respectfully submitted,

                    /s/ Cadio Zirpoli
                    Cadio Zirpoli

                    Attorneys for Plaintiffs

2

# EXHIBIT A

**REDACTED Pursuant to Court Order
DKT. No. 254**

Highly Confidential - Attorneys' Eyes Only

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION


In Re:                              MASTER FILE NO.

                                    C 09-03043 PJH

FACEBOOK CPC Advertising            Judge:  Honorable

Litigation                          Phyllis J. Hamilton

_____/

This Document Relates to All Actions.



VIDEOTAPED DEPOSITION OF JOHN McKEEMAN

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY


The videotaped deposition of JOHN McKEEMAN,
called by the Plaintiffs for examination, taken
pursuant to the Federal Rules of Civil Procedure of
the United States District Courts pertaining to the
taking of depositions, taken before Diane S.
Martin, C.S.R. No. 6464, a Certified Shorthand
Reporter for the State of California, at the law
offices of Cooley, LLP, 3175 Hanover Street, Palo
Alto, California, on November 30, 2011, commencing
at 1:12 p.m.

Highly Confidential – Attorneys' Eyes Only

Page 2

```
 1              A P P E A R A N C E S:
 2
 3   For the Plaintiffs:
 4          SEEGER WEISS, LLP
            BY:  JONATHAN SHUB, ESQUIRE
 5          1515 Market Street
            Suite 1380
 6          Philadelphia, Pennsylvania   19102
            (215) 564-2300
 7          jshub@seegerweiss.com
 8
 9          SAVERI & SAVERI
            BY:  CADIO ZIRPOLI, ESQUIRE
10          706 Sansome Street
            Suite 200
11          San Francisco, California   94111
            (415) 217-6810
12          zirpoli@saveri.com
13
14
15   For the Defendant:
16          COOLEY, LLP
            BY:  WHITTY SOMVICHIAN, ESQUIRE
17          101 California Street
            Fifth Floor
18          San Francisco, California   94111-5800
            (415) 693-2000
19          wsomvichian@cooley.com
20
21          FACEBOOK
            BY:  SANDEEP N. SOLANKI, ESQUIRE
22          1601 South California Avenue
            Palo Alto, California   94304
23
24
25   The Videographer:      Stan Booker
```

Golkow Technologies, Inc. - 1.877.370.DEPS

Highly Confidential - Attorneys' Eyes Only

1      Q.   And the decision as to whether or not

2   you're going to buy CPC versus CPM is on another

3   page?

4      A.   It's I believe the page where you click

5   submit order, it contains what you've bid, the

6   method you bid, your name and your ads and

7   information.  So you have the context of 80 cents

8   CPC when you click and when you tell us what you

9   want to bid, what you want to buy and if we accept

10  it, then yeah.

11     Q.   So, in fact, in paragraph 7 you really

12  meant to say when you talk about the contract, is

13  you weren't just talking about the statement of

14  rights and responsibilities, you were actually

15  talking about the whole process of creating the

16  relationship between the advertiser and Facebook;

17  right?

18     A.   Can you be more specific in what you're

19  referencing here?

20     Q.   Sure.  You said that the Facebook here a

21  minute ago when I asked you in paragraph 7 what the

22  contract was, you said it's the SRR.  But now we've

23  established that there's actually other parts of

24  that contract because you've got the price, you've

25  got the CPM or CPC, you've got to click through.

Highly Confidential - Attorneys' Eyes Only

1          Isn't that all part of the contract; not

2    just the statement of rights and responsibilities?

3          MR. SOMVICHIAN:  Object to the form of the

4    question.  It's argumentative.

5          MR. SHUB:  Well, it's not argumentative.

6    I'm asking him whether, in fact, the advertising

7    contract that he was referring to in paragraph 7

8    was more than just the SRR.

9    BY MR. SHUB:

10         Q.  Or are you saying it's not?

11         A.  The contract part of it is the SRR.  When

12   you've -- you agree to that contract when you've

13   already personally made the decision on what to

14   bid, how much to bid, how much to buy.  But that's

15   again up to the advertiser.  So, you know, I think

16   once you've accepted that for yourself, you do

17   enter into this agreement, which is what I was

18   referring to.

19         Q.  Do you also enter -- if you agree to bid --

20   if you agree to bid 80 cents for CPC and Facebook

21   accepts it, are you responsible for paying Facebook

22   80 cents for a click that's legitimate?

23         A.  Up to 80 cents.

24         Q.  You're responsible because you clicked;

25   right?  You said I submit that -- you hit the I

Highly Confidential - Attorneys' Eyes Only

Page 83

1    submit button on the site and that commits you to

2    paying Facebook; correct?

3        A.  In the event that you get clicks, yes.

4        Q.  Where on the SRR are you committing to do

5    anything with Facebook?

6        A.  Can you be more --

7        Q.  In other words, is there any provision on

8    this agreement that says I accept it or am agreeing

9    with it?

10       A.  It says you will pay for your orders in

11   accordance with our payment terms.

12       Q.  That's on a different page; right?  That's

13   not the -- you couldn't look on this document and

14   find out what those terms are.  You'd have to go

15   somewhere else?

16       A.  Sure.

17       Q.  So how is this the only contract?  That's

18   what I'm trying to understand.  This doesn't have

19   the payment terms.  You've got to go somewhere

20   else, how is this considered to be the contract and

21   only this document?

22       A.  It's the aspects that will specifically

23   cover the advertising process.

24       Q.  But not how much you're going to pay?

25       A.  That's going to depend on how much activity

Highly Confidential – Attorneys' Eyes Only

Page 86

1      A.  Your personal decision?

2      Q.  Right.

3      A.  No.

4      Q.  Or that you are agreeing to pay on a CPC

5   basis, is that on the statement of rights and

6   responsibilities?

7      A.  You're agreeing to pay, but I don't think

8   we specify CPC or CPM.  You will pay for your

9   orders.

10     Q.  Right.  But it's vague as to what the

11  orders means; right?

12     A.  What do you mean by "vague"?

13     Q.  I mean it doesn't say whether it's --

14  you're paying on a CPC or on a CPM or any other

15  basis?

16         MR. SOMVICHIAN:  The SRR document itself?

17  BY MR. SHUB:

18     Q.  Yeah.

19     A.  The SRR just uses the term orders to

20  encompass all of that.

21     Q.  Okay.  Let's look at paragraph 9 of your

22  declaration.  You say there that as stated in step

23  4 "All advertisers using the self-serve channel

24  must affirmatively click to agree to Facebook's

25  terms before starting an ad."  Correct?

Highly Confidential – Attorneys' Eyes Only

1      Q.  This document is dated June 28th, 2011.

2  Okay?  Exhibit -- your Exhibit 5 is dated June 28,

3  2011; okay?  Do you see that?

4           MR. SOMVICHIAN:  At the top.

5           THE WITNESS:  Yep.

6  BY MR. SHUB:

7      Q.  Now, do you know whether this is the

8  current operative document for payment terms?

9  Because we've gotten no payment terms document so

10  we don't know.  Is this the document that's in

11  effect now?

12      A.  I'm not sure, to be honest.

13      Q.  Do you know what payment terms documents

14  were in effect prior to June 28, 2011?

15      A.  Specifically, no.

16      Q.  Okay.  Do you know why you attached this

17  document which you do reference in paragraph 16 of

18  your declaration, why did you attach this document?

19      A.  We specifically call out the June 28th,

20  2011 version.

21      Q.  Yes, you do.

22      A.  So we attached that specific version.

23      Q.  But you didn't tell us in your declaration

24  whether there were other versions or not; did you?

25      A.  I don't believe so.

Golkow Technologies, Inc. - 1.877.370.DEPS

Highly Confidential – Attorneys' Eyes Only

Page 95

1       Q.  Or you didn't tell us whether there were

2  earlier versions of this document; correct?

3       A.  We specifically called out the June 28th

4  version.

5       Q.  And you don't know sitting here today

6  whether, in fact, there were earlier versions of

7  this document; correct?

8       A.  I do not know that for sure.

9       Q.  And therefore you wouldn't know whether the

10  terms that you quote in paragraph 16 were in any

11  document prior to June 28th, 2011; correct?

12       A.  Can you restate, please?

13       Q.  You don't know whether Exhibit 5 was in

14  existence before June 28, 2011; right?

15       A.  I'm sorry, I thought you asked specifically

16  if I knew if there were any other versions.  This

17  is the version as- I know it.

18       Q.  Do you know what the other versions said?

19       A.  I don't know if there were other versions.

20       Q.  So therefore you see in paragraph 16 you

21  then quote from this document?

22       A.  Correct.

23       Q.  You don't know, in fact, whether or not

24  what you quoted existed before June 28, 2011; do

25  you?

Highly Confidential - Attorneys' Eyes Only

1      A.   I assume it does because I wasn't aware of

2   any other versions.

3      Q.   But you don't have any knowledge -- without

4   assuming, you can't sit here today and testify

5   under oath that you know what was in the payment

6   term document prior to June 28, 2011 because you

7   just told me a minute ago that you didn't know

8   whether it existed or not?

9      A.   I have no specific recollection of any

10. payment terms documentation or the wording earlier

11  to this one.

12     Q.   All right.  Just so the record is clear, in

13  fact, that last sentence in paragraph 16 that says,

14  "This provision was in effect throughout the

15  proposed class period," is not a provision that

16  sitting here today testifying under oath you can

17  say you know for certain?

18     A.   I can say for certain I don't know that

19  there were other versions.  So I would testify that

20  this is the version.

21     Q.   But no, that's different.

22          You can't say because you don't know that

23  there were other versions, therefore you know this

24  is the version.  That's not -- you can't make that

25  leap, okay, without speculating; right?

Highly Confidential - Attorneys' Eyes Only

Page 97

1        Do you sitting here today know that there

2   were earlier versions?  You said no; right?

3        A.  Correct.

4        Q.  Okay.  So it's fine, but just so we have

5   the record is clear, in fact, then, you can't say

6   that this provision was in effect during the class

7   period because you don't know what were earlier

8   versions of this payment terms document; correct?

9        A.  Again, my expertise is not the payment side

10  of it.  When we prepared and discussed through

11  folks who are in charge of this, this was certainly

12  the details that we were made aware.

13       Q.  But you told me you didn't discuss

14  preparing this document with anybody at Facebook

15  other than your lawyer?

16       A.  Correct.

17       Q.  So he told you that it was in effect and

18  therefore you adopted it as your own knowledge?

19       A.  We looked --

20            MR. SOMVICHIAN:  Well, calls for

21  attorney-client privileged communications.

22            MR. SHUB:  Well, then I'm going to move to

23  strike that sentence because it's not based on

24  independent knowledge.  Either he tells me he was

25  told, okay, which if you want to protect it, that's

Highly Confidential - Attorneys' Eyes Only

Page 121

1    disclaimer.

2           Do you see that in paragraph 20?

3      A.   In paragraph 20?

4      Q.   Yes.

5      A.   Yes.

6      Q.   What was the disclaimer that was different

7    before July 2010?  What was different about the

8    disclaimer?

9      A.   I believe the disclaimer read Facebook

10   shall have no liability for click fraud or for

11   improper actions or other technical issues.

12     Q.   It didn't have the term invalid clicks in

13   it; correct?

14     A.   I believe that's correct, yes.

15     Q.   What's an invalid click?

16     A.   An invalid click, I would define an invalid

17   click by -- I mean again, I think it's going to be

18   something where depending on how you're -- you

19   know, if you're using our method, someone else's

20   methods, whatever it might be, it falls outside of

21   the -- some set of parameters you set up to

22   determine whether or not it's valid, for lack of a

23   better answer.

24     Q.   And what Facebook uses is what's on Exhibit

25   2; correct?

Highly Confidential - Attorneys' Eyes Only

Page 137

1   STATE OF CALIFORNIA)

                    )ss.

2   SANTA CLARA COUNTY )

3                   REPORTER'S CERTIFICATE

4          The undersigned Certified Shorthand

5   Reporter licensed in the State of California does

6   hereby certify:

7          I am authorized to administer oaths or

8   affirmations pursuant to Code of Civil Procedure,

9   Section 2093(b), and prior to being examined, the

10  witness was duly administered an oath by me.

11         I am not a relative or employee or attorney

12  or counsel of any of the parties, nor am I a

13  relative or employee of such attorney or counsel,

14  nor am I financially interested in the outcome of

15  this action.

16         I am the deposition officer who

17  stenographically recorded the testimony in the

18  foregoing deposition, and the foregoing transcript

19  is a true record of the testimony given by the

20  witness.

21         Before completion of the deposition, review

22  of the transcript [X] was [ ] was not requested.

23  If requested, any changes made by the deponent (and

24  provided to the reporter) during the period allowed

25  are appended hereto.

# EXHIBIT B

**REDACTED Pursuant to Court Order**
**DKT. No. 254**

# EXHIBIT C

**REDACTED Pursuant to Court Order**
**DKT. No. 254**

**Page 1:**

```
1        ROUGH DRAFT DISCLAIMER

2   ANDREA H. IGNACIO HOWARD, CSR, RPR, CCRR, CLR

3      CERTIFIED SHORTHAND REPORTER, CSR No. 9830
4   ---------------------------------------------
5        It is understood by all attorneys and/or
    their staff using, saving onto a hard
6   computer disk, or receiving a
    Livenote/Realtime ASCII or e-mailed rough
7   draft transcript that:

8        1.   The following is an unedited rough
    draft transcript.  Various corrections
9   and/or changes may be made before the
    final version is complete.  The use of
10  this rough draft transcript is limited
    by C.C.P. 2025.540(b).  This reporter, as
11  well as any affiliated court reporting
    agency, will not be responsible for any
12  variance of this draft from the final
    transcript.

13       2.   Because of the nature of
    stenographic outlines, differences WILL
14  exist between the Livenote/Realtime rough
    draft copy and the certified transcript
15  prepared by the reporter.  Those
    differences will include the following,
16  among others:

17       A.   Words may change;
         B.   Page and line numbers may change;
18       C.   Punctuation may change; and/or
         D.   Quotes may change.

19
         3.   Providing a Livenote/Realtime ASCII
20  and/or e-mail or saving Livenote/Realtime
    onto a computer hard drive will only be
21  provided when a certified copy is
    purchased and there will be a charge for
22  the Livenote/Realtime rough transcript in
    addition to the charge for the certified
23  copy.

24  ACCEPTANCE OF THIS REALTIME DRAFT IS AN AUTOMATIC
          FINAL COPY ORDER
25             ---oOo---
                                              1
```

**Page 2:**

```
1
2
3
00:04  4        Good morning counsel
00:12  5        Wednesday, September 21, 2011,
00:12  6        Deposition of Markus Jakobsson
00:13  7        In re: Facebook PPC Advertising Litigation
00:13  8        Reporting services brought to you by Veritext
00:13  9   National Deposition & Litigation Services
00:14 10        THE VIDEOGRAPHER: Benjamin Gerald.
00:14 11        THE REPORTER: Andrea Ignacio, CSR, RPR,
CCRR, CLR - License No. 9830.
00:14 12
00:14 13        Real time was requested.  If you do not wish
00:14 14   to use these services for a fee, please close the
00:14 15   screen.
00:14 16        Thank you.
00:14 17        Role:
00:24 18        MR. SOMVICHIAN:
00:25 19        MR. SHUB:
00:25 20        MS. MILLER:
00:35 21
00:35 22
00:35 23
00:35 24
00:35 25
                                              2
```

**Page 3:**

```
00:35  1        SAN FRANCISCO, CALIFORNIA
00:35  2        WEDNESDAY, SEPTEMBER 21, 2011
00:35  3             9:33 a.m.
00:38  4
00:38  5
00:38  6        THE VIDEOGRAPHER: Good morning.
00:38  7        We're on the record, ladies and gentlemen, at
00:38  8   9:33 a.m., on September 21st, 2011.
00:38  9        This is the videotaped deposition of Markus
00:38 10   Jakobsson, Ph.D.
00:38 11        My name is Benjamin Gerald, here with our
00:38 12   court reporter, Andrea Ignacio.  We are here from
00:38 13   Veritext National Deposition & Litigation Services at
00:39 14   the request of counsel for defendant.
00:39 15        This deposition is being held at 100 Bush
00:39 16   Street, in the City of San Francisco, California.
00:39 17        The caption of this case is In Re: Facebook
00:39 18   PPC Advertising Litigation.  Case number is
00:39 19   C09-03043JF.
00:39 20        Please note that audio and video recording
00:39 21   will take place unless all parties agree to go off the
00:39 22   record.  Microphones are sensitive and may pick up
00:39 23   whispers, private conversations, and cellular
00:39 24   interference.
00:39 25        At this time, will counsel and all present
                                              3
```

**Page 4:**

```
00:39  1   please identify themselves for the record.
00:39  2        MR. SHUB: Yes.
00:39  3        MR. SOMVICHIAN: Oh.
00:40  4        Good morning, Whitney Somvichian with Cooley
00:40  5   representing Facebook.
00:40  6        MR. SHUB: Jonathan Shub representing
00:40  7   plaintiffs.
00:40  8        MS. MILLER: Julie Miller.
00:40  9        THE VIDEOGRAPHER: Thank you.
00:40 10        Will the reporter please swear the witness.
00:40 11
      12        MARKUS JAKOBSSON, PH.D.,
      13        having been sworn as a witness,
      14        by the Certified Shorthand Reporter,
      15        testified as follows:
00:40 16
00:40 17        THE VIDEOGRAPHER: Thank you.
00:40 18        Please proceed.
00:40 19
00:40 20        EXAMINATION BY MR. SOMVICHIAN
00:40 21        MR. SOMVICHIAN: Q.  Good morning,
00:40 22   mr. Jakobsson.
00:40 23        A    Good morning.
00:40 24        MR. SHUB: For the record, it's
00:40 25   Dr. Jakobsson.
                                              4
```

# EXHIBIT D

**REDACTED Pursuant to Court Order**
**DKT. No. 254**

# EXHIBIT E

**REDACTED Pursuant to Court Order**
**DKT. No. 254**

# EXHIBIT F

**REDACTED Pursuant to Court Order**
**DKT. No. 254**

Confidential - Subject to Protective Order

1           UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3              SAN JOSE DIVISION

4

5     - - - - - - - - - - - - - - - - - - - - - - - - -

6  IN RE FACEBOOK PPC ADVERTISING  ) Case No.

7  LITIGATION                      ) C 09-03043 JF

8  - - - - - - - - - - - - - - - - - - - - - - - - )

9  This Document relates To:       )

10     All Actions.                 )

11 - - - - - - - - - - - - - - - - - - - - - - - - -

12

13     CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

14

15     Videotaped Deposition of BERNARD JANSEN,

16     PH.D., at 2002 Massachusetts Avenue NW,

17     Washington, D.C., commencing at 9:35 a.m.,

18     Monday, October 17, 2011, before Nancy J.

19     Martin, CSR No. 9504.

20

21

22

23

24

25 PAGES 1 - 183

                                        Page 1

Confidential - Subject to Protective Order

```
 1    APPEARANCES OF COUNSEL:
 2
 3        FOR THE PLAINTIFFS:
 4            SEEGER WEISS LLP
             BY:  JONATHAN SHUB, ESQ.
 5            1515 Market Street
 6            Suite 1380
             Philadelphia, Pennsylvania  19102
 7            (215) 564-2300
 8            jshub@seegerweiss.com
 9        -AND-
             FREED & WEISS LLC
10            BY:  RICHARD J. BURKE, ESQ.
11            1010 Market Street
             Suite 660
12            St. Louis, Missouri   63101
13            (314) 880-7000
14            rich@freedweiss.com
15
          FOR THE DEFENDANT FACEBOOK, INC.:
16            COOLEY LLP
17            BY:  WHITTY SOMVICHIAN, ESQ.
             101 California Street
18            5th Floor
19            San Francisco, California 94111-5800
20            (415) 693-2061
21            wsomvichian@cooley.com
22
23        ALSO PRESENT:
24            LARRY FLOWERS, LEGAL VIDEOGRAPHER
25
```

Page 2

Confidential - Subject to Protective Order

```
1      The time is approximately 2:58 p.m.  This concludes        14:58:05

2    today's deposition of Dr. Bernard Jansen.

3              (TIME NOTED:  2:58 P.M.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 179

# EXHIBIT G

## Facebook Advertising Terms and Conditions

These Facebook Advertising Terms and Conditions (these "Terms and Conditions" and together with any Insertion Orders executed by the parties, the "Agreement") are entered into by and between Facebook, Inc., a Delaware corporation ("Facebook") and the undersigned entity ("Client").

### Section 1.    Insertion Orders

**1.1 IOs.** From time to time, the parties may mutually agree on insertion orders ("Insertion Orders" or "IOs") under which Facebook will deliver advertisements or other content provided by Client ("Client Ads") on websites or other properties (including www.facebook.com) operated by or on behalf of Facebook or its affiliates, including through any media, devices or networks now known or hereafter developed (the "Service"). Each IO will specify: (a) where on the Service the Client Ads will be delivered; (b) the amount and type of advertising inventory on the Service being purchased (e.g., impressions, clicks, duration or other desired actions or metrics with respect to Client Ads) (the "Deliverables"); (c) the fees and rates applicable to the Deliverables; (d) the maximum amount of money to be spent pursuant to the IO (if applicable); (e) the start and end dates of the applicable Client Ad campaign; and (f) the identity of and contact information of any third party Client Ad server and tracking mechanism ("3rd Party Client Ad Server") if applicable. Client may not use 3rd Party Client Ad Servers unless specified in the IO and then only in accordance with Facebook's then-current policies for 3rd Party Client Ad Servers. Except as otherwise specified in this Section 1.1, Facebook will not be bound by conditions or instructions printed or appearing on IO forms submitted by or on behalf of Client, and in the event of any conflict or inconsistency between any IO and these Terms and Conditions, these Terms and Conditions will control, except to the extent such IO expressly supersedes or amends a specifically referenced section of these Terms and Conditions.

**1.2 IO Effective Date and Modification.** The effective date of each IO will be the earlier of: (a) execution thereof by both Facebook and Client; or (b) the display of the first Client Ad impression specified in an IO executed by Client. Subject to Section 3.2, modifications to any existing IO will not be binding unless made in a writing signed by both parties.

### Section 2.    Advertising Agencies.

In the event that the Client is an advertising agency or other entity representing an Advertiser (as defined in Section 2.1), including executing any IO or submitting advertisements to Facebook on behalf of an Advertiser, this Section 2 shall apply to Client.

**2.1 Advertiser Definition.** As used herein, "Advertiser" means the individual or entity on whose behalf Client is placing Client Ads on the Service that has entered into an Advertiser Agreement (as defined in Section 2.2(b)).

**2.2 Additional Representations and Warranties.** Client represents, warrants and covenants that:

(a) it is the authorized agent of Advertiser and it has the legal authority to enter into this Agreement and any IO on behalf of the Advertiser, make all decisions, and take all actions relating to the Advertiser's accounts (these rights "Agency Rights");

(b) it has or will enter into a written agreement with Advertiser (i) that obtains Agency Rights; (ii) that binds the Advertiser to terms as protective of Facebook as is this Agreement and (iii) to which Facebook is an intended third party beneficiary with respect to Client Ads delivered on the Service (the written agreement between Advertiser and Client containing the requirements in this Section 2.2(b), the "Advertiser Agreement");

(c) it will not, without Facebook's prior written consent: (i) make any representation, guarantee, condition, or warranty concerning any Service, or that Client is an affiliate or partner of Facebook, (ii) make any commitments (for example, guarantees as to placement of ads) to an Advertiser or potential Advertiser beyond Facebook's obligations under this Agreement, (iii) negotiate any terms or conditions related to the Service which are inconsistent with this Agreement, or (iv) engage in any telesales or telemarketing in connection with the Service; and (d)    it will perform its duties pursuant to this Agreement in a professional manner consistent with the requirements established by Facebook.

**2.3 Agency Agreement and Relationship Termination.** Upon Facebook's request, Client will immediately deliver to Facebook each applicable Advertiser Agreement. If Client's relationship with an Advertiser terminates, Client agrees that Facebook may contract directly with such Advertiser to allow such Advertiser to continue to place Client Ads on the Service and obtain information related to Client Ads run on its behalf, including account and performance history, and that Client shall no longer have access to such Advertiser's account.

**2.4 Additional Liability.** Without limiting any other provision of this Agreement, any acts or omissions by any Advertiser in violation of this Agreement shall be deemed a breach of this Agreement by Client, and Client will indemnify, defend, and hold Facebook harmless from and against all damages, liabilities, costs, and expenses that Facebook may incur as the result of such violation. However, Client acknowledges that Facebook may but shall in no event be obligated to directly contact any Advertiser and directly enforce the

1

FACEBOOK CONFIDENTIAL – 12/2008

CONFIDENTIAL

FBCPC00208922

terms of such Advertiser Agreement, including if Facebook has not received payment for such Advertiser's account within 30 days from the date of the applicable payment due date.

## Section 3.    Client Ads and Deliverables

**3.1  Placement of Client Ads.** Subject to the terms of this Agreement, Facebook will deliver Client Ads in accordance with the terms of the applicable IO. To the extent that the size, placement, positioning or any other aspects of the presentation of any Client Ads are not specified in an IO, Facebook may determine any of the foregoing in its sole discretion.    For Client Ads where Deliverables consist of placement for a specified period of time, Facebook may deliver such Deliverables as continuous placements for that period, or some other equivalent combination of duration and rotation (e.g., 1 week of persistent placement = 2 weeks of 50% rotation placements).  Scheduling of delivery of any Client Ads is subject to availability and may not be continuous.    Facebook will use commercially reasonable efforts to notify Client in advance of any inability to deliver Client Ads in accordance with the terms of the applicable IO.

**3.2  Changes to IOs.** As described in Section 1.2, an IO may only be amended by signed,  written agreement of Client and Facebook; provided, however, that Facebook may, in its sole discretion, accept a written request from Client to change the following provisions of an IO without a formal amendment of the IO:  (a) a reallocation of placements between types of advertising Deliverables, (b) a change to delivery dates of specific lines of Deliverables on the IO, and (c) a change in demographic targeting (each of the foregoing, a "**Limited Change**"). Client shall submit Limited Change requests by email. If Facebook agrees to such Limited Change, Facebook may indicate such agreement by implementing such Limited Change without further confirmation. Facebook may also propose a Limited Change to maximize performance of a particular Client Ad campaign, but will not implement such Limited Change without email confirmation from Client. Notwithstanding anything to the contrary in this Section 3.2, in no event shall a change to the overall start or end date of a Client Ad campaign or the total spend amount under a Client Ad campaign be deemed a Limited Change and shall only be accomplished through signed written amendment of the IO between Client and Facebook.

**3.3  Facebook Technical Specifications.** Within 5 days of the effective date of an IO, Facebook shall make available the applicable Facebook technical specifications for such Client Ads ("**Facebook Technical Specifications**"). Client will submit all applicable Client Ads in accordance with the applicable Facebook Technical Specifications.  Facebook may modify the Facebook Technical Specifications from time to time and shall notify Client of any such modifications. If Client is unable to comply with any such modified Facebook

Technical Specifications, Client may, as its sole and exclusive remedy, either: (a) suspend delivery of any affected Client Ads for a reasonable time in order to send compliant Client Ads to Facebook (in which event the end date for any campaign involving suspended Client Ads will be extended by a period equal to the period of the suspension) or (b) accept comparable replacement Client Ads as agreed upon by the Parties.

**3.4  Client Ad Content.** All content for Client Ads must be in compliance with the then-current version of Facebook's Advertising  Guidelines  (located  at www.facebook.com/ad_guidelines.php),  the  Facebook Technical Specifications and any other applicable Facebook policies, including editorial, advertising, privacy, user experience, publicity and branding policies (collectively, the "**Facebook Guidelines**"). Each of the Facebook Guidelines is hereby incorporated by this reference. All content for Client Ads must be received at least 5 days in advance of the earliest Flight Date for any Deliverable on the applicable IO. Changes to Client Ad content for text or standard graphical Client Ads must be received by Facebook at least 3 days in advance of requested change date; changes to content for all other Client Ads must be received by Facebook at least 5 days in advance of requested change date. Facebook will not be required to accept changes to Client Ad content more than once in any rolling 7 day period.  Client shall not be relieved of its payment obligations under an IO for Client Ads not delivered due to delays by Client in delivery of Client Ads to Facebook. Client will be solely responsible for all fees associated with serving any "rich media" Client Ads.

**3.5  Promotions.** For any contest, sweepstakes, coupon or other promotion to be offered or promoted by or on behalf of Client on the Service ("**Promotion**"), Client (or a third party contracted by Client and for which Client is solely responsible) will perform and be solely responsible for such Promotion, including administration of the Promotion, ensuring that the Promotion complies with any and all applicable laws and regulations, setting and enforcing official rules and offer terms, collecting entries, drawing, selecting and notifying winners and timely procuring and fulfilling prizes, premiums or discounts that may be offered in connection with such Promotion (these and other similar obligations the "**Promotion Obligations**").  No approval by or assistance from Facebook in connection with a Promotion (including as may be specified in an IO or elsewhere) shall reduce or satisfy the Promotional Obligations, and Client shall  remain  solely  responsible  for  the  Promotion Obligations.    Without limiting the foregoing, Facebook's review or approval of the official rules, offer terms or regulations for any Promotion shall not constitute a legal opinion as to the legal appropriateness, accuracy or adequacy of those rules or their manner of use, nor a waiver of Facebook's indemnity rights under this Agreement.

**3.6  Delivery Statistics.** All figures relating to all Deliverables as determined by Facebook in accordance with its standard tracking methodologies will govern; provided, however that

CONFIDENTIAL                                                                       FBCPC00208923

if Client is using a 3rd Party Client Ad Server, figures relating to any Deliverables that are impressions provided by Client from such 3rd Party Client Ad Server will govern unless such figures are more than ten percent (10%) lower than those determined by Facebook for the same period, in which case Facebook and Client will work in good faith to reconcile the discrepancy. If Client is using a 3rd Party Client Ad Server, Client will provide all figures that Facebook requests relating to the Deliverables from such 3rd Party Client Ad Server by either (a) providing Facebook access to an online portal that provides such figures or (b) reporting such figures on a weekly basis. If Client fails to provide such figures as specified, Facebook may calculate payment and other figures relating to Deliverables using its own data. Facebook will monitor delivery of Client Ads, and will notify Client either electronically or in writing as soon as reasonably possible (and no later than two weeks before the end date of any IO unless the campaign was less than two weeks in length) if Facebook believes that an under-delivery of any Deliverables specified in an IO is likely.

**3.7 Performance-Based Advertising Orders.** For all IOs where inventory is invoiced on a cost per click ("CPC") or other performance-related basis, the following additional terms shall apply: (a) the IO shall specify the agreed upon CPC or other performance-based rate that will apply to such IO and (b) the IO shall not guarantee any amount of clicks or impressions to be delivered. Facebook's reported numbers for clicks shall be controlling for all CPC-based or other performance-based Deliverables.

**3.8    Failure to Deliver and Makegoods/Remedies.** If Facebook fails to deliver any Deliverables in accordance with the terms of an IO, Client's sole and exclusive remedy shall be limited to the following, which Facebook may choose in its sole discretion: (a) a refund of the charges representing the Client Ads that were undelivered or delivered to the wrong location, (b) placement of the Client Ads at a later time in a comparable position as determined by Facebook, and/or (c) an extension of the term of the IO with a refund representing any remaining undelivered Client Ads at the end of such extended term. Facebook will have no obligation to continue to deliver any such Client Ads after the term of the IO if the IO has been terminated by reason of Client's breach pursuant to Section 5. Facebook will not be required to remedy under-deliveries due to delays caused by Client. Client understands that all discounts are based on Client's commitment to fulfilling the discount criteria indicated in the IO. If, for any reason, these criteria are not satisfied at the expiration or cancellation of the IO, Client will pay a short rate charge on all Client Ads run equal to the difference between the rate shown in the IO and the rate earned based on the applicable rate card without consideration of any discounts.

**Section 4.    Payments and Reporting**

**4.1  Payments.** Any initial payment specified in any IO will be due and payable upon the effective date of such IO. For subsequent payments specified in any IO, unless otherwise specified in such IO, Facebook will invoice Client, at the address specified in the IO, not more frequently than once per calendar month. Invoiced amounts will be due and payable thirty (30) days after Facebook's delivery of the applicable invoice. Invoiced amounts and all other amounts payable by Client to Facebook are exclusive of any applicable tax, duty, levy, or other governmental charge, including but not limited to sales, use, value-added, withholding, and excise taxes ("Taxes"). Client is responsible for payment of all Taxes to the proper taxing or governmental authority. Client will be liable to Facebook for all costs of collection of amounts due but unpaid. Interest will accrue on any past due amounts at the rate of the lesser of 1% per month or the lawful maximum. If Client's payment method fails or Client's account is past due, Facebook may collect past due amounts using other collection mechanisms, and Client agrees to pay all expenses associated with such collection, including reasonable attorneys' fees. If Client pays any amounts due with a credit card and the issuer of the credit card seeks to recover from Facebook any amounts received by Facebook from the issuer, Client will immediately remit to Facebook all amounts necessary to comply with the issuer's request and any costs and expenses incurred by Facebook in connection therewith.

**4.2  Reporting.** Within 2 business days of the effective date of any IO, Facebook will notify Client (either electronically or in writing) as to whether the Client Ads specified in the IO have begun delivery. Thereafter, Facebook will: (a) if so requested by Client in writing, make available to Client weekly interim reports ("Interim Reports") setting forth Facebook's then-current calculation of the Deliverables delivered during the period covered by the report and the anticipated payments due therefor; and (b) include with each invoice delivered pursuant to Section 4.1 a report (a "Monthly Report") setting forth Facebook's final calculation of the Deliverables delivered during the period covered by the invoice and the payments due therefor. If Client is using a 3rd Party Client Ad Server, in generating Monthly Reports, Facebook will use the figures obtained from Client or otherwise agreed by the Parties pursuant to Section 3.6. Client understands and agrees that Interim Reports are for Client's convenience only and not for any other purpose, and Facebook makes no representation or warranty as to the accuracy of, and will not be bound by any information furnished in any, Interim Report. Accordingly all payments due hereunder shall be based solely on the information contained Monthly Reports, and only Monthly Reports will be deemed binding upon Facebook.

**4.3  Cancelled IOs.** If Client cancels any portion of an IO pursuant to Section 5, then except to the extent otherwise specified in such IO, Client will not be charged for any Client Ads delivered under such IO after the effective date of such cancellation.

**Section 5.    Termination.**

FACEBOOK CONFIDENTIAL – 12/16/2008

CONFIDENTIAL                                                                                       FBCPC00208924

Either party may terminate this Agreement at any time upon written notice to the other party if the other party materially breaches this Agreement and such breaching party does not cure the same within 30 days after written notice thereof from the non-breaching party. In addition, Facebook may suspend delivery of Client Ads under any and all IOs immediately upon written notice to Client in the event of any failure by Client to make any payment hereunder when due (and, if Facebook elects to suspend delivery of any Client Ads, the end date specified in the applicable IO will be extended by a number of days equal to the period of suspension). Sections 2.4 (Additional Liability), 3.4 (Client Ad Content), 3.5 (Promotions), 3.8 (Failure to Deliver and Makegoods), 4 (Payments and Reporting), 5 (Termination), 7.4 (Persistence), 9 (Confidentiality), 10 (Representations and Indemnification), 11 (Limitation of Liability), 13 (Disputes) and 14 (General) of these Terms and Conditions, together with any accrued but unpaid payment obligations of either party, will survive any expiration or termination of this Agreement.

**Section 6.    Facebook Control of Service**

**6.1 Service Design.** Client acknowledges and agrees that Facebook is, and will at all times be, the "executive producer" of the Service, and will be responsible for the design, layout, look-and-feel, and maintenance of any and all aspects of the Service, including with respect to the display and performance of any Client Ads. Facebook may, in its sole discretion, redesign, delete or replace any pages, groups or other areas on which Client Ads will be displayed, even if such redesign, deletion or replacement results in the removal of Client Ads; provided, however, that if Client Ads are removed or not able to be served in connection with such change to the Service, as Client's sole and exclusive remedy, Facebook will provide Client with Client Ads that are comparable in prominence to the affected Client Ads.

**6.2 Rejection/Removal of Client Ads.** Facebook may, in its sole discretion, reject or remove any Client Ad at any time, with or without notice, which (a) violates this Agreement, the content restrictions or any other provision of the Facebook Guidelines or the Facebook Technical Specifications or (b) which Facebook otherwise determines to be inappropriate for any reason in its sole discretion, whether or not such Client Ad was previously accepted. In such event, Facebook will notify Client of the reasons for such removal or rejection, and Client will promptly re-submit a Client Ad that addresses the issues specified by Facebook.

**Section 7.    Licenses.**

**7.1 License to Client Materials.** Client hereby grants to Facebook (and its affiliates) a worldwide, non-exclusive, royalty-free, fully-paid license to (a) use, reproduce, perform, display, and distribute Client Ads and any related information provided by Client in connection with, on and through the Service ("Client Materials") and (b) alter, modify, repurpose or create derivative works of Client Materials as necessary or desirable in order to serve

advertising units and newsfeed content or other content on the Service. Client Ads include any copyrighted materials, and any trademarks, service marks, logos or other source or business identifiers included therein ("Trademarks"). Except as otherwise expressly set forth in this Agreement, the licenses granted under this Section 7.1 shall be for the period of the applicable IO.

**7.2 Publicity.** During and after the term of this Agreement, Facebook may use Client's Ads, name and logo, and may reference the type of advertising and flight dates for the advertising campaign delivered on behalf of the Client, in a factual and non-disparaging manner, for promotional or marketing purposes. Facebook may also reference any information publicly available about the Client on or off the Service.

**7.3 Reservation of Rights.** As between Facebook and Client, Client retains all rights in and to any Client Ads (including all Client Trademarks and all other related intellectual property rights embodied therein), and, upon the termination of this Agreement, all rights conveyed to Facebook hereunder with respect to Client Ads will cease and all such rights will revert to Client, except as otherwise provided herein. Client will not use, reproduce or display any Trademarks of Facebook in any manner without Facebook's prior written consent.

**7.4 Persistence.** Notwithstanding anything to the contrary in this Agreement, Client acknowledges and agrees that Client Ads and other Trademarks that are used or displayed on the Service may continue to be used and displayed on the Service, even after Client has completed the ad campaign or terminated this Agreement or the applicable IO, as such Client Ads or Trademarks may have been incorporated into user profiles, news feeds or other features, and that such usage and display may continue indefinitely.

**Section 8.    Use of Pages and iFrames.** The terms of this Section 8 shall apply to any use of Pages or iFrames (each as defined in Section 8.1) by Client in connection with the Service:

**8.1 Permitted Use of Pages and iFrames.** Client may create Pages and use iFrames on its Pages on the Service provided that Client complies with the terms of this Section 8 and all applicable Facebook guidelines regarding iFrames and Pages (including as set forth at http://www.facebook.com/terms.php and http://www.facebook.com/terms_pages.php). Notwithstanding the foregoing, use of iFrames and Pages remains subject to Facebook's review and approval at all times and Client agrees that it shall promptly remove any iFrame or Page as may be requested by Facebook in writing if Facebook determines in its sole discretion that such usage violates any Facebook guidelines or policies. "Page" means a customized profile for the Client (or a Client brand) on the Service. "iFrame" means a web page frame that allows a third party web site to be embedded within such frame.

CONFIDENTIAL

**8.2 Promotions/Commercial Content.** Client agrees that for any contest, sweepstakes, coupon or other promotion appearing on or promoted through any Client Page or iFrame shall be deemed a "Promotion" for all purposes under this Agreement. Client further agrees that content on any Page or within any iFrame shall comply with all applicable policies for the content of Client Ads and shall not be unlawful, fraudulent, false, or misleading in any manner.

**8.3 3rd Party Advertising Prohibited.** Client shall not include or display any advertising, sponsored content, promotion or other commercial message by or on behalf of any third-party (including with respect to any third-party product or service) on any Page or iFrame.

**8.4 Misrepresentations.** Client shall not present its iFrames, Pages or the content on such Pages in a way that could mislead a user to believe that the user is interacting with Facebook. Client may not (a) prompt for user names or emails in way that the user could believe Facebook or the Service is prompting for such information, (b) reference Facebook, its site, or brand in any manner, (c) use any Facebook logos, trademarks, or Service terminology, (d) emulate any of the Service features, or (e) cause a user to mistakenly believe that any content posted by Client was posted by Facebook.

**8.5 Security of iFrames.** Client shall ensure that each iFrame and its content shall pose no risk whatsoever to the Page, any Facebook user, or the Service. Further, Client shall only pull content from its own site via an iFrame if such content is hosted in a reliable environment and complies with all guidelines.

**Section 9. Confidentiality**

**9.1 Confidential Information.**

(a) "Confidential Information" means information disclosed by one party ("Discloser") (whether verbally, in writing or otherwise, and whether of a business, technical or other nature) to the other party ("Recipient") that has been designated as confidential or that, given the nature of the information and/or the circumstances surrounding its disclosure, should reasonably be considered confidential. Without limiting the foregoing, Confidential Information of Facebook shall include all Facebook technical specifications, information relating to Deliverables, and any information relating to Facebook products. Recipient shall maintain in confidence Confidential Information and not disclose Confidential Information to any third party (other than its employees, agents or contractors who have a need to know and who have agreed in writing to obligations as protective of Confidential Information as set forth herein), or use or accumulate such Confidential Information for any purpose other than performance of this Agreement, without Discloser's prior written consent. For the avoidance of doubt, the terms of this Agreement will be deemed Confidential

Information of both parties. Notwithstanding the foregoing: (i) the foregoing restrictions will not apply as to any information that was in the Recipient's possession prior to disclosure thereof by Discloser, that is or subsequently becomes available to the general public other than through a breach by Recipient, or that is independently developed by Recipient without reference to Confidential Information; and (ii) Recipient will be permitted to disclose Confidential Information to the extent required by applicable law, regulation or legal process, provided that it provides prompt written notice to Discloser of any such disclosure and provides reasonable cooperation to the Discloser in connection with any attempt to contest or limit such disclosure.

(b) Recipient agrees and acknowledges that any breach of this Section 9 will cause irreparable harm to Discloser for which monetary damages will be inadequate. Accordingly, the aggrieved Discloser will be entitled to seek and, if granted, obtain and enforce injunctive or other equitable relief (in addition to any other remedies available to it) to remedy any threatened or actual breach of Section 9 by Recipient without the necessity of posting any bond or proving any harm or damages. In addition, Recipient agrees promptly to advise Discloser in writing of any unauthorized misappropriation, disclosure or use by any person of the Confidential Information which may come to its attention and to take all steps at its own expense reasonably requested by the Discloser to limit, stop or otherwise remedy such misappropriation, disclosure or use.

(c) Recipient's obligation under this Section 9 as to any Confidential Information will continue for 5 years after its receipt of such information. Upon the Discloser's request, Recipient will return, or, at Discloser's option, destroy and certify destruction of, all Confidential Information (including any summaries or analyses thereof) in the Recipient's possession.

**9.2 Feedback.** Client may from time to time provide ideas, suggestions or other feedback regarding the Service (including as to improvements or modifications thereto). Both parties agree that except as otherwise agreed by Facebook in a signed writing, such ideas, suggestions and other feedback is not Confidential Information of Client and that Facebook will be entitled to use, implement disclose and otherwise exploit such feedback in any manner, without restriction or duty to account.

**9.3 Public Disclosures.** Except as permitted by Section 7.2 and Section 9.1(a)(ii), neither party will issue any press releases, or otherwise make any public statements or communications regarding this Agreement or the relationship of the parties without the other party's prior written consent.

**Section 10. Representations and Indemnification**

**10.1 Representations and Warranties.** Each party represents and warrants that: (a) it is duly organized, validly

5

CONFIDENTIAL

existing, and in good standing under the laws of the jurisdiction in which it was organized; (b) the execution and delivery of this Agreement, and the performance of the transactions contemplated hereby, are within its corporate powers, and have been duly authorized by all necessary corporate action; and (c) its performance of this Agreement, and the other party's exercise of its rights under this Agreement, will not result in a violation of any agreement or other obligation by which it is bound. Client further represents and warrants to Facebook that: (x) the Client Ads shall not contain any material which violates the Facebook Guidelines or which is otherwise unlawful, defamatory or obscene, or which infringes or violates any third-party rights (including any intellectual property rights or privacy or publicity rights) or which may encourage a criminal offense or otherwise give rise to civil liability and (y) it will comply with all applicable laws and regulations in its performance of this Agreement (including all applicable (i) privacy and data protection laws and (ii) regulations and laws and regulations related to Promotions).

**10.2    Disclaimer of Warranties.** EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, NEITHER PARTY MAKES ANY REPRESENTATIONS OR WARRANTIES REGARDING THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT OR IMPLIED WARRANTIES ARISING OUT OF COURSE OF DEALING, COURSE OF PERFORMANCE OR USAGE OF TRADE. FACEBOOK DOES NOT WARRANT THAT THE SERVICE OR ITS DELIVERY OF ADVERTISEMENTS HEREUNDER WILL BE ERROR-FREE, UNINTERRUPTED OR CONTINUOUS.   WITHOUT LIMITING THE FOREGOING, FACEBOOK SHALL HAVE NO LIABILITY FOR CLICK FRAUD OR OTHER IMPROPER ACTIONS OF THIRD PARTIES WHICH MAY AFFECT THE COST OF ADVERTISING. THE FOREGOING DISCLAIMER OF WARRANTY IS A FUNDAMENTAL PART OF THE BASIS OF THE BARGAIN HEREUNDER, AND THAT THE PARTIES WOULD NOT ENTER INTO THIS AGREEMENT ABSENT SUCH DISCLAIMER.

**10.3    Indemnification.** Client will indemnify and hold harmless Facebook and its affiliates, and each of their officers, directors and employees (collectively, the "Indemnified Parties"), from and against any and all expenses, damages and losses of any kind (including reasonable legal fees and costs) incurred by any of the Indemnified Parties arising out of or in connection with any claim by a third party (a "**Third Party Claim**") against any of the Indemnified Parties resulting from: (a) any actual or alleged breach of Client's representations or warranties under *Sections 10.1* and *2.2 (as applicable)*; (b) any Promotion, including any claims for any delivery of, non-delivery of, defects in, use of or inability to use any prizes or any violation by the Promotion of any applicable law, rule or regulation; (c) any Client Ad or other materials provided by Client or any material to which users can link, or any products or services made available to users, through the

Client Ads. Facebook will notify Client promptly of any Third Party Claim for which it seeks indemnification and will permit Client to control the defense of such Third Party Claim with counsel chosen by Client; provided, that Client will not enter into any settlement that contains any admission of or stipulation to any guilt, fault, liability or wrongdoing on the part of any Indemnified Party without Facebook's prior written consent.

**Section 11.   Limitation of Liability**

EXCEPT TO THE EXTENT ARISING OUT OF A BREACH OF CONFIDENTIALITY, OR AMOUNTS PAYABLE TO A THIRD PARTY PURSUANT TO A PARTY'S INDEMNIFICATION OBLIGATIONS, FACEBOOK NOT WILL BE LIABLE FOR LOST PROFITS OR OTHER CONSEQUENTIAL, SPECIAL, INDIRECT OR INCIDENTAL DAMAGES, WHETHER ARISING IN CONTRACT, TORT, INCLUDING NEGLIGENCE, WARRANTY, STRICT LIABILITY OR OTHERWISE, EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**Section 12.  Force Majeure**

Excluding payment obligations, neither party will be liable for any delay or default in the performance of its obligations if such delay or default is caused by conditions beyond its reasonable control, including fire, flood, accident, earthquakes, telecommunications line failures, electrical outages, network failures or acts of God (collectively, "**Force Majeure**"). If performance is delayed by more than 30 days as a result of any Force Majeure, the non-delayed party will be entitled to terminate this Agreement by written notice delivered at any time prior to the other party's resumption of performance of this Agreement.

**Section 13.  Disputes.**

The laws of the State of California, without regard to principles of conflict of laws, will govern any dispute related to this Agreement. Client agrees that, except as otherwise provided for in this <u>Section 13</u>, all claims and disputes that arise out of or relate in any way to this Agreement or Client's placement of Client Ads on the Service will be resolved by binding arbitration by a single arbitrator in Santa Clara County, California, administered by JAMS (see www.jamsadr.com) pursuant to its Comprehensive Arbitration Rules. The arbitrator's award shall be binding and may be entered as a judgment in any court of competent jurisdiction. With respect to any claims or disputes Client intends to bring on behalf of a class, Client further agrees to arbitrate whether a class should be certified before bringing such action in a court of law. If the arbitrator refuses to certify the class, Client will continue to resolve its individual claims or disputes through binding arbitration. If the arbitrator finds that a class should be certified, Client may file the class action in a court located in Santa Clara County, California and hereby waive any right to a trial by jury. Claims for injunctive or other equitable relief pending the conclusion of an arbitration under this <u>Section 13</u> must also be brought in a court in Santa Clara County, California. For

6

FACEBOOK CONFIDENTIAL – 12/16/2008

CONFIDENTIAL

FBCPC00208927

purposes of such relief or remedy, or any other court proceeding under this <u>Section 13</u>, Client agrees to submit to the exclusive jurisdiction of the state and federal courts located in Santa Clara County, California. Except as specifically provided herein, if any portion of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, the remaining portions of this Agreement will remain in full force and effect and the court will construe any invalid or unenforceable portions in a manner that most closely reflects the effect and intent of the original language. If such construction is not possible, the provision will be severed from this Agreement and the rest of the Agreement shall remain in full force and effect. The failure by either party to enforce any provision of this Agreement shall in no way be construed to be a present or future waiver of such provision, nor in any way affect the right of such party to enforce such provision thereafter.

Section 14.   General.   Client may not assign or otherwise transfer (including by any reorganization, change of control, merger, acquisition or sale or transfer of all or part of its assets or business) Client's rights or obligations under this Agreement including any IO without the prior written permission of Facebook, and in no event will Facebook be obligated to serve Client Ads for any third party. Facebook may freely assign or otherwise transfer its rights and obligations under this Agreement including any IO, in whole or in part. Any purported assignment or other transfer in violation of this provision shall be null and void. This Agreement will be binding upon, and inure to the benefit of the parties and their permitted respective successors and assigns. Each of Facebook's affiliates are express and intended third party beneficiaries of this Agreement and may enforce any of its terms and exercise any of the rights to the same extent as Facebook. Client and Facebook are independent contractors, and nothing in this Agreement is intended to or does create any type of joint venture, partnership or employer/employee relationship between Client and Facebook or its affiliates. Notices under this Agreement must be in writing and sent via facsimile, registered or certified mail or commercial courier to the parties at their respective addresses set forth herein, and in the case of Facebook, to the attention of its General Counsel. Whenever used in this Agreement, unless otherwise specified, the terms "includes", "including", "e.g.,", "for example", "for instance" and other similar terms are deemed to include the term "without limitation" immediately thereafter. This Agreement is in the English language only, which language shall be controlling in all respects, and all versions hereof in any other language shall not be binding on the parties hereto. All communications and notices to be made or given pursuant to this Agreement shall be in the English language.  This Agreement (including any IOs, agreements, policies and other documents incorporated by reference herein), constitutes the entire agreement between Client and Facebook regarding the subject matter hereof and supersedes any and all prior or contemporaneous representation, understanding, agreement or communication between Client and Facebook, whether written or oral, including all terms and conditions on Facebook's rate cards or other published materials regarding such subject matter.

ACKNOWLEDGED AND AGREED:

| Facebook, Inc. | Client:_____ |
| By: _____ | By: _____ |
| Name: _____ | Name: _____ |
| Title: _____ | Title: _____ |
| Signature Date:_____ | Signature Date:_____ |
| Address: | Address: |

FACEBOOK CONFIDENTIAL – 12/16/2008

CONFIDENTIAL

FBCPC00208928

# EXHIBIT H

Page 1

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                  SAN JOSE DIVISION

4     _____

5     In Re FACEBOOK PPC          )      Master Case No.

6     Advertising Litigation,     )      5:09-cv-03043 JF

7                                 )

8     This Document Related To:   )

9         All Actions.            )

10    _____)

11

12

13

14

15         VIDEOTAPED DEPOSITION OF NATHAN FOX

16                JUNE 21, 2011

17

18

19

20

21

22

23

24    REPORTED BY:

25    JANIS JENNINGS, CSR 3942, CLR, CCRR

```
 1
 2
 3
 4
 5
 6
 7              DEPOSITION OF NATHAN FOX, taken on
 8    behalf of the Defendant, at Cooley LLP,
 9    101 California Street, 5th Floor,
10    San Francisco, California, commencing at
11    9:33 a.m., Tuesday, June 21, 2011, before
12    Janis L. Jennings, Certified Shorthand
13    Reporter No. 3942, CLR, CCRR.
14
15
16
17
18
19
20
21
22
23
24
25
                                         Page 2
```

```
 1    APPEARANCES OF COUNSEL (Continued):
 2
 3      For the Defendant Facebook, Inc.:
 4          COOLEY LLP
 5          BY: WHITTY SOMVICHIAN, ESQ.
 6          101 California Street
 7          5th Floor
 8          San Francisco, California  94111-5800
 9          415.693.2061
10          wsomvichian@cooley.com
11
12      ALSO PRESENT:
13          FRANK QUIRARTE, Videographer
14
15
16
17
18
19
20
21
22
23
24
25
                                         Page 4
```

```
 1    APPEARANCES OF COUNSEL:
 2
 3      For the Plaintiff:
 4          FINKELSTEIN THOMPSON LLP
 5          BY:  ROSEMARY M. RIVAS, ESQ.
 6          100 Bush Street, Suite 1450
 7          San Francisco, California  94104
 8          415.398.8700
 9          rrivas@finkelsteinthompson.com
10
11      For the Plaintiff Class:
12          SEEGER WEISS, LLP
13          BY:  JONATHAN SHUB, ESQ. -
14          1515 Market Street
15          Suite 1380
16          Philadelphia, Pennsylvania  19102
17          215.564.2300
18          jshub@seegerweiss.com
19
20
21
22
23
24
25
                                         Page 3
```

```
 1    SAN FRANCISCO, CALIFORNIA; TUESDAY, JUNE 21, 2011;
 2                  9:33 A.M.
 3                  --oOo--
 4         THE VIDEOGRAPHER:  Good morning, ladies
 5    and gentlemen.  We are on the record.  The time is   09:33:39
 6    9:33 a.m. on June 21st, 2011.  This is the
 7    videotaped deposition of Nathan Fox.
 8         My name is Frank Quirarte, here with our
 9    court reporter Janis Jennings.  We are here from
10    Veritext National Deposition & Litigation Services   09:33:55
11    at the request of counsel for the defense.
12         This deposition is being held at
13    101 California Street in the City of San Francisco.
14    The caption of this case is In Re Facebook PPC
15    Advertising Litigation, case No. 5:09-cv-03043 JF.   09:34:10
16         Please note that audio and video recording
17    will take place unless all parties agree to go off
18    the record.  Microphones are sensitive and may pick
19    up whispers, private conversations and cellular
20    interference.                     09:34:29
21         At this time will counsel and all present
22    please identify yourself for the record.
23         MR. SOMVICHIAN:  Whitty Somvichian with
24    Cooley representing Facebook.
25         MS. RIVAS:  Rosemary Rivas with       09:34:37
                                         Page 5
```

Pages 2 to 5

1     advertising on Facebook?
2         A.   Well, I had to set up the targeting, so
3     yeah.
4         Q.   Are there any other features of the
5     Facebook advertising platform that you see as being   10:04:39
6     different from Google AdWords or -- or providing an
7     additional benefit to you?
8         MS. RIVAS:  Same objection.
9         THE WITNESS:  No.
10        MR. SOMVICHIAN:  Let me just mark this for   10:05:28
11    the record.  This is just the second amended
12    complaint.  It was marked in Root Zoo.  I don't know
13    if we need to keep marking this as an exhibit.
14        I will just give that to you, Mr. Fox.
15        Do you want a copy?                10:05:45
16        MS. RIVAS:  Yeah.
17        MR. SHUB:  I have one.
18    BY MR. SOMVICHIAN:
19        Q.   Mr. Fox, we will come back to this later,
20    but I just wanted to have it in front of you as we   10:05:57
21    move forward through the deposition.  Do you
22    recognize this as the complaint in which you are a
23    named plaintiff?
24        A.   This is the second amended complaint?  The
25    one that I was added to?  Yes.              10:06:13

Page 30

1         Q.   Okay.  So we are going to come back to
2     that, but just so you have it in front of you.
3         Mr. Fox, can you -- can you just describe
4     for me in your own words the basis of the claim that
5     you are seeking to make against Facebook --      10:06:39
6         MS. RIVAS:  Objection.
7     BY MR. SOMVICHIAN:
8         Q.   -- in this complaint?
9         MS. RIVAS:  Objection.  Seeks a legal
10    conclusion.  Lacks foundation.           10:06:51
11        THE WITNESS:  Can you restate it?
12    BY MR. SOMVICHIAN:
13        Q.   Well, you are making certain allegations
14    in this complaint against my client, Facebook;
15    right?                      10:07:00
16        A.   Yeah.
17        Q.   I just want to have you describe in your
18    own words what you think the thrust of your
19    complaint is against Facebook.
20        MS. RIVAS:  Same objections.        10:07:09
21        THE WITNESS:  I am alleging that Facebook
22    charged me for invalid clicks.
23    BY MR. SOMVICHIAN:
24        Q.   Have you ever heard or used the term
25    "fraudulent clicks" or "click fraud"?         10:07:24

Page 31

1         MS. RIVAS:  Objection.  Vague and
2     ambiguous.  Lacks foundation.
3         Go ahead.
4         THE WITNESS:  I have heard that term.
5     BY MR. SOMVICHIAN:                10:07:36
6         Q.   What does that term mean to you?
7         A.   To me, that sounds like a legal term.  I
8     don't -- I don't know what that means.
9         Q.   You have heard it before, but you don't
10    have any understanding of what it means?      10:07:48
11        A.   Yes.
12        Q.   Do you understand click fraud or
13    fraudulent clicks to be part of the complaint that
14    you are making against Facebook?
15        MS. RIVAS:  Objection.  Legal conclusion.  10:08:09
16    Lacks foundation.
17        THE WITNESS:  I do not understand it to be
18    part of the complaint.
19    BY MR. SOMVICHIAN:
20        Q.   Let me just phrase it a different way.   10:08:17
21        MS. RIVAS:  Objection.  Asked and
22    answered.
23        MR. SHUB:  He just answered it.  Why do
24    you phrase it a different way?
25        MR. SOMVICHIAN:  I haven't even asked the  10:08:2?

Page 32

1     question yet.
2         MR. SHUB:  But he has already given you
3     the answer.
4     BY MR. SOMVICHIAN:
5         Q.   You understand that click fraud is not   10:08:3?
6     part of this case?
7         MS. RIVAS:  Objection.  Legal conclusion,
8     lacks foundation, asked and answered.
9         MR. SHUB:  Asked and answered.
10        THE WITNESS:  My understanding is that     10:08:44
11    it's not part of the complaint.
12    BY MR. SOMVICHIAN:
13        Q.   Okay.  How can you come to that conclusion
14    if you don't have an understanding of what click
15    fraud is?                   10:08:59
16        MS. RIVAS:  Objection.  Seeks a legal
17    conclusion.  It is vague and ambiguous, and it is
18    privileged.
19        THE WITNESS:  There's a lot of things I
20    don't understand, and I can say that I don't think   10:09:08
21    those things are in this complaint either.
22    BY MR. SOMVICHIAN:
23        Q.   What?
24        A.   I don't understand astrophysics either,
25    and I understand that astrophysics are not part of   10:09:17

Page 33

Pages 30 to 33

1     this complaint.
2     Q. Well, let me ask you, then: What is your
3     understanding of the term "invalid clicks"?
4         MS. RIVAS: Objection. Seeks a legal
5     conclusion. Lacks foundation.      10:09:30
6         THE WITNESS: It seems to me that that's
7     what this case is about, is what is a valid click
8     and what is not a valid click. I think I should
9     have to pay for valid clicks and not have to pay for
10    invalid clicks.      10:09:44
11    BY MR. SOMVICHIAN:
12     Q. Okay. So tell me what your understanding
13    is of the types of invalid clicks that you don't
14    think you should be charged for.
15         MS. RIVAS: Objection. Seeks a legal    10:09:56
16    conclusion. Calls for expert testimony. Lacks
17    foundation.
18         THE WITNESS: Yeah. The reason why I got
19    involved in this case is that I had a suspicion
20    based on my Google Analytics that there was a    10:10:11
21    problem. And that's why I quit advertising with
22    Facebook, is because I didn't think that I was
23    getting good-quality traffic from Facebook. I think
24    it's really to my attorneys and to expert testimony
25    to figure out what a valid click is and what an    10:10:30

Page 34

1     invalid click is.
2    BY MR. SOMVICHIAN:
3     Q. You're a named plaintiff in the
4    complaint --
5     A. Yes.      10:10:38
6     Q. -- filed in federal court. This complaint
7    includes throughout the complaint allegations about
8    invalid clicks. I just want to get your
9    understanding of what an invalid click is, because
10    that's the fundamental basis of the complaint.    10:10:49
11         MS. RIVAS: Objection. Seeks a legal
12    conclusion. Calls for expert testimony, and lacks
13    foundation.
14         THE WITNESS: The reason why I had a
15    suspicion that the clicks weren't valid is that my    10:10:59
16    Google Analytics said that the average time
17    on-site for -- on my website for someone who was
18    coming through the Facebook ads was one second. If
19    someone comes to the site and spends one second on
20    the site, that doesn't seem like a valid click to    10:11:19
21    me.
22    BY MR. SOMVICHIAN:
23     Q. Why not?
24         MS. RIVAS: Object. Same objections.
25    Legal conclusion. Calls for expert testimony.    10:11:30

Page 35

1         THE WITNESS: Just in comparison to the
2    other traffic that I was getting, it just didn't
3    seem like it was a valid visitor to my website.
4    BY MR. SOMVICHIAN:
5     Q. So, in your mind, is the definition of an    10:11:46
6    invalid click based on the length of time that
7    someone spends on your site?
8         MS. RIVAS: Objection. Misstates his
9    testimony. Calls for a legal conclusion and expert
10    testimony.      10:12:03
11         THE WITNESS: Yeah. I don't -- I don't
12    have a definition of an invalid click. I have -- I
13    have a suspicion that there was something wrong.
14    BY MR. SOMVICHIAN:
15     Q. But you said you came to the conclusion    10:12:14
16    that there were invalid clicks because your
17    Analytics program reflected information indicating
18    that there were some visitors that may have spent
19    only a second on the site; correct?
20         MS. RIVAS: Objection to the extent it    10:12:33
21    misstates his testimony.
22         THE WITNESS: My Analytics suggested that
23    the average time on-site was one second. The
24    average time on-site from, like, Yelp was five
25    minutes, and the average time on-site from Google    10:12:47

Page 36

1     was two or three minutes, and that seemed like I was
2    getting my money's worth. Facebook was one second.
3    It just seemed like there was something wrong, so I
4    discontinued that.
5    BY MR. SOMVICHIAN:      10:13:05
6     Q. Well, do you think -- did you think at the
7    time that you signed up to be an advertiser on
8    Facebook that you would only have to pay for a click
9    if somebody stayed on your site after clicking on an
10    ad for a particular length of time?    10:13:30
11         MS. RIVAS: Objection. Vague and
12    ambiguous. Seeks a legal conclusion.
13         THE WITNESS: And, no, I did not.
14    BY MR. SOMVICHIAN:
15     Q. Okay. And so you understood when you    10:13:40
16    became a Facebook advertiser that you would have to
17    pay for clicks regardless of whether somebody
18    clicked through and stayed on your site for a short
19    amount of time or a long -- or a longer amount of
20    time; right?      10:13:53
21         MS. RIVAS: Same objection, and it's
22    compound.
23         THE WITNESS: I had no expectation about
24    the amount of time that they would spend on my site.
25    BY MR. SOMVICHIAN:      10:14:05

Page 37

Pages 34 to 37

| | |
|---|---|
| 1  THE WITNESS: I'm not sure what types of | 1  MR. SHUB: If you don't think he's an |
| 2  clicks are involved in the lawsuit. | 2  adequate plaintiff, you argue that in your brief, |
| 3  BY MR. SOMVICHIAN: | 3  but, you know -- |
| 4  Q.  You aren't? | 4  MR. SOMVICHIAN: And I'm trying -- I'm |
| 5  A.  I know that there -- I suspected that I     10:47:14 | 5  trying to make a record.                    10:48:55 |
| 6  was getting ripped off in my deal with Facebook. | 6  BY MR. SOMVICHIAN: |
| 7  The -- the Analytics made it look like it was | 7  Q.  So, Mr. Fox, what is your understanding of |
| 8  something that I probably shouldn't have been | 8  the claims that you are seeking to pursue on behalf |
| 9  charged for. | 9  of class? |
| 10  So I think that's what we're here to     10:47:33 | 10  MS. RIVAS: Objection. Seeks a legal     10:49:00 |
| 11  figure out, is whether I should have been charged | 11  conclusion. The complaint speaks for itself. Asked |
| 12  for those or not. And I don't know what types of -- | 12  and answered. |
| 13  I have no -- I don't even know what any of those | 13  MR. SHUB: He has already said what he is |
| 14  clicks looked like. I just know that they, | 14  seeking. |
| 15  according to Analytics, were on my site for one     10:47:44 | 15  THE WITNESS: My understanding is that we     10:49:08 |
| 16  second. That seems like a bad deal, so that's why I | 16  were charged for things that we should not have been |
| 17  am here. | 17  charged for. I think that it's going to be up to |
| 18  Q.  Mr. Fox, you understand that the complaint | 18  the experts and lawyers to figure out what -- what |
| 19  is a class-action complaint; correct? | 19  that really was. |
| 20  A.  Yes. | 20  BY MR. SOMVICHIAN:                    10:49:18 |
| 21  Q.  And you understand that means that you and | 21  Q.  Can you give me any examples of the types |
| 22  your lawyers are seeking to represent not just you | 22  of clicks that you think Facebook should not have |
| 23  and the other named plaintiffs, but also a class of | 23  charged to advertisers in the class you are seeking |
| 24  advertisers who advertise on Facebook. Do you | 24  to represent? |
| 25  understand that?                    10:48:05 | 25  MS. RIVAS: Objection. Seeks a legal     10:49:30 |
| Page 62 | Page 64 |

| | |
|---|---|
| 1  A.  Yes. | 1  conclusion. Lacks foundation. Vague and ambiguous. |
| 2  Q.  So I understand that the genesis of your | 2  MR. SHUB: The complaint states the |
| 3  individual claim is based on your Analytics report; | 3  clicks. |
| 4  correct? | 4  THE WITNESS: I would be purely |
| 5  A.  Yes.                    10:48:14 | 5  speculating. I don't know. I don't know what those     10:49:37 |
| 6  Q.  But what is the scope of the claims that | 6  clicks looked like or where they came from. I have |
| 7  you are intending to pursue on behalf of the class | 7  no idea. I just know I was charged for them. |
| 8  as their representative? | 8  BY MR. SOMVICHIAN: |
| 9  MS. RIVAS: Objection. | 9  Q.  Well, let me ask one basic question, |
| 10  MR. SHUB: If you want to show him the     10:48:22 | 10  Mr. Fox. Are you intending to act as a class     10:49:52 |
| 11  complaint, he can read it. I mean, it is a legal | 11  representative on behalf of other advertisers? |
| 12  document. It is all there. I don't know what you | 12  A.  Yes. Yes. |
| 13  need to know other than what's in the complaint. I | 13  Q.  And what is your basis to believe that |
| 14  think that states what we're seeking to represent. | 14  other advertisers were overcharged for clicks? |
| 15  MR. SOMVICHIAN: He wants to be a class     10:48:34 | 15  MS. RIVAS: Objection. Overbroad. Seeks     10:50:07 |
| 16  representative, and he should have an understanding | 16  a legal conclusion. Lacks foundation. |
| 17  of what the claims are about that he's seeking to | 17  THE WITNESS: I think if it happened to |
| 18  assert on behalf of a nationwide class. | 18  me, it must have happened to a lot of other people. |
| 19  MR. SHUB: He does. | 19  BY MR. SOMVICHIAN: |
| 20  MS. RIVAS: He does.                    10:48:43 | 20  Q.  Is that speculation on your part, or do     10:50:21 |
| 21  MR. SHUB: He read the complaint -- | 21  you have any reason to think that that's the case? |
| 22  MS. RIVAS: He does. | 22  MS. RIVAS: Argumentative. |
| 23  MR. SHUB: -- and he approved it. | 23  THE WITNESS: I would suspect that I'm not |
| 24  MS. RIVAS: You are asking a legal | 24  the only one. |
| 25  conclusion and --                    10:48:48 | 25  BY MR. SOMVICHIAN:                    10:50:30 |
| Page 63 | Page 65 |

Pages  62 to  65

| | |
|---|---|
| 1     MR. SHUB: Mr. Fox, I have a few questions | 1  assurance as to their quality? |
| 2  for you. | 2     MR. SOMVICHIAN: Leading. |
| 3 | 3     THE WITNESS: That seems like a good idea |
| 4     EXAMINATION | 4  to have someone else look at it, yeah. |
| 5  BY MR. SHUB:     15:29:38 | 5  BY MR. SHUB:     15:31:42 |
| 6    Q.  You — are you interested in serving as | 6    Q.  And if you found out that someone else did |
| 7  the class representative in this case, sir? | 7  look at them and received a clean bill of health, so |
| 8    A.  Yes. | 8  to speak, in an audit process, would you consider |
| 9    Q.  Would you come in and testify at trial if | 9  advertising on Facebook again? |
| 10  necessary in this case?     15:29:46 | 10     MR. SOMVICHIAN: Leading.     15:31:52 |
| 11    A.  Sure. | 11     THE WITNESS: Yeah, I would. |
| 12    Q.  Would you — are you willing to | 12     MR. SHUB: Okay. I have no further |
| 13  periodically confer with counsel on behalf of the | 13  questions at this time. Thanks. |
| 14  class to understand what is going on in the case? | 14     Are we done? |
| 15    A.  Yes.     15:29:59 | 15     MR. SOMVICHIAN: I'm done subject to     15:32:01 |
| 16    Q.  Are you — are you a computer engineer? | 16  issues on the sufficiency of the document |
| 17    A.  No, I'm not. | 17  production. And I would reserve the right to recall |
| 18    Q.  Have you had — have you taken courses in | 18  the witness, depending on if there are any further |
| 19  computer programming? | 19  documents that should have been produced but were |
| 20    A.  I had one that was in business school for  15:30:09 | 20  not.     15:32:13 |
| 21  business people. Other than that, no. | 21     MR. SHUB: Good. We reserve our right to |
| 22    Q.  Do you write computer programming? | 22  object, so we will leave it at that. |
| 23    A.  No, I do not. | 23     THE VIDEOGRAPHER: This concludes today's |
| 24    Q.  Do you read computer programming? | 24  deposition of Nathan Fox. The master disks of |
| 25    A.  No, I do not.     15:30:22 | 25  today's deposition will remain in the custody of  15:32:26 |
| Page 218 | Page 220 |
| 1    Q.  What is the reason why you stopped | 1  Veritext. |
| 2  advertising with Facebook? | 2     The time is now 3:32 p.m. We are off the |
| 3    A.  My Google Analytics suggested that I was | 3  record. |
| 4  getting charged for things I shouldn't be getting | 4     (Whereupon, at 3:32 p.m. the deposition |
| 5  charged for, so I stopped.     15:30:43 | 5     concluded.)     15:32:34 |
| 6    Q.  Is that your understanding is the basis | 6     --o0o-- |
| 7  upon which you are going to present evidence to a | 7 |
| 8  jury to prove your claim? | 8 |
| 9     MR. SOMVICHIAN: Objection. Leading. | 9 |
| 10  BY MR. SHUB:     15:30:54 | 10 |
| 11    Q.  You can answer. | 11 |
| 12    A.  I don't think that my Google Analytics is | 12 |
| 13  going to prove my case. I think that there is other | 13 |
| 14  data that's out there, probably in Facebook's hands, | 14 |
| 15  that if an expert were able to see that would be  15:31:05 | 15 |
| 16  able to really figure out what happened. | 16 |
| 17    Q.  Did you have a lack of trust in Facebook | 17 |
| 18  systems when you stopped advertising? | 18 |
| 19     MR. SOMVICHIAN: Objection. Leading. | 19 |
| 20  BY MR. SHUB:     15:31:20 | 20 |
| 21    Q.  You can answer. | 21 |
| 22    A.  Yeah, I did. | 22 |
| 23    Q.  If you knew that Facebook were being | 23 |
| 24  audited by an outside party with regard to their | 24 |
| 25  quick filter systems, would that give you some  15:31:31 | 25 |
| Page 219 | Page 221 |

Pages 218 to 221

# EXHIBIT I

